James H.M. Sprayregen, P.C.
Brian E. Schartz, P.C.
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900

Anup Sathy, P.C.
Stephen C. Hackney, P.C. (*admitted pro hac vice*)
Alexandra Schwarzman (*admitted pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200

*Counsel to ASSF IV AIV B Holdings III, L.P. and AEIF Trade, LLC*

Steven M. Abramowitz
Marisa Antos-Fallon
**VINSON & ELKINS LLP**
666 Fifth Avenue, 26th Floor
New York, New York 10103-0040
Telephone:    (212) 237-0000
Facsimile:    (212) 237-0100

*Counsel to SPT Infrastructure Finance Sub-1, LLC and SPT Infrastructure Finance Sub-2, Ltd*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| EMPIRE GENERATING CO, LLC, *et al.*,[1] | Case No. 19-23007 (RDD) |
| | (Jointly Administered) |

**MINORITY LENDERS' OMNIBUS OBJECTION TO DEBTORS' MOTION FOR
ENTRY OF AN ORDER AUTHORIZING AND DIRECTING ASSUMPTION OF
THE RESTRUCTURING SUPPORT AGREEMENT AND DEBTORS' SALE MOTION**

---

[1]   The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification number are:  Empire Generating Co, LLC [3821], Empire Gen Holdco, LLC [3820], Empire Gen Holdings, LLC [4849], and TTK Empire Power, LLC [none].  The Debtors' corporate address is: Empire Generating Co, LLC, c/o Tyr Energy, LLC, 7500 College Blvd., Suite 400, Overland Park, Kansas 66210.

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................................ 2

BACKGROUND ..................................................................................................................... 7

I.    THE DEBTORS' PREPETITION CORPORATE AND CAPITAL
      STRUCTURE. ............................................................................................................... 7

      A.    The Debtors' Capital Structure. .............................................................. 9

II.   THE DEBTORS AND THEIR SECURED LENDERS PURSUE A
      PREPACKAGED BANKRUPTCY INVOLVING A DEBT-FOR-EQUITY
      EXCHANGE................................................................................................................ 10

III.  BLACK DIAMOND AND THE DEBTORS ABANDON THE PRE-PACK
      APPROACH IN EARLY APRIL .................................................................................... 12

IV.   THE DEBTORS AND BLACK DIAMOND CRAFT THE RESTRUCTURING
      SUPPORT AGREEMENT. ........................................................................................... 13

V.    DESPITE THE COLLAPSE OF THE AD HOC GROUP, WOODLANDS HAS
      EXPANDED ITS ROLE TO OPERATE AS THE DEBTORS' DE FACTO
      ASSET MANAGER. .................................................................................................... 18

OBJECTION ......................................................................................................................... 20

I.    THE MINORITY LENDERS HAVE STANDING TO BRING THESE
      OBJECTIONS............................................................................................................. 21

      A.    The Loan Documents Do Not Expressly Waive the Minority Lenders'
            Right to Object to the Motions. ........................................................... 21

      B.    The Credit Agreement Clearly Envisions That Debt Holders Retain Their
            Right to Vote on a Plan—And They Thus Should Have Standing to Object
            to Efforts to Deprive Them of That Vote............................................. 23

      C.    The RSA Motion and the Sale Motion Are Not Enforcement Actions and
            Do Not Preclude the Minority Lenders' Rights to Object. ................... 24

II.   THE RSA, BIDDING PROCEDURES, AND STALKING HORSE BID ARE
      NOT THE PRODUCT OF SOUND BUSINESS JUDGMENT AND INSTEAD
      PRESENT A *SUB ROSA* PLAN AIMED AT EVADING SECTION 1129 OF
      THE BANKRUPTCY CODE. ........................................................................................ 26

      A.    The Debtors Are Not Entitled to the Protections of the Business Judgment
            Rule.................................................................................................... 26

## TABLE OF CONTENTS (CONT'D)

**Page**

    1.     Seller TTK Empire Has No Independent Fiduciary and No Fiduciary Duties............................................................................... 28

    2.     Not Surprisingly, TTK Empire Power Negotiated for the Benefit of Tyr—Not the Estates............................................................... 29

    3.     The RSA Negotiation Process Was Secretive and Exclusionary............. 33

B.     The RSA, Stalking Horse Bid, and Bidding Procedures Constitute an Impermissible *Sub Rosa* Plan............................................................ 34

C.     The Sale Process Is a Sham that Will Not Generate Any Meaningful Cash Bids—Because, By Design, No One Will Be Able to Compete with Black Diamond's Artificially Inflated Credit Bid.......................................... 41

    1.     No Sound Business Reason for the Sale Exists. ...................................... 43

    2.     The Bid Procedures Demonstrate the Sale Process Is a Sham Designed to Achieve a Specific Outcome. ................................ 47

    3.     The Bid Protections Are Unreasonable and Should Not Be Approved................................................................................ 51

D.     The RSA, Stalking Horse Bid, and Bidding Procedures Are Not the Product of a Fair Process. ...................................................................... 53

III.   THE FOREGOING DEMONSTRATES THAT CAUSE EXISTS TO LIMIT THE CREDIT BID UNDER SECTION 363(K) OF THE BANKRUPTCY CODE............................................................................................................. 54

A.     The Credit Bid Violates the Pro Rata Sharing Provision of the Intercreditor Agreement............................................................................ 56

B.     The Credit Bid Is Likely Unauthorized Under The Credit Agreement Because It Was Not Directed By The Required Secured Parties..................... 56

C.     This Is Not the First Time Black Diamond has Engaged in Conduct That Unfairly Distorts the Sale Process In Its Favor....................................... 61

D.     The Credit Bid Is Not Permissible as a Matter of Law Because No Allowed, Secured Claim Against TTK Empire Exists. ....................................... 63

    1.     The Collateral Agent Does Not Have a Claim Against TTK Empire that May Be the Subject of a Credit Bid Under Section 363(k) of the Bankruptcy Code............................................................... 66

## TABLE OF CONTENTS (CONT'D)

**Page**

2. The Pledge Agreement Expressly Waives Any Potential Claim of the Collateral Agent Against TTK Empire. ............................................. 70

E. The Credit Bid Has Already Chilled Bidding. ....................................................... 73

F. As a Policy Matter, Parties Should Not Be Required to Own a Regulated Asset. .................................................................................................................... 74

IV. THE DEBTORS HAVE PROVIDED NO BASIS TO WAIVE THE NOTICE REQUIREMENTS. ......................................................................................................... 75

V. THE DEBTORS HAVE PROVIDED NO BASIS TO WAIVE THE STAY. ................. 75

CONCLUSION ........................................................................................................................... 76

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Aéropostale, Inc.*,
555 B.R. 369 (Bankr. S.D.N.Y. 2016) ....................................................................51, 52, 53, 61

*In re Aloha Airlines, Inc*.,
No. 08–00337, 2009 WL 1371950 (Bankr. D. Haw. May 14, 2009) ....................................52

*In re Ames Dep't Stores*,
115 B.R. 34 (Bankr. S.D.N.Y. 1990) ....................................................................................40

*Arson v. Lewis*,
473 A.2d 805 (Del. 1984) ......................................................................................................26

*In re Atlantic Terrace Apartment Corp.*,
226 B.R. 535 (Bankr. E.D.N.Y. 1998) ..................................................................................37

*In re Au Natural Rest., Inc.*,
63 B.R. 575 (Bankr. S.D.N.Y. 1986) ....................................................................................40

*In re Bethlehem Steel Corp.*,
2003 WL 21738964 (S.D.N.Y. July 28, 2003) ......................................................................41

*In re Bidermann Indus. U.S.A. Inc. (In re Bidermann)*,
203 B.R. 547 (Bankr. S.D.N.Y. 1997) ............................................................................25, 40

*In re Bombay Company, Inc.*,
No. 07-44084-rfn-11, 2007 WL 2826071 (Bankr. N.D. Tex. Sept. 26, 2007) .................45, 46

*In re Borders Group, Inc.*,
453 B.R. 477 (Bankr. S.D.N.Y. 2011) ..................................................................................71

*In re Boston Generating LLC*,
440 B.R. 302 (Bankr. S.D.N.Y. 2010) .............................................................................20, 21

*In re Caesar's Operating Co., Inc.*,
562 B.R. 168 (Bankr. N.D. Ill. 2016) ...................................................................................69

*In re Chrysler LLC*,
405 B.R. 84 (Bankr. S.D.N.Y. 2009) ...............................................................................42, 43

*In re Continental Air Lines, Inc.*,
780 F.2d 1223 (5th Cir. 1986) ..........................................................................................31, 35

## TABLE OF AUTHORITIES (CONT'D)

**Page(s)**

*Credit Agricole Corp. and Inv. Bank N.Y. Branch v. Black Diamond Capital Mgmt., L.L.C.*,
  AAA Case No. 01-17-0007-1196 (2018) ................................................51

*Crédit Agricole Corp. and Inv. Bank v. Black Diamond Capital Management, LLC*,
  Case No. 18-07620 (S.D.N.Y. Mar. 22, 2019) ........................................60

*In re Crowthers McCall Pattern*, Inc.,
  114 B.R. 877 (Bankr. S.D.N.Y. 1990) .................................................31

*In re CyberDefender Corp.*,
  Case No. 12-10633-BLS (Bankr. D. Del. May 2, 2012) ..............................20

*Czyzewski v. Jevic Holding Corp.*,
  137 S.Ct. 973 (2017) .........................................................33, 34, 35

*In re Energy Future Holdings Corp.*,
  648 Fed. Appx. 277 (3d Cir. 2016) ....................................................34

*In re Enterprise Acquisition Partners, Inc.*,
  319 B.R. 626 (B.A.P. 9th Cir. 2004) ..................................................56

*In re Exaeris, Inc.*,
  380 B.R. 741 (Bankr. D. Del. 2008) ...................................................40

*In re Fisker Auto. Holdings, Inc.*,
  510 B.R. 55 (Bankr. D. Del. 2014) ........................................51, 52, 53, 61

*In re Free Lance-Star Publ'g Co. of Fredericksburg, VA*,
  512 B.R. 798 (Bankr. E.D. Va. 2014) ......................................51, 52, 53

*In re Genco Shipping & Trading Ltd.*,
  509 B.R. 455 (Bankr. S.D.N.Y. 2014) .................................................24

*In re General Motors Corp.*,
  407 B.R. 463 (Bankr. S.D.N.Y. 2009) .................................................42

*In re Global Crossing Ltd.*,
  295 B.R. 726 (Bankr. S.D.N.Y. 2003) .................................................41

*In re Great Atlantic & Pacific Tea Co.*,
  No. 15-23007 (RDD) (Bankr. S.D.N.Y. July 21, 2015) .............................40

*Greenblatt v. Steinberg*,
  339 B.R. 458 (N.D. Ill. 2006) ..........................................................52

ii

## TABLE OF AUTHORITIES (CONT'D)

**Page(s)**

*In re GSC, Inc.*,
453 B.R. 132 (Bankr. S.D.N.Y. 2011) ..............................................................................37, 39

*In re Gucci*,
193 B.R. 411 (S.D.N.Y. 1996) ...............................................................................................24

*In re Humboldt Creamery, LLC*,
No. 09-11078, 2009 WL 2820610 (Bankr. N.D.Cal. Aug. 14, 2009) ....................................46

*In re Innkeepers USA Trust, et al.*,
442 B.R. 227 (Bankr. S.D.N.Y. 2010) .......................................................................... *passim*

*In re Innkeepers USA Trust*,
No. 10-13800 (SCC) (Bankr. S.D.N.Y. July 20, 2010) ........................................................40

*In re Integrated Res., Inc.*,
147 B.R. 650 (S.D.N.Y. 1992) ....................................................................................45, 49, 50

*In re Ionosphere Clubs, Inc.*,
100 B.R. 670 (Bankr. S.D.N.Y. 1989) ..................................................................................39

*In re Iridium Operating LLC*,
478 F.3d 452 (2d Cir. 2007) ..........................................................................................31, 33, 34

*In re Lehman Brothers Holdings Inc.*,
445 B.R. 143 (Bankr. S.D.N.Y. 2011) ..................................................................................42

*In re Lionel Corp.*,
722 F.2d 1063 (2d Cir. 1983) ....................................................................................... *passim*

*In re Metaldyne Corp.*,
409 B.R. 661 (Bankr. S.D.N.Y. 2009) ....................................................................45, 49, 50

*In re Metromedia Fiber Network, Inc.*,
416 F.3d 136 (2d Cir. 2005) .............................................................................................36, 37

*In re MF Global Holdings Ltd.*,
466 B.R. 239 (Bankr. S.D.N.Y. 2012) ..............................................................................7, 24

*In re Montgomery Ward, LLC*,
634 F.3d 732 (3d Cir. 2011) .............................................................................................66, 67

*In re MPM Silicones, L.L.C.*,
596 B.R. 416 (S.D.N.Y. 2019) ...............................................................................................20

*In re Mushroom Trans. Co., Inc.*,
382 F.3d 325 (3d Cir. 2004) ...................................................................................................45

## TABLE OF AUTHORITIES (CONT'D)

**Page(s)**

*Norwest Bank Worthington v. Ahlers*,
    485 U.S. 197 (1988).................................................................................................34

*In re Orion Pictures Corp.*,
    4 F.3d 1095 (2d Cir. 1993)....................................................................................24

*In re Philadelphia Newspapers, LLC*,
    599 F.3d 298 (3d Cir. 2010)..................................................................................53

*Police Pension Trust v. Chrysler LLC*,
    558 U.S. (2009)..............................................................................................33, 42

*Protective Comm. for Indep. S'holders of TMT Trailer Ferry, Inc. v. Anderson*,
    390 U.S. 414 (1968)..............................................................................................42

*In re Public Serv. Co. of New Hampshire*,
    90 B.R. 575 (Bankr. D.N.H. 1988).......................................................................33

*Ross v. Kirschenbaum (In re Beck Industries, Inc.)*,
    605 F.2d 624 (2d Cir.1979)...................................................................................25

*In re Taberna Preferred Funding IV, Ltd.*,
    594 B.R. 576 (Bankr. S.D.N.Y. 2018)............................................................66, 67

*In re The Great Atlantic & Pacific Tea Company, Inc.*,
    544 B.R. 43 (Bankr. S.D.N.Y. 2016)....................................................................24

*In re U.S. Med., Inc.*,
    531 F.3d 1272 (10th Cir. 2008).............................................................................56

*In re Winstar Commc'ns, Inc.*,
    554 F.3d 382 (3d Cir. 2009)..................................................................................56

**Statutes**

11 U.S.C. § 101..............................................................................................64, 65, 66

11 U.S.C. § 102............................................................................................................67

11 U.S.C. § 303............................................................................................................67

11 U.S.C. § 363...................................................................................................*passim*

11 U.S.C. § 365...........................................................................................23, 24, 46

11 U.S.C. § 541(a)(1)..................................................................................................63

11 U.S.C. § 1109(b).....................................................................................................20

iv

## TABLE OF AUTHORITIES (CONT'D)

**Page(s)**

11 U.S.C. § 1124.................................................................................................................37, 39

11 U.S.C. § 1126(c) ..........................................................................................................37, 38

11 U.S.C. § 1129................................................................................................................ *passim*

**Rules**

Fed. R. Bankr. P. 2002(a)(2)........................................................................................71

Fed. R. Bankr. P. 6004(a) ............................................................................................71

Fed. R. Bankr. P. 6004(h) ........................................................................................71, 72

Fed. R. Bankr. P. 6006(d) ........................................................................................71, 72

Ares[2] and Starwood[3] (together, the "Minority Lenders")[4] object to the *Debtors' Motion for Entry of an Order Authorizing and Directing Assumption of the Restructuring Support Agreement* [Docket No. 5] (the "RSA Motion") and the *Debtors Motion for Entry of Orders (I) (A) Approving Bid Procedures Relating to the Sale of Substantially All of the Assets of Empire Generating Co, LLC, or Interests in Empire Gen Holdings, LLC, (B) Establishing Procedures in Connection With the Assumption or Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, (C) Approving Notice Procedures (D) Approving Stalking Horse Bid Protections, and (E) Granting Related Relief; and (II) (A) Authorizing the Sale of Substantially All of the Assets of Empire Generating Co, LLC, or Interests in Empire Gen Holdings, LLC, Free and Clear of Liens, Claims, Encumbrances, and Other Interests; (B) Approving the Assumption or Assumption and Assignment of Certain Executory Contracts and Unexpired Leases Related Thereto, and (C) Granting Related Relief* [Docket No. 6] (the "Sale Motion" and together with the RSA Motion, the "Motions").[5]

In support of this objection (this "Objection"),[6] the Minority Lenders submit the *Declaration of Stephen J. Antinelli in Support of Minority Lenders' Omnibus Objection to Debtors' Motion for Entry of an Order Authorizing and Directing Assumption of the Restructuring*

---

[2]   "Ares" means ASSF IV AIV B Holdings III, L.P. and AIEF TRADE, LLC.

[3]   "Starwood" means SPT Infrastructure Finance Sub-1, LLC and SPT Infrastructure Finance Sub-2, Ltd.

[4]   Collectively, the Minority Lenders hold approximately 45 percent of the Debtors' outstanding funded indebtedness.

[5]   Capitalized terms used but not defined herein shall have the meaning ascribed to them in the Motions.

[6]   The Minority Lenders submit this Objection prior to receiving any requested discovery and reserve the right to supplement the Objection with new information in advance of a hearing on the Motions.

*Support Agreement and Debtors' Sale Motion* (the "<u>Antinelli Declaration</u>") attached hereto as

**<u>Exhibit A</u>**. In further support of this Objection, the Minority Lenders respectfully state as follows:

## <u>PRELIMINARY STATEMENT</u>

1.      The Restructuring Support Agreement ("<u>RSA</u>") and Sale Motion are fatally flawed
and should not be approved.  The Debtors, Tyr, and Black Diamond are all too happy to avail
themselves of the benefits of chapter 11.  But none of these parties has been willing to do the hard
work of compromise that is the price of obtaining these benefits.  Instead, they have arranged a
scheme to skirt the requirements of section 1129 by styling an unconfirmable plan as a sale of
stock by a non-recourse holding company under section 363 of the Bankruptcy Code and then
coupling that sale with an artificially-inflated credit bid made for no other purpose than to snuff
out the rights of the Minority Lenders.  Their process to date has bred contempt, not consensus.[7]

2.      To achieve their scheme, the Debtors, Tyr, and Black Diamond each promised the
other significant value.  The selling Debtor entity, TTK Empire, will get releases for itself and,
more importantly, for the Sponsors,[8] thanks to the sole vote by and self-dealing of Mr. Garrick
Venteicher—himself a Tyr officer and a released party in his own right.  Sponsor Tyr Energy also
gets a post-sale asset management deal for its affiliate worth between $267,000 to $436,000 per
month.[9]  In exchange, Black Diamond gets absolute power over the governance terms of the

---

[7]    *In re Innkeepers USA Trust, et al.*, 442 B.R. 227, 234 (Bankr. S.D.N.Y. 2010) ("One objector has—in my view,
correctly—argued that the PSA breeds contempt rather than fostering negotiations. This is not what chapter 11 is
supposed to be about.").

[8]    The Debtors' sponsors include:  Tyr Energy, Inc. (together with its affiliates, "<u>Tyr</u>"), The Kansai Electric Power
Co., Inc. (together with its affiliates, "<u>Kansai</u>"), and Tokyo Gas America, Ltd. (together with its affiliates, "<u>Tokyo
Gas</u>" and, together with Tyr and Kansai, the "<u>Sponsors</u>").

[9]    *See Declaration of Garrick F. Venteicher (I) In Support of Chapter 11 Petitions and First Day Motions and
(II) Pursuant to Local Bankruptcy Rule 1007-2* [Docket No. 3] (the "<u>First Day Decl.</u>") ¶ 19.

acquiring entity,[10] an uncompetitive sale process, and the ability to entirely evade a plan vote. All of this was arranged in secrecy (and thus there may be other considerations that come to light with the benefit of full discovery)[11] and is now proposed to be accomplished in haste. This is not what chapter 11 is about.

3.      If the limitations on the Debtors in the Cash Collateral Order were the proverbial "handcuffs," the RSA and Bid Procedures are the legal straight-jacket that allows Black Diamond to continue its unfettered operational control of the Debtors' assets, management, and policies. As Tyr walked away from its now worthless equity in the Debtors, it abdicated its asset management responsibilities. Into this vacuum stepped Mr. Dan Hudson and Woodlands Energy Management ("Woodlands"). Mr. Hudson appears to be a sound operator who has negotiated insurance contracts, negotiated PILOT agreement amendments, ordered the re-commissioning of the plant's fuel oil system, and otherwise taken operational responsibility for a host of the asset manager's duties. The problem is not *what* Mr. Hudson is doing—it is *to whom* he answers. As the Minority Lenders understand it, Mr. Hudson has no formal contractual relationship with the Debtors or their estates. All of the significant asset management services he and Woodlands presently are performing are done pursuant to a contract that was quietly moved to the Collateral Agent in the days leading up to these cases. None of this was disclosed to the Court, despite the fact that the Debtors sought to pay Woodland's pre and postpetition fees through a provision in the Cash

---

10    *See* RSA § 1(ee) ("Definitive Documents" means all material agreements . . .' provided that any documents related to any exit financing or the corporate governance or equity ownership of reorganized Empire shall be acceptable to the Requisite Consenting Lenders in their *sole and absolute discretion*.") (emphasis added); *id.* § 3(b)(v) (requiring amendments and modifications to Material Agreements to be satisfactory to the Requisite Consenting Lenders "in their *sole and absolute discretion*") (emphasis added).

11    *See In re GSC*, *Inc.*, 453 B.R. 132, 142, 147 (Bankr. S.D.N.Y. 2011) (finding that cause existed to appoint a trustee as the Chairman and CEO had a conflict of interest arising from signing a side letter with Black Diamond conditioned on Black Diamond obtaining the winning bid at a section 363 sale).

3

Collateral Order.[12]  Put simply, not only is there no independent fiduciary looking out for creditor interests, but the Debtors have completely surrendered their asset management duties to a party that ultimately acts at the direction of Black Diamond.

4.    But neither bankruptcy law nor the Loan Documents are so easily evaded.  The Debtors must establish that the RSA and the Bid Procedures are the product of the Debtors' sound business judgment—a showing they cannot make given Tyr's obvious self-dealing and conflicts of interest.

5.    Separate and apart from business judgment, the Court should not bless an RSA and Sale Motion that aim so openly to evade section 1129 of the Bankruptcy Code.  This case constitutes a textbook example of a so called "Chapter 363."  The Debtors could have done a plan, a sale, or a sale in the plan.  But they chose to do a plan in a sale for the sole purpose of avoiding the substantive and procedural protections of section 1129.  Sustaining the Minority Lenders' *sub rosa* plan objection will align this case with the growing canon of decisions, including the recent Supreme Court decision in *Jevic*, holding that the tools of bankruptcy—structured dismissals, Rule 9019 settlements, sales under section 363—are not to be employed as convenient end-runs around section 1129 of the Bankruptcy Code.

6.    Last, having assumed near total legal and operational control over the Debtors, Black Diamond must now bear the consequences of that control:  disqualification from directing the actions of the Collateral Agent under section 11.06(d) of the Credit Agreement.[13]  At a bare

---

[12]    *Interim Order (I) Authorizing Debtors' Use of Cash Collateral, (II) Providing Adequate Protection Thereof and (III) Scheduling a Final Hearing* [Docket No. 51] ("Cash Collateral Order") ¶ 13.

[13]    Credit Agreement § 11.06(d) (Stating that no "Sponsor-Related Party, in its capacity as Lender, shall have any voting or approval rights whatsoever under the Loan Documents (including, without limitation, for purposes of any action requiring the approval of "Required Lenders" or pursuant to Section 11.05) . . . or be permitted to require any Agent or any other Lender to undertake any action (or refrain from taking any action) pursuant to or with respect to the Loan Documents.").

minimum, cause exists to bar the Collateral Agent from credit bidding where, as here, the credit

bid is being weaponized to achieve a sham sale process and implement an overzealous

"loan-to-own" strategy via an impermissible *sub rosa* plan.  While there are other objections to the

proposed relief, the core of the Minority Lenders' objection is simple:  a 51% holder cannot buy

off a sponsor with releases and assumption of insider-benefiting contracts in exchange for an

inflated credit bid designed to deprive the Minority Lenders of the protections afforded them by

their contracts and the Bankruptcy Code.

7.     The Minority Lenders would be well within their rights to pursue litigation in state

court and before state and federal regulators over the pre-petition conduct of Black Diamond and

the Debtors.  And if forced to, they will.  But, as they have emphasized from the start, the Minority

Lenders are commercial players who simply want assurances that they will be adequately protected

post-sale.  The basic minority protections they request are not only reasonable, they are ***consistent***

***with the protections afforded to Minority Lenders under the Loan Documents***:

| "Bidco's" Governance Should... | ...Just Like the Intercreditor Does |
|---|---|
| Affirm that members, officers and directors owe fiduciary duties | Section 2.3 of the ICA requires the Collateral Agent to "act for the benefit solely and exclusively of all present and future Secured Parties." |
| Protect equity holders against dilution | Section 5.3(e)(B) of the ICA bars any amendment that would alter the amount or priority of Secured Obligations without the consent of **all** Lenders. |
| Prohibit amendments to the important provisions in the operating agreement that speak to the economics of owning shared equity in the post-acquisition company | Section 11.05(b) of the Credit Agreement bars Amendments to the core terms of the documents without the consent of all lenders. These "sacred rights" are directly aimed at protecting the economic value of the lenders' rights, such as the maturity date, interest payments, and reduction of principal. |

5

| "Bidco's" Governance Should... | ...Just Like the Intercreditor Does |
|---|---|
| | Additionally, section 4.1 of the Intercreditor Agreement provides for *pro rata* distribution of the economic value of the shared Collateral. |
| Give minority members a say in major decisions, like the sale of substantially all of the company | Section 7.02 of the Credit Agreement bars the Loan Parties from Selling assets (subject to certain exceptions) and section 11.05(b)(ix) of the Credit Agreement bars amendments to any provision that would operate as a release of all or substantially of the Collateral. |
| Prohibit affiliate transactions unless approved by disinterested members | Section 11.06(d) of the Credit Agreement bars Sponsor Related Parties from directing the Collateral Agent and section 7.02(q) of the Credit Agreement bars transactions with affiliates that are not on an arm's length basis |

8.      The fact that Black Diamond, Tyr, and the Debtors will not even disclose what the governance terms will be tells the Court that something is amiss here.  To be clear, the Debtors have not provided any form of governance term sheet.  Despite suggesting to the Court that they would see unfair treatment coming "a mile away," counsel to the Minority Lenders have been told a form of the proposed governance does not even exist.[14]  And, to add insult to injury, the Debtors are actively seeking to deprive the Minority Lenders, which hold nearly 45 percent of the Debtors' impaired funded debt claims, of standing to even object to these very important issues.  Robotically claiming that this is "simply an intercreditor dispute" signals a complete abdication by the Debtors of their only meaningful obligation:  to run a fair and transparent process that maximizes value.[15]

---

[14]    Tr. of May 20, 2019 H'rg ("First Day Tr.") at 75:23–24.

[15]    First Day Decl. ¶ 51.

Rather than allow this flawed process to roll forward unabated and at lightning speed, the Minority

Lenders respectfully request the Court deny the Motions.

9.      There are multiple alternative forms of relief this Court could fashion to allow the

process to go forward in a more fair and transparent manner.  For instance, the Court could prohibit

the credit bid and allow the Debtors to proceed with an all cash auction.  In fact, the Minority

Lenders have been working on an all cash bid to propose should such relief be granted.

Alternatively, the Court could allow each lender to credit bid its own claims.  Finally, the Court

could instruct the parties to negotiate acceptable governance terms, which would allow for a

smooth transition of ownership and improve the chances that the necessary regulatory approvals

will be obtained.

## **BACKGROUND**

## I.      **THE DEBTORS' PREPETITION CORPORATE AND CAPITAL STRUCTURE.**

10.      The Debtors—a group of entities that own and operate a power plant in Rensselaer,

New York—maintain a simple corporate and capital structure.  Empire Generating Co, LLC

("Empire Generating") directly owns the power plant and is the only Debtor with any meaningful

operations.  Empire Generating is wholly owned by Debtor Empire Gen Holdco, LLC ("Holdco"),

which is wholly owned by Debtor Empire Gen Holdings, LLC ("Holdings").  Holdings, in turn, is

wholly owned by Debtor TTK Empire Power, LLC ("TTK Empire").

11.      TTK Empire, the entity proposing to sell its interests in Holdings to the Collateral

Agent under the Sale, is owned by a non-debtor, TTK Power, LLC, which in turn is indirectly

owned by three sponsors:  Tyr, Kansai, and Tokyo Gas.  Each of the Debtors is thus indirectly

controlled by these three Sponsors, with Tyr holding a 50 percent stake, and the other Sponsors

each holding 25 percent stakes.

12.     There is substantial overlap in management between the Debtors and Tyr. Mr. Garrick Venteicher, the Debtors' First Day Declarant, serves as the President and Chief Executive Officer of each of the Debtors, as well as the Chief Executive Officer of Tyr.  Despite the overlapping role and the conflicts endemic to such a structure, the Debtors' corporate structure contains little in the way of independent oversight.  TTK Empire (the lead Debtor and the entity proposing to sell its sole asset) does not have any independent manager.[16]  The three subsidiary Debtors (Empire Generating, Holdings, and Holdco) have a single independent manager (Mr. Michael Wilson), but his decision-making authority is limited to commencing bankruptcy, making an assignment for the benefit of creditors, or admitting insolvency.[17]

13.     Consistent with this laissez-faire approach to governance, the organizational documents of TTK Empire specifically disclaim any fiduciary duties.[18]  Consequently, TTK Empire, the Debtor that made the determination to sell its interests as part of the contemplated Sale and enter into the RSA, has no independent manager and is, instead. directly and exclusively controlled by Tyr's Chief Executive Officer who has disclaimed fiduciary duties to that entity.

14.     The below chart shows the organizational structure of the Empire enterprise:

---

[16]   Voluntary Petition of TTK Empire [Docket No. 1] at 10–13 (resolution concerning bankruptcy filing of TTK Empire Power, signed solely by Garrick F. Venteicher and describing Mr. Venteicher in his capacity as President and CEO of TTK Power, LLC, in that entity's capacity as TTK Empire's manager and sole member).

[17]   See Fourth Amended and Restated Operating Agreement of Empire Generating Co, LLC, § 3 (limiting independent manager's decision-making authority to "Material Actions," defined to mean causing Empire Generating to (a) commence bankruptcy, insolvency, or related proceedings; (b) make an assignment for the benefit of creditors; (c) admit insolvency; or (d) take any action in furtherance of the foregoing); Third Amended and Restated Operating Agreement of Empire Gen Holdco, LLC, § 3 (same, with respect to Holdco); Limited Liability Company Agreement of Empire Gen Holdings, LLC, § 7 (same, with respect to Holdings).

[18]   See Limited Liability Company Agreement of TTK Empire Power, LLC, § IX.9.05 ("To the extent permissible under the [Delaware Limited Liability Company], no Officer shall owe a fiduciary duty of loyalty or care to the Company.").



### A.    The Debtors' Capital Structure.

15.    Turning to the Debtors' capital structure, the sole source of funded debt for the

Debtors arises under a Credit and Guaranty Agreement, dated as of March 14, 2014 (as amended,

the "Credit Agreement").   Amounts outstanding under the Credit Agreement are secured by liens

on substantially all of the assets of Empire Generating, Holdings, and Holdco (collectively,

the "Loan Parties").   In addition, although TTK Empire is not a Loan Party and is not obligated on

the funded debt outstanding under the Credit Agreement, TTK Empire has pledged its 100 percent

equity interest in Holdings on a nonrecourse basis as security for the amounts owed by the Loan

Parties pursuant to the Pledge Agreement dated as of February 23, 2017, among TTK Empire and

the Collateral Agent (the "Pledge Agreement") (collectively with the Loan Parties' other pledged

assets, the "Collateral").  In connection with TTK Empire's pledge of these assets, the Secured

Parties expressly waived any claims (other than the ability to foreclose on the pledged collateral)

against TTK Empire arising under the Loan Documents.[19]

16.    The Debtors have no employees of their own.[20]  Instead, the Debtors historically

outsourced all operation and servicing of the power plant to affiliates of Tyr.  Specifically, Tyr

Energy, LLC provided asset management services such as management and administrative

services, while NAES Corporation (another affiliate of Tyr) provided operations and maintenance

services.   Both of these Tyr-affiliates were well-compensated for these services, with Tyr

Energy, LLC receiving a base fee of $700,000 per year plus additional fees, and NAES receiving

between $267,000 and $436,000 per month.  The agreement with NAES is slated to be assumed

under the Debtors' proposed scheme.[21]

**II.    THE DEBTORS AND THEIR SECURED LENDERS PURSUE A PREPACKAGED
BANKRUPTCY INVOLVING A DEBT-FOR-EQUITY EXCHANGE.**

17.    In early 2018, the Debtors began tripping defaults under the Loan Documents.  In

order to address these defaults, various holders of the Debtors' outstanding secured debt formally

organized and began negotiations around a consensual restructuring (the "Ad Hoc Group").  These

lenders included, among others, the Minority Lenders and Black Diamond.

---

[19]    Pledge Agreement at § 6.25.

[20]    First Day Decl. ¶ 18 ("The Debtors have no employees.").

[21]    *See Debtors' Joint Chapter 11 Plan* [Docket No. 8] ("Plan") § 4.6 ("On or before the Effective Date, Empire, Reorganized Empire, and NAES, as applicable, shall enter into the Amended O&M Agreement.").  While the Minority Lenders originally participated in renegotiation of the NAES agreement, since the dissolution of the Ad Hoc Group, the Minority Lenders have not had any involvement in the NAES negotiations and is unaware of any request for proposal or any other market test by the Debtors as one would expect in a non-prepackaged plan situation.

18.     The Ad Hoc Group seemingly made a great deal of progress towards finalizing a fully-consensual pre-packaged bankruptcy, which contemplated a debt-for-equity exchange, granting ownership of the Debtors to the Ad Hoc Group.  The potential deal advanced to the point that the only material outstanding issue was determining a governance structure for the reorganized entity.

19.     Recognizing they were on the path towards becoming owners of the power plant, and in an effort to better understand the Debtors' business, the Ad Hoc Group retained Mr. Hudson and his firm, Woodlands, as a consultant to work through the ownership transition and to potentially become the asset manager of the power plant for the reorganized entity (thereby replacing Tyr).  Mr. Hudson is the principal of Woodlands, and brought to the table a great deal of experience as a plant operator.  The initial consulting agreement was between Woodlands on the one hand, and Stroock & Stroock & Lavan, counsel to the Ad Hoc Group, on the other.

20.     As part of its consulting role to the Ad Hoc Group, Woodlands conducted a review of the Debtors to assess operations, key commercial agreements, and cost saving opportunities.  Through this review, the Ad Hoc Group learned that by around the middle of 2018 Tyr had adopted a "hands-off" approach to the operational management and control of the Debtors.  According to a presentation from Woodlands and Houlihan Lokey (another advisor to the Ad Hoc Group), by late December 2018, Woodlands observed that the Debtors' "resources [were] limited to one person for all asset management, energy management and operations functions."[22]  Woodlands and Houlihan also identified a number of other issues with Tyr's management of the Debtors, including:

- lack of coordinated business planning;

---

[22]   *Operational Due Diligence Overview*, dated December 20, 2019, slide 7 (attached hereto as **Exhibit B**).

- lack of involvement in annual budget development;

- limited engagement with plant staff; and

- no relationships developed with local or community officials that are counterparties to important commercial agreements.[23]

21.    Faced with this vacuum at the Debtors, Mr. Hudson and Woodlands began to take affirmative steps to protect the asset, steps which should have been the responsibility of Tyr.  For example, Woodlands:

- negotiated an amendment to the NAES O&M Agreement;

- renegotiated the long-term service agreement;

- began negotiating a payment-in-lieu-of-taxes ("PILOT") agreement with the local community; and

- took steps to evaluate a new energy management provider and new gas supplier.[24]

22.    Even as the Ad Hoc Group's efforts began to falter, Woodlands continued to exercise growing influence over the management of the plant.

## III.    BLACK DIAMOND AND THE DEBTORS ABANDON THE PRE-PACK APPROACH IN EARLY APRIL

23.    As detailed in the Cash Collateral Objection, the Ad Hoc Group negotiations were initially productive and resulted in near-final documentation for a prepackaged debt-for-equity plan.  One of the few outstanding items (if not the only material open item) related to the governance of the reorganized Debtors.  Then, in December 2018, in the midst of governance term sheet negotiations and without informing any other members of the Ad Hoc Group, Black Diamond surreptitiously purchased an incremental amount of debt outstanding under the Credit Agreement, thereby purporting to hold a majority of outstanding obligations under the Credit

---

[23]    *See id.*

[24]    *See* Work Plan, attached hereto as **Exhibit C**.

Agreement.  Black Diamond used its newly-acquired majority position to install Ankura Trust Company ("Ankura") as the Collateral Agent and approve or deny extensions of the Debtors' subsequent forbearance agreements and use of cash.

24.    While the Minority Lenders continued their attempts to engage with Black Diamond and the Debtors into mid-April 2019 and beyond, these efforts proved fruitless.  The Minority Lenders have since learned from the First Day Declaration that the Debtors and Black Diamond considered the Ad Hoc Group negotiations terminated in early April, notwithstanding the continued outreach by the Minority Lenders.[25]  Since that early April time period, the Debtors, Black Diamond, and Ankura, have steadfastly refused to engage with the Minority Lenders any further, opting instead to try to silence the Minority Lenders through the bankruptcy process.

## IV.    THE DEBTORS AND BLACK DIAMOND CRAFT THE RESTRUCTURING SUPPORT AGREEMENT.

25.    While the Minority Lenders continued to press for basic minority protections under a governance term sheet, the Debtors, Black Diamond, and Tyr turned their attention to structuring a series of transactions that would use Black Diamond's bare majority voting position to sideline the Minority Lenders completely and deliver significant value to Tyr and Black Diamond.  The result of these efforts was the RSA and the Sale.

26.    The RSA contemplates consummation of the Restructuring Transactions, which form the core of the Debtors' restructuring strategy of crowding out the Minority Lenders.[26]  *First*,

---

[25]    First Day Decl. ¶ 44.

[26]    *Id*. at ¶¶ 41, 47 ("[T]he Credit Bid will have the effect of discharging and satisfying the Credit Facility in its entirety, making it unnecessary to solicit votes from Prepetition Lenders or to treat the Credit Facility under the Plans in any way. . . . [B]ecause the Plans do not 'impair' any class of creditors, no votes on the Plans need to be solicited. . . . [T]he foregoing facts will facilitate expedited confirmation of the Plans and provide an efficient process for the Loan Party Debtors to exit bankruptcy."); First Day Tr. at 15:12–24 (P. Partee: "So TTK Empire Power is the seller in the proposed transaction. And it's selling a hundred percent of the membership interests in [Holdings] in exchange for a complete full discharge in satisfaction of the secured debt. . . .  Once that sale closes, it does eliminate the debtors' secured debt in its entirety. And therefore, it eliminates the necessity of treating, in

the RSA mandates an expedited schedule leading up to the Sale.  And Black Diamond is required to direct the Collateral Agent to credit bid the full amount of the secured debt as part of the sale process.  The Debtors and Black Diamond are remarkably candid about their purpose in proceeding through the Sale instead of through a plan:  a plan process would require the support of the Minority Lenders.[27]  The RSA thus structures the Sale in an effort to preclude the Minority Lenders from being heard at all in this process.

28.       Most debtors are loathe to discuss value openly in advance of a sale process for fear of chilling the opportunity for value maximizing bids.[28]  Not this one.  In an effort to deter bidders, the Debtors have expressly and publicly stated that the amount of the proposed credit bid is "a number that well exceeds what the debtor believes the value of its assets to be."[29]  And yet the Debtors would have the Court believe that equity in a new entity with no governance protections would render the Minority Creditors "unimpaired."  The "high" purchase price the Debtors trumpet in the context of the credit bid is illusory—whether the lenders obtain equity in the asset via a plan or sale, the asset remains the same.  What changes is the minority protections afforded to the Minority Lenders, and whether the process leading to the change in control is fair and transparent.

28.       ***Second***, the RSA buys off Tyr (and through Tyr, the Debtors) by providing broad releases and providing continuing revenue to Tyr's affiliate.  Specifically, the Plan contemplates

---

any downstream debtors' plans, any of that secured debt.  And it enables us to confirm, under the terms of the RSA, with funds provided by the majority lenders who are sponsoring the credit bid, payment in full of all unsecured creditors in cash.").

[27]   First Day Tr. at 13:7–10 ("And as the Court can see from those percentages, it made confirmation of a consensual prepackaged hinge on the votes of the funds controlled by both Black Diamond as well as Ares.").

[28]   *See* Antinelli Decl. ¶ 16 ("In my experience, it is highly unusual for a party legitimately seeking to test the value of an existing bid and generate higher and better bids to publicly state that the value of their assets is substantially less than the proffered bid.").

[29]   First Day Tr. at 10:17–18.

broad Debtor and third-party releases of (a) Tyr, by whom Mr. Venteicher is employed as the President and CEO,[30] (b) Mr. Venteicher personally, in his capacities as an officer and director for each of the Debtors and as an officer and director of Tyr,[31] and (c) the other Sponsors. Further, the closing of the Sale itself will act as a *de facto* release because it will extinguish all funded debt claims, thereby eliminating the need to explore any derivative claims owned by the Debtors' estates that could be brought for the benefit of the Debtors' credits. Likewise, the Restructuring Transactions require the continued use of Tyr-affiliate NAES to provide operations and maintenance services to the reorganized entity.[32] Despite this seeming conflict between the interest of the Debtors and the interest of Tyr, the RSA was approved by Mr. Venteicher on behalf of TTK Power without any oversight from an independent fiduciary.

29. ***Third***, in addition to providing for consummation of the Restructuring Transactions, the RSA cedes plenary authority over the Debtors' operations to Black Diamond. The RSA contains over forty covenants of the Debtors, in favor of Black Diamond.[33] These

---

[30] Plan § VIII Section 8.3 (providing third party releases for "Released Parties" which, as defined in Article I, Section 1.1.111 includes Tyr); *Sale Motion*, Ex. B, *Order (A) Approving the Purchaser's Purchase Agreement, (B) Authorizing Sale of Membership Interests in Empire Gen Holdings, LLC Free and Clear of Liens, Claims, Encumbrances, and Interests, (C) Authorizing the Assumption of Executory Contracts and Unexpired Leases, and (D) Granting Related Relief* ("Sale Order"), Ex. A § 4.3(b) (providing that Purchaser Releasing Parties shall execute third party releases for "Seller Released Parties" which, as defined in Article I, Section 1.1, includes Tyr).

[31] *Plan* § 8.3 (providing third party releases for "Released Parties" which, as defined in Article I, Section 1.1.111 includes Tyr's officers and directors); Sale Order, Ex. A § 4.3(b) (providing that Purchaser Releasing Parties shall execute third party releases for "Seller Released Parties" which, as defined in Article I, Section 1.1, includes officers and directors of the Debtors and Tyr).

[32] *Plan* § 9.2 (providing that as a condition precedent to the Effective Date, the Amended O&M Agreement between NAES and the Debtors with prior consent of the Purchaser shall be in full force and effect); Sale Order, Ex. A § 4.2(j) (listing the executed O&M Agreement as a required deliverable by the Debtors at the closing).

[33] *See* RSA § 3 ("Agreements of the Company"); *id.* § 3(a) ("Upon the terms and subject to the conditions of this Agreement, the [Debtors] agree[] that, for the duration of the Restructuring Support Period, unless otherwise expressly consented to in advance in writing by the Requisite Consenting Lenders, the Company shall . . ."). Black Diamond's holdings mean Black Diamond, even without the support of the other Consenting Lender, MGX, can act as the "Requisite Consenting Lenders" pursuant to the RSA.

covenants go well beyond the standard fare terms relating to bankruptcy that are expected in this type of agreement.  Instead, these covenants extend to cover the management and policies of the Debtors including, among others, the obligation:

- to "negotiate and enter into any amendments or modifications of any of the Material Agreements only upon the written *direction* of the Requisite Consenting Lenders, in a manner that is reasonably satisfactory to the Requisite Consenting Lenders as soon as reasonably practicable after receipt of such direction";[34]

- not to "move for an order approving the assumption or rejection of an Executory Contract or Unexpired Lease without the consent of the Requisite Consenting Lenders";[35]

- to "obtain the *consent* of the Requisite Consenting Lenders with respect to any settlement discussions or settlement proposals by the Company of any claim, litigation, dispute, controversy, cause of action, proceeding, appeal, determination, investigation, matter or otherwise where the amount in controversy is in excess of $100,000 or that will require payment of any amount in excess of $100,000 (whether such payments are made individually or in the aggregate) (as applicable)";[36]

- not to "withdraw or revoke the Plan or the Sale, or announce its intention not to pursue the Plan or the Sale";[37]

- to "notify the Consenting Lender Advisors promptly in writing, and in any event within twenty-four (24) hours, after receipt of any Alternative Transaction Proposal, or any request for nonpublic information relating to an Alternative Transaction Proposal";[38]

- to "promptly (and in any event within twenty-four (24) hours) keep the Consenting Lender Advisors informed of any changes in the status and any

---

[34]   *Id.* § 3(a)(xvi) (emphasis added).

[35]   *Id.* § 3(b)(vi).

[36]   *Id.* § 3(a)(xi) (emphasis added).

[37]   *Id.* § 3(b)(iii).

[38]   *Id.* § 3(a)(v)(A).  Moreover, such notice must "(1) indicate the identity of the Person submitting or making the Alternative Transaction Proposal or requesting nonpublic information related thereto and (2) include a copy (or a summary, if such Alternative Transaction Proposal was orally made) of the terms of any such Alternative Transaction Proposal[.]"  *Id.*

changes or modifications in the terms of any Alternative Transaction Proposal (along with a copy thereof) or request for nonpublic information";[39] and

- not to "enter into any confidentiality or other agreement that would in any respect impede, or reasonably be expected to impede, [the Debtors'] ability to comply with their obligations under" the foregoing covenants.[40]

The RSA also provides Black Diamond "sole and absolute discretion" over multiple fundamental business and management issues, including, among other things:  exit financing for reorganized Empire Generating, governance of reorganized Empire Generating, and any amendment or modification of any Material Agreement.[41]  As contemplated by the RSA, "Material Agreements" includes both the Asset Management Agreement and the Services Agreement, as well as any other contract that Black Diamond identifies in its sole discretion.  In short, through the RSA and Woodlands' ever-increasing operational role, the Debtors have turned over control of their business to Black Diamond.

30.    The RSA contains a purported "fiduciary out," no doubt included so that it could be relied upon to counteract any argument that Black Diamond has complete control over the Debtors.  But the fiduciary out in the RSA is illusory because it is subject to at least three fatal flaws: (1) it is limited in scope and may only be exercised by an interested individual, (2) it is largely overridden by section 3(b)(i) of the RSA, which restricts the Debtors from even engaging in negotiations in connection with an any proposed "Alternative Transactions"; and (3) it is diluted by the Debtors' express obligation to provide Black Diamond's counsel with "contemporaneous[]"

---

[39]    *Id.* § 3(a)(v)(B).

[40]    *Id.* § 3(a)(v).

[41]    *See id.* § 1(ee) ("Definitive Documents" means all material agreements . . . provided that any documents related to any exit financing or the corporate governance or equity ownership of reorganized Empire shall be acceptable to the Requisite Consenting Lenders in their sole and absolute discretion."); *id.* § 3(b)(v) (requiring amendments and modifications to Material Agreements to be satisfactory to the Requisite Consenting Lenders "in their sole and absolute discretion").

information regarding any "Alternative Transactions."  In addition to these restraints, the Cash

Collateral Order acts to further circumscribe the Debtors' fiduciary out because the Cash Collateral

Order only permits the use of cash for express, permitted purposes.[42]  None of these permitted

purposes include the use of funds to pursue matters pursuant to this fiduciary out, leaving the

Debtors with no resources to effectuate the fiduciary out even if an opportunity arises.

31.     *Fourth*, the RSA allows Black Diamond to arrogate to itself the value of the

governance rights of the reorganized company at the expense of the Minority Lenders.  Despite

repeated requests, neither Black Diamond, the Debtors, nor the Collateral Agent have produced

information concerning the proposed governance of Empire Acquisition, LLC (the acquisition

vehicle) post-closing.  Despite the Debtors having filed thousands of pages of paper, the most

important document in these cases is nowhere to be found.

## V.    DESPITE THE COLLAPSE OF THE AD HOC GROUP, WOODLANDS HAS EXPANDED ITS ROLE TO OPERATE AS THE DEBTORS' DE FACTO ASSET MANAGER.

32.     Despite the disbandment of the Ad Hoc Group and the Debtors' termination of

negotiations with the Minority Lenders in favor of a sale process, Woodlands stayed on and has

increased its role, effectively becoming the Debtors' *de facto* asset manager through the prepetition

period as Black Diamond, the Debtors, and Tyr negotiated the RSA.[43]  Nonetheless, Woodlands

has continued to assume greater control over the operations and management of the Debtors.

Woodlands' role has developed to the point where Woodlands—not Tyr—is running the Debtors'

business, as evidenced by Woodlands' lead role in renegotiating the Debtors' PILOT agreement

---

[42]   Cash Collateral Order ¶ 3.

[43]   *Rensselaer power plant expects to file for bankruptcy, seeks bigger tax break*, ALBANY BUS. REV., Apr. 12, 2019, https://www.bizjournals.com/albany/news/2019/04/12/rensselaer-power-plantbankruptcy-tax-breaks.html ("'It's a pre-packaged bankruptcy . . . If there's too much debt, the next debt holders become equity holders.'").

with Rensselaer County,[44] deciding to recommission the Debtors' fuel oil system, negotiating the Amended NAES Agreement and Amended O&M Agreement (which are contemplated to be assumed and assigned pursuant to the RSA and Stalking Horse Purchase Agreement), and overseeing and managing all aspects of the transition to the owners of reorganized Empire.  Indeed, as reflected in the work plan attached hereto as **Exhibit C** (the "Work Plan"), as of late April or early May 2019, Tyr had ceased to act as an asset manager.  That detailed Work Plan identifies dozens of completed or ongoing tasks related to the management of the power plant and transition of operations to the new owners.  Tyr is not once identified as a "responsible party" for a task, while Woodlands is tasked as the responsible party for all but two workstreams, each of which is legal in nature.[45]

33.     Although Woodlands originally contracted with the Ad Hoc Group, since the dissolution of the Ad Hoc Group, the Minority Lenders' understanding is that Woodlands has reported to Black Diamond (while sometimes providing limited information to the Minority Lenders as a courtesy).  Black Diamond's control over Woodlands and the power plant was formalized shortly prior to the Petition Date when Woodland's consulting agreement was transferred to the Collateral Agent.  The facts and circumstances surrounding the Collateral Agent's retention of Woodlands are unknown to the Minority Lenders at this time, despite ongoing inquiries, and were not disclosed to the Court, despite the fact that the Debtors' sought to pay

---

[44]   *Id.* ("[Hudson] was trying to convince the [IDA] board to lower the power plant's annual payment in lieu of taxes from $1.75 million to $1 million next year and then make further reductions during the last 10 years of the agreement.  'It's very important we get [the PILOT agreement],' Hudson said. 'If our [electric] capacity prices go over certain levels then our payments will go back up.'").

[45]   *See generally* Work Plan.

Woodlands' fees pursuant to the Cash Collateral Order without any disclosure or discussion of who Woodlands is or what it does.[46]

34.     The bottom line is plain:   through both the RSA and its indirect control of Woodlands, Black Diamond has had the power "by contract or otherwise" to direct the actions of the Debtors during the prepetition period.   While such business control may have been non-controversial were this a consensual prepackaged bankruptcy, the Debtors' and Black Diamond's decision to proceed through a contested sale process but ***not*** cede control of operations back to the Debtors has import under the existing Loan Agreements.   Specifically, as discussed below, the provisions of the Loan Agreement prevent a party holding secured debt who also exercises control over the management and policies of TTK Empire from being considered when the Collateral Agent determines who constitutes the "Required Secured Parties."   This likely makes any direction given by Black Diamond void.

## OBJECTION

35.     The Debtors, Tyr, and Black Diamond have entered into an unholy alliance aimed at silencing potential critics, delivering significant value to the Sponsors in the form of releases and insider contracts, and ceding almost complete control of these cases and the Debtors to Black Diamond.   The Minority Lenders, the parties' specifically targeted and injured by this scheme, object on multiple grounds.  The RSA, Bidding Procedures, and Sale are the product of an improper process overseen by conflicted insiders.   The result is a *sub rosa* plan designed to strip Minority Lenders of their right to vote or even participate.   To execute on this scheme, the Debtors, Tyr, and Black Diamond have engineered a sham sale process—one that has already been tainted

---

[46]   Cash Collateral Order ¶ 13.

by the Debtors' public statements—and anchored by an artificially inflated credit bid, which is designed to suppress third-party interest and secure a specific outcome under the guise of a fair and open process.

36.     But even the credit bid is fundamentally flawed.  Black Diamond's direction to the Collateral Agent to submit the credit bid is invalid as a result of Black Diamond's control over the Debtors.  Further, the Collateral Agent does not possess a claim to credit bid against the selling entity.  Even if it did, ample cause exists to limit or prohibit the credit bid, including the improper process by which the credit bid was negotiated, its inconsistency with the Loan Documents, and the fact that it results in an impermissible *sub rosa* plan.  And, underlying all of these issues is the fatal flaw that the proposed Restructuring Transactions are unsupported by any sound business rationale or authority under the applicable documents.  For these reasons, the Motions must be denied.

## I.   THE MINORITY LENDERS HAVE STANDING TO BRING THESE OBJECTIONS.

37.     The Minority Lenders have standing to object to the Motions as the Loan Documents do not contain any express waiver of their right to object.  Further, the lenders' delegation of certain rights to the Collateral Agent is not a bar on lenders' ability to object or be heard with respect to such actions, as evidenced by the terms of the Intercreditor Agreement and the course of conduct in these cases.

### A.   The Loan Documents Do Not Expressly Waive the Minority Lenders' Right to Object to the Motions.

38.     The Bankruptcy Code expressly provides creditors with the right to "appear and be heard on any issue" in a chapter 11 case.[47]  Courts in this district have made clear that any purported

---

[47]   11 U.S.C. § 1109(b).

waiver of a creditor's rights in bankruptcy is ineffective unless the waiver is expressed in clear, specific language in the applicable agreement.[48]  For example, in *Boston Generating*, the court explained that "[i]f a secured lender seeks to waive its rights to object to a 363 sale, it must be **clear beyond peradventure** that it has done so."[49]  There, the court was called upon to interpret an intercreditor agreement that vested the first-lien collateral agent with the "exclusive right to enforce rights, exercise remedies . . . and make determinations regarding the release, sale, disposition or restrictions with respect to the Collateral."[50]  The agreement at issue did not expressly prohibit the second-lien agent or the second-lien lenders from objecting to a 363 sale of the collateral.[51]  On these facts, the *Boston Generating* court held that the second-lien agent and second-lien lenders had standing to object to bidding procedures for a proposed 363 sale of the collateral and to the sale itself.[52]

39.     In an important way, the Intercreditor Agreement here is even more clear that objections are not waived than the agreements at issue in *Boston Generating*, *LLC* and *MPM Silicone*.  In both of those cases, the intercreditor agreement had a broad provision stating that the

---

[48]  *See, e.g.*, *In re MPM Silicones, L.L.C.*, 596 B.R. 416, 430 (S.D.N.Y. 2019) ("Where . . . there is no express waiver or specific constricting language in the contract, courts are reluctant to read such constraints into broad provisions."); *In re Boston Generating LLC*, 440 B.R. 302, 318–19 (Bankr. S.D.N.Y. 2010) (same); *accord* Tr. of May 2, 2012 H'rg at 7–8, 32, 64, *In re CyberDefender Corp.*, Case No. 12-10633-BLS (Bankr. D. Del. May 2, 2012) (hereinafter, "*CyberDefender* Tr.") (holding that intercreditor agreement language broadly prohibiting second-lender lenders from interfering with first-lien lenders' rights and remedies did not divest the second-lien lenders of standing to object to the first-lien lenders' credit bidding in a 363 sale of estate assets).

[49]  *Boston Generating*, 440 B.R. at 318–19 (emphasis added).

[50]  *Id.* at 316.

[51]  *See id.* at 319 ("[N]othing in the Intercreditor Agreement specifically prohibits the Second Lien Agent from objecting to the Sale Transaction.").

[52]  *Id.* at 317 (holding that "the Second Lien Agent had standing to object to the Bid Procedures," as there was no "express prohibition against objection to bidding procedures anywhere in the intercreditor agreement"); *id.* at 320 (concluding that "the Second Lien Agent and Second Lien Lenders ha[d] standing to object to the 363 sale").

junior creditors agreed not to "hinder any exercise of remedies" by the collateral agent.[53]   Here,
the Intercreditor Agreement was drafted after numerous courts had issued opinions constraining
the rights of junior creditors, and the drafters responded by striking this clause.

40.   In addition, the Minority Lenders intend to prove through discovery that other
restrictions were specifically negotiated out of the document.   For example, section 6.1 of the
Intercreditor Agreement is titled "Finance and Sale Issues," however, the text only restricts the
parties' ability to object to Cash Collateral and DIP Financing orders, (that is, "finance issues")
and contains no restriction on the parties' right to object to "sale issues."   The Minority Lenders
believe that the parties began with a form of intercreditor agreement that would have restricted the
parties' rights to object to 363 sales, and intentionally deleted that language as part of a negotiated
compromise.   Had those sophisticated parties wanted those provisions included, they would have
done so.   Because the Loan Documents do not contain any express waiver of Minority Lenders'
rights to object to a restructuring support agreement or a sale, the Minority Lenders have standing
to object to the RSA Motion and the Sale Motion.

**B.   The Credit Agreement Clearly Envisions That Debt Holders Retain Their Right to Vote on a Plan—And They Thus Should Have Standing to Object to Efforts to Deprive Them of That Vote.**

41.   Even if the Court were to find a waiver under the Intercreditor Agreement, which
it should not, section 11.06(d) of the Credit Agreement makes clear that individual lenders have
the right to vote in bankruptcy unless such lender is a Sponsor-Related Party.[54]   By clarifying that
the Sponsor-Related Party does not have the right to vote its interests, the Credit Agreement

---

[53]   *Boston Generating*, 440 B.R. at 317–18; *In re MPM Silicones, L.L.C.*, 518 B.R. 740, 750 (Bankr. S.D.N.Y. 2014).

[54]   *See* Credit Agreement 11.06(d) (prohibiting a Sponsor-Related Party "in any bankruptcy or similar proceeding, in respect of any Loan Party, [having] any right to vote any of its interest under the Term B Facility").

expressly contemplates that individual lenders who are not Sponsor-Related Parties would have such rights consistent with the Bankruptcy Code.[55]  The Credit Agreement accordingly disclaims the Sponsor-Related Parties' rights to vote while leaving intact the Minority Lenders' rights to vote.

42.     The Debtors cannot use an implied waiver of the right to object to certain specified actions (*i.e.*, cash collateral usage and DIP financing) to strip the Minority Lenders' of standing to object to matters which, if approved, would have the effect of eviscerating rights expressly granted to the Minority Lenders under the Loan Documents and the Bankruptcy Code.  If this Court grants the RSA Motion and the Sale Motion, the Debtors will be locked into a process whereby the Minority Lenders will be unable to vote whether to accept or reject a Plan despite the Loan Documents and the Bankruptcy Code expressly granting them the right to vote their interests, and will be unable to exercise their approval rights on other renouncements of fundamental rights as a lender.  Accordingly, the Minority Lenders retain the right to object to all aspects of the RSA Motion and the Sale Motion.

> **C.      The RSA Motion and the Sale Motion Are Not Enforcement Actions and Do Not Preclude the Minority Lenders' Rights to Object.**

43.     Even if the Debtors' interpretation of section 3.1 of the Intercreditor Agreement was correct—which it is not—the Motions are not enforcement actions that would result in the waiver of Minority Lenders' right to object.  ***First***, the RSA is not an exercise of remedies or an enforcement of rights, as evidenced by the fact that Black Diamond is a party to the RSA, not the Collateral Agent.  As a result, section 3.1 of the Intercreditor Agreement cannot bar the Minority Lenders' rights to object the RSA Motion.

---

[55]     *See* 11 U.S.C. § 1126(a).

44.    ***Second***, at most, any implied waiver by the Minority Lenders would be limited to what Section 3.1 of the Intercreditor Agreement specifically provides "the exclusive right to enforce rights, exercise remedies (including setoff (but subject to Section 5.5(a)) and the right to credit bid the Secured Obligations) and make determinations regarding the release, sale, dispositions or restriction with respect to the Collateral."[56]  Therefore, only the Collateral Agent (and not any individual lender) can submit a "credit bid" of "the Secured Obligations ."  But the Collateral Agent's contractual authority to submit a credit bid is itself limited to the rights of a secured creditor to credit bid in bankruptcy.[57]  Such rights are specifically limited "for cause."[58] As a result, the Minority Lenders must retain the right to be heard with respect to whether cause exists to limit the credit bid where, as here, no other party has any incentive to speak up, by design. Further, the Sale Motion contains many other elements, including the Debtors' business judgment to pursue a sale, the business rationale for such sale, and the bid procedures, to name a few.[59]  As these are not actions of the Collateral Agent, the Minority Lenders retain their rights to object thereto.

---

[56]    Intercreditor Agreement § 3.1.

[57]    Intercreditor Agreement § 3.1(a) (delegating to the Collateral Agent the exclusive right "to exercise all rights and remedies . . . of a secured creditor under the Bankruptcy Laws of any applicable jurisdiction").

[58]    11 U.S.C. § 363(k).

[59]    The Debtors have also acknowledged that the Sale process is an extra-contractual process, reinforcing that the Loan Documents do not waive the Minority Lenders' rights to object to the Sale Motion.  *See* Email from P. Partee to A. Schwarzman (May 17, 2019) (attached hereto as **Exhibit D**).

## II.    THE RSA, BIDDING PROCEDURES, AND STALKING HORSE BID ARE NOT THE PRODUCT OF SOUND BUSINESS JUDGMENT AND INSTEAD PRESENT A *SUB ROSA* PLAN AIMED AT EVADING SECTION 1129 OF THE BANKRUPTCY CODE.

45.    The RSA represents an Unholy Alliance between the Debtors, Tyr, and Black Diamond.  Tyr (and the rest of the Sponsors) get releases and Tyr also gets the assumption of valuable affiliate contracts.  The Debtors get a hassle-free bankruptcy case without having to broker consensus or carry out their mandate to maximize value for all stakeholders.  In exchange, Black Diamond gets total control over the chapter 11 process and, most importantly, governance of the acquiring entity.  This scheme does not comport with the Bankruptcy Code and it is not supported by sound business judgment.

### A.    The Debtors Are Not Entitled to the Protections of the Business Judgment Rule.

46.    Section 365(a) of the Bankruptcy Code provides that a debtor-in-possession, "subject to the court's approval, may assume or reject any executory contract or unexpired lease."[60] Courts in the Second Circuit will approve the assumption of an executory contract "upon a showing that the debtor's decision to take such action will benefit the debtor's estate and is an exercise of sound business judgment."[61]  A debtor "must support the motion with evidence—usually in the form of a declaration or affidavit—demonstrating that [assumption] of the contract falls within the

---

[60]    11 U.S.C. § 365(a).

[61]    *In re MF Global Holdings Ltd.*, 466 B.R. 239, 242 (Bankr. S.D.N.Y. 2012); *see In re Gucci*, 193 B.R. 411, 415 (S.D.N.Y. 1996) ("A bankruptcy court reviewing a trustee's decision to assume or reject an executory contract should apply its 'business judgment' to determine if it would be beneficial or burdensome to the estate to assume it."); *In re The Great Atlantic & Pacific Tea Company, Inc.*, 544 B.R. 43, 48 (Bankr. S.D.N.Y. 2016) ("A&P") (In determining whether to approve a motion to assume or reject an executory contract, courts place themselves in the position of the debtor in possession and determine whether assuming or rejecting the contract would be a good business decision or a bad one.); *see also In re Orion Pictures Corp.*, 4 F.3d 1095, 1098–99 (2d Cir. 1993) (stating that section 365 "permits the trustee or debtor-in-possession, subject to the approval of the bankruptcy court, to go through the inventory of executory contracts of the debtor and decide which ones it would be beneficial to adhere to and which ones it would be beneficial to reject").

proper exercise of the [debtors'] business judgment."[62]  Courts may "defer to the debtor's view

that rejection or assumption will benefit the estate, ***provided that the debtor is not conflicted and***

***has taken sufficient steps to maximize value***."[63]

47.     In order to establish their right to deference, the Debtors must establish: "(i) a

business decision, (ii) disinterestedness, (iii) due care, (iv) good faith, and (v) according to some

courts and commentators, no abuse of discretion or waste of corporate assets."[64]  Due care requires

"the transaction not only . . . be fair, but it has to look fair as well."[65]  Good faith requires an

examination of the Debtors' negotiation process.[66]  At least one court has found that a lack of

transparency can be grounds for not acting in good faith.[67]

48.     If, as here, the parties involved in the decision-making process lack independence

or otherwise breached their fiduciary duties, then the Court must apply the more stringent "entire

fairness" or "heightened scrutiny" test.[68]  The entire fairness test is triggered when a transaction

involves insiders, because courts are concerned with the integrity and entire fairness of the

transaction at issue and will closely examine whether the process and price of a proposed

---

[62]    *MF Global,* 466 B.R. at 242.

[63]    *A&P,* 544 B.R. at 48 (emphasis added) (citing *In re Genco Shipping & Trading Ltd.*, 509 B.R. 455, 463 (Bankr. S.D.N.Y. 2014) ("[A] debtor must . . . put forth a showing that assumption or rejection of the . . . unexpired lease will benefit the Debtor's estate.")).

[64]    *Innkeepers*, 442 B.R. at 231.

[65]    *Id.*

[66]    *See id.* at 233–34 (finding a lack of good faith where the Debtors ran a process that shut out all parties in interest other than a single secured creditor and "at best, downplayed, and, at worst, obfuscated" that the Debtors' proposed restructuring transactions would result in the Debtors' sponsor receiving half of the equity in the reorganized Debtors).

[67]    *See id.* at 233–34.

[68]    *See id.* at 231 (*citing In re Bidermann*, 203 B.R. 547, 551 (Bankr. S.D.N.Y. 1997) ("[s]ales to fiduciaries in chapter 11 cases are not per se prohibited, 'but [they] are necessarily subjected to heightened scrutiny because they are rife with the possibility of abuse.'") (internal citation omitted))..

transaction are inherently fair, appear fair, and whether fiduciary duties were properly taken into consideration.[69]

49.     The Debtors cannot satisfy the criteria necessary to receive business judgment deference in light of the insider nature of the Restructuring Transactions.   Accordingly, the Debtors' decision to assume the RSA should be considered under the "entire fairness" standard. Regardless of the standard applied, the Debtors cannot satisfy it and the RSA Motion should be denied.

### 1.     Seller TTK Empire Has No Independent Fiduciary and No Fiduciary Duties.

50.     In a bankruptcy case, a debtor and its board of directors owe fiduciary duties to the debtor's creditors to maximize the value of the estate.[70]   "Fiduciaries owe duties of care and loyalty, and courts have held that these duties apply with equal or greater force in the context of a sale of assets."[71]   Directors are found to be interested if they "appear on both sides of the transaction or expect to derive any personal financial benefit from it in the sense of self-dealing, as opposed to a benefit which devolves upon the corporation or all stockholders generally."[72]

51.     As discussed, the RSA was negotiated by interested parties on all sides. Mr. Venteicher was TTK Empire's sole decision maker.   Importantly, in blessing the RSA, Mr. Venteicher approved transactions from which he stood to personally benefit as both an officer

---

[69]   *Id.*

[70]   *See id.* at 235 ("In a bankruptcy case, it is 'Bankruptcy 101' that a debtor and its board of directors owe fiduciary duties to the debtor's creditors to maximize the value of the estate, and each of the estates in a multi-debtor case."); *see also Bidermann*, 203 B.R. at 551 (citing *In re Beck Industries, Inc.*, 605 F.2d 624, 634 (2d Cir. 1979) ("The fiduciary obligations of directors pervade bankruptcy administration.   And the actions of the chief officer of the company are imbued with fiduciary obligations as well.")).

[71]   *Id.* at 235.

[72]   *Aronson v. Lewis*, 473 A.2d 805, 812 (Del. 1984).

and director of the Debtors and of Tyr.  Nor are Tyr or Black Diamond charged with any fiduciary duty to the Debtors' estates.  Both parties stand to benefit greatly from the Restructuring Transactions as a result of broad releases, assumption of lucrative affiliate contracts, and unrestricted governance rights for the post-reorganized company.  Absent any true fiduciary, the RSA fails to satisfy the disinterestedness requirement of the business judgment standard.

## 2. Not Surprisingly, TTK Empire Power Negotiated for the Benefit of Tyr—Not the Estates.

52.     In order to satisfy the duty of due care, courts have found that the transaction not only has to be fair, but it has to look fair as well.[73]  The due care prong is also directly related to the "fair process" inquiry of the heightened entire fairness test.[74]  Courts have found that due care is absent where a single creditor wields great power in the negotiations and the Debtors succumb to virtually all of their demands.[75]  Further, courts have found that a fair process is lacking where there are substantial limitations in place on a debtor's ability to engage in discussions with any other major creditors.[76]

53.     Here, the Debtors have not demonstrated, and cannot demonstrate, that the RSA was entered into with the requisite amount of due care to satisfy the entire fairness test.  As discussed, the agreement was negotiated in secret by conflicted insiders.  Unsurprisingly then, the RSA provides the insiders with significant benefits.  With respect to Tyr, the RSA provides Tyr (and all other Sponsors) with broad Debtor releases under the plan and the Sale, as well as *de facto*

---

[73]   *Innkeepers*, 442 B.R. at 231.

[74]   *Id*. at 232 ("[T]he 'due care' prong is also directly relevant to the 'fair process' inquiry of the entire fairness test.").

[75]   *See, e.g.*, *id*. at 232–33 (so concluding).

[76]   *See, e.g.*, *id*. at 232 (so finding).

third party releases as a result of the credit bid extinguishing the ability of any interested party (*i.e.*,

the Minority Lenders) from seeking standing to pursue claims against the Sponsors.  Further, the

RSA and Sale provide for the assumption and assignment of insider contracts with NAES and Tyr

Energy, LLC.

54.     In return for these benefits, Tyr allowed Black Diamond to assume outsized control

of these cases and management of the Debtors' business.  For example, the RSA contains over 40

covenants of the Debtors, including TTK Empire, in favor of Black Diamond, all of which may be

waived only with the advance, express written consent of Black Diamond.[77]  Those covenants

relate not only to certain bankruptcy matters, but also the management and policies of the Debtors

including, among others, the obligation:

- to "negotiate and enter into any amendments or modifications of any of the Material Agreements only upon the written ***direction*** of the Requisite Consenting Lenders, in a manner that is reasonably satisfactory to the Requisite Consenting Lenders as soon as reasonably practicable after receipt of such direction";[78]

- not to move for an order approving assumption or rejection of an Executory Contract or Unexpired Lease without the ***consent*** of the Requisite Consenting Lenders;"[79]

- to "obtain the ***consent*** of the Requisite Consenting Lenders with respect to any settlement discussions or settlement proposals by the Company of any claim, litigation, dispute, controversy, cause of action, proceeding, appeal, determination, investigation, matter or otherwise where the amount in controversy is in excess of $100,000 or that will require payment of any amount

---

[77]  *See* RSA § 3 ; *id.* § 3(a) ("Upon the terms and subject to the conditions of this Agreement, the [Debtors] agree[] that, for the duration of the Restructuring Support Period, unless otherwise expressly consented to in advance in writing by the Requisite Consenting Lenders, the Company shall . . .")..  Black Diamond's holdings mean Black Diamond, even without the support of the other Consenting Lender, MJX, can act as the "Requisite Consenting Lenders" pursuant to the RSA.

[78]  *Id.* § 3(a)(xvi) (emphasis added).

[79]  *Id.* § 3(b)(vi).

in excess of $100,000 (whether such payments are made individually or in the aggregate) (as applicable)";[80]

- not to "withdraw or revoke the Plan or the Sale, or announce its intention not to pursue the Plan or the Sale";[81]

- not to "move for an order approving the assumption or rejection of an to "notify the Consenting Lender Advisors promptly in writing, and in any event within twenty-four (24) hours, after receipt of any Alternative Transaction Proposal, or any request for nonpublic information relating to an Alternative Transaction Proposal";[82]

- to "promptly (and in any event within twenty-four (24) hours) keep the Consenting Lender Advisors informed of any changes in the status and any changes or modifications in the terms of any Alternative Transaction Proposal (along with a copy thereof) or request for nonpublic information";[83] and

- not to "enter into any confidentiality or other agreement that would in any respect impede, or reasonably be expected to impede, [the Debtors'] ability to comply with their obligations under" the foregoing covenants.[84]

55.    As discussed, the Material Agreements establish the management of the Debtors and form the core of the Debtors' operations.  Black Diamond's ability to control the negotiation of those agreements in the first instance provides them with enormous control of the management of the Debtors.  Black Diamond's control is further solidified by their ability to indirectly control Woodlands via the Collateral Agent.

56.    Perhaps most relevant to the due care inquiry, the RSA completely hamstrings the Debtors' ability to engage in discussions with any other major creditors to carry out their fiduciary

---

[80]    *Id.* § 3(a)(xi) (emphasis added).

[81]    *Id.* § 3(b)(iii).

[82]    *Id.* § 3(a)(v)(A).  Moreover, such notice must "(1) indicated the identity of the Person submitting or making the Alternative Transaction Proposal or requesting nonpublic information related thereto and (2) include a copy (or a summary, if such Alternative Transaction Proposal was orally made) of the terms of any such Alternative Transaction Proposal[.]"  *Id.*

[83]    *Id.* § 3(a)(v)(B).

[84]    *Id.* § 3(a)(v).

duties.  The Debtors assert that section 3(d) of the RSA provides the Debtors a "fiduciary out."[85]

There are three fatal flaws in the fiduciary out.  *First*, the fiduciary out is limited in scope and

applies only to the Debtors' and their respective officers' and directors' "fiduciary obligations

under applicable law."[86]  Where, as here, the Debtors' officers and directors have disclaimed all

fiduciary obligations, no such obligations remain to be exercised pursuant to this provision.

57.     *Second*, the fiduciary out under section 3(d) of the RSA is almost entirely

overridden by section 3(b)(i) of the RSA, which eliminates the Debtors' ability to "propose, seek,

solicit, support, encourage, assist, consent to, vote for, *engage in negotiations in connection with*,

participate in the formulation of, or consummate any Alternative Transaction or Alternative

Transaction Proposal[.]"[87]  Transactions typically do not spring like Athena from Zeus's forehead.

Instead, they must be fostered through diligence and negotiation.[88]  But the RSA bars those sorts

of precursor efforts entirely.   Adding insult to injury, the Cash Collateral Order prohibits the

Debtors from fulfilling their fiduciary out activities in the first instance.[89]

58.     *Third*, the fiduciary out is further diluted by the Debtors' obligation to provide

Black Diamond's counsel with near real-time information regarding competing offers, calling into

question whether the Debtors could ever actually negotiate an alternative transaction even if

section 3(b) of the RSA allowed them to.[90]  When viewed in tandem with the other provisions in

---

[85]   *Id*. § 3(d).

[86]   *Id*. § 3(d).

[87]   *Id*. § 3(b)(i) (emphasis added).

[88]   *See* Antinelli Decl. ¶ 13.

[89]   RSA § 5(a)(i).

[90]   *See id.* (requiring the Debtors to (A) provide to Skadden a copy of any written Alternative Transaction Proposal
       (and notice of any oral Alternative Transaction Proposal and a summary of the terms and conditions thereof)
       within twenty-four (24) hours of their or their advisors' receipt of such Alternative Transaction Proposal and
       (B) provide such information to Skadden regarding (x) any discussions and/or negotiations relating to any

RSA, the fiduciary out is functionally non-existent.  In light of the insider nature of negotiations, outsized control granted to Black Diamond under the RSA and via its control of Woodlands, and substantial limitation on the Debtors' ability to engage with their creditors or maximize value, the RSA and Sale cannot be found to have been negotiated with due care.

### 3.   The RSA Negotiation Process Was Secretive and Exclusionary.

59.   The good faith inquiry is relevant to both the heightened scrutiny and business judgment standards.  Courts have found that a debtor did not act in good faith due to a lack of transparency in process, unwillingness to engage in negotiation with other lenders, refusal to share documents and terms, and where one party wielded too much power over the fate of the cases.[91]

60.   Here, the Debtors, Tyr, and Black Diamond negotiated the RSA in a shroud of secrecy, refusing the Minority Lenders' good faith attempts to engage.[92]  And the RSA imposes a schedule that is unnecessarily expedited.  Indeed this Objection was written on eight-days' notice and without the benefit of discovery simply because Black Diamond and the Debtors devised that everything should be done in haste.

61.   Why the rush?  Expedience is no substitute for compromise of applicable standards, especially where, as here, the Debtors have been captured by Black Diamond and a self-interested Sponsor.  The Debtors' months of obfuscation and exclusion do not constitute good faith negotiations.  Absent any disinterested parties and any transparency, the Debtors' decision to

---

Alternative Transaction Proposal (including copies of any materials provided to such parties thereunder) and/or (y) any amendments, modifications or other changes to, or any further developments of, any Alternative Transaction Proposal, in any such case as is necessary to keep the Consenting Lenders contemporaneously informed as to the status and substance of such discussions, negotiations, amendments, modifications, changes, and/or developments).

[91]   *See, e.g.*, *Innkeepers*, 442 B.R. at 233–34.

[92]   *See* Email from P. Partee to A. Sathy (May 10, 2019) (attached hereto as **Exhibit E**).

assume the RSA is not entitled to business judgment deference.  Further, the RSA and the Restructuring Transactions contemplated thereby were not negotiated via a fair process and do not provide for a fair result.  As a result, the RSA Motion should be denied.

**B.      The RSA, Stalking Horse Bid, and Bidding Procedures Constitute an Impermissible *Sub Rosa* Plan.**

62.      A bankruptcy court may not approve a section 363 sale of substantially all of a debtor's assets if it circumvents the creditor protections set forth in chapter 11 of the Bankruptcy Code.[93]  Specifically, a bankruptcy court cannot approve of a *sub rosa* plan that uses "§ 363(b) to sidestep the protection creditors have when it comes time to confirm a plan of reorganization."[94]

63.      In *Braniff*, the seminal *sub rosa* plan case, the Fifth Circuit held that a plan support agreement was a *sub rosa* plan when it provided, among other things, that certain of the buyer's consideration "be used only in a future Braniff reorganization" and could only be distributed to certain parties.[95]  "This provision not only changed the composition of Braniff's assets, . . . [but] also had the practical effect of dictating some of the terms of any future reorganization plan," thereby "short circuit[ing] the requirements of Chapter 11 for confirmation of a reorganization plan."[96]  The court flagged other provisions that placed restrictions on creditor voting for a plan of reorganization and altered creditors' rights with respect to debtor and third-party releases,

---

[93]   *See In re Iridium Operating LLC*, 478 F.3d 452, 466 (2d Cir. 2007) (explaining that *sub rosa* plans are prohibited because they "short circuit the requirements of [C]hapter 11 for confirmation of a reorganization plan" (quoting *In re Braniff Airways, Inc.*, 700 F.2d 935, 940 (5th Cir. 1983)) (internal quotation marks omitted)).

[94]   *In re Continental Air Lines, Inc.*, 780 F.2d 1223, 1227 (5th Cir. 1986); *accord In re Crowthers McCall Pattern*, Inc., 114 B.R. 877, 883 (Bankr. S.D.N.Y. 1990) ("[M]ajor pre-confirmation transactions, such as use, sale or lease of estate property under section 363(b), settlement, abandonment of property under section 554, or a transaction out of the ordinary course of business under section 1108, raise the concern that the scheme of Chapter 11 will be distorted.").

[95]   *Braniff*, 700 F.2d at 939–40.

[96]   *Id.* at 939–40.

reasoning they were not within the scope of section 363(b) of the Bankruptcy Code. Specifically, these plan support agreement provisions required secured creditors to vote a portion of their deficiency claim in favor of any future reorganization plan approved by a majority of the unsecured creditors' committee and also provided for "the release of claims by all parties against Braniff, its secured creditors and its officers and directors."[97]   The court held that the transaction was essentially a reorganization which did not "scale the hurdles erected in chapter 11."[98]

64.     Following *Braniff*, courts generally analyze three factors when determining whether a debtor has sidestepped the rights of creditors:  (a) whether the proposed transaction has "the practical effect of dictating some of the terms of any future reorganization plan;" (b) whether creditor voting rights are restricted; and (c) whether other creditor rights are altered.[99]  In reviewing these factors, "[t]he degree of Court scrutiny of proposed transactions under § 363 must be elastic becoming more strict and searching the nearer the transaction gets to the heart of the reorganization plan process in terms of channeling that process toward any particular plan option."[100]   The underlying rationale for prohibiting *sub rosa* plans through a section 363 sale is the "fear that a debtor-in-possession will enter into transactions that will, in effect, 'short circuit the requirements of [C]hapter 11 for confirmation of a reorganization plan.'"[101]

65.     This same rationale was recently reaffirmed by the Supreme Court in the context of structured dismissals.  The Supreme Court, relying on the concerns underlying the *sub rosa*

---

[97]   *Id.* at 940.

[98]   *Id.*

[99]   *Id.*; *see, e.g.*, *Crowthers*, 114 B.R. at 883, 888–90 (referencing and analyzing these factors).

[100]   *In re Public Serv. Co. of New Hampshire*, 90 B.R. 575, 582 (Bankr. D.N.H. 1988) (denying approval to transfer management and operational control of a nuclear power plant outside of the ordinary course of business).

[101]   *Iridium*, 478 F.3d at 466 (quoting *Braniff*, 700 F.2d at 940).

doctrine, held that a bankruptcy court does not have "the legal power to order [a] priority-skipping . . . distribution scheme in connection with a Chapter 11 dismissal."[102]  Specifically, the Supreme Court found that the distributions contemplated by the structured dismissal "resemble[d] proposed transactions that lower courts have refused to allow on the ground that they circumvent the [Bankruptcy] Code's procedural safeguards."[103]  In reversing and remanding the Third Circuit's decision to approve the structured dismissal, the Supreme Court recognized that "courts cannot deviate from the procedures specified by the [Bankruptcy] Code, even when they sincerely believ[e] that . . . creditors would be better off."[104]

66.     The principles underlying the *sub rosa* doctrine are also core to approval of Rule 9019 settlements.  The Second and Third Circuits have long held that whether a pre-plan settlement complies with the requirements of the Bankruptcy Code is the most important factor in approving a settlement.[105]

67.     As stated by the district court for the Southern District of New York, "although a bankruptcy trustee is permitted to settle lawsuits under Rule 9019(a), the trustee is not authorized to enter into a settlement if it results in a de facto or sub rosa plan of reorganization."[106]

---

[102]   *Czyzewski v. Jevic Holding Corp.*, 137 S.Ct. 973, 978 (2017).

[103]   *Id.* at 986 (citing, among other cases, *Braniff*, 700 F.2d at 940, *Lionel*, 722 F.2d at 1069, and *Chrysler II*, 576 F.3d at 118).

[104]   *Id.* at 987 (quoting *Norwest Bank Worthington v. Ahlers*, 485 U.S. 197, 207 (1988)) (internal quotation marks omitted).

[105]   *See Iridium*, 478 F.3d at 455 ("We hold that in the Chapter 11 context, whether a pre-plan settlement's distribution plan complies with the Bankruptcy Code's priority scheme will be the most important factor for a bankruptcy court to consider in approving a settlement under Bankruptcy Rule 9019.  In most cases, it will be dispositive."); *In re Energy Future Holdings Corp.*, 648 Fed. Appx. 277, 283 (3d Cir. 2016) ("Indeed, a settlement's fidelity to the requirements of the Bankruptcy Code will generally be the most important factor in determining whether a settlement is fair and equitable.").

[106]   *In re Global Vision Prods., Inc.*, No. 09 Cv. 374, 2009 WL 2170253, at *6 (S.D.N.Y. July 14, 2009) (approving settlement because it "d[id] not dictate the terms of a future plan[,]" "d[id] not restrict any rights afforded to creditors under the Bankruptcy Code, such as the right to vote on a proposed plan[,]" and "preserve[d] all other

68.     Similarly, the Bankruptcy Court for the Eastern District of Tennessee, when faced with a proposed Rule 9019 settlement that involved payment of one unsecured creditor ahead of creditors of equal or superior priority, found that deviation from the ordinary priority rules was not justified by any Bankruptcy Code-related objectives and denied the settlement.[107]    Specifically, the court expressed a concern that, "[a]s with the situation in *Jevic*, this case more closely resembles the proposed transactions that lower courts have refused to allow on the ground that they circumvent the [Bankruptcy] Code's procedural safeguards."[108]    The court emphasized that deviation from the Bankruptcy Code's procedural safeguards entitles creditors "to ask the court for close scrutiny of the proposed compromise and the prospects for reorganization."[109]

69.     Here, the RSA and Sale run roughshod over the Bankruptcy Code's procedural safeguards at the expense of the Minority Lenders.    The proposed Sale is, by the Debtors' own admission, designed to annihilate—not just side step—the safeguards afforded to secured creditors under chapter 11 of the Bankruptcy Code, especially section 1129.    The Bid Procedures are designed to gag the Minority Lenders throughout the sale process by depriving them of standing to object to the Bidding Procedures or the credit bid.    Then, the Minority Lenders' right to object to a plan would be completely extinguished following close of the Sale and discharge of their liens and claims.    The Debtors make no secret that this was their intent: "[T]he Credit Bid will have the

---

claims that either party may have against other individuals."); *see also In re Biolitec, Inc.*, 528 B.R. 261, 271 (Bankr. D.N.J. 2014) (rejecting 9019 settlement because, among other things, "parties other than those to the settlement did not receive disclosures or the opportunity to negotiate or vote on the settlement's provisions," as they would have under a plan.).

[107]    *In re Fryar*, 570 B.R. 602, 609 (Bankr. E.D. Tenn. 2017).

[108]    *Id.* at 610.

[109]    *Id.*

effect of discharging and satisfying the Credit Facility in its entirety, making it unnecessary to solicit votes from Prepetition Lenders or to treat the Credit Facility under the Plans *in any way*."[110]

70.     In addition to denying the Minority Lenders' the right to vote and be heard, the Bid Procedures deprive the Minority Lenders of the right to receive information.  Absent a sale process, information pertaining to the valuation of the Debtors' assets and governance of the reorganized Debtors would be disclosed in accordance with section 1125 of the Bankruptcy Code.[111]  Without so much as a governance term sheet, the Minority Lenders—and the Court—are unable to determine the extent of impairment of the term loan lenders' secured claim, a protection that would otherwise be afforded under the Bankruptcy Code, including the "fair and equitable" requirement.[112]

71.     Finally, the Stalking Horse Purchase Agreement contemplates express and *de facto* debtor and third-party releases that bind the Minority Lenders without their consent.[113]   If approved, the proposed Sale will extinguish all Credit Facility Claims at the outset of these cases. If all other claims are rendered unimpaired, no party will remain to pursue estate claims and causes of action.  By simply putting a sale before a plan, the Debtors and Tyr—the ***likely targets*** of such claims—are trying to obtain an improper free pass to ignore the Second Circuit's non-consensual third-party release framework established in *Metromedia*, where the court expressly noted that "a nondebtor release is a device that lends itself to abuse [whereby] a nondebtor can shield itself from

---

[110]   First Day Decl. ¶ 47 (emphasis added).

[111]   11 U.S.C. § 1125.

[112]   11 U.S.C. § 1129(b)(2)(A).

[113]   Stalking Horse Purchase Agreement §§ 4.2(c), 9.15, and 11.2(c).

liability to third parties . . . without a filing and without the safeguards of the Code."[114]   Indeed,

the Fifth Circuit court in *Braniff* disallowed a "release of claims by all parties against [the debtor],

its secured creditors and officers and directors" on the basis that the releases were not a "'use, sale

or lease' . . . authorized by § 363(b)."[115]   If the Debtors, Tyr, and Black Diamond seek such broad

releases then they should do so through a chapter 11 plan.

72.     As a technical matter, the proposed Sale would fail on multiple grounds if pursued

via plan instead of pursuant to a section 363 sale.   With respect to TTK Empire, the Credit Facility

Claims would be the only class of claims under the plan, if any claims exist at TTK Empire, at

all.[116]   The Debtors concede that the value of the collateral is far below the outstanding amounts

owed under the Credit Facility.[117]   Therefore, the proposed Sale provides for Minority Lenders to

receive equity that is worth less than the Credit Facility Claims, yet the Debtors attempt to say the

Minority Lenders are unimpaired.    The Minority Lenders will not vote to accept the plan on the

terms set forth in the credit bid absent acceptable governance.[118]   As a result, the plan would not

satisfy the confirmation requirement that "at least one class of claims that is impaired under the

plan has accepted the plan."[119]   The lack of any other consenting impaired class of claims would

---

[114]   *In re Metromedia Fiber Network, Inc.*, 416 F.3d 136, 142 (2d Cir. 2005).

[115]   *Braniff*, 700 F.2d at 940.

[116]   *See* ¶ 15, *supra.*

[117]   *See GSC*, 453 B.R. at 177–78 (Bankr. S.D.N.Y. 2011) ("If a creditor is forced to receive property instead of the cash value of its claim, it would be impaired since had it 'received the cash value of its claim it would be in a position to turn around and invest again,' whereas receiving property in lieu of cash would make it an owner." (quoting *In re Atlantic Terrace Apartment Corp.*, 226 B.R. 535, 536 (Bankr. E.D.N.Y. 1998))).

[118]   11 U.S.C. § 1126(c).

[119]   11 U.S.C. § 1129(a)(10).

preclude confirmation of the plan via "cram up" under section 1129(b) of the Bankruptcy Code.[120]

As a result, a plan-sale could not be confirmed.

73.     The below chart summarizes the *sub rosa* nature of the proposed Sale:

| Key Questions | Plan Sale | Section 363 Sale (Credit Bid) |
|---|---|---|
| Who votes? | • All Credit Agreement lenders. The plan class of Credit Facility Claims is impaired under section 1124 of the Bankruptcy Code based on the consideration each Credit Agreement lender will receive under the plan on account of its Credit Facility Claim; *i.e.*, equity in reorganized TTK.[121] | • The Credit Agreement lender(s) constituting the "Controlling Required Secured Parties" under the Intercreditor Agreement. |
| What is the required voting threshold? | • At least two-thirds in amount and a majority in number of all Credit Facility Claims voted.[122] | • More than 50 percent of (1) the outstanding Credit Agreement indebtedness; and (2) the exposure under any outstanding hedges (if any).[123] |
| Are there sufficient votes to satisfy voting threshold? | • ***No.*** | • Yes.[124] |
| Non-consensual third party releases? | • ***Likely, no.*** | • Yes. |
| Can the sale transaction close? | • ***No.*** The plan does not satisfy section 1129(a)(10) of the Bankruptcy Code because the | • Yes. All lender claims satisfied in full.[126] |

---

[120]  *See* 11 U.S.C. § 1129(b)(1) (providing that confirmation via "cram up" is available only if "all of the applicable requirements of [section 1129(a) of the Bankruptcy Code other than section 1129(a)(8)] are met"); *see also* April 30 Reply Letter at 1 (representing that consummation of the proposed sale would be followed by "a 'no impairment' reorganizing Chapter 11 plan for Empire").

[121]  *See GSC*, 453 B.R at 177–78 (explaining that a secured creditor is impaired if it is "forced to receive property instead of the cash value of its claim").

[122]  11 U.S.C. § 1126(c).

[123]  *See* Intercreditor Agreement, definition of "Controlling Required Secured Parties" and related definitions.

[124]  Assuming Black Diamond is allowed to direct the Collateral Agent, which it likely cannot.

[126]  *See GSC*, 453 B.R. at 180 (determining that a credit bid of all claims arising under the debtors' prepetition secured loan facility resulted in full satisfaction of those claims).

| Key Questions | Plan Sale | Section 363 Sale (Credit Bid) |
|---|---|---|
| | only class of claims under the plan (Credit Facility Claims) is impaired and has not voted to accept the plan.  Moreover, the lack of an impaired consenting creditor class precludes cram-up under section 1129(b) of the Bankruptcy Code.[125] | |

74.     Even a cursory review of the Plan shows that it accomplishes nothing more than is already predestined by the Sale.  Of course, the Debtors' statements that these terms are all an integrated transaction do not give them authority to apply section 363 law to a plan treatment.[127] Because the RSA and Sale were expressly designed to circumvent the Bankruptcy Code's safeguards and extinguish the rights of Minority Lenders, they should be denied.  The *sub rosa* nature of the Sale is underscored by the Debtors' stated intent to file "no impairment plans" at each of the non-selling Debtors.  This indicates there is no estate to administer following the close of the Sale as all parties' rights are prescribed thereby.

**C.**     **The Sale Process Is a Sham that Will Not Generate Any Meaningful Cash Bids—Because, By Design, No One Will Be Able to Compete with Black Diamond's Artificially Inflated Credit Bid.**

75.     The debtor bears the burden of establishing that a proposed action under section 363 of the Bankruptcy Code "will aid [the debtors'] reorganization and is supported by a good business

---

[125]   *See* 11 U.S.C. § 1129(b)(1) (providing that confirmation via "cram up" is available only if "all of the applicable requirements of [section 1129(a) of the Bankruptcy Code other than section 1129(a)(8)] are met");  Letter from Peter Partee to Brian Schartz, (Apr. 30, 2019) at 1 (representing that consummation of the proposed Sale would be followed by "a 'no impairment' reorganizing Chapter 11 plan for Empire").

[127]   First Day Tr. at 15:4–24 (describing the "package . . . in the form of an RSA, a PSA, and a number of other documents" that provides for the contemplated Credit Bid, which "links up to in a very integrated way" with the RSA . . .).

justification."[128]   When considering whether to approve a Debtors' use of property under section 363 of the Bankruptcy Code, courts will apply the same business judgment standard applicable to other business decisions.[129]  As discussed, while this standard is the default, it is not absolute.  In light of the insider nature of the Restructuring Transactions, including the Sale,[130] the lack of due care, and the bad faith negotiation of the Restructuring Transactions, the Debtors' decision to proceed with the Sale is not entitled to business judgment deference.[131]

76.   Further, a bankruptcy court cannot approve a section 363 sale of estate property unless the court "expressly find[s] from the evidence presented" that there is a sound business reason for the sale.[132]  Because section 363 sales fall outside of the Bankruptcy Code's carefully considered protections of creditors' rights, it becomes "incumbent upon the bankruptcy judge" to hold a debtor to its burden.[133]  This is especially so where the debtor seeks to sell all or substantially all of the estate's assets under section 363(b) of the Bankruptcy Code as the Debtors are contemplating here.[134]

---

[128]  *In re Ionosphere Clubs, Inc.*, 100 B.R. 670, 675 (Bankr. S.D.N.Y. 1989).

[129]  *See In re Ames Dep't Stores*, 115 B.R. 34, 38 (Bankr. S.D.N.Y. 1990); *see also In re Great Atlantic & Pacific Tea Co.*, No. 15-23007 (RDD) (Bankr. S.D.N.Y. July 21, 2015) (approving the use of cash collateral as an exercise of the Debtors' prudent business judgment); *In re Innkeepers USA Trust*, No. 10-13800 (SCC) (Bankr. S.D.N.Y. July 20, 2010) (same).

[130]  The Collateral Agent, and, by extension Empire Acquisition, is an "insider" of the Debtors pursuant to its control of Woodlands.  *See* 11 U.S.C. § 101(31)(E).

[131]  *Innkeepers*, 442 B.R. at 231 (*citing Bidermann*, 203 B.R. at 551 ("[s]ales to fiduciaries in chapter 11 cases are not per se prohibited, 'but [they] are necessarily subjected to heightened scrutiny because they are rife with the possibility of abuse.'") (internal citation omitted)).

[132]  *Lionel*, 722 F.2d at 1071 ("The rule we adopt requires that a judge determining a § 363(b) application expressly find from the evidence presented before him at the hearing a good business reason to grant such an application.").

[133]  *In re Au Natural Rest., Inc.*, 63 B.R. 575, 580 (Bankr. S.D.N.Y. 1986) (citing *Lionel*, 722 F.2d at 1071).

[134]  *See, e.g.*, *In re Exaeris, Inc.*, 380 B.R. 741, 744 (Bankr. D. Del. 2008) (noting that a section 363 sale of substantially all of the debtor's assets "requires a bankruptcy court's careful review").

### 1.    No Sound Business Reason for the Sale Exists.

77.    Where a debtor seeks to sell estate property under section 363(b) of the Bankruptcy Code, the debtor bears the burden of demonstrating "some articulated business justification, other than appeasement of major creditors" exists for the sale.[135]   The Second Circuit set out in *In re Lionel* a non-exhaustive list of factors relevant to the determination of whether a sound business reason exists for a section 363 sale, including:

- the proportionate value of the asset to the estate as a whole;

- the amount of elapsed time since the filing;

- the likelihood that a plan of reorganization will be proposed and confirmed in the near future;

- the effect of the proposed disposition on future plans of reorganization, the proceeds to be obtained from the disposition vis-à-vis any appraisals of the property;

- which of the alternatives to use, sale, or lease the proposal envisions; and

- whether the asset is increasing or decreasing in value.[136]

78.    In *Lionel*, the unsecured creditors' committee strong-armed the debtor into proceeding with an expedited 363 sale of its "most important asset"—an 82% equity interest in a non-debtor operating company—which the Bankruptcy Court approved.[137]   The Second Circuit, in reversing the Bankruptcy Court's sale order, made clear that "[a]ppeasement of [a] major

---

[135]   *Lionel*, 722 F.2d at 1070; s*ee also In re Bethlehem Steel Corp.*, 2003 WL 21738964, at *10 (S.D.N.Y. July 28, 2003) ("Section 363(b) does not permit the debtor in possession to use [estate assets] solely to benefit a creditor."); *In re Global Crossing Ltd.*, 295 B.R. 726, 743 (Bankr. S.D.N.Y. 2003) (explaining that "*Lionel* further teaches that the required 'good business reason' is not established when the only reason advanced [for a 363 sale] is the 'Creditors' Committee's insistence on it'.") (quoting *Lionel*, 722 F.2d at 1071).

[136]   *Lionel*, 722 F.2d at 1071.

[137]   *Id.* at 1065.

creditor[]" is not a sound business reason for a section 363 sale.[138]  Similarly, the Second Circuit

found that the possibility of delay in the debtor's chapter 11 case resulting from the denial of the

debtor's sale motion also is not a sound business reason for a section 363 sale.[139]

79.      Courts in this district have found that an expedited sale of all or substantially all

assets pursuant to section 363 of the Bankruptcy Code generally is only permissible "when the

court is faced with the situation of a so-called 'melting ice cube,'"[140] that is, where "[t]he only

other alternative [to the sale] is the immediate liquidation of the [debtor]."[141]  In *GM*, the court

encountered a "melting ice cube" scenario where the debtors had already "suffered a steep erosion

in revenues, significant operating losses, and a dramatic loss of liquidity, putting [their] future in

grave jeopardy."[142]  Based on these facts, the court found a sound business reason existed for an

expedited section 363 sale of substantially all of the debtors' assets because the debtors had "no

---

[138]  *Id.* at 1065, 1072 (finding that the creditors' committee's insistence on the disposition of the debtors' "most important asset" did not constitute a sound business reason for the sale).

[139]  *See id.* ("The [bankruptcy] court also expressed its concern that a present failure to approve the sale would result in a long delay. . . . 'The need for expedition, however, is not a justification for abandoning proper standards.'") (quoting *Protective Comm. for Indep. S'holders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 450 (1968)).

[140]  *See, e.g.*, *In re Lehman Brothers Holdings Inc.*, 445 B.R. 143, 180 (Bankr. S.D.N.Y. 2011) ("The 'most important[]' factor for the court in determining whether to approve a § 363 sale is whether the asset is decreasing in value. Thus, a sale should be approved when the court is faced with the situation of a so-called 'melting ice cube.'") (internal citations omitted); *In re General Motors Corp.*, 407 B.R. 463, 493 (Bankr. S.D.N.Y. 2009) ("*GM*") (explaining that "there is a good business reason for an immediate sale [where the debtor] does not have the luxury to wait for the ultimate confirmation of a plan, and the only alternative to an immediate sale is liquidation.").

[141]  *In re Chrysler LLC*, 405 B.R. 84, 96 (Bankr. S.D.N.Y. 2009) ("*Chrysler I*") ("Here, the Debtors have established a good business reason for the sale of their assets at the early stages of these cases. . . . The only other alternative is the immediate liquidation of the company."); *In re Chrysler LLC*, 576 F.3d 108, 119 (2d Cir. 2009) ("*Chrysler II*") ("With its revenues sinking, its factories dark, and its massive debts growing, Chrysler fit the paradigm of the melting ice cube."), *vacated as moot, Ind. Police Pension Trust v. Chrysler LLC*, 558 U.S. 1087 (2009).

[142]  *General Motors I*, 407 B.R. at 476.

liquidity" to fund operations, had an acute "need to quickly address consumer and fleet owner doubt,"[143] and "the only alternative to an immediate sale [was] liquidation."[144]

80.    Similarly, in *Chrysler I*, the court approved an expedited section 363 sale of substantially all of the debtors' assets on the basis that the debtors shuttered certain of their operations, lacked liquidity to fund ongoing operations, and were losing value with each passing day.[145]  Had the court not approved of the sale, the court found that the debtors would have been "forced to cease operations in order to conserve resources," resulting in "the only other alternative [being] the immediate liquidation of the company."[146]

81.    These chapter 11 cases bear no resemblance to *GM* or *Chrysler I*.  **First**, the Debtors have sufficient liquidity to fund operations without the need for DIP financing.[147]

---

[143]    *Id.* at 491.

[144]    *Id.* at 493.

[145]    *See Chrysler I*, 405 B.R. at 96.

[146]    *Id.*

[147]    *See* Docket No. 4, Exhibit A (showing cash flow would be neutral to positive absent the cost of these cases).



82.  ***Second***, as discussed in detail herein, the Debtors' assets are not deteriorating in value.  If anything, there are multiple potential positive developments in the future that could enhance value, including:  (a) the impending retirement of the Indian Point's two nuclear reactors in 2020 and 2021; (b) potential shut down of local coal facilities, including Cayuga Power Plant and Somerset Power Plant; (c) approved transmission upgrades that will bring upstate power to the Lower Hudson Valley; (d) Woodlands' successful renegotiation of the PILOT agreement and (e) the Independent System Operator's proposal to implement carbon pricing that would benefit efficient thermal generators like the Debtors.  ***Third***, the Debtors are not at risk for losing a viable buyer if the Debtors shift to a plan structure as the proposed stalking horse bidder is the Collateral Agent who will continue to play a role in these cases until the secured obligations are extinguished.  ***Fourth***, there are no operational considerations weighing in favor of a sale the Interests, such as erosion of the Debtors' customer or vendor base, as TTK Empire has none.  Accordingly, the Debtors are not a melting ice cube and will not be forced to liquidate if the Sale Motion is denied.

83.     The Debtors have not articulated any other sound business reason for the Sale.  The
only justification the Debtors provide for the proposed Sale is a conclusory statement in the Sale
Motion that the "expeditious sale of Interests or Assets is critical to both preserving and realizing
the Debtors' going-concern value and maximizing recoveries for the Debtors' economic
stakeholders."[148]  But a conclusory statement made by a captive Debtor with no real fiduciary is
not a business rationale.   Indeed, this entire process is a sale in name only—the true goal is a
debt-for-equity conversion without the hassle of complying with the Bankruptcy Code's
requirements.

### 2.       The Bid Procedures Demonstrate the Sale Process Is a Sham Designed to Achieve a Specific Outcome.

84.     "It is the overarching objective of sales in bankruptcy to maximize value to the
estate."[149]  Bid procedures should enhance, not chill, competitive bidding.[150]

85.     Section 363 sales held on an extremely expedited basis warrant careful
consideration.   Courts have ample reason to be concerned with rushed asset sales.[151]   "At a
minimum, if section 363(b)(1) is the means for effecting the debtor's disposition, the creditors

---

[148]   Sale Motion ¶ 49.

[149]   *In re Metaldyne Corp.*, 409 B.R. 661, 667–68 (Bankr. S.D.N.Y. 2009); *see also In re Integrated Res., Inc.*, 147 B.R. 650, 659 (S.D.N.Y. 1992) ("It is a well-established principle of bankruptcy law that the objective of bankruptcy rules and the [Debtor's] duty with respect to such sales is to obtain the highest price or greatest overall benefit possible for the estate."); *see also In re Mushroom Trans. Co., Inc.*, 382 F.3d 325, 339 (3d Cir. 2004) (finding that a debtor-in-possession "had a fiduciary duty to protect and maximize the estate's assets").

[150]   *See, e.g.*, *Integrated Resources*, 147 B.R. at 659 ("The usual rule is that if break-up fees encourage bidding, they are enforceable; if they stifle bidding they are not enforceable.").

[151]   *In re Bombay Company, Inc.*, No. 07-44084-rfn-11, 2007 WL 2826071, at *3 (Bankr. N.D. Tex. Sept. 26, 2007) (stating that the court was extremely concerned by the necessity of considering a sale motion on an expedited basis, as such expedited consideration was "inconsistent with the Code, due process of law, the exercise of the court's authority and simple common sense" and noting that the court was "most anxious to discourage any future debtor from considering imposing in a chapter 11 case a time line similar to that called for by the [sale motion]").

should have the luxury of enough time for their representative to assess fully the proposed transactions."[152]

86.    The Debtors propose to complete the entire sale process in 60 days despite the lack of an apparent exigency or other evidence-backed reason for an expedited sale.  Specifically, the Bid Procedures contemplate the following milestones:

| Event | Date | Days from Petition Date |
| --- | --- | --- |
| Bid Deadline | July 3, 2019 | 45 days |
| Auction | July 8, 2019 | 50 days |
| Sale Hearing | July 18, 2019 | 60 days |

87.    The Bid Procedures do not provide third parties sufficient time to meaningfully participate in the sale process.[153]   For instance, the time between the Petition Date and Bid Deadline, 45 days on its face and even shorter given the restrictions imposed by the RSA, is insufficient to secure the necessary financing to qualify as a Qualified Bid.[154]  The Bid Procedures

---

[152]   *See Bombay Company*, 2007 WL 2826071 at *4 (finding that, despite the unsecured creditors' committee's support within 12 hours of being formed, landlords appearing on five days' notice, and the U.S. Trustee supporting the committee's position, the court was not satisfied that there was no party in interest whose rights would not be affected by granting a sale motion on five days' notice); *see also In re Humboldt Creamery, LLC*, No. 09-11078, 2009 WL 2820610, at *2 (Bankr. N.D. Cal. Aug. 14, 2009) (stating that in such expedited section 363 sales, "the judge is reduced to a figurehead without any meaningful discretion and might as well leave his or her signature stamp with the debtor's counsel and go on vacation or shift attention to consumer cases where the law may still mean something."); *In re Gulf Coast Oil Corp.*, 404 B.R. 407, 420–21 (discussing section 363 sales, and stating that "[t]he lack of transparency, the pace of the process, and the inconsistent treatment by the courts. . . leave the bankruptcy courts and parties in interest vulnerable to unfair dealing, abuse, and sweetheart deals.") (quoting Elizabeth B. Rose, *Chocolate, Flowers, and Section 363(b): The Opportunity for Sweetheart Deals Without Chapter 11 Protections*, 23 EMORY BANKR. DEV. J. 249, 249 (2006)).

[153]   Antinelli Decl. ¶ 13–15 (discussing the truncated postpetition marketing timeline).

[154]   *See* Antinelli Decl. ¶ 13 ("When accounting for restrictions imposed by the RSA, the Debtors' postpetition marketing process will span only 29 days.  Such a short process will make it difficult for potential bidders to conduct necessary diligence or arrange financing in an effort to submit a Qualified Bid."); Bid Procedures, pg. 6 (dictating that a Qualified Bid "[c]ontain evidence of financing, access to funds or such other financial and other information that will reasonably allow the Debtors to make a determination as to such Qualified Bidder's financial and other capabilities to consummate the transactions contemplated by the Modified Purchase Agreement, which

48

limit Qualified Bids to all cash offers. Interested parties are unlikely to write a check well in excess of $350 million. Rather, interested parties generally seek to finance such transactions through a combination of debt and equity.[155]

88.     Based on a study of cases similar to these, the median number of days provided between the petition date and the bid deadline is 89 days; prepetition marketing was employed in more than 75% of cases studied.[156]  In this case, the Debtors are seeking to execute on a 45-day process. When viewed in light of the restrictions in the RSA, this period shortens even further to just 29 days between the Petition Date and Bid Deadline. The Debtors' truncated process is exacerbated by their failure to undertake any meaningful prepetition marketing process. The Sale Motion begins its description of the Debtors' prepetition marketing efforts by citing to trading prices of the debt under the Credit Facility.[157]  Trading prices are not a marketing process, especially when the company at issue is private and not subject to the public reporting requirements or oversight. The Sale Motion goes on to note that, beginning on May 13, 2019, the Debtors initiated a process to market the Debtors' assets on a "last look" basis, which consisted of sending a "teaser" to 26 parties.[158]  The Sale Motion is devoid of any discussion of a "first look" process.

---

evidence is satisfactory to the Debtors, including, without limitation, such financial and other information setting forth adequate assurance under section 365 of the Bankruptcy Code in a form requested by the Debtors.").

[155]  *See* Antinelli Decl. ¶ 13 n. 6 ("In my experience . . . it is most common for purchasers to finance transactions of this size through debt and equity.").

[156]  *See* Antinelli Decl. ¶ 14 ("In connection with analyzing the Debtors' proposed process, I have examined 68 section 363 sale processes for assets with an initial proposed purchase price equal to or in excess of $75 million, with petition dates dating back to 2011. The median number of days provided between the petition date and the bid deadline in these cases is 89 days, whereas the Debtors' proposed timeline provides 45 days between the Petition Date and the Bid Deadline. Further, the vast majority of these cases (more than 75%) included a prepetition marketing process in addition to the amount of time of the process between the petition date and the bid deadline.").

[157]  Sale Motion ¶ 27.

[158]  Sale Motion ¶ 28.

While the Cummins Declaration implies that likely strategic buyers were familiar with the Debtors' assets due to recent "downgrade" reports issued by public credit rating agencies, such ratings reports are not a substitute for a marketing process.[159]

89.      Further, the teaser distribution was woefully inadequate.  26 parties, some of which are investment banks and therefore not purchasers of this asset, is an incredibly limited universe of potential buyers compared to a typical prepetition marketing effort.[160]  The fact that RPA sent out emails and only a few parties responded within the five business days between the date the emails were sent and the Petition Date is not illustrative of a lack of interest.  The Debtors do not indicate whether RPA followed up with any of the 26 parties or made any efforts to generate legitimate interest.[161]  The Debtors' process does not resemble a process designed to maximize value.[162]  Rather, it resembles a process designed to secure a specific outcome (which, of course, is exactly what Black Diamond and Tyr want).

90.      In the face of these serious deficiencies, the Debtors offer no justification for the expedited timeline other than pointing to the fact that chapter 11 is expensive, and so they should move expeditiously through the process to avoid any additional expense.  But, of course, that is circular.  The Debtors' failure to conduct a proper process prepetition eliminates their ability to

---

[159]  Cummins Decl. ¶ 12; Antinelli Decl. ¶ 15 ("[T]he existence of third-party press or ratings agency coverage provides no basis to truncate a marketing process.").

[160]  Antinelli Decl. ¶ 11 (stating that "a true marketing process, particularly one in which the debtor seeks to limit the timeline associated with the bid procedures, would include a much broader outreach by significantly increasing the number of parties contacted").

[161]  *But see id*. (stating that "a true marketing process, particularly one in which the debtor seeks to limit the timeline associated with the bid procedures, would include…actively following up on initial email or phone contacts…and providing a more fulsome information package to any interested parties who have signed non-disclosure agreements").

[162]  *Id*. ("The prepetition marketing process described in the Sale Motion, in my opinion, does little to justify the value of the bid received or the limited timeline it seeks to complete its postpetition marketing.").

request a truncated trip through chapter 11.  As discussed, the Debtors are not a melting ice cube and face no immediate liquidity constraints.  The Debtors generate sufficient cash in the ordinary course to fund ongoing operations and the financial projections show cash decreasing only slightly over the duration of these cases.[163]  The Debtors have presented no evidence of the operational issues that may change this outlook.  To the contrary, the Debtors intentionally omit, both from the evidence presented to the Court and materials distributed in connection with the marketing process, salient information regarding near-term events that are likely to have a positive impact on the Debtors and their business.[164] The Debtors' true incentive to move quickly appears to be their desire to execute on an insider transaction absent proper oversight.  The Debtors are merely pantomiming a sale process.  The whole point of the outsized credit bid is to **ensure** there are no cash offers and thus cement the Unholy Alliance struck in the RSA.  As the Second Circuit instructed in *Lionel*, "[t]he need for expedition, however, is not a justification for abandoning proper standards."[165]  Because the Bid Procedures are designed to secured a specific outcome instead of maximizing value, they should be denied.

### 3.        The Bid Protections Are Unreasonable and Should Not Be Approved.

91.        A break-up fee can incentivize a potential purchaser to bid and compensates the bidder that started the auction process.[166]  "Bidder protections are granted when a bidder provides

---

[163]   Docket No. 51, Exhibit  A.

[164]   *See* V.B., *infra*.

[165]   *Lionel*, F.2d at 1071.

[166]   *See In re Integrated Resources, Inc.*, 147 B.R. at 659 (stating that a break-up fee is "an incentive payment to an unsuccessful bidder who placed the estate property in a sales configuration mode . . . to attract other bidders to the auction.") (internal citations omitted); *In re Marrose Corp.*, No. 89 B 12171 (CB), 1992 WL 33848 (Bankr. S.D.N.Y. Feb. 15, 1992) ("Agreements to provide break-up fees or reimbursement of fees and expenses are meant to compensate the potential acquirer who serves as a catalyst or 'stalking horse' which attracts more favorable offers.").

a floor for bidding by expending resources to conduct due diligence and allowing its bid to be shopped around for a higher offer."[167]  The *Integrated Resources* Court found that there are "three questions for courts to consider in assessing break-up fees:  (1) is the relationship of the parties who negotiated the break-up fee tainted by self-dealing or manipulation; (2) does the fee hamper, rather than encourage, bidding; (3) is the amount of the fee unreasonable relative to the proposed purchase price?"[168]  Relevant here are the first two questions.  As discussed, the Stalking Horse Purchase Agreement is the result of insider negotiations designed to deprive minority creditors of the Bankruptcy Code's protections.[169]  Further, the credit bid is intentionally and artificially inflated in a blatant attempt to chill—not encourage—bidding.[170]  Finally, the credit bid does not require Black Diamond to tie up capital.  As a result, the break-up fee should be denied.

92.    Along with the break-up fee, the Bid Protections provide for reimbursement of Black Diamond's expenses up to $2 million.  Expense reimbursement should be reasonable, actual, and necessary.  Black Diamond's fees are covered under the terms of the RSA.  Expense reimbursement, then, is duplicative and not necessary.  Further, nothing in the Bid Procedures contemplates review by the Court or parties in interest of any expenses being reimbursed to Black Diamond; this lack of oversight grants administrative priority status to Black Diamond's expenses without providing any party (including the Debtors) the ability to review or object to such expenses.  To the extent that the Court is inclined to approve an expense reimbursement provision,

---

[167]  *Metaldyne*, 409 B.R. at 670; *see also Integrated Resources*, 147 B.R. at 659 ("By design, [a] break-up fee is an incentive payment to an unsuccessful bidder who placed the estate property in a sales configuration mode . . . . . to attract other bidders to the auction.) (internal quotations omitted).

[168]  *Integrated Resources*, 147 B.R. at 657; *see also Metaldyne*, 409 B.R. at 670 (stating and applying the *Integrated Resources* test).

[169]  *See* Objection § II.A and B, *supra*.

[170]  See Objection § III.A, *infra*.

a mechanism should be established whereby such expenses are subject to the review of the parties in interest.

93.     This is not the first time Black Diamond has sought unnecessary bid protections. Recently, in *In re Orchids Paper Products Company, et al.*, Black Diamond—as a lender seeking to credit bid in the role of stalking horse bidder—initially sought a break-up fee and expense reimbursement.[171]  Denying the bid protections, the court noted that the lenders were likely to bid regardless of receiving bid protections since they had "kicked the tires" and "are more likely than not to bid with or without any expense reimbursement or breakup fee."[172]  In sum, under circumstances nearly identical to these, the lenders' request for a break-up fee or expense reimbursement in *Orchids Paper* was denied.

**D.      The RSA, Stalking Horse Bid, and Bidding Procedures Are Not the Product of a Fair Process.**

94.     Contrary to the Debtors' assertion that the RSA and Sale benefit all parties by paying everyone in full, the term loan lenders are poised to get the ***exact same asset*** whether the reorganization is executed through a plan or a sale—ownership of the Plant that, by the Debtors' own admissions, is worth far less than the face amount of the outstanding debt.  The only difference between a reorganizing via a plan or a sale is whether the Minority Lenders get a voice in negotiating post-acquisition governance.  The RSA and the Credit Bid were negotiated in secret with the express goal of silencing the Minority Lenders' voice and depriving them of the right to

---

[171]   No. 19-10729 (MFW) (Bankr. D. Del. May 10, 2019) H'rng Tr. at 74: 20-22; 105: 13-19.

[172]   *See id.* at 104:21-105:6; *see also In re Orchids Paper Products Co., et al.*, No. 19-10729 (MFW) (Bankr. D. Del. May 20, 2019) (denying stalking horse bid protections in the form of expense reimbursement in connection with the credit bid).

negotiate for appropriate governance protections.[173]   Such a scheme is not fair and is not the product of a fair process.   Accordingly, the Motions should be denied.

## III.   THE FOREGOING DEMONSTRATES THAT CAUSE EXISTS TO LIMIT THE CREDIT BID UNDER SECTION 363(K) OF THE BANKRUPTCY CODE.

95.   A secured creditor's "right to credit bid is not absolute."[174]   Courts may deny a lender the right to credit bid "in the interest of any policy advanced by the Code, such as to ensure the success of the reorganization or to foster a competitive bidding environment."[175]   Specifically, under section 363(k) of the Bankruptcy Code, the court may deny a secured creditor's credit bid "for cause."   "Intrinsically, acting 'for cause' looks to the court's equity powers that allow the court to balance the interests of the debtor, its creditors, and the other parties [in interest] in order to achieve the maximization of the estate and an equitable distribution to all creditors."[176]

96.   A party may establish "cause" for limiting or prohibiting credit bidding by showing that:

---

[173]   "Experts for both Claimants and Respondents agreed that the hallmark of a syndicated loan is that each lender will receive recoveries on a *pro rata* basis with the other lenders in the syndicate. While we have found that the sharing clause of the contract was not violated, we nonetheless find that the [Black Diamond] Lenders' conduct did, in fact, deny Claimants the right to receive the fruits of their bargain by the manner in which they exercised their discretion to instruct the Agent. On this record, there can be no doubt the [Black Diamond] Lenders used their discretion as the Required Banks to instruct the Agent to Credit Bid in a manner that produced a vastly disproportionate allocation of assets between the Cash Bid and the Credit Bid as ultimately reflected in the distribution of shares in GSCAH at Closing." (citations omitted).   *Credit Agricole Corp. and Inv. Bank N.Y. Branch v. Black Diamond Capital Mgmt., L.L.C.*, AAA Case No. 01-17-0007-1196 (2018) (Scheindlin, S.A., Davis, R. J., Lerner, J.J., Arbs.) ("GSC Arbitration"), 134–35.

[174]   *In re Aéropostale, Inc.*, 555 B.R. 369, 414 (Bankr. S.D.N.Y. 2016) (citing *In re Free Lance-Star Publ'g Co. of Fredericksburg, VA*, 512 B.R. 798, 808 (Bankr. E.D. Va. 2014); *In re Fisker Auto. Holdings, Inc.*, 510 B.R. 55, 59 (Bankr. D. Del. 2014)).

[175]   *Free Lance-Star*, 512 B.R. at 805 (Bankr. D. Va. 2014).   *See Fisker*, 510 B.R. at 61 (Bankr. D. Del. 2014) ("The law leaves no doubt that the holder of a lien the validity of which has not been determined, as here, may not bid its lien.") (citations omitted).

[176]   *Aéropostale*, 555 B.R. at 415 (internal quotation marks and citation omitted).

    a.    the party submitting, or directing the submission of a credit bid, has engaged in misconduct or conduct that "unfairly distort[s] the sale process" in its favor;[177]

    b.    prohibition of credit bidding as provided for in the applicable credit documents;[178] and

    c.    the limitation of credit bidding would promote "[a] policy advanced by the [Bankruptcy] Code."[179]

97.    Further, evidence that credit bidding will chill bidding for the assets in scope, along "with some other factor that supports a limitation on" credit bidding, such as prosecuting an over-zealous loan-to-own strategy,[180] is also insufficient to demonstrate that "cause" exists.[181]

98.    Here,  (a) Black Diamond and Tyr have engaged in conduct that unfairly distorted the sale process in their favor; (b) the credit bid is a *sub rosa* plan; (c) the credit bid violates the Loan Documents; (d) no allowed secured claim exists against TTK Empire to be credit bid; (e) the credit bid chills bidding, and (f) as a policy matter, credit bidding should be limited or prohibited

---

[177] *Id.* at 416; *see Fisker*, 510 B.R. at 61 (finding that the prospective credit bidder sought to unfairly distort the sale process in its favor by insisting on a "hurried process"); *Free Lance-Star*, 512 B.R. at 806–07 (determining that the prospective credit bidder's "overly zealous loan-to-own strategy," including unauthorized filing of financing statements in respect of the debtors' assets, and "the negative impact of the [creditor's] misconduct . . . had on the auction process . . . created the perfect storm requiring curtailment of the [creditor's] credit bid rights"); *In re Aloha Airlines, Inc*., No. 08–00337, 2009 WL 1371950, at *8 (Bankr. D. Haw. May 14, 2009) (denying prospective credit bidder's credit bid because of its undisclosed sponsorship of a third party's acquisition of the debtor's assets through that bid); *cf. Greenblatt v. Steinberg*, 339 B.R. 458, 463 (N.D. Ill. 2006) (denying credit bid due to prospective credit bidder's failure to comply with the Court's sale procedures order).

[178] First Day Tr. at 71.

[179] *In re Philadelphia Newspapers, LLC*, 599 F.3d 298, 316 n.14 (3d Cir. 2010).

[180] *Free Lance-Star*, 512 B.R. at 806 ("From the moment it bought the loan from BB & T, DSP pressed the Debtor 'to walk hand in hand' with it through an expedited bankruptcy sales process. It was a classic loan-to-own scenario. . . . The Court finds that DSP did engage in inequitable conduct. The credit bid mechanism that normally works to protect secured lenders against the undervaluation of collateral sold at a bankruptcy sale does not always function properly when a party has bought the secured debt in a loan-to-own strategy in order to acquire the target company.").

[181] *Id.* at 417.

where, as here, the collateral comprises regulated assets, and a successful credit bid would require non-consenting secured lenders to own a regulated entity.

### A.      The Credit Bid Violates the Pro Rata Sharing Provision of the Intercreditor Agreement.

99.     Section 4.1 of the Intercreditor Agreement requires that the distribution of proceeds from a sale of the Collateral be on a *pro rata* basis.[182]    Absent full disclosure of the post-reorganization governance, no party, including the Court, can evaluate whether the distribution of the Interests will be in accordance with this provision.  To be *pro rata*, distribution of the interests must be accompanied by governance terms that provide at least as much protection for minority owners as provided under the Intercreditor Agreement.  Such protections include, but are not limited to, obligations to act in the interests of all lenders, anti-dilution provisions, prohibition on amendments to important provisions of the operating agreement that speak to the economics of the equity ownership, minority owner participation in major decisions, and a prohibition on affiliate transactions absent approval by disinterested members.  Absent such protections, the equity interests that the Minority Lenders receive will be worth less than their respective *pro rata* share of the underlying Collateral.  This is an impermissible violation of section 4.1 of the Intercreditor Agreement.

### B.      The Credit Bid Is Likely Unauthorized Under The Credit Agreement Because It Was Not Directed By The Required Secured Parties.

100.     Black Diamond issued a direction to the Collateral Agent to, among other things, submit a credit bid for the full amount of the Secured Obligations outstanding under the Credit

---

[182]    *See* Intercreditor Agreement § 4.1 (specifying that "any Collateral or any proceeds thereof" resulting from a sale or other disposition "shall be applied on a ***pro rata*** basis, to the payment of, without duplication, (i) any Interest Expense and all principal and other amounts then due and payable in respect of the Secured Obligations").

Agreement and take all steps necessary to consummate the Sale.[183]  Black Diamond asserts that

the Consenting Lenders (*i.e.*, Black Diamond and MJX) "constitute 'Required Lenders' under the

Credit Agreement and 'Required Secured Parties' necessary to effect an 'Act of Secured Parties'

under the Intercreditor Agreement."[184]  This assertion may not be correct in light of Black

Diamond's near complete control of the Debtors.  Because the Direction Letter may be invalid,

the credit bid should not be permitted until such time it is litigated to a final resolution in the

appropriate forum.[185]

101.    Section 11.06(d) of the Credit Agreement states that no "Sponsor-Related Party, in

its capacity as Lender, shall have any voting or approval rights whatsoever under the Loan

Documents (including, without limitation, for purposes of any action requiring the approval of

"Required Lenders" or pursuant to Section 11.05) . . . or be permitted to require any Agent or any

other Lender to undertake any action (or refrain from taking any action) pursuant to or with respect

to the Loan Documents."[186] A "Sponsor-Related Party" includes any Affiliate of a Designated

---

[183]  *See* Letter to Collateral Agent re Directions Regarding Credit Bid for the Collateral, attached hereto as **Exhibit F** (the "Direction Letter").

[184]  *Id.*

[185]  While the intercreditor dispute between Black Diamond and the Minority Lenders is not before the court, the implications of it are.  After all, it's hard to imagine that State and Federal regulators will approve the transfer of ownership of the power plant to parties that are at war, especially where the majority party (Black Diamond) lacks meaningful experience owning power plants.  And regulatory approvals are a condition to the sale, so if they are not obtained, the sale will not close and we will all be back in front of the Court having to start afresh.

[186]  Credit Agreement § 11.06(d).

Holder (other than any Loan Party and natural persons).[187]  "Designated Holder" includes, among

others, the ECP Pledgors.[188]  TTK Empire is an ECP Pledgor.[189]

102.    "Affiliate" means "as applied to any Person, any other Person directly or indirectly

Controlling, Controlled by, or under common Control with, that Person."[190]  "Control" means  "as

applied to any Person, [ ] the possession, directly or indirectly, of the power . . . ***to direct or cause***

***the direction of management and policies of that Person***, whether through the ownership of

voting securities or ***by contract or otherwise***."[191]  In concert, these contractual provisions present

a simple question: did Black Diamond exert control over TTK Empire?

103.    The answer is likely, yes.  As discussed, Black Diamond has assumed control of

the Debtors pursuant to the RSA, the significant increase in Woodlands' operational control at the

Debtors, and the transfer of Woodlands' contract to the Collateral Agent.[192]  The RSA obligates

---

[187]   Credit Agreement § 1.01.

[188]   *Id.*

[189]   *See* Pledge Agreement §6.27 (noting TTK Empire is an "ECP Pledgor" for all purposes under the Intercreditor
Agreement, Credit Agreement, and Security Agreement); Credit Agreement § 1.01 ("'Control Investment
Affiliate' means, as to any Person, any other Person that (a) directly or indirectly, is in Control of, is Controlled
by, or is under common Control with, such Person and (b) is organized by such Person primarily for the purpose
of making equity investments in or acquisitions of one or more companies to own and/or operate electric
generating facilities.").

[190]   Credit Agreement § 1.01.  Additionally, Courts have construed the phrase "person in control of the debtor" in
section 101(31)(B)(iii) of the Bankruptcy Code to mean a person that "exercises such control or influence over
the debtor as to render [a transaction between that person and the debtor] not arms-length."  *In re Enterprise
Acquisition Partners, Inc.*, 319 B.R. 626, 631, 633 n.5 (B.A.P. 9th Cir. 2004) (internal quotation marks and
citation omitted); *accord In re Winstar Commc'ns, Inc.*, 554 F.3d 382, 396–97 (3d Cir. 2009) (holding that the
relevant "question 'is whether there is a close relationship [between the parties] and . . . anything other than
closeness to suggest that any transactions were not conducted at arm's length.'") (quoting *In re U.S. Med., Inc.*,
531 F.3d 1272, 1277 (10th Cir. 2008)).  Thus, a person who exercises "actual control (or its close equivalent)"
over the debtor's business affairs is a "person in control of the debtor" within the meaning of the Bankruptcy
Code.  *Winstar*, 554 F.3d at 396.  In that regard, a person with the "ability to coerce [the debtor] into transactions
not in [the debtor's] interest," for example, has "[a]ctual control (or its close equivalent)" over the debtor's
business affairs—and thus constitutes a "person in control of the debtor."  *Id* at 397.

[191]   *Id.* (emphasis added).

[192]   *See* Prelim. Statement, *supra.*

the Debtors to over 40 covenants in favor of Black Diamond with limited ability to terminate.  In

contrast, Black Diamond has approximately 26 termination rights and the ability to dictate the

management and policies of the Debtors through their consent rights on all Material Agreements

and their indirect control of Woodlands, the de facto current asset manager.

104.    Section 11.06(d) bars Sponsor-Related Parties from directing the Collateral Agent

for obvious reasons.  A party who directly or indirectly controls the Pledgor may have mixed

motives when it comes to deciding what to do with the lenders' collateral.  To solve for this

potential process failure, section 11.06(d) simply disables the Sponsor-Related Party from voting,

and moves the direction of the Collateral Agent in the hands of the remaining—unbiased—lenders.

105.    Here, the concerns which motivate section 11.06(d) are manifest.  The **_price_** of

Black Diamond's control was releases and assumed contracts for the Sponsors and their affiliates

(and potentially other considerations that come to light with the benefit of full discovery).  This

_quid pro quo_ has firmly aligned the Debtors with Black Diamond, creating precisely the type of

lender-in-possession concerns that section 11.06(d) of the Credit Agreement is designed to thwart.

106.    It should come as no surprise that the Loan Documents prohibit an interested party

from controlling the Collateral Agent.  After all, section 2.3 of the Intercreditor Agreement requires

the Collateral Agent to act "solely and exclusively" on behalf of **_all_** lenders.[193]  If the Collateral

Agent is required to act at the behest of a single interested party, it cannot be assured that the

directions it is being given are in the interest of **_all_** lenders and not a single, conflicted lender.

Section 11.06(d) of the Credit Agreement is designed to guard against a situation where a single

---

[193]   Credit Agreement § 9.02 ("Each Lender Party irrevocably authorizes each Agent to take such action on such Lender Party's behalf and to exercise such powers, rights and remedies hereunder and under the other Loan Documents as are **_specifically_** delegated or granted to such Agent by the terms hereof and thereof, together with such powers, rights and remedies as are **_reasonably incidental_** thereto.") (emphasis added).

lender (*i.e.*, Black Diamond) gains control over a Designated Holder (*i.e.*, TTK Empire) and

attempts to use that control to carry out a series of transactions specifically aimed at disadvantaging

other Lenders under the Credit Agreement (*i.e.*, the Restructuring Transactions). Because there is

a material dispute regarding whether Black Diamond is prohibited from directing the Collateral

Agent, the credit bid should be denied.

107.    The conclusion that Black Diamond used contractual rights and other mechanisms

to exert control over the Debtors, accords with case law in a variety of contexts. Courts often

determine whether one party exercised control over another in the context of lender liability claims

and the securities regulation space.[194] In assessing whether a party has exercised control over

another, courts recognize a myriad of factors that could impact such a finding in a given factual

scenario.[195] The decision in *Basho Technologies* is instructive. There, plaintiffs brought a claim

against Georgetown Basho Investors, an investor in Basho Technologies, had breached its

fiduciary duties to Basho. The court recognized that as a shareholder in Basho, Georgetown would

ordinary not owe fiduciary duties to the company, but Georgetown would own such fiduciary

duties if it "weild[ed] control" over Basho.[196] The court analyzed a number of factors in ultimately

determining that Georgetown, despite not maintaining a majority of the equity of Basho, exercised

control and therefore owed fiduciary duties. But the most important piece of the court's analysis

---

[194]    The definition of "control" in the Credit Agreement is taken nearly verbatim from the definition of "control" in the regulations promulgated under the Securities laws. 17 C.F.R. §230.405 (defining "control" as "the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person whether through ownership of voting securities, by contract or otherwise").

[195]    *Basho Techs. Holdco B, LLC v. Georgetown Basho Inv'rs, LLC*, No. CV 11802-VCL, 2018 WL 3326693, at *26-28 (Del. Ch. July 6, 2018) ("It is impossible to identify or foresee all of the possible sources of influence that could contribute to a finding of actual control over a particular decision.").

[196]    *Id*. at *25.

was the contractual rights that Georgetown wielded over Basho.[197]  Those contractual rights

included the ability to block the Company from raising capital through equity financings, which

arose due to Georgetown's status as the holder of a majority of the Series F preferred stock in

Basho.[198]  In short, Georgetown used its contractual veto rights to prevent Basho from finding any

other source of funding, forcing Basho to accept the proposal for additional financing from

Georgetown.[199]

108.    Black Diamond followed a similar game-plan in this case.  Black Diamond used its

contractual power as the majority holder of the Debtors' only class of debt to scupper the potential

for a consensual restructuring, forcing the Debtors to accede to Black Diamond's demands.  Black

Diamond then used its leverage to exercise even greater control over the Debtors, both through the

actions of Woodlands and through the onerous provisions of the RSA.  In short, all of these factors

together show that Black Diamond controlled TTK Empire, and thus is an Affiliate of that entity

under the Loan Documents.

### C.    This Is Not the First Time Black Diamond has Engaged in Conduct That Unfairly Distorts the Sale Process In Its Favor.

109.    Black Diamond's aggressive prepetition conduct with respect to these Debtors is

consistent with the playbook Black Diamond has relied on in the past:  hiding information from

other parties in interest and the Court, pursuing rapid consummation of transactions that

improperly arrogate value to Black Diamond at the expense of other parties in interest, and fighting

---

[197]  *Id*. at *29–*31.

[198]  *Id*. at *29.

[199]  *Id*. at *31 ("By exercising its contract rights in this fashion, Georgetown forced the Company into a financial crisis. By the time Southeast withdrew, the Company had no other alternatives. Gallagher asked Davenport to make a fair proposal. Instead, Georgetown resubmitted its proposal for the Series G Financing and demanded an answer in less than 20 hours. With Georgetown and Davenport having cut off all exits, the Board was forced to accept it.").

tooth and nail to avoid having those transactions unwound after Black Diamond's inequitable conduct is forced into the light of day via judicial process.

110.    Only two months ago, the district court for the Southern District of New York confirmed an arbitral award requiring Black Diamond to pay almost $40 million in damages to its fellow lenders as a result of its bad faith dealings in a prior bankruptcy case.[200]  In that case, Black Diamond provided insider deals to the debtors' principals, each of whom would go on to formally work for Black Diamond following the sale.  Moreover, in the period leading up to the petition date, Black Diamond appointed its affiliate as administrative agent and collateral agent under the prepetition credit facility, then directed the debtors to take actions to solidify Black Diamond's control over them, including, among other things:

- directing the debtors to pay certain trade creditors, but not others;

- directing the debtors to terminate certain employees and not honor their standard severance policies with respect to those employees; and

- entering into contracts with the debtors' principals and sole directors.

The minority lenders under the credit facility were forced to pursue remedies against Black Diamond in state court, all while Black Diamond successfully diverted millions of dollars of value to itself.[201]

111.    The arbitration tribunal found, among other things, that Black Diamond "breached the implied covenant of good faith and fair dealing by depriving [minority lenders] of the fruits of

---

[200]  *Crédit Agricole Corp. and Inv. Bank v. Black Diamond Capital Management, LLC*, Case No. 18-07620 (S.D.N.Y. Mar. 22, 2019) [Docket No. 31], attached hereto as **Exhibit G**.

[201]  *See Credit Agricole Corp. and Inv. Bank v. Black Diamond Capital Mgmt., LLC*, AAA Case No. 01-17-0007-1196 (2018) (Scheindlin, Davis, and Lerner, Arbs.) at 134–35 (the "Final Award") attached hereto as **Exhibit H** ("[Black Diamond] used their discretion as the Required Banks to instruct the Agent to Credit Bid in a manner that produced a vastly disproportionate allocation of assets between the Cash Bid and the Credit Bid . . .  [Black Diamond's] Cash Bid of $5 million in cash and $6 million in a note[] purchased the assets with a significantly higher value.  Capstone, for one, provided a value of *$126,690,357* for those assets." (emphasis added)).

their bargain" and concluded, among other things, that Black Diamond's "discretion [to direct the Agent] was used intentionally to enrich [Black Diamond] at the expense of the [minority lenders].[202]   This Court should be cognizant that these cases are another instance of the Black Diamond "playbook" and should not allow the Minority Lenders to suffer a similar fate without a full and fair opportunity to be heard.

### D.   The Credit Bid Is Not Permissible as a Matter of Law Because No Allowed, Secured Claim Against TTK Empire Exists.

112.    Section 363(k) of the Bankruptcy Code prescribes the circumstances under which credit bidding is allowed:

> At a sale under subsection (b) of this section of property that is subject to a lien *that secures an allowed claim*, unless the court for cause orders otherwise the holder of such claim may bid at such sale, and, if the holder of such claim purchases such property, such holder *may offset such claim* against the purchase price of such property.[203]

Section 363(b) of the Bankruptcy Code, in turn, states, "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate[.]"[204]

113.    Cases addressing "credit bidding" under section 363(k) of the Bankruptcy Code address the existence of a claim as a necessary predicate.[205]   In other words, where there is no claim to offset against the estate, there can be no credit bid under section 363(k) of the Bankruptcy

---

[202]   Final Award at 136–37, 141.

[203]   11 U.S.C. § 363(k) (emphasis added).

[204]   11 U.S.C. § 363(b).

[205]   *See, e.g.*, *Aéropostale*, 555 B.R. at 414 ("[I]f the bidding at the sale is less than the amount of the claim the collateral secures, the secured creditor can, if it chooses, bid up the price to as high *as the amount of its claim*.") (emphasis added) (quotations omitted); *Fisker*, 510 B.R. at 59 ("[A] secured creditor is entitled to credit bid *its allowed claim*.") (emphasis added).

Code.   More than a "century's worth of bankruptcy law has limited setoffs to mutual obligations."[206]

114.    Beyond the straightforward text of the statute and history of the offset right, the structure of the Bankruptcy Code and Bankruptcy Rules and the common law of a secured creditor's remedy of offset (or setoff) bolster the notion that an allowed, secured claim must exist against the selling debtor's estate to be validly "credit bid."  *First*, the offset remedy encoded in section 363(k) of the Bankruptcy Code is the same as the common law right of offset, which requires mutuality.[207]   "[C]ourts consistently find debts to be mutual only when they are in the same right and between the same parties, standing in the same capacity."[208]  Because TTK Empire does not owe a debt to the Collateral Agent, the Collateral Agent cannot offset against any eventual purchase price of the interests in Holdings that are part of TTK Empire's estate.

115.    *Second*, the Bankruptcy Rules contemplate the separateness of the estates of different debtors in jointly administered chapter 11 reorganization cases.   Bankruptcy Rule 1015(b), which authorizes joint administration, requires the court to "give consideration to protecting creditors of different estates against potential conflicts of interest."[209]   Moreover,

---

[206]   *Lehman Bros.*, 445 B.R. at 133 (citing *Gray v. Rollo*, 85 U.S. 629, 633-34 (1873) (mutuality required under the Bankruptcy Acts of 1800 and 1867); *McCollum v. Hamilton Nat'l Bank*, 303 U.S. 245, 248 (1938) (mutuality required under the Bankruptcy Act of 1898)).

[207]   *See Citizens Bank of Maryland v. Strumpf*, 516 U.S. 16, 18 (1995) ("The right of setoff (also called 'offset') allows entities that owe each other money to apply their mutual debts against each other, thereby avoiding 'the absurdity of making A pay B when B owes A.'" (citing *Studley v. Boylston Nat'l Bank*, 229 U.S. 523, 528 (1913)); *In re RML Development*, 528 B.R. 150, 154 (Bankr. W.D. Tenn. 2014) (noting that the right to "offset" under section 363(k) of the Bankruptcy Code is the same as the right of setoff).

[208]   *In re Lehman Bros. Inc.*, 458 B.R. 134, 140 (Bankr. S.D.N.Y. 2011) (citation omitted).

[209]   Fed R. Bankr. P. 1015(b); *see also* Fed. R. Bankr. P. 2009(c)(2), (d) (providing for the appointment of one *or more* trustees for estates being jointly administered and requiring the court to order the selection of separate trustees on a showing that creditors of different estates would be prejudiced by inter-estate conflicts of interest).

Bankruptcy Rule 2009(e) requires a trustee (or debtor in possession) in jointly administered cases to keep separate accounts of the property and distribution of each estate.[210]

116.    **Third**, the Bankruptcy Code contains no authority to commingle the assets of and claims against separate estates in jointly administered chapter 11 cases, and, notwithstanding the judge-made of "substantive consolidation,"[211] these Debtors' estates have not been so consolidated.[212]   Nor could they be—the Second Circuit mandates that substantive consolidation is available only if the various debtors' assets and business functions are so commingled that "untangling is either impossible or so costly as to consume the assets."[213]   By contrast, the separateness of these Debtors' estates has been meticulously documented.[214]

---

[210]   Fed. R. Bankr. P. 2009(e); *see also* 11 U.S.C. § 1106.

[211]   Substantive consolidation lacks an express statutory basis; it is a "judicial gloss in the face of changes in the makeup of companies involved with the country's insolvency laws."  *In re Commercial Envelope Mfg. Co., Inc.*, No. 76 B 2354, 1977 WL 182366, at *1 (S.D.N.Y. Aug. 22, 1977).  *See also In re Augie/Restivo Banking Co., Ltd.*, 860 F.2d 515, 518 n.1 (2d Cir. 1988) ("Substantive consolidation has no express statutory basis but is a product of judicial gloss.").

[212]   *See, e.g.*, *Order (I) Directing Joint Administration of the Chapter 11 Cases Under Fed. R. Bankr. P. 1015(b), (II) Waiving Requirements of 11 U.S.C. § 342(c)(1), Fed. R. Bankr. P. 1005 and 2002(n), and (III) Authorizing the Debtors to File Monthly Operating Reports on a Consolidating Basis* [Docket No. 34] ¶ 3 ("Nothing contained in this Order shall be deemed or construed as directing or otherwise effecting the substantive consolidation of any of the Chapter 11 Cases.").

[213]   *Augie/Restivo Baking Co., Ltd.*, 860 F.2d at 519.

[214]   *See, e.g.*, First Day Decl. ¶¶ 14, 17 ("Empire Generating's principal assets consist of the equipment comprising the Plant and its leasehold interests."; "Holdco's assets consist of (i) approximately $35,000 in cash; (ii) an office lease; and (iii) Holdco's membership interests in Empire Generating.  Holdings holds no assets other than the membership interests in Holdco.  TTK Empire holds no assets other than the membership interests in Holdings.").

1.     **The Collateral Agent Does Not Have a Claim Against TTK Empire that May Be the Subject of a Credit Bid Under Section 363(k) of the Bankruptcy Code.**

117.    The interests in Holdings are property of TTK Empire's estate[215] and subject to the Pledge Agreement between TTK Empire and the Collateral Agent.  The Pledge Agreement provides the Collateral Agent a security interest in the interests in Holdings that TTK Empire owns.[216]  The lien must secure an allowed or allowable claim against TTK Empire to be credit bid under section 363(k) of the Bankruptcy Code.[217]

118.    The Credit Agreement does not give rise to a secured claim against TTK Empire as TTK Empire is neither an obligor nor a guarantor under the Credit Agreement.[218]  Further, while a lien may secure payment of a debt, it is not itself a debt and does not give rise to a "claim" within the meaning of section 101(5) of the Bankruptcy Code against the owner of the encumbered property.[219]  As explained below, section 102(2) of the Bankruptcy Code does not change this result in the context of a sale of property.

119.    The Bankruptcy Code contains separate definitions for "claim," "lien," and "security interest."[220]  "Claim" under section 101 of the Bankruptcy Code is not defined to include

---

[215]  The debtor's estate consists, *inter alia*, of "all legal or equitable interests of the debtor in property as of the" petition date.  11 U.S.C. § 541(a)(1).  The Debtors have asserted that the interests were property of TTK Empire as of the Petition Date.  First Day Decl. ¶ 17.

[216]  "Security interest" means a lien created by an agreement.  11 U.S.C. § 101(51).  "Lien" means a charge against or interest in property to secure payment of a debt or performance of an obligation.  *Id.* § 101(37).

[217]  11 U.S.C. § 363(k).

[218]  The Credit Agreement identifies Empire Generating as "Borrower" and each of Holdco and Holdings as "Guarantors."  Credit Agreement at 6, 28.

[219]  As discussed further herein, the the Bankruptcy Code provides for differential treatment of "claims" and "liens" and refers to a "lien" as a property interest.  *See, e.g.*, 11 U.S.C. § 363(f) ("The trustee may sell property under subsection (b) or (c) of any **interest in property** other than the estate, only if . . . **such interest is a lien** . . .") (emphasis added).

[220]  11 U.S.C. § 101(5) (defining "claim"), 101(37) (defining "lien"), and 101(51) (defining "security interest").

a "lien," unlike the numerous definitions of section 101 of the Bankruptcy Code that are defined in relation to "lien."[221]   The inverse is also true:  "lien" is not defined in terms of "claim," whereas there is a wealth of other definitions in section 101 of the Bankruptcy Code that are defined in terms of "claim."[222]   The Bankruptcy Code contains numerous provisions that distinguish between

---

[221]   *Compare* 11 U.S.C. §§ 101(11) ("The term 'custodian' means [] trustee, receiver, or agent under applicable law, or under a contract, that is appointed or authorized to take charge of property of the debtor for purpose of enforcing a lien against such property . . ."), 101(28) ("The term 'indenture' means mortgage, deed of trust, or indenture, under which there is outstanding a security, other than a voting-trust certificate, constituting a claim against the debtor, a claim secured by a lien on any of the debtor's property, or an equity security of the debtor."), 101(36) ("The term 'judicial lien' means lien obtained by judgment . . ."), 101(51) ("The term 'security interest' means lien created by an agreement."), 101(53) ("The term 'statutory lien' means lien arising solely by force of a statute on specified circumstances or conditions, or lien of distress for rent, whether or not statutory . . ."), and 101(54)(A) ("The term 'transfer' means [] the creation of a lien[.]") *with id.* § 101(5) ("The term 'claim' means— (A) right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured; or (B) right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured.").

[222]   *See, e.g.*, 11 U.S.C. §§ 101(7) ("The term 'community claim' means claim that arose before the commencement of the case . . ."); 101(10) ("The term 'creditor' means (A) entity that has a claim against the debtor that arose before the [petition date]; (B) entity that has a claim against the estate of a kind specified in section 348(d), 502(f), 502(g), 502(h), or 502(i) of this title; or entity that has a community claim."); 101(12) ("The term 'debt' means liability on a claim."); 101(28) ("The term 'indenture' means mortgage, deed of trust, or indenture, under which there is outstanding a security, other than a voting-trust certificate, constituting a claim against the debtor, a claim secured by a lien on any of the debtor's property, or an equity security of the debtor."); 101(49)(A)(xiv) ("The term 'security' includes other claim or interest commonly known as 'security[.]').

liens and claims, including sections 362(a),[223] 510(c),[224] 722,[225] 922,[226] 1123(a),[227] and

1129(b)(2)(A)(i).[228]   Moreover, the defined term "lien" is expressly referred to as a subset of

---

[223]   "Except as provided in subsection (b) of this section, a petition filed under section 301, 302, or 303 of this title, or an application filed under section 5(a)(3) of the Securities Investment Protection Act of 1970, operates as a stay, applicable to all entities, of—(1) the commencement or continuation, including the issuance or employment of process, of a judicial, administrative, or other action or proceeding against the debtor that was or could have been commenced before the commencement of the case under this title, or to recover a claim against the debtor that arose before the commencement of the case under this title; . . . (4) any act to create, perfect, or enforce any lien against property of the estate; (5) any act to create, perfect, or enforce against property of the debtor any lien to the extent that such lien secures a claim that arose before the commencement of the case under this title; (6) any act to collect, assess, or recover a claim against the debtor that arose before the commencement of the case under this title . . ."

[224]   "Notwithstanding subsections (a) and (b) of this section, after notice and a hearing, the court may—(1) under principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim or all or part of an allowed interest to all or part of another allowed interest; or (2) order that any lien securing such a subordinated claim be transferred to the estate."

[225]   "An individual debtor may, whether or not the debtor has waived the right to redeem under this section, redeem tangible personal property intended to be primarily for personal, family, or household use, from a lien securing a dischargeable consumer debt, if such property is exempted under section 522 of this title or has been abandoned under section 554 of this title, by paying the holder of such lien the amount of the allowed secured claim of such holder that is secured by such lien in full at the time of redemption."

[226]   "A petition filed under this chapter operates as a stay, in addition to the stay provided by section 362 of this title, applicable to all entities, of—(1) the commencement or continuation, including the issuance or employment of process, of a judicial, administrative, or other action or proceeding against an officer or inhabitant of the debtor that seeks to enforce a claim against the debtor; and (2) the enforcement of a lien on or arising out of taxes or assessments owed to the debtor."

[227]   "Notwithstanding otherwise applicable nonbankruptcy law, a plan shall—(1) designate, subject to section 1122 of this title, classes of claims, other than claims of a kind specified in section 507(a)(2), 507(a)(3), or 507(a)(8) of this title, and classes of interests; (2) specify any class of claims or interests that is not impaired under the plan; (3) specify the treatment of any class of claims or interests that is impaired under the plan; (4) provide the same treatment for each claim or interest of a particular class, unless the holder of a particular claim or interest agrees to a less favorable treatment of such particular claim or interest; (5) provide adequate means for implementation, such as— . . . (D) sale of all or any part of property of the estate, either subject to or free of any lien, or the distribution of all or any part of the property of the estate among those having an interest in such property of the estate; (E) satisfaction or modification of any lien . . ."

[228]   To be "fair and equitable" with respect to a class of secured claims, the plan must provide "(I) that the holders of such claims retain the liens securing such claims, whether the property subject to such liens is retained by the debtor or transferred to another entity, to the extent of the allowed amount of such claims; and (II) that each holder of a claim of such class receive on account of such claim deferred cash payments totaling at least the allowed amount of such claim, of a value, as of the effective date of the plan, of at least the value of such holder's interest in the estate's interest in such property[.]"

"interest" in section 363(f)(3) of the Bankruptcy Code.[229]  The notion that a lien is an interest in property (as opposed to claim against the debtor) is further reflected in the defined term, "security interest," which is "a lien created by an agreement."[230]

120.    Recent case law in this district makes clear that the "[Bankruptcy] Code . . . does not change the nature or terms of a creditor's security interest."[231]  Outside of bankruptcy, the sole remedy of the Collateral Agent under the Pledge Agreement is to foreclose on the interests in Holdings that are pledged by TTK Empire.[232]  In an event of default, the Collateral Agent may not, for example, demand payment by TTK Empire of the outstanding secured debt obligations,[233] in stark contrast to the Collateral Agent's right to demand payment by any or all of Empire Generating, Holdco, and Holdings under the Credit Agreement.[234]

---

[229]  "The trustee may sell property under subsection (b) or (c) of this section free and clear of any interest in such property of an entity other than the estate, only if . . . (3) such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property."

[230]  11 U.S.C. § 101(51).

[231]  *In re Taberna Preferred Funding IV, Ltd.*, 594 B.R. 576, 591 (Bankr. S.D.N.Y. 2018) (asserting that the 1111(b) recourse transformation is "for distribution purposes only") (citing *In re Montgomery Ward, LLC*, 634 F.3d 732, 740 (3d Cir. 2011)).

[232]  *See* Pledge Agreement §§ 5.01–5.05.

[233]  Pledge Agreement § 6.25 (providing, *inter alia*, that "the obligations of [TTK Empire] under this Agreement or otherwise in respect of any other Financing Document or any such other document, certificate, or instrument (if any) are several (and not joint) obligations of such Pledgor and do not constitute a debt, liability or obligation of (and no recourse shall be had thereto) any Non-Recourse Persons [including TTK Empire]"); *accord id.* § 5.04 ("For avoidance of doubt, it is understood that [Empire Generating, Holdco, and Holdings] shall remain liable to the extent of any deficiency between the amount of proceeds of the Pledged Collateral and the aggregate amount of the Secured Obligations in accordance with the Financing Documents, but that [TTK Empire] and any direct or indirect owner of the Capital Stock of [TTK Empire] shall not be so liable.").

[234]  Credit Agreement § 8.01 ("[I]n any such [Event of Default], the Administrative Agent . . . shall at the request, or may with the consent, of the Required Lenders, by notice to the Borrower, declare the Advances, all interest thereon and all amounts payable under this Agreement and the other Loan Documents to be forthwith due and payable . . ."); *see also id.* § 10.01(a) ("Each Guarantor, *joint and severally*, hereby absolutely, unconditionally and irrevocably guarantees the punctual payment when due, whether at scheduled maturity or on any date of a required prepayment or by acceleration, *demand or otherwise*, of all Obligations of each other Loan Party now or hereafter existing . . ." (emphasis added)).

121.     Even the Pledge Agreement itself distinguishes between liens and claims. Section 4.03 of the Pledge Agreement says:

> Such Pledgor shall not create, incur or permit to exist, shall defend the Pledged Collateral of such Pledgor against and shall take such other action as is reasonably necessary to remove, any Lien or claim on or to such Pledged Collateral, other than Permitted Liens which arise by operation of law and the Liens created pursuant to this Agreement, and shall defend the right, title and interest of the Collateral Agent and the other Secured Parties in and to the Pledged Collateral of such Pledgor against the claims and demands of all other Persons.[235]

That the Pledge Agreement refers in the alternate to "Lien *or* claim" drives home the distinction between the two terms.

122.     Here, the interests in TTK Empire's subsidiary that TTK Empire has pledged are security for a debt owed by Empire Generating and guaranteed by Holdco and Holdings.  But, as even the Debtors acknowledge, TTK Empire actually is not obligated on the Credit Facility.[236]

### 2.     The Pledge Agreement Expressly Waives Any Potential Claim of the Collateral Agent Against TTK Empire.

123.     The commencement of the chapter 11 case does not transform the non-recourse pledge by TTK Empire into a "claim" under the Bankruptcy Code because the Collateral Agent has expressly waived the existence or possibility of any claim against TTK Empire under the Pledge Agreement.  Section 6.25 of the Pledge Agreement operates as a general, express waiver

---

[235]  Pledge Agreement § 4.03.  "Lien" is defined in the Credit Agreement as "(a) any lien, mortgage, deed of trust, deed to secure debt, pledge, collateral assignment, security interest, charge or encumbrance of any kind (including any agreement to give any of the foregoing, any conditional sale or other title retention agreement, and any lease or license in the nature thereof) and any option, trust or other preferential arrangement having the practical effect of any of the foregoing and (b) in the case of Securities, any purchase option, call or similar right of a third party with respect to such Securities.  For the avoidance of doubt, "*Lien*" shall not include any netting or set-off arrangements under any Contractual Obligation (other than any Contractual Obligation constituting Debt for Borrowed Money or having the effect of Debt for Borrowed Money) otherwise permitted under the terms of this Agreement."  Credit Agreement at 34 (emphasis in original).

[236]  First Day Decl. ¶ 22 ("The obligations of Debtors Empire Generating, Holdco, and Holdings [] under the Credit Facility are secured by liens on . . . the membership interests in Holdings which are pledged by Debtor TTK Empire.").

of claims by the Collateral Agent against TTK Empire "including as may arise by operaton of law"[237] except to the extent of enforcing the Collateral Agent's lien on the interests in Holdings.[238] Section 5.04 of the Pledge Agreement, in turn, provides that "it is understood that the Loan Parties shall remain liable to the extent of any deficiency between the amount of proceeds of the Pledged Collateral and the aggregate amount of the Secured Obligations in accordance with any Financing Documents, but that any Pledgor and any direct or indirect owner of the Capital Stock of any Pledgor *shall not be so liable*."[239]

124.     While debtors have been held protected against purported contractual waivers of the benefits of bankruptcy, "[t]here is no similar protection for creditors—particularly not large, sophisticated creditors represented by large, sophisticated law firms."[240]   Applying New York contract law, the bankruptcy court for the Northern District of Illinois recently found that an express provision of a collateral agreement that "no recourse shall be had . . . under any law" was fully enforceable inside of bankruptcy.[241]   The court rejected the creditors' argument that their

---

[237]   Section 6.25(a) of the Pledge Agreement specifies that "the obligations of [TTK Empire] under this Agreement or otherwise in respect of any other Financing Document . . . do not constitute a debt, liability or obligation of (and no recourse shall be had with respect thereto) any Non-Recourse Persons (as defined in the [] Security Agreement." Pledge Agreement § 6.25(a). "Non-Recourse Persons," as defined in the Security Agreement, includes TTK Empire. Security Agreement § 13 (defining "Non-Recourse Persons" as, collectively, "any present or future holder (whether direct or indirect) of any Capital Stock of any Grantor (other than any such holder who is a Grantor), or, in each case, any of their respective Affiliates (other than the Grantors) (except, in each case, to the extent set forth in the Financing Documents to which the Grantor or any holder of Capital Stock is a party), shareholders, partners, members, officers, directors, employees, representatives, controlling persons, executives or agents"). "Grantors" includes Holdco and Holdings, but not TTK Empire. *See* Security Agreement at 1.

[238]   Section 6.25(d) of the Pledge Agreement states, "none of the Secured Parties shall have any claims with respect to any Financing Document or any of the transactions contemplated thereby against any Pledgor (except to the extent of such Pledgor's ownership interest in its Pledged Collateral), such claims against the Pledgors (*including as may arise by operation of law*) being expressly waived hereby." Pledge Agreement § 6.25(d) (emphasis added).

[239]   Pledge Agreement § 5.04 (emphasis added).

[240]   *In re Caesar's Operating Co., Inc.*, 562 B.R. 168, 179–80 (Bankr. N.D. Ill. 2016).

[241]   *Id.* at 173.

"right" to recourse treatment under section 1111(b) of the Bankruptcy Code could not be waived.[242]  So long as there is an "express agreement," as in the Pledge Agreement, the waiver will be effective.[243]

125.    The waiver in the Pledge Agreement is clear, unambiguous, and express. Specifically, the Pledge Agreement expressly waives any claims, including as may arise "by operation of law."[244]  Rather than have the Collateral Agent foreclose outside of bankruptcy, the Debtors and Black Diamond chose to pursue the benefits of a chapter 11 process.  They must, therefore, bear its attendant burdens.  This bargained-for waiver should not now be read out of the contract.

126.    Nothing in the Bankruptcy Code changes this result.  Although section 102(2) of the Bankruptcy Code provides that "claim against the debtor" includes claim against property of the debtor, that provision only provides for the *existence* of a claim against the debtor, but does not determine the scope, amount, or extent of such claim, or the extent to which such claim is "allowed" as required by section 363(k) of the Bankruptcy Code.  Those questions are directly addressed by section 1111(b) of the Bankruptcy Code, which provides generally that "a claim secured by a lien on property of the estate shall be allowed or disallowed under section 502 of this

---

[242]  *Id.* at 180 ("Read by itself, then, section 7.18 suggests that the First Lien Creditors have no section 1111(b)(1)(A) rights[.]").

[243]  *Id.* at 179.  To be sure, outside of bankruptcy, in an event of default under the Credit Agreement, the Collateral Agent would be entitled to foreclose on the interests in Holdings pursuant to its remedies under the Pledge Agreement.  Section 5.01(a) of the Pledge Agreement, in particular, allows the Collateral Agent to exercise all "powers of ownership" pertaining to the Pledged Collateral—*i.e.*, the foreclosure remedy extends to the extent of the Pledgor's "ownership interest" in the interests in Holdings.  Inside of bankruptcy, however, enforcement of a security interest via a foreclosure remedy is stayed by Section 362(a)(5) of the Bankruptcy Code. 11 U.S.C. § 362(a)(5) ("Except as provided by subsection (b) of this section, a petition filed under section 301, 302, or 303 of this title . . . operates as a stay, applicable to all entities of . . . (5) *any act* to create, perfect, or enforce against property of the debtor *any lien* to the extent that such lien secures a claim that arose before the commencement of the case under this title." (emphasis added)).

[244]  Pledge Agreement § 6.25(d).

title, the same as if the holder of such claim had recourse against the debtor on account of such

claims, whether or not such holder has such recourse, unless . . . (ii) such holder does have such

recourse and such property is sold under section 363 of this title or is to be sold under the plan."[245]

The proposed credit bid sale clearly falls within the four corners of the exception to section

1111(b)—the Collateral Agent does not have recourse against the Debtor (TTK Empire), and the

relevant property (the stock of Holdings) is proposed to be sold under section 363 of the

Bankruptcy Code.  What the Collateral Agent is trying to do here is simply not permitted, under

the applicable loan documents or the Bankruptcy Code.

127.    The plain language of the Pledge Agreement stands alone.  The Collateral Agent

has knowingly and expressly waived any and all claims against TTK Empire.  The Bankruptcy

Code expressly disclaims any recourse rights against TTK Empire.  Absent an allowed, secured

claim against TTK Empire, the Collateral Agent may not offset its purchase price of the interests

in Holdings pursuant to section 363(k) of the Bankruptcy Code.  Thus, any credit bid for the

interests in Holdings is not permissible as a matter of law.

### E.    The Credit Bid Has Already Chilled Bidding.

128.    Bid chilling occurs where the circumstances or structure of a proposed sale of estate

assets frustrate an open, fully competitive auction process.[246]  The credit bid, if not limited or

disallowed, will significantly chill—if not freeze—bidding.[247]

---

[245]   11 U.S.C. § 1111(b).

[246]   *See, e.g.*, *Free Lance-Star*, 512 B.R. at 806 (finding bid chilling where the prospective credit bidder "pressed the Debtor 'to walk hand in hand' with it through an expedited bankruptcy process"); *cf. Fisker*, 510 B.R. at 60 (finding bid "freezing" where failure to limit credit bidding would preclude an auction for estate assets).

[247]   *Fisker*, 510 B.R. at 60 (finding bid "freezing" where failure to limit credit bidding would preclude an auction for estate assets).

129.    The Debtors are using the credit bid to artificially inflate the purchase price for the Assets.  The Debtors acknowledge and have publicly announced on numerous occasions that their assets are worth less than the full current balance of the Debtors' secured debt.[248]  Nevertheless, on information and belief, the Debtors insisted the credit bid be for the full amount of the Credit Agreement Claims so the Debtors can avoid the hard work required by the Bankruptcy Code in favor of filing a "no impairment" plan.  In the face of the artificially inflated credit bid, the Debtors are requiring bidders other than the stalking horse to submit all cash bids.[249]  The cash-only bid requirement means that any other potential bidder will need to submit an all-cash bid far in excess of the value of the Assets.  This is economically irrational..

**F.    As a Policy Matter, Parties Should Not Be Required to Own a Regulated Asset.**

130.    As a matter of public policy, non-consenting parties should not be forced through a credit bid to own a regulated entity, and be subject to regulatory oversight themselves.  The Debtors are subject to both Federal Energy Regulatory Commission and New York Public Service Commission regulation.  If the Minority Lenders are dragged into an ownership structure against their will via the credit bid, the regulatory regime to which they would be subject could have significant consequences for the remainder of their business.  Where, as here, non-consenting parties would be forced to submit to multiple regulatory schemes as a result of a credit bid on governance terms that they have not seen (and to which they have not consented), the right to credit bid should be prohibited.

---

[248]  *See* April 30 Reply Letter at 2 (stating that the equity of an entity holding the [Assets] "does not appear to equal much less exceed the current balance of Empire's secured debt").

[249]  *See* April 30 Reply Letter at 2 ("To the extent Ares genuinely believes Empire's valuation (with control) to be $368,780,000, Empire encourages Ares to submit an all-cash offer."); Bid Procedures, pg. 7.

## IV.   THE DEBTORS HAVE PROVIDED NO BASIS TO WAIVE THE NOTICE REQUIREMENTS.

131.   Rules 6004(a) and 2002(a)(2) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") require that the debtors, trustee, all creditors, and indenture trustees receive 21 days' notice of a proposed use, sale, or lease of property, other than cash collateral, not in the ordinary course of business. The Bid Procedures dictate the terms of the sale of property outside the ordinary course of business and therefore fall within the scope of Rule 6004(a). As such, all creditors, including the Minority Lenders, should receive 21-days' notice of the Bid Procedures unless the Court for cause shown shortens the time for giving notice. The Debtors have shown no cause why full and adequate notice should not be given. As such, the full 21-day notice period should apply.

## V.   THE DEBTORS HAVE PROVIDED NO BASIS TO WAIVE THE STAY.

132.   The Debtors seek to waive the application of Rules 6004(h) and 6006(d). Rule 6004(h) provides: "[a]n order authorizing the use, sale or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order." Bankruptcy courts in the Southern District of New York have found that there is often good reason to enforce the fourteen-day stay provided by Rule 6004(h).[250] Likewise, Bankruptcy Rule 6006(d) provides: "[a]n order authorizing the trustee to assign an executory contract or unexpired lease under 365(f) is stayed until the expiration of 14 days after the entry of the order." The Debtors have provided no evidence that waiver of the stay is justified.[251] The Debtors contend waiver of these provisions

---

[250] *In re Borders Group, Inc.*, 453 B.R. 477, 486 (Bankr. S.D.N.Y. 2011) ("The purpose of this rule is to 'provide sufficient time for an objecting party to request a stay pending appeal before an order can be implemented. A short period of time is often needed and essential to an objecting party intending to appeal because, if the sale is closed in the absence of a stay, any appeal by an objecting party may well be moot.'") (quoting 10 Collier on Bankruptcy ¶ 6004.11).

[251] *See Borders Group*, 453 B.R. at 486 (discussing the fourteen-day stay provided by Rule 6004(h)) ("If an objection has been filed and is overruled, the court should eliminate or reduce the 14-day stay period 'upon a showing that

will expedite the sale, thereby providing certainty to potential Bidders and reducing costs.  Any savings resulting from waiving these provisions, however, may be accompanied by serious, negative consequences for the Debtors' estates.

133.   The Court should therefore deny any request to waive the fourteen-day stay provided by Bankruptcy Rules 6004(h) and 6006(d).

## **CONCLUSION**

For the foregoing reasons, the Minority Lenders respectfully request the Court deny the Debtors' Motion to Assume the RSA and Sale Motion.

[*Remainder of page intentionally left blank.*]

---

there is a sufficient business need to close the transaction within the 14-day period and the interests of the objecting party, taking into account the likelihood of success on appeal, are sufficiently protected.").

Dated:  May 28, 2019          */s/ Brian E. Schartz*
New York, New York            Brian E. Schartz, P.C.
                              James H.M. Sprayregen, P.C.
                              **KIRKLAND & ELLIS LLP**
                              **KIRKLAND & ELLIS INTERNATIONAL LLP**
                              601 Lexington Avenue
                              New York, New York 10022
                              Telephone:    (212) 446-4800
                              Facsimile:    (212) 446-4900

                              - and -

                               Anup Sathy, P.C.
                               Stephen C. Hackney, P.C. (*admitted pro hac vice*)
                               Alexandra Schwarzman (*admitted pro hac vice*)
                              **KIRKLAND & ELLIS LLP**
                              **KIRKLAND & ELLIS INTERNATIONAL LLP**
                              300 North LaSalle Street
                              Chicago, Illinois 60654
                              Telephone:    (312) 862-2000
                              Facsimile:    (312) 862-2200

                              *Counsel to ASSF IV AIV B Holdings III, L.P. and AEIF Trade, LLC*

                              - and -

                              Steven M. Abramowitz
                              Marisa Antos-Fallon
                              **VINSON & ELKINS LLP**
                              666 Fifth Avenue, 26th Floor
                              New York, NY 10103-0040
                              Telephone:    (212) 237-0000
                              Facsimile:    (212) 237-0100

                              *Counsel to SPT Infrastructure Finance Sub-1, LLC and SPT
                              Infrastructure Finance Sub-2, Ltd*

# **EXHIBIT A**

**Antinelli Declaration**

James H.M. Sprayregen, P.C.
Brian E. Schartz, P.C.
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900

Anup Sathy, P.C.
Stephen C. Hackney P.C. (*admitted pro hac vice*)
Alexandra Schwarzman (*admitted pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200

*Counsel to ASSF IV AIV B Holdings III, L.P. and AEIF Trade, LLC*

Steven M. Abramowitz
Marisa Antos-Fallon
**VINSON & ELKINS LLP**
666 Fifth Avenue, 26th Floor
New York, NY 10103-0040
Telephone:    (212) 237-0000
Facsimile:    (212) 237-0100

*Counsel to SPT Infrastructure Finance Sub-1, LLC and SPT Infrastructure Finance Sub-2, Ltd*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| In re: | ) Chapter 11 |
|  | ) |
| EMPIRE GENERATING CO, LLC, *et al.*,[1] | ) Case No. 19-23007 (RDD) |
|  | ) |
| Debtors. | ) (Jointly Administered) |
|  | ) |
|  | ) **Re: Docket Nos. 5,6** |
|  | ) |
|  | ) |

**DECLARATION OF STEPHEN J. ANTINELLI IN SUPPORT OF**
**MINORITY LENDERS' OMNIBUS OBJECTION TO DEBTORS' MOTION**
**FOR ENTRY OF AN ORDER AUTHORIZING AND DIRECTING ASSUMPTION OF**
**THE RESTRUCTURING SUPPORT AGREEMENT AND DEBTORS' SALE MOTION**

I, Stephen J. Antinelli, hereby declare under penalty of perjury:

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification number are:  Empire Generating Co, LLC [3821], Empire Gen Holdco, LLC [3820], Empire Gen Holdings, LLC [4849], and TTK Empire Power, LLC [none].  The Debtors' corporate address is: Empire Generating Co, LLC, c/o Tyr Energy, LLC, 7500 College Blvd., Suite 400, Overland Park, Kansas 66210.

1.     I am a Global Partner of Rothschild & Co and Co-Head of Rothschild & Co's

North America Restructuring Group.   Rothschild & Co is a financial advisory services and

investment banking firm, which has its North American headquarters at 1251 Avenue of the

Americas, 33rd Floor, New York, New York 10020.   In the United States, Rothschild & Co

operates through Rothschild & Co US Inc., a registered broker-dealer.

2.     Rothschild & Co has been engaged as a financial advisor and investment banker

for Ares, one of the Minority Lenders.   I am generally familiar with the Debtors' (as defined

herein) overall day-to-day operations, business and financial affairs, and restructuring efforts.

3.     I submit this declaration (this "Declaration") in support of the *Minority Lenders'*

*Omnibus Objection to Debtors' Motion for Entry of an Order Authorizing and Directing*

*Assumption of the Restructuring Support Agreement and Debtors' Sale Motion*

(the "Objection").[2]

4.     Except as otherwise indicated herein, all facts set forth in this Declaration are

based upon my personal knowledge, or my opinion based on my experience, knowledge, and

information concerning the operations and financial condition of the above-captioned debtors

and debtors in possession (collectively, the "Debtors," and together with their non-Debtor

affiliates, the "Company").[3]   I am authorized to submit this Declaration on behalf of Ares, one of

---

[2]   Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the
Objection or the *Debtors' Motion for Entry of Orders (I) (A) Approving Bid Procedures Relating to the Sale of
Substantially All of the Assets of Empire Generating Co, LLC, or Interests in Empire Gen Holdings, LLC, (B)
Establishing Procedures in Connection With the Assumption or Assumption and Assignment of Certain
Executory Contracts and Unexpired Leases, (C) Approving Notice Procedures (D) Approving Stalking Horse
Bid Protections, and (E) Granting Related Relief; and (II) (A) Authorizing the Sale of Substantially All of the
Assets of Empire Generating Co, LLC, or Interests in Empire Gen Holdings, LLC, Free and Clear of Liens,
Claims, Encumbrances, and Other Interests; (B) Approving the Assumption or Assumption and Assignment of
Certain Executory Contracts and Unexpired Leases Related Thereto, and (C) Granting Related Relief*
[Docket No. 6] (the "Sale Motion").

[3]   Certain of the disclosures herein relate to matters within the personal knowledge of other professionals at
Rothschild & Co and are based on information provided by them.

the Minority Lenders, and, if called upon to testify, I could and would testify competently to the facts set forth herein.

## Professional Qualifications

5.      Over the last 23 years, my transaction experience has ranged from out-of-court restructurings to in-court insolvencies in the U.S., Europe, Canada, and Mexico.  Additionally, my experience in mergers and acquisitions includes healthy and troubled company buy-side and sell-side assignments, as well as special committee representations.  My expertise includes, but is not limited to, corporate and securities valuations and various forms of debt and equity financing. I have been involved with approximately 30 completed M&A transactions spanning a broad range of industries, approximately one-third of which were structured and implemented via section 363 of the Bankruptcy Code.  I have been involved with many more efforts with companies considering such sales in the context of exploring strategic alternatives.  I also sit on the Global Advisory Commitment Committee of Rothschild & Co US Inc., where I regularly review proposed M&A mandates and fairness opinions issued by the firm.

6.      Prior to joining Rothschild & Co in 2009, I was a Managing Director and assisted in the founding of Conway, Del Genio, Gries & Co., LLC.  Previously, I was a senior manager in Ernst & Young LLP, specializing in both healthy and distressed M&A.

7.      Prior to my career in finance, I was a Captain in the United States Air Force specializing in contract negotiation.  I hold a BS degree in Mathematics and Economics from the University of Notre Dame and an MBA from Boston College.

## Review of the Sale Process

8.      I have reviewed the Sale Motion and the description of the Debtors' sale process contained therein.  There are several reasons why the Debtors' proposed sale process, as

designed, is not value-maximizing and will discourage competition with the Stalking Horse Bidder.

9.      ***First***, it appears the process the Debtors described in the Sale Motion used to consider strategic alternatives was inadequate.  The Debtors claim that the "proposed Stalking Horse Bid is the culmination of months of negotiations and exploring strategic alternatives for the Debtors."  *See* Sale Mot. ¶ 49.  Yet there is no description of what "strategic alternatives" the Debtors actually explored beyond a failed equity investment by the existing equity sponsors and failed prepackaged chapter 11 plan negotiations.  In my experience, when companies are in the financial condition of the Debtors, it is common for financial advisors to run credible refinancing, recapitalization, and sales processes before rendering advice regarding an optimal path to maximize value.  Knowing the specifics of the alternatives the Debtors considered is a necessary component of understanding whether the Stalking Horse Bid represents an attractive bid for the Debtors' assets.  Without more information regarding their consideration of strategic alternatives, the Debtors' prepetition marketing process, discussed below, looks more like a "first look" rather than the "last look" described by the Debtors' advisors (C. Cummins Decl. at ¶ 11).

10.     ***Second***, as it relates to the prepetition marketing process, it appears the Debtors relied on a limited email campaign to market the assets (Sale Mot.¶ 28).  The process entailed RPA (the Debtors' financial advisor) sending emails to 26 parties a mere 6 days before the Petition Date.  *See* Sale Mot. ¶ 28.  Neither the Debtors nor their advisors provide any further detail on the identity of the 26 entities (beyond generally stating they ranged from "industry participants to investment banks" (C. Cummins Decl. at ¶ 11)) that received such an email or how these specific entities were chosen.  Furthermore, it is unclear why the Debtors contacted "investment banks," which generally are not owners of power generation assets, other than to use

4

such institutions to introduce potential buyers to the process, which would have been an inappropriate replacement for the Debtors' advisors reaching out to the universe of potential buyers themselves.  It is unclear whether the remaining emailed parties represent a diverse set of potential investors from different geographies, as would be appropriate for a true wide-ranging marketing of such an asset.  Further, the Debtors only emailed a "teaser" to these parties, describing this as a "last look."  (C. Cummins Decl. at ¶ 4.)  Finally, it is unclear whether certain necessary due diligence information, including a confidential information package, financial models, data room access, or consultants' reports have been prepared or made available to would-be bidders who have or intend to sign non-disclosure agreements.  All of these are necessary steps for running a fulsome marketing process.

11.    The Debtors seek to justify their marketing process by noting the Stalking Horse Bid "represents a highly favorable offer" in light of the Credit Facility trading at levels between 70% and 80% of par.  *See* Sale Mot. ¶ 27.  Using the recent trading levels of a loan, including a loan with highly concentrated ownership, to justify the value of the bid and/or the process by which the bid was obtained is not an appropriate standard.  In my experience, regardless of the trading price of debt, a true marketing process, particularly one in which the debtor seeks to limit the timeline associated with the bid procedures, would include a much broader outreach by significantly increasing the number of parties contacted, actively following up on initial email or phone contacts, and providing a more fulsome information package to any interested parties who have signed non-disclosure agreements.  The prepetition marketing process described in the Sale Motion, in my opinion, does little to justify the value of the bid received or the limited timeline it seeks to complete its postpetition marketing.

12.    ***Third***, the Debtors are seeking to compound an insufficient prepetition marketing "process" by running a truncated postpetition "process."  There are two primary problems with this "process":  the proposed timeline and public statements made by the Debtors.

13.    Based on my experience, the Debtors are seeking an unreasonably tight timeline to complete their postpetition process.  On its face, the marketing process spans 45 days from the Petition Date to the Bid Deadline.  The process is in fact much shorter.  When accounting for restrictions imposed by the RSA,[4] the Debtors' postpetition marketing process will span only 29 days.[5]  Such a short process will make it difficult for potential bidders to conduct necessary diligence or arrange financing in an effort to submit a Qualified Bid.[6]  Combined with the Debtors' 6 day prepetition marketing process, the Debtors' advisors will be permitted to market the Debtors' assets for a 35 day process in total.

14.    In my opinion and experience, the combined pre- and postpetition marketing efforts that the Debtors have engaged in and intend to engage in is not a sufficient process to generate the highest or otherwise best bid for the Debtors.  In connection with analyzing the Debtors' proposed process, I have examined 68 section 363 sale processes for assets with an

---

[4]    The RSA provides that the Debtors "for the duration of the Restructuring Support Period . . . . shall not . . . propose, seek, solicit, support, encourage, assist, consent to, vote for, engage in negotiations in connection with, participate in the formulation of, or consummate any Alternative Transaction or Alternative Transaction Proposal."  *See* RSA § 3(b)(i).  This provision is only subject to a weak fiduciary out, which provides that the Debtors may "receive, ***but not seek, solicit or encourage***" an alternative proposal.  *See* RSA § 3(d) (emphasis added).  If an unsolicited proposal is received, the Debtors' personnel can only discuss such proposal with the third parties if there is an "executed confidentiality agreement that is acceptable to the Requisite Consenting Lenders." *See id.*  To be sure, the RSA does state: "For the avoidance of doubt, the Company . . . may seek solicit and encourage Persons other than the Stalking Horse Bidder to bid . . . ***in accordance with the Bid Procedures Order*** and the Stalking Horse Purchase Agreement."  *See* RSA § 3(d) (emphasis added).  And the Debtors state in the Sale Motion that:  "***If the Court enters the Bid Procedures Order***, the Debtors have instructed RPA to continue soliciting bids throughout the marketing process for an additional 45 days, with a proposed bid deadline of July 3, 2019." Sale Mot. ¶ 28 (emphasis added).

[5]    This figure assumes the Bid Procedures Order is entered on June 4, 2019, and the Bid Deadline is set for July 3, 2019.

[6]    The Bid Procedures require that a Qualified Bid be in cash (Bid Procedures, pg. 7).  In my experience, however, it is most common for purchasers to finance transactions of this size through debt and equity.

initial proposed purchase price equal to or in excess of $75 million, with petition dates dating back to 2011.  The median number of days provided between the petition date and the bid deadline in these cases is 89 days, whereas the Debtors' proposed timeline provides 45 days between the Petition Date and the Bid Deadline.[7]  Further, the vast majority of these cases (more than 75%) included a prepetition marketing process in addition to the amount of time of the process between the petition date and the bid deadline.  See **Exhibit 1** attached hereto for a study of sale timelines associated with similar asset sales.

15.     The Debtors claim that their "last look" postpetition process is reasonable in light of third-party press, including recent credit ratings agency downgrades to the Credit Facility. *See* Sale Mot. ¶ 29.[8]  In my experience, a ratings agency downgrade or any other press coverage on its own for a non-public company is not likely to result in strategic buyers becoming familiar with the Debtors' assets, and, in any event, would not provide any occasion for potential financial buyers to analyze the Debtors' assets or serve as a substitute for active marketing by the Debtors' advisors.  Accordingly, the existence of third-party press or ratings agency coverage provides no basis to truncate a marketing process.  The Debtors' reliance on the debt rating downgrades or similar press is not a reasonable standard; in most major corporate bankruptcies, it is typically the case that the debtors have been the subject of ratings agency scrutiny or other third-party press, and I have never seen a debtor rely on this to justify an expedited marketing process.

---

[7]     As discussed above, marketing will only occur during the last 29 days of this period due to the restriction imposed by the RSA.

[8]     ("Thus, most of the likely strategic buyers already were familiar with the Debtors' assets before the prepetition marketing process began, making it appropriate to structure the postpetition marketing process on a reasonably expedited 'last look' basis.")

16.    With respect to the public statements, the Debtors and their advisors began the postpetition marketing process by stating in open court that the amount of the proposed credit bid "is a number that well exceeds what the [Debtors believe] the value of [their] assets to be." *See* First Day H'rng Tr. at 10:17.  In my experience, it is highly unusual for a party legitimately seeking to test the value of an existing bid and generate higher and better bids to publicly state that the value of their assets is substantially less than the proffered bid.  In my opinion, this public statement serves no purpose other than to limit interest in participating in the Debtors' bidding process.

## Conclusion

17.    In conclusion, the sale process described in the Sale Motion is an inadequate and ineffective process to obtain the highest or otherwise best value for the Debtors' estates.

*[Remainder of page intentionally left blank.]*

18.     Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing

is true and correct to the best of my knowledge and belief.

New York, New York                      _/s/ Stephen J. Antinelli_
Dated:  May 28, 2019                     Stephen J. Antinelli
                                         Global Partner, Co-Head of Restructuring in North
                                         America
                                         Rothschild & Co US Inc.

## **<u>Exhibit 1</u>**

Section 363 Asset Sale Study



# Empire Generating Co

§363 overview

May 28, 2019



# §363 timetable comparison[1]



| Company | Court | Petition Date | Bid Procedure Motion | Court Approval | Bid Deadline | Auction Date | Marketed Prepetition[2] | Days between Bid Procedure Motion Bid Deadline | Petition Date Bid Deadline | Petition Date Auction Date | Bid Deadline Auction Date |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Pernix Therapeutics Holdings Inc. | DE | 2/18/19 | 2/19/19 | 3/22/19 | 4/5/19 | 4/11/19 | Y | 45 | 46 | 52 | 6 |
| Synergy Pharmaceuticals | TX - S | 12/12/18 | 12/12/18 | 1/7/2019 | 2/9/19 | 2/12/19 | Y | 59 | 59 | 62 | 3 |
| Rex Energy | PA | 5/18/18 | 6/1/18 | 6/29/2018 | 7/26/18 | 8/16/18 | N | 55 | 69 | 90 | 21 |
| Rockport (Relay Shoe Company) | DE | 5/14/18 | 5/14/18 | 6/5/18 | 6/29/18 | 7/10/18 | Y | 46 | 46 | 57 | 11 |
| Orexigen Therapeutics | DE | 3/12/18 | 3/16/18 | 4/23/18 | 5/21/18 | 5/24/18 | Y | 66 | 70 | 73 | 3 |
| Cobalt Int. Energy - several assets in Gulf of Mexico | TX - S | 12/14/17 | 12/14/17 | 1/25/2018 | 2/22/18 | 3/6/18 | Y | 70 | 70 | 82 | 12 |
| GST AutoLeather | DE | 10/3/17 | 10/3/17 | 11/15/17 | 12/5/17 | 12/11/17 | Y | 48 | 63 | 69 | 6 |
| Appvion, Inc. | DE | 10/1/17 | 10/2/17 | 2/8/18 | 4/19/18 | 4/23/18 | Y | 199 | 200 | 204 | 4 |
| Angelica Corp. | NY - S | 4/3/17 | 4/3/17 | 4/28/17 | 6/2/17 | 6/5/17 | Y | 60 | 60 | 63 | 3 |
| Azure Midstream Partners LP | TX - S | 1/30/17 | 2/10/17 | 2/23/17 | 3/6/17 | 3/10/17 | Y | 24 | 35 | 39 | 4 |
| Avaya Inc. - Networking assets | NY - S | 1/19/17 | 3/8/17 | 4/5/17 | 5/18/17 | 5/23/17 | Y | 71 | 119 | 124 | 5 |
| Stone Energy Corp. - Appalachian assets | TX - S | 12/14/16 | 12/14/16 | 1/18/17 | 2/6/17 | 2/8/17 | Y | 54 | 54 | 56 | 2 |
| Shoreline Energy LLC | TX - S | 11/2/16 | 11/21/16 | 12/15/16 | 1/16/17 | 1/23/17 | Y | 56 | 75 | 82 | 7 |
| Performance Sports Group Ltd. | DE | 10/31/16 | 10/31/16 | 11/30/16 | 1/25/17 | 1/30/17 | N | 86 | 86 | 91 | 5 |
| Implant Sciences Corp. - explosives trace detection assets | DE | 10/10/16 | 10/10/16 | 10/31/16 | 12/8/16 | 12/12/16 | Y | 59 | 59 | 63 | 4 |
| Garden Fresh Restaurant Corp. | DE | 10/3/16 | 10/7/16 | 11/15/16 | 12/6/16 | 1/3/17 | Y | 60 | 64 | 92 | 28 |
| Gawker | NY - S | 6/10/16 | 6/13/16 | 7/8/16 | 8/15/16 | 8/16/16 | Y | 63 | 66 | 67 | 1 |
| Vertellus Specialties Inc. | DE | 5/31/16 | 5/31/16 | 6/28/16 | 8/29/16 | 9/1/16 | Y | 90 | 90 | 93 | 3 |
| Abengoa Bioenergy US Holding | MI | 2/24/16 | 6/12/16 | 6/15/16 | 8/18/16 | 8/22/16 | Y | 67 | 176 | 180 | 4 |
| Noranda Aluminum | MO | 2/8/16 | 2/29/16 | 3/21/16 | 6/29/16 | 7/7/16 | N | 121 | 142 | 150 | 8 |
| Rdio, Inc. | CA | 11/16/15 | 11/16/15 | 11/24/15 | 12/13/15 | 12/18/15 | Y | 27 | 27 | 32 | 5 |
| Parallel Energy | DE | 11/9/15 | 11/9/15 | 12/10/15 | 12/22/15 | 1/6/16 | Y | 43 | 43 | 58 | 15 |
| Trinity Environmental Services LLC | TX - W | 10/12/15 | 11/25/15 | 12/8/15 | 2/19/16 | 2/23/16 | N | 86 | 130 | 134 | 4 |
| Samson Resources Corp. - Williston properties | DE | 9/16/15 | 9/27/16 | 9/30/16 | 10/4/16 | 10/10/16 | Y | 7 | 384 | 390 | 6 |
| Samson Resources Corp. - San Juan assets | DE | 9/16/15 | 9/27/16 | 9/30/16 | 10/4/16 | 10/10/16 | Y | 7 | 384 | 390 | 6 |
| Samson Resources Corp. - Central Andarko assets | DE | 9/16/15 | 9/27/16 | 9/30/16 | 10/4/16 | 10/10/16 | Y | 7 | 384 | 390 | 6 |
| Samson Resources Corp. - West Andarko assets | DE | 9/16/15 | 9/27/16 | 9/30/16 | 10/4/16 | 10/10/16 | Y | 7 | 384 | 390 | 6 |
| Samson Resources Corp. - East Andarko assets | DE | 9/16/15 | 9/27/16 | 9/30/16 | 10/4/16 | 10/10/16 | Y | 7 | 384 | 390 | 6 |
| Hovensa LLC | STX | 9/15/15 | 9/15/15 | 10/7/15 | 11/5/15 | 11/10/15 | Y | 51 | 51 | 56 | 5 |
| Alpha Natural Resources - PLR | VA | 8/3/15 | 2/8/16 | 2/28/16 | 5/9/16 | 5/16/16 | N | 91 | 280 | 287 | 7 |
| Alpha Natural Resources - Coal | VA | 8/3/15 | 2/8/16 | 2/28/16 | 5/9/16 | 5/16/16 | N | 91 | 280 | 287 | 7 |
| Relativity Media LLC - television business | NY - S | 7/30/15 | 7/30/15 | 8/28/15 | 9/25/15 | 10/1/15 | N | 57 | 57 | 63 | 6 |
| Relativity Media LLC | NY - S | 7/30/15 | 7/30/15 | 8/28/15 | 9/25/15 | 10/1/15 | N | 57 | 57 | 63 | 6 |
| The Great Atlantic & Pacific Tea Company (A&P) | NY - S | 7/19/15 | 7/19/15 | 8/11/15 | 9/11/15 | 9/21/15 | Y | 54 | 54 | 64 | 10 |
| Walter Energy, Inc. | AL | 7/15/15 | 11/5/15 | 11/25/15 | 1/4/16 | 1/5/16 | N | 60 | 173 | 174 | 1 |
| Patriot Coal | VA | 5/12/15 | 6/2/15 | 6/25/15 | 9/4/15 | 9/9/15 | Y | 94 | 115 | 120 | 5 |
| The Standard Register Company | DE | 3/12/15 | 3/12/15 | 4/15/15 | 6/11/15 | 6/15/16 | Y | 91 | 91 | 461 | 370 |
| RadioShack Corp. | DE | 2/5/15 | 2/5/15 | 3/9/15 | 3/20/15 | 3/25/15 | Y | 43 | 43 | 48 | 5 |
| Dendreon Corp. | DE | 11/10/14 | 11/10/14 | 12/17/14 | 2/10/15 | 2/12/15 | Y | 92 | 92 | 94 | 2 |
| ALCO Stores, Inc. | TX -N | 10/12/14 | 10/14/14 | 10/30/14 | 11/17/14 | 11/19/14 | Y | 34 | 36 | 38 | 2 |
| NII Holdings, Inc. | NY - S | 9/15/14 | 1/27/15 | 2/17/15 | 3/17/15 | 3/20/15 | N | 49 | 183 | 186 | 3 |
| Associated Wholesalers, Inc. | DE | 9/9/14 | 9/9/14 | 10/3/14 | 10/22/14 | 10/24/14 | Y | 43 | 43 | 45 | 2 |

**Notes**

1  Transactions with an initial purchase price greater than $75m
2  Includes cases with a prepetition marketing process for a partial or complete sale of the debtor or its assets. Multiple sale processes within the same case are treated as one for the purpose of this calculation



# §363 timetable comparison[1] (cont'd)

| Company | Court | Petition Date | Bid Procedure Motion | Court Approval | Bid Deadline | Auction Date | Marketed Prepetition[2] | Days between — Bid Procedure Motion / Bid Deadline | Days between — Petition Date / Bid Deadline | Days between — Petition Date / Auction Date | Days between — Bid Deadline / Auction Date |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Revel AC Inc. | NJ | 6/19/14 | 9/10/14 | 9/15/14 | 9/23/14 | 10/1/14 | Y | 13 | 96 | 104 | 8 |
| PSL - North America | DE | 6/16/14 | 6/16/14 | 7/14/14 | 8/11/14 | 8/13/14 | Y | 56 | 56 | 58 | 2 |
| Natrol, Inc. | DE | 6/11/14 | 9/29/14 | 10/24/14 | 11/6/14 | 11/10/14 | Y | 38 | 148 | 152 | 4 |
| Brookstone Holdings Corp | DE | 4/3/14 | 4/3/14 | 4/25/14 | 5/8/14 | 6/7/14 | Y | 35 | 35 | 65 | 30 |
| Event Rentals Inc (Classic Party Rentals Inc) | DE | 2/13/14 | 2/14/14 | 3/14/14 | 4/14/14 | 4/21/14 | Y | 59 | 60 | 67 | 7 |
| First Mariner Bank | MD | 2/10/14 | 2/10/14 | 3/8/14 | 4/7/14 | 4/10/14 | Y | 56 | 56 | 59 | 3 |
| Allens Inc | AK | 10/28/13 | 11/22/13 | 1/7/14 | 1/27/14 | 2/3/14 | Y | 66 | 91 | 98 | 7 |
| Furniture Brands Holdings | DE | 9/9/13 | 9/9/13 | 10/3/13 | 12/5/13 | 12/10/13 | Y | 87 | 87 | 92 | 5 |
| Florida Gaming Centers Inc. | FL | 8/19/13 | 11/25/13 | 12/30/13 | 3/19/14 | 3/25/14 | Y | 114 | 212 | 218 | 6 |
| Orchard Supply | DE | 6/17/13 | 6/17/13 | 7/8/13 | 8/9/13 | 8/14/13 | Y | 53 | 53 | 58 | 5 |
| TLO LLC | FL - S | 5/9/13 | 10/15/13 | 10/24/13 | 11/15/13 | 11/20/13 | N | 31 | 190 | 195 | 5 |
| Lifecare11 | DE | 12/11/12 | 12/11/12 | 1/25/13 | 3/13/13 | 3/20/13 | Y | 92 | 92 | 99 | 7 |
| First Place Bank | DE | 10/19/12 | 10/29/12 | 11/28/12 | 12/11/12 | 12/14/12 | Y | 43 | 53 | 56 | 3 |
| A123 Systems | DE | 10/16/12 | 10/16/12 | 11/8/12 | 12/4/12 | 12/6/12 | Y | 49 | 49 | 51 | 2 |
| Vertis Holdings Inc. | DE | 10/10/12 | 10/11/12 | 11/2/12 | 11/23/12 | 11/30/12 | Y | 43 | 44 | 51 | 7 |
| Residential Capital LLC - mortgage loan portfolio | NY - S | 5/14/12 | 5/14/12 | 6/28/12 | 10/19/12 | 10/23/12 | Y | 158 | 158 | 162 | 4 |
| Residential Capital LLC - mortgage orig. and servicing | NY - S | 5/14/12 | 5/14/12 | 6/28/12 | 10/19/12 | 10/23/12 | Y | 158 | 158 | 162 | 4 |
| Hostess Brands Inc. (National Bread Business) | NY - S | 1/11/12 | 1/11/13 | 1/28/13 | 2/25/13 | 2/28/13 | Y | 45 | 411 | 414 | 3 |
| Hostess Brands Inc. - cake business | NY - S | 1/11/12 | 1/30/13 | 2/11/13 | 3/11/13 | 3/13/13 | Y | 40 | 425 | 427 | 2 |
| Coach Am Group Holdings | DE | 1/3/12 | 1/13/12 | 1/27/12 | 4/13/12 | 4/18/12 | N | 91 | 101 | 106 | 5 |
| AES Eastern Energy LP - two power plants | DE | 12/30/11 | 1/13/12 | 3/5/12 | 3/19/12 | 4/11/12 | Y | 68 | 80 | 103 | 23 |
| SP Newsprint Holdings LLC | DE | 11/15/11 | 7/19/12 | 7/27/12 | 8/13/12 | 8/17/12 | N | 25 | 272 | 276 | 4 |
| The Clare at Water Tower, Inc. | IL - N | 11/14/11 | 3/9/12 | 3/21/12 | 4/10/12 | 4/12/12 | N | 32 | 148 | 150 | 2 |
| Solyndra LLC - manufacturing plants | DE | 9/6/11 | 8/22/12 | 9/18/12 | 11/12/12 | 11/15/12 | N | 82 | 433 | 436 | 3 |
| CDC Software Corporation | GA - N | 6/28/11 | 2/6/12 | 2/17/12 | 3/9/12 | 3/16/12 | Y | 32 | 255 | 262 | 7 |
| Doral Golf Resort & Spa | NY - S | 2/1/11 | 10/18/11 | 12/20/11 | 2/20/12 | 2/27/12 | N | 125 | 384 | 391 | 7 |
| High | | | | | | | | 199 | 433 | 461 | 370 |
| Mean | | | | | | | 46 | 62 | 139 | 151 | 12 |
| Median | | | | | | | | 56 | 89 | 94 | 5 |
| Low | | | | | | | | 7 | 27 | 32 | 1 |

*76% of bankruptcy cases involving a 363 sale included a prepetition marketing process*

**Notes**
1   Transactions with an initial purchase price greater than $75m
2   Includes cases with a prepetition marketing process for a partial or complete sale of the debtor or its assets. Multiple sale processes within the same case are treated as one for the purpose of this calculation



# Summary §363 process timelines



## Select §363 transactions from 2011 – 2019 (transactions over $75m)

**Petition Date to Bid Deadline (days)**

# of data points: 68
100% of data set

**Petition Date to Bid Deadline without prepetition marketing (days)**

# of data points: 16
24% of data set





**Note**
1    When accounting for restrictions outlined in the RSA, the figure shown herein illustrates the truncated period in which Empire may solicit bids, assuming the Bid Procedures Order is entered into on June 4, 2019

# **EXHIBIT B**

***Operational Due Diligence Overview***, **dated December 20, 2019**

[Exhibit Filed Under Seal]

# **EXHIBIT C**

### **Work Plan**


[Exhibit Filed Under Seal]

**<u>EXHIBIT D</u>**

**Email from P. Partee to A. Schwarzman (May 17, 2019)**

**From:** Partee, Peter <ppartee@hunton.com>
**Sent:** Friday, May 17, 2019 12:50 PM
**To:** Schwarzman, Alexandra <alexandra.schwarzman@kirkland.com>
**Cc:** Sathy, Anup <asathy@kirkland.com>; Hackney, Stephen C. <shackney@kirkland.com>; Schartz, Brian <bschartz@kirkland.com>; Rich, Robert A. <RRich2@hunton.com>
**Subject:** [EXT] RE: Empire Generating NDA

Alex, unfortunately, I don't think Section 11.17 of the Credit Agreement by its terms applies to information distributed in connection with RPA's marketing efforts, as the information is not being shared "pursuant to the requirements [of the Credit Agreement]." I believe RPA distributed a form NDA that is pretty banal and so hopefully is not problematic.

--Peter



**Peter S. Partee, Sr.**
Partner

ppartee@HuntonAK.com
p  212.309.1056
m 917.683.9439
f   804.353.4558
bio  |  vCard

Hunton Andrews Kurth LLP
200 Park Avenue
52nd Floor
New York, NY 10166

HuntonAK.com

**From:** Schwarzman, Alexandra <alexandra.schwarzman@kirkland.com>
**Sent:** Friday, May 17, 2019 1:10 PM
**To:** Partee, Peter <ppartee@hunton.com>
**Cc:** Sathy, Anup <asathy@kirkland.com>; Hackney, Stephen C. <shackney@kirkland.com>; Schartz, Brian
<bschartz@kirkland.com>
**Subject:** Empire Generating NDA

Peter,

Please confirm that Ares can rely on the confidentiality provision in the credit agreement to get further information in
connection with RPA's request and that they do not need to sign a separate NDA.

Thanks,
Alex

**Alex Schwarzman**

**KIRKLAND & ELLIS LLP**
300 North LaSalle, Chicago, IL 60654
**T** +1 312 862 3160  **M** +1 203 253 9248
**F** +1 312 862 2200

alexandra.schwarzman@kirkland.com

The information contained in this communication is confidential, may be attorney-client privileged, may constitute inside information, and is intended only
for the use of the addressee. It is the property of Kirkland & Ellis LLP or Kirkland & Ellis International LLP. Unauthorized use, disclosure or copying of
this communication or any part thereof is strictly prohibited and may be unlawful. If you have received this communication in error, please notify us
immediately by return email or by email to postmaster@kirkland.com, and destroy this communication and all copies thereof, including all attachments.

## **EXHIBIT E**

**Email from P. Partee to A. Sathy (May 10, 2019)**

**From:** "Partee, Peter" <ppartee@hunton.com>
**Date:** May 10, 2019 at 9:19:37 PM CDT
**To:** "Sathy, Anup" <asathy@kirkland.com>
**Subject: [EXT] Re: EmGen**

 We are having a meeting, but I do not think it would be productive for you to attend.  That said, I will float the idea and let you know if it gains any traction.

_____

Peter S. Partee, Sr. | Hunton Andrews Kurth LLP 212 309 1056 Office | 917 683 9439 Cell

On May 10, 2019, at 9:27 PM, Sathy, Anup <asathy@kirkland.com<mailto:asathy@kirkland.com>> wrote:

Would you consider calling a meeting and requiring all the principals to attend?  We would go.

Anup Sathy, P.C.
------------------------------------------------------

# **EXHIBIT F**

**Letter to Collateral Agent re Directions Regarding Credit Bid for the Collateral**

**Execution Version**

As of May 19, 2019

Ankura Trust Company, LLC
485 Lexington Avenue, 10th Floor
New York, New York 10017
Attention: Michael Fey


Re:     Directions Regarding Credit Bid for the Collateral (this "Letter of Direction")

Mr. Fey:

Reference is hereby made to (a) that certain Credit and Guaranty Agreement, dated as of March 14, 2014 (as amended, amended and restated, supplemented or otherwise modified from time to time in accordance with the terms thereof, the "Credit Agreement"), by and among Empire Generating Co, LLC, a New York limited liability company, as borrower (the "Borrower"), Empire Gen Holdco, LLC, a New York limited liability company ("Holdco"), Empire Gen Holdings, LLC, a Delaware limited liability company (the "Parent"), Ankura Trust Company, LLC ("Ankura"), as successor administrative agent and successor collateral agent (in such collective capacities, the "Agent"), and certain lenders and other parties thereto from time to time, (b) that certain Collateral Agency and Intercreditor Agreement, dated as of March 14, 2014 (as amended, amended and restated, supplemented or otherwise modified from time to time in accordance with the terms thereof, the "Intercreditor Agreement"), by and among the Agent, the Borrower, Parent, Holdco and each other person party thereto from time to time, (c) that certain Pledge Agreement, dated as of February 23, 2017 (as amended, amended and restated, supplemented or otherwise modified from time to time in accordance with the terms thereof, the "Pledge Agreement"), by and among TTK Empire Power, LLC ("TTK Empire" and, together with Borrower, Holdco, and the Parent, the "Debtors"), the Agent, the Borrower and the other Pledgors from time to time party thereto, (d) that certain Pledge and Security Agreement, dated as of March 14, 2014 (as amended, amended and restated, supplemented or otherwise modified from time to time in accordance with the terms thereof, the "Pledge and Security Agreement", and together with the Credit Agreement, the Pledge Agreement, and the Intercreditor Agreement, the "Loan Documents"), by and among the Borrower, Holdco, the Parent and the Agent, and (e) the other Loan Documents.   Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Credit Agreement, the Intercreditor Agreement or the Security Agreement, as applicable.  As of the date hereof, various Defaults and Events of Default (each as defined in the Credit Agreement) have occurred and the Required Lenders (as defined herein) intend to direct the Agent to exercise certain remedies available to the Agent under the Loan Documents as a result of such Defaults and Events of Default.

Pursuant to (i) Sections 8.01, 9.02, 9.03(c), 9.08 and 11.22 of the Credit Agreement, (ii) Sections 3.1(a), 3.2, 5.1, 6.1, 7.1, 7.2 and 7.8(b) of the Intercreditor Agreement, (iii) Sections 5.01 through 5.05 of the Pledge Agreement, and (iv) Section 7 of the Pledge and Security Agreement, the undersigned Lenders, which as of the date hereof collectively constitute "Required Lenders" under the Credit Agreement and "Required Secured Parties" necessary to effect an "Act of Secured Parties" under the Intercreditor Agreement (such Required Lenders and Required Secured Parties, as applicable, the "Required Lenders"), hereby request and direct the Agent to (x) engage and retain, either directly or through counsel, (i) Houlihan Lokey Capital, Inc.

("Houlihan") to provide financial advisory and investment banking services on terms substantially consistent with that certain engagement letter dated as of April 1, 2018 (as amended from time to time), with any updates thereto approved by the Required Lenders and (ii) Woodlands Energy Management LLC to provide consulting and advisory services on terms substantially consistent with that certain Consulting and Advisory Agreement dated as of June 27, 2018 (as amended from time to time), with any updates thereto approved by the Required Lenders, each in connection with the Agent's exercise of the Agent's rights and duties under the Loan Documents, *provided* that the Agent shall not be obligated to accept any actual or potential liability (including for payment of fees or indemnification) to any person in connection with such letters, (y) permit, in accordance with Section 6.1 of the Intercreditor Agreement, upon the commencement by the Debtors of any cases under chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 101-1532, (as may be amended from time to time the "Bankruptcy Code"), the Debtors to use "cash collateral" (as such term is defined in section 363(a) of the Bankruptcy Code) on such terms as may be acceptable to the Agent and the Required Lenders pursuant to the terms of an order governing the use of cash collateral substantially similar to the form attached hereto as Exhibit A and otherwise acceptable to the Agent and the Required Lenders and (z) for the purpose of bidding and making settlement or payment of the purchase price for certain Collateral (such Collateral, the "Auctioned Collateral") to be sold to Empire Acquisition, LLC ("Purchaser"), a newly formed Delaware limited liability company that will upon or immediately prior to the consummation of the sale of the Auction Collateral to the Purchaser (such sale being referred to herein as the "363 Sale") be beneficially owned by the Lenders, or its designee as provided in the order approving the 363 Sale, in accordance with bidding procedures to be approved by the United States Bankruptcy Court for the Southern District of New York (the "Bidding Procedures"), including, if necessary, at an auction to be conducted in accordance with the Bidding Procedures (the "Auction"), take the following actions (collectively, the "Credit Bid Steps"):

A.   Take all steps necessary and execute all documents necessary to form the Purchaser as a limited liability company under Delaware law with an initial limited liability company agreement in the form attached hereto as Exhibit B and a certificate of formation in a form reasonably agreeable to the Agent and the Required Lenders.  To the extent the Purchaser is formed prior to the date hereof, the Required Lenders ratify such formation, including the certificate of formation, and approve the adoption of the initial liability company agreement in the form attached hereto as Exhibit B.

B.   Appoint the Purchaser as sub-Collateral Agent and sub-Administrative Agent under the Credit Agreement and other Loan Documents (collectively, in such capacities, the "Sub-Agent"), with the powers and duties and responsibilities as expressly delegated by the Agent (at the written direction of the Required Lenders) to the Sub-Agent from time to time.  By execution of this Letter of Direction, (i) the Agent, in accordance with the direction in the immediately preceding sentence and pursuant to Section 9.03 of the Credit Agreement and Section 7.2(a) of the Intercreditor Agreement, hereby appoints Purchaser as its Sub-Agent and (ii) Purchaser upon its formation shall be automatically deemed to accept its appointment as Sub-Agent.

C. Assign (and by executing this Letter of Direction, the Agent so assigns) to the Sub-Agent all rights of the Agent to credit bid up to the full amount of the Obligations on behalf of the Lenders as consideration for the 363 Sale of the interests in Holdings owned by TTK Empire.

D. Direct (and by executing this Letter of Direction, the Agent so directs) the Sub-Agent to execute and deliver to the Debtors a purchase and sale agreement in the form attached hereto as <u>Exhibit C</u> (the "<u>PA</u>"), pursuant to which the Purchaser will acquire the interests in Holdings owned by TTK Empire in exchange for the Purchase Consideration (as defined in the PA), including a credit bid of the full amount of the Obligations (other than any Obligations owed to the Agent, including fees, expenses and indemnification), and any related and ancillary agreements or documents (including the Letter Agreement Regarding Certain Tax Matters in the form attached hereto as <u>Exhibit D</u> and regulatory applications) that the Required Lenders deem necessary.

E. Take all steps necessary to (i) distribute or assign interests in the Purchaser in accordance with Section 4.1 of the Intercreditor Agreement, the Loan Documents and applicable law and (ii) cease to hold any interest in the Purchaser as of immediately prior to or upon consummation of the 363 Sale in the case of clause (ii) as directed by the Required Lenders; *provided* that, in connection with the consummation of the 363 Sale, the Agent will in any event cease to own any equity interests in the Purchaser.

F. Upon the closing of the 363 Sale, (i) deem all Obligations (other than any Obligations owed to the Agent, including fees, expenses and indemnification) satisfied in full and (ii) execute and deliver to the Debtors releases and terminations of the liens securing the Obligations in form and substance satisfactory to the Required Lenders.

The Required Lenders hereby agree to do all things necessary or appropriate or otherwise reasonably requested by the Purchaser in order to allow the Purchaser to timely comply with its obligations under the PA as set forth therein, and request, authorize and direct the Agent and the Purchaser as designated Sub-Agent to comply with any instructions and directions (without the need for further direction letters) given to them by Les Meier or Rich Ehrlich (each, an "<u>Authorized Representative</u>") related to the 363 Sale, the Bidding Procedures, the Auction or the Credit Bid Steps for so long as the undersigned Lenders constitute "Required Lenders" under the Credit Agreement and "Required Secured Parties" under the Intercreditor Agreement; *provided* that (i) the Agent and the Sub-Agent may each require, at their sole discretion, that such instructions and directions be made in writing and (ii) the Agent and the Sub-Agent may each decline to follow instructions that it reasonably believes, on the advice of counsel, to be unlawful or inconsistent with the Loan Documents.  As of the date of this letter, Les Meier is a principal of Black Diamond Capital Management, L.L.C. ("<u>BDCM</u>"), the investment advisor or manager to one or more Lenders, and Rich Ehrlich is an employee of BDCM.  As of the date of this letter, at least one Authorized Representative intends to attend the Auction.

The Agent and the Sub-Agent shall enjoy all rights and benefits under the Credit Agreement and the other Loan Documents, including (i) the rights and immunities of the Agent set forth in Section 9.03(a) of the Credit Agreement and (ii) the exculpatory, expense reimbursement and indemnification provisions in favor of the Agent set forth in the Credit Agreement (including, without limitation, those set forth in Sections 9.03(b) and 9.06 of the Credit Agreement) in connection with any act or omission taken pursuant to this Letter of Direction or any Loan Document and in connection with this Letter of Direction, the APA, the Auction, or the Bid Procedures.  The Required Lenders also hereby acknowledge and agree (i) that the Agent shall not be liable for any actions or omissions of the Sub-Agent and (ii) that the provisions of Section 9.03 (General Immunity) of the Credit Agreement and Section 9.06 (Right to Indemnity) of the Credit Agreement and any other of the Agent's rights to indemnity or reimbursement of costs, expenses and other charges shall apply to the Agent, the Sub-Agent and their respective successors and assigns, officers, directors, employees, partners, trustees, members, controlled persons, agents, advisors, attorneys and other representatives (together, "Related Persons") in respect of any action or inaction of the Sub-Agent.  The rights and remedies conferred hereunder shall be cumulative and the exercise or waiver of any such right or remedy shall not preclude or inhibit the exercise of additional rights or remedies or the subsequent exercise of such right or remedy.  Furthermore, no action taken by the Agent, the Sub-Agent, or their respective Related Persons in accordance with this Letter of Direction or at the further direction of the Requested Lenders shall be deemed to constitute gross negligence, bad faith or willful misconduct.

Each of the undersigned Lenders (a) agrees that the terms of this Letter of Direction shall be governed by, and shall be construed and enforced in accordance with, the laws of the State of New York, (b) to the extent permitted by law, waives its right to trial by jury in any action, suit, or proceeding arising out of, in connection with or relating to, this Letter of Direction and any other transaction contemplated hereby, which waiver applies to any action, suit or proceeding, whether sounding in tort, contract or otherwise, (c) agrees that any legal action or proceeding with respect to this Letter of Direction shall be brought only (i) in the United States District Court for the Southern District of New York, sitting in the County of New York, or (ii) if such court lacks subject matter jurisdiction, then in the Commercial Division of the New York Supreme Court sitting in the County of New York, (d) represents and warrants to the Agent that it possesses full power and authority to execute this Letter of Direction and that it has duly authorized the execution and delivery of this Letter of Direction, (e) represents and warrants to the Agent that it has, independently of and without reliance on the Agent and the Agent's Related Persons, and based on such documents and information as it has deemed appropriate, made its own appraisal of and investigation into the transactions contemplated by this Letter of Direction and has made its own decision to enter into the transactions contemplated by this Letter of Direction, and (f) represents that it is the beneficial owner of the Obligations associated with the Advances and Commitments set forth on its signature page, free and clear of any pledge, lien, security interest, charge, claim, option, proxy, voting restriction, right of first refusal, or other encumbrance of any kind that would adversely affect its ability to direct the Agent or to fulfill its obligations under the Loan Documents.  Furthermore, each of the undersigned Lenders shall immediately notify the Agent if at any time it is no longer the beneficial owner of the Obligations associated with the Advances and Commitments set forth on its signature page, free and clear of any pledge, lien, security interest, charge, claim, option, proxy, voting restriction, right of first refusal, or other encumbrance of any kind that would adversely affect its ability to direct the Agent or to fulfill its obligations under the Loan Documents.

This Letter of Direction shall not be amended, modified, waived or revoked without the prior written consent from the Required Lenders delivered to the Agent.  If any provision of this Letter of Direction is held invalid or unenforceable by any court of competent jurisdiction, the other provisions of this Letter of Direction will remain in full force and effect.  Any provision of this Letter of Direction held invalid or unenforceable only in part will remain in full force and effect to the extent not held invalid or unenforceable.  In the event of any conflict between the provisions of this Letter of Direction and any of the Loan Documents, the provisions of this Letter of Direction shall govern.

This Letter of Direction may be executed in any number of counterparts, and may be delivered in electronic form (including facsimile and PDF), each of which, when executed and delivered, shall be deemed to be an original and all such counterparts shall constitute one and the same instrument.

[Signature page(s) on file with agent]

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

———————————————————————— )
                                                    )
In re:                                              )    Chapter 11
                                                    )
EMPIRE GENERATING CO, LLC, *et al.,*[1]             )    Case No. 19-[_____] (___)
                                                    )
                              Debtors.              )    (Jointly Administered)
                                                    )
———————————————————————— )

## INTERIM ORDER (I) AUTHORIZING DEBTORS' USE OF CASH COLLATERAL, (II) PROVIDING ADEQUATE PROTECTION THEREOF AND (III) SCHEDULING A FINAL HEARING

Upon the motion (the "Motion")[2] of Empire Generating Co, LLC ("Empire Generating"), Empire Gen Holdco, LLC ("Holdco"), Empire Gen Holdings, LLC ("Holdings"), and TTK Empire Power, LLC ("TTK Empire" and together with Empire Generating, Holdco and Holdings, the "Debtors"), in the above-captioned Chapter 11 cases (collectively with any Successor Cases (as defined herein), the "Chapter 11 Cases") seeking entry of an order (this "Interim Order") granting inter alia:

(a) authorization for the Debtors to use Cash Collateral (as defined below) in accordance with the Approved Budget (as such terms are defined below);

(b) adequate protection to the Prepetition Agent, for the benefit of the Prepetition Lenders, with respect to any Diminution in Value (as defined below) of the Prepetition Secured Parties' (as defined below) interests in the Prepetition Collateral (as defined below), whether from the use of the Cash Collateral or the use, sale, lease, depreciation, disposition or other decline in value of the Prepetition Collateral, or as a result of the imposition of the automatic stay under section 362(a) of the Bankruptcy Code;

---

[1]  The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification number, if applicable, are:  Empire Generating Co, LLC [3821], Empire Gen Holdco, LLC [3820], Empire Gen Holdings, LLC [4849], and TTK Empire Power, LLC [none].  The Debtors' corporate address is:  Empire Generating Co, LLC, c/o Tyr Energy, LLC, 7500 College Blvd., Suite 400, Overland Park, Kansas 66210.

[2]  Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Motion.

(c) approval of certain stipulations by the Debtors with respect to (i) the Credit

Agreement (as defined below) and the claims, liens and security interests arising therefrom and

(ii) the Letters of Credit (as defined below); and

(d) a final hearing (the "Final Hearing") on the Motion to be held within twenty-

eight (28) days after entry of this Interim Order to consider entry of a final order (the "Final

Order") authorizing the Debtors' use of the Cash Collateral and granting the adequate protection

described herein;

and the Court (as defined below) having considered the Motion, the *Declaration of Garrick F.*

*Venteicher (I) in Support of Chapter 11 Petitions and First Day Motions and (II) Pursuant to*

*Local Bankruptcy Rule 1007-2* and the evidence and arguments submitted at the interim hearing

held on May [__], 2019 (the "Interim Hearing"); and adequate notice of the Interim Hearing

having been provided in accordance with Bankruptcy Rules 4001 and 9014 and the Local Rules;

and all objections, if any, to the interim relief requested in the Motion having been withdrawn,

resolved or overruled by the Court as set forth below; and it appearing to the Court that granting

the interim relief requested is necessary to avoid immediate and irreparable harm to the Debtors

and their respective bankruptcy estates (the "Estates") pending the Final Hearing, and otherwise

is fair and reasonable and in the best interests of the Debtors and the Estates; and after due

deliberation and consideration, and good and sufficient cause appearing therefor;

BASED UPON THE RECORD ESTABLISHED AT THE INTERIM HEARING, THE

COURT HEREBY MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS

OF LAW:

A.     *Jurisdiction and Venue*.  The Court has jurisdiction, pursuant to 28 U.S.C.

§§ 157(b) and 1334, over these proceedings, and over the persons and property affected hereby.

Consideration of the Motion constitutes a core proceeding under 28 U.S.C. § 157(b)(2), and the Debtors, the Prepetition Agent (as defined below) and the Consenting Lenders consent to the entry of a Final Order by the Court in connection with the Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgements in connection with the Motion consistent with Article III of the United States Constitution. The statutory predicates for the relief sought herein are sections 105, 361, 362, 363 and 507 of the Bankruptcy Code, Bankruptcy Rules 4001(b), 4001(d) and 9014 and Local Rule 4001-2. Venue for the Chapter 11 Cases and proceedings on the Motion is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

B.      _Commencement of the Chapter 11 Cases_.   On May [__], 2019 (the "Petition Date"), the Debtors filed voluntary petitions under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of New York (the "Court") commencing the Chapter 11 Cases. The Debtors are continuing in the management and operation of their business and properties as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code. No trustee or examiner has been appointed in the Chapter 11 Cases. As of the date of this Interim Order, the United States Trustee (the "U.S. Trustee") has not appointed an official committee of unsecured creditors in the Chapter 11 Cases (any such committee, the "Creditors' Committee").

C.      _Debtors' Stipulations_.   The Debtors admit, stipulate, acknowledge and agree that (the following paragraphs (C)(i) through (C)(x) are collectively defined as the "Debtors' Stipulations"):

(i)      **_Prepetition Facility_.**   Pursuant to (a) that certain Credit and Guaranty Agreement, dated as of March 14, 2014 (as amended, amended and restated,

3

supplemented or otherwise modified from time to time in accordance with the terms thereof, the "Credit Agreement"), by and among Empire Generating, as borrower, Holdco, Holdings, the lenders party thereto from time to time (the "Prepetition Lenders"), Ankura Trust Company, LLC, as successor administrative agent and collateral agent (the "Prepetition Agent" and, together with the Prepetition Lenders, the "Prepetition Secured Parties") and the other financial institutions party thereto from time to time; (b) that certain Collateral Agency and Intercreditor Agreement, dated as of March 14, 2014 (as amended, amended and restated, supplemented or otherwise modified from time to time in accordance with the terms thereof, the "Intercreditor Agreement"), by and among Empire Generating, Holdco, Holdings, the ECP Pledgors (as defined in the Intercreditor Agreement), the Prepetition Agent, and the other financial institutions party thereto from time to time; (c) that certain Pledge and Security Agreement, dated as of March 14, 2014 (as amended, amended and restated, supplemented or otherwise modified from time to time in accordance with the terms thereof, the "Pledge and Security Agreement"), by and among Empire Generating, Holdco, Holdings, and the Prepetition Agent; and (d) the other "Loan Documents" (as defined in the Credit Agreement and, together with the Credit Agreement, the Intercreditor Agreement, and the Pledge and Security Agreement, the "Prepetition Loan Documents"), the Prepetition Lenders provided a fully perfected secured loan to and for the benefit of the Debtors.

        (ii)    ***Prepetition Obligations.*** As of the Petition Date, the Debtors were indebted to the Prepetition Secured Parties, without defense, counterclaim or offset of any kind, in respect of loans made in the aggregate principal amount under the Prepetition Loan Documents of not less than $353,436,447.99, plus accrued and unpaid interest and fees with respect thereto (which, as of May 1, 2019, was not less than $17 million, which amounts, for the

avoidance of doubt, do not include the Prepetition Secured Parties' accrued and unpaid attorneys' fees, costs, and expenses, or any prepayment premium or any other premium, make-whole or penalty payments otherwise required by the terms of the Prepetition Loan Documents, including, without limitation, upon a prepayment or acceleration of the obligations thereunder, but which shall be included in the definition of "Prepetition Obligations") (such amounts, together with any amounts incurred or accrued but unpaid prior to the Petition Date in accordance with the Prepetition Loan Documents, including but not limited to, accrued and unpaid interest, any fees, expenses and disbursements, treasury, cash management, derivative obligations, indemnification obligations, and other charges, amounts and costs of whatever nature owing, whether or not contingent, whenever arising, accrued, accruing, due, owing or chargeable in respect of any of the obligations owed by the Debtors pursuant to the Prepetition Loan Documents, collectively, the "Prepetition Obligations").

                    (iii)    ***Prepetition Collateral.***    To secure the Prepetition Obligations, (a) Empire Generating granted to the Prepetition Agent, for its benefit and the benefit of the Prepetition Lenders, a security interest in and lien upon (the "Prepetition Liens") all "Collateral" under and as defined in the Prepetition Loan Documents, including a second lien on the Webster Accounts (as defined below), (b) Holdco pledged to the Prepetition Agent all of its equity interest in Empire Generating, (c) Holdings pledged to the Prepetition Agent all of its equity interest in Holdco and (d) TTK Empire pledged to the Prepetition Agent all of its equity interest in Holdings (the collateral described in clauses (a), (b), (c) and (d), the "Prepetition Collateral").

                    (iv)    ***Letters of Credit***.    As of the Petition Date, Empire Generating is indebted and liable in the aggregate principal amount of $7,450,000 in face amount of undrawn letters of credit (the "Letters of Credit") issued by Webster Bank, National Association

("Webster").    Pursuant to those certain Cash Collateral Agreements, dated as of January 24, 2019, and March 12, 2019, between Empire Generating and Webster, those certain Reimbursement Agreements, dated as of January 24, 2019, and March 12, 2019, made by Empire Generating in favor of Webster, and those certain Deposit Account Control Agreements, dated as of February 4, 2019, and March 12, 2019, among Empire Generating, the Prepetition Agent and Webster (together, the "Webster Agreements"), Empire Generating granted to Webster first priority security interests (the "Webster Liens") in two (2) deposit accounts at Webster with account number 24139830 and account number 24139825 (the "Webster Accounts"). Empire Generating's obligations under the Webster Agreements constitute (a) legal, valid, enforceable, binding and non-avoidable obligations of Empire Generating and (b) allowed secured claims against the Estates. The Webster Liens were fully perfected as of the Petition Date and constitute legal, valid, binding, enforceable and perfected first priority liens in and to the Webster Accounts, are not subject to avoidance, reduction, disallowance, disgorgement, counterclaim, surcharge or subordination pursuant to the Bankruptcy Code or applicable non-bankruptcy law and are Permitted Liens (as defined below) under the Credit Agreement.

(v)    ***Emera Agreements***.    Pursuant to: (a) that certain International Swap Dealer Association Master Agreement, dated April 1, 2010 (the "Master Agreement"), between Empire Generating and Emera Energy Services, Inc. ("Emera"); (b) that certain Amended and Restated Schedule to the Master Agreement, dated as of April 1, 2011; (c) that certain Amended and Restated Credit Support Annex, dated as of April 1, 2011; (d) that certain Amended and Restated Transaction Confirmation, dated June 1, 2017, between Empire Generating and Emera; and (e) all other documents evidencing or relating to the foregoing (in each case as may be amended, amended and restated, supplemented or otherwise modified from

time to time in accordance with the terms thereof, the "Emera Agreements"), Empire Generating granted to Emera security interests (the "Emera Liens") in (A) Empire Generating's New York Independent System Operator ("NYISO") accounts receivable and (B) cash held in an account maintained by Emera into which Empire Generating's NYISO cash revenues are deposited (the "Emera Collateral"), as security for amounts owed by Empire Generating to Emera for gas supply, which Emera Liens constitute Permitted Liens under the Credit Agreement.

(vi)    ***Restructuring Support Agreement***.    As of the Petition Date, the Debtors had executed that certain Restructuring Support Agreement, dated as of May [•], 2019, by and among the Debtors, Tyr Energy, LLC, and the lenders party thereto from time to time (as amended, amended and restated, supplemented or otherwise modified from time to time, in accordance with the terms thereof, the "RSA").

(vii)    ***Validity of Prepetition Liens and Prepetition Obligations***.

(a)    The Prepetition Obligations constitute legal, valid, enforceable, binding and non-avoidable obligations of each of the Debtors, jointly and severally.

(b)    No offsets, challenges, objections, defenses, claims or counterclaims to the Prepetition Obligations exist.

(c)    No portion of the Prepetition Obligations is subject to avoidance, disallowance, reduction or (other than as contemplated by this Interim Order) subordination pursuant to the Bankruptcy Code or applicable non-bankruptcy law.

(d)    The Prepetition Loan Documents are valid and enforceable by the Prepetition Secured Parties against each of the Debtors.

(e)    The Prepetition Liens were fully perfected as of the Petition Date and constitute legal, valid, binding, enforceable and perfected liens in and to the

Prepetition Collateral and are not subject to avoidance, reduction, disallowance, disgorgement, counterclaim, surcharge or (other than as contemplated by this Interim Order) subordination pursuant to the Bankruptcy Code or applicable non-bankruptcy law, and such liens had priority over any and all other liens on the Prepetition Collateral, subject only to certain legal, valid, properly-perfected, non-avoidable and senior in priority liens otherwise expressly permitted by the Prepetition Loan Documents (and only to the extent any such permitted liens were valid, binding, enforceable, non-avoidable, properly perfected and senior in priority to the Prepetition Liens as of the Petition Date or after the Petition Date pursuant to section 546(b) of the Bankruptcy Code) (the "Permitted Liens").

(f)    The Prepetition Obligations constitute allowed secured claims against the Estates.

(g)    The Debtors and the Estates have no offsets, claim, counterclaim, objection, defense, challenge or cause of action against the Prepetition Secured Parties or any of their respective successors, assigns, affiliates, parents, subsidiaries, partners, controlling persons, representatives, agents, attorneys, advisors, financial advisors, consultants, professionals, officers, directors, members, managers, shareholders, and employees, past, present and future, and their respective heirs, predecessors, successors and assigns, whether arising under applicable state or federal law (including, without limitation, any recharacterization, (other than as contemplated by this Interim Order), subordination, avoidance or other claims arising under or pursuant to sections 105, 510 or 542 through 553 of the Bankruptcy Code), in connection with any of the Prepetition Loan Documents (or the transactions contemplated thereunder), the Prepetition Obligations or the Prepetition Liens, including without limitation, any right to assert any disgorgement or recovery.

8

(h)    Any payments made on account of the Prepetition Obligations to or for the benefit of the Prepetition Secured Parties prior to the Petition Date were legal and valid and are not subject to avoidance or disgorgement, and the Debtors have waived any right to challenge such payments.

(viii)    *Cash Collateral.*  All of the Debtors' cash and cash equivalents, including, without limitation (i) all cash proceeds, products, offspring, rents, or profits of property of the Prepetition Collateral held in any of the Debtors' banking, checking or other deposit accounts with financial institutions as of the Petition Date or deposited into the Debtors' banking, checking or other deposit accounts with financial institutions after the Petition Date; (ii) the cash in certain of their deposit accounts, wherever located, including the Funded L/C Collateral Account and the Debt Service Reserve Account (each, as defined in the Credit Agreement), whether as original Prepetition Collateral or proceeds of other Prepetition Collateral, except the cash in the Webster Accounts; and (iii) cash held as a security deposit retainer or in retainer accounts with respect to the professional fees and expenses of the professionals and advisors retained by the Debtors.  All such cash and cash equivalents described in the foregoing constitutes cash collateral as such term is defined in section 363(a) of the Bankruptcy Code (the "Cash Collateral") of the Prepetition Secured Parties.

(ix)    *Default by the Debtors*.  The Debtors are in default of their debts and obligations under the Prepetition Loan Documents.

(x)    *No Control.*  None of the Prepetition Secured Parties (a) control any of the Debtors or their operations, (b) have the authority to determine the manner in which the Debtors' operations are conducted, or (c) are control persons or insiders of the Debtors by virtue of any of the actions taken in connection with, related to or arising from the Prepetition

Loan Documents.

D.       *Need for Use of Cash Collateral*.  An immediate and critical need exists for the Debtors to use the Cash Collateral (in the amount and in the manner set forth in the Approved Budget (as defined below)) to continue to operate their businesses in the ordinary course, maintain business relationships with customers, vendors and suppliers, make adequate protection payments and to generally conduct their business affairs so as to avoid immediate and irreparable harm to their Estates and the value of their assets.

E.       *Consent to Use of Cash Collateral*.  The Prepetition Lenders are willing to consent to the use of the Cash Collateral by the Debtors only in accordance with the Approved Budget and upon the terms and conditions of this Interim Order.  The Debtors are willing to agree to the terms and conditions for use of Cash Collateral as set forth in this Interim Order.

F.       *Business Judgment and Good Faith*.  Good cause has been shown for entry of this Interim Order.  The relief requested herein is necessary, essential and appropriate to aid the continuation of the Debtors' operations and the preservation and maintenance of their assets and businesses, absent which the Debtors' ability to maximize the value of the Estates for the benefit of the Debtors' creditors will be irreparably jeopardized, and the Debtors' customers will be significantly and adversely impacted.  The authority granted herein to use the Cash Collateral is necessary to avoid immediate and irreparable harm to, and is therefore in the best interests of, the Debtors, their creditors and the Estates.  The terms and conditions of this Interim Order (i) have been negotiated at arms' length and in good faith by the Debtors, the Prepetition Agent and the Prepetition Consenting Lenders, (ii) are fair, reasonable and the best available under the circumstances, (iii) reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties, and (iv) are enforceable pursuant to their terms.

G.      *Adequate Protection*.    The Prepetition Secured Parties, Webster and Emera are entitled to receive adequate protection of their interests in the Prepetition Collateral (including Cash Collateral) to the extent of any net diminution in value from and after the Petition Date resulting from, among other things, the use, sale, depreciation, or disposition by the Debtors (or other decline in value) of the Prepetition Collateral (including Cash Collateral) during the Chapter 11 Cases, the amount of any fees and expenses paid to retained professionals in these Chapter 11 Cases in accordance with the Approved Budget, the imposition of the Carve-Out (defined below) and the imposition of the automatic stay pursuant to section 362 of the Bankruptcy Code (collectively, the "Diminution in Value").

H.      *Notice.*    Notice of the Interim Hearing on the Motion has been provided by the Debtors, whether by facsimile, email, overnight courier and/or hand delivery, to certain parties in interest, including: (i) the U.S. Trustee; (ii) the Internal Revenue Service; (iii) creditors holding the twenty (20) largest unsecured claims against the Estates, as identified on the Debtors' chapter 11 petitions; (iv) counsel to the Prepetition Agent; (v) counsel to the Consenting Lenders; (vi) counsel to Webster; (vii) Emera, and (viii) all other parties required to receive notice pursuant to Bankruptcy Rule 4001 or requesting to receive notice prior to the date hereof.    The Debtors have made reasonable efforts to afford the best notice possible under the circumstances and such notice is good and sufficient to permit the interim relief set forth in this Interim Order and no further notice need be given.

I.      *Entry of this Interim Order*.    The Debtors have requested immediate entry of this Interim Order pursuant to Bankruptcy Rule 4001(b)(2).    The permission granted herein to use the Cash Collateral is necessary to avoid immediate and irreparable harm to the Debtors and the Estates.    The Court concludes that immediate entry of this Interim Order is in the best

11

interests of the Debtors and the Estates.

Based upon the foregoing findings and conclusions, the Motion and the record made before the Court, and good and sufficient cause appearing therefor:

IT IS HEREBY STIPULATED, CONSENTED, AGREED, AND ORDERED that:

1.      Authorization to Use Cash Collateral.  The Motion is granted on an interim basis on the terms set forth herein.  Subject to the terms and conditions of this Interim Order, the Debtors are authorized to use the Cash Collateral during the period beginning with the Petition Date and ending on the Termination Date (as defined herein) (such period, the "Budget Period"), solely up to the amounts, at the times, in accordance with and for the purposes identified in the Approved Budget.  Nothing in this Interim Order shall authorize the disposition of any assets of the Debtors or their Estates outside the ordinary course of business, or the Debtors' use of any Cash Collateral or other proceeds resulting therefrom, except as permitted herein and in accordance with the Approved Budget.  The Debtors are expressly prohibited from using the Cash Collateral other than as expressly contemplated in this Interim Order.

2.      Objections Overruled.  All objections to the interim relief sought in the Motion to the extent not withdrawn or resolved are hereby overruled on the merits.

3.      Use of Cash Collateral.  As a condition to the authorization to use the Cash Collateral, the Prepetition Secured Parties require, and the Debtors have agreed, that the Cash Collateral shall be used only for the following purposes:  (a) to provide working capital and for general corporate purposes of the Debtors during the Chapter 11 Cases; (b) for the Sale (as defined in the RSA) marketing process; (c) to pay the fees, costs and expenses of the Estate Professionals (as defined below) retained in the Chapter 11 Cases and approved by the Court, including Hunton Andrews Kurth LLP, Steinhilber Swanson LLP and RPA Advisors, LLC;

12

(d) to satisfy any adequate protection obligations owing under this Interim Order; (e) to make all permitted payments of costs of administration of the Chapter 11 Cases, including without limitation in connection with the pursuit of confirmation of the Plan; and (f) to pay such prepetition expenses as are consented to by the Requisite Consenting Lenders (as defined in the RSA) and approved by the Court.

4.    <u>Letters of Credit</u>.   The Debtors shall be authorized to maintain and, to the extent subject to auto-renewal, renew existing Letters of Credit issued prior to the Petition Date on an uninterrupted basis, in accordance with the same practices and procedures as were in effect prior to the Petition Date and to take all actions reasonably appropriate with respect thereto; <u>provided</u> that the obligations of the parties with respect to the Letters of Credit shall be continued without modification in accordance with their existing terms.

5.    <u>Continuation of Prepetition Procedures</u>.   The Debtors shall continue their existing cash management systems as approved and in accordance with the Court's order allowing such continuation in these Chapter 11 Cases, and all of the Debtors' deposit accounts and amounts on deposit therein shall be subject, as applicable, to the Prepetition Liens, the Emera Liens, the Webster Liens, and the Adequate Protection Liens (as defined below).

6.    <u>Termination of Cash Collateral</u>.   Unless otherwise agreed in writing between the Requisite Consenting Lenders and the Debtors, the Debtors' right to use the Cash Collateral shall automatically terminate (the date of any such termination, the "<u>Termination Date</u>") on the earliest to occur of (a) November 13, 2019 (the "<u>Scheduled Termination Date</u>"), (b) June 14, 2019, if the Final Order shall not have been entered by the Court on or before such date, and (c) the date upon which each of the following events shall have occurred and be continuing (each, a "<u>Termination Event</u>") unless waived or otherwise consented to by the

13

Requisite Consenting Lenders:

(i)       the occurrence of any "Default" or "Event of Default" under (and as defined in) the Credit Agreement, other than (A) the Specified Defaults (as defined in that certain Amendment and Forbearance Agreement, dated April 8, 2019, as amended, restated or otherwise modified from time to time, by and among the Debtors, TTK Empire Power, LLC, and the lenders party thereto), (B) a Default or Event of Default pursuant to § 8.01(a) or § 8.01(g) of the Credit Agreement, or (C) a Default or Event of Default concerning any Loan Party's (as defined in the Credit Agreement) failure to perform or observe any term, covenant, or agreement contained in Article VII of the Credit Agreement that is otherwise expressly provided for in this Interim Order, in which case, the terms of this Interim Order shall control;

(ii)       the Debtors filing a motion seeking, or the Court entering, an order authorizing the sale of all or any portion of the Collateral (as defined in the Prepetition Loan Documents) or any of the Debtors' assets covered by the Adequate Protection Liens outside the ordinary course of business, or the Debtors shall sell all or any portion of such assets, in each case, other than the Sale;

(iii)       the dismissal (or filing of a motion seeking the dismissal) of any of the Chapter 11 Cases or conversion of any of the Chapter 11 Cases to a case under chapter 7 or section 1112 of the Bankruptcy Code;

(iv)       the appointment, or the filing of an application by any Debtor seeking the appointment, of a chapter 11 trustee, a receiver or an examiner with expanded powers in any of the Chapter 11 Cases;

(v)       the effective date of any chapter 11 plan in the Chapter 11 Cases, other than the Plan (as defined in the RSA);

(vi)    any representation, warranty, certification or statement of material fact made after the Petition Date by the Debtors or their agents to the Prepetition Agent or any of the Prepetition Lenders or their respective advisors about the financial condition of the Debtors, the nature, extent, location or quality of any Collateral, or the disposition or use of any Collateral, including Cash Collateral, shall prove to have been incorrect or misleading in any material respect when made;

(vii)    the Debtors shall have created, incurred, or suffered to exist any postpetition lien, security interest, or secured debt other than (a) those granted or permitted pursuant to this Interim Order, (b) carriers', mechanics', warehousemen's, repairmen's or other similar liens arising in the ordinary course of business, (c) pledges or deposits in connection with workers' compensation, unemployment insurance and other social security legislation or (d) deposits to secure the payment of any postpetition statutory obligations, performance bonds and other obligations of a like nature incurred in the ordinary course of business, or pursuant to an order of the Court; provided that the aggregate value of the liens, pledges or deposits referred to in clauses (c) and (d) above shall not exceed $200,000 at any one time (other than such liens, pledges or deposits required pursuant to contractual arrangements with NYISO, which shall not exceed $500,000 at any one time).

(viii)    any other superpriority administrative claim (other than the Carve-Out) which is *pari passu* with or senior to the claims of the Prepetition Secured Parties has been granted in the Chapter 11 Cases;

(ix)    the Court enters an order reversing, amending, supplementing, staying, vacating or otherwise modifying this Interim Order;

(x)    the Debtors file a motion seeking, or the Court enters, an order

15

authorizing the incurrence of any debtor-in-possession financing;

(xi)    any judgment in excess of $250,000 not covered by insurance as to any postpetition obligation is rendered against the Debtors and the enforcement thereof is not stayed; or there is rendered against the Debtors a non-monetary judgment with respect to a postpetition event which would (a) cause the Debtors to be unable to comply with the terms and conditions of, and perform their obligations under, this Interim Order or (b) result in a material adverse effect;

(xii)    failure by the Debtors to comply with the Approved Budget or the use of Cash Collateral other than as set forth in the Approved Budget, each subject to the Permitted Variance (as defined below);

(xiii)    any lien purported to be created under this Interim Order ceases to be, or is asserted by the Debtors not to be, a valid, perfected and enforceable lien, with the priority required by this Interim Order, or the Debtors purport to revoke, terminate or rescind any lien granted thereunder;

(xiv)    the commencement of any objection, challenge or cause of action by any Debtor (or any other party with requisite standing on behalf of the Debtors or any of the Estates) against any of the Prepetition Agent or the Prepetition Lenders with respect to the Prepetition Loan Documents, including, without limitation, any action to avoid, modify, dispute, challenge or subordinate any of the Prepetition Obligations or Prepetition Liens, or entry of an order in any action by any other party granting such relief;

(xv)    any lien or security interest purported to be created under the Prepetition Loan Documents shall cease to be, or shall be asserted by the Debtors not to be, a valid, perfected and enforceable lien on or security interest in the Collateral, with the priority

16

required by the Prepetition Loan Documents;

(xvi)    the entry of an order by the Court granting relief from or modifying the automatic stay of section 362 of the Bankruptcy Code (a) to allow any creditor to execute upon or enforce a lien on or security interest in any Collateral, or (b) with respect to any lien of or the granting of any lien on any Collateral to any state or local environmental or regulatory agency or authority, which in either case would have a material adverse effect on the business, operations, inventory, property, assets, or condition financial or otherwise, of the Debtors;

(xvii)    termination of the Debtors' exclusive periods under section 1121(d) of the Bankruptcy Code, unless such termination occurs as a result of a motion filed by the Prepetition Secured Parties;

(xviii)    the filing of any plan or reorganization or disclosure statement attendant thereto, or any direct or indirect amendment to such plan or disclosure statement by any Debtor, other than the Plan and Disclosure Statement (as defined in the RSA);

(xix)    the remittance, use or application of Cash Collateral, other than in accordance with any cash management procedures and orders entered by the Court;

(xx)    the entry of an order precluding the Prepetition Agent (or designated sub-agent(s)) from having the right to or being permitted to "credit bid" the Prepetition Obligations in full or modifying such a right;

(xxi)    the failure by the Debtors to deliver to the Prepetition Agent any of the documents or other information required to be delivered pursuant to this Interim Order when due, including without limitation, the Variance Report;

(xxii)    any attempt by any Debtor to reduce, set off or subordinate the

Prepetition Obligations or the Prepetition Liens to any other debt, except as set forth in this Interim Order;

(xxiii) the payment of or granting adequate protection with respect to any Prepetition Obligations, except as set forth in this Interim Order;

(xxiv) the Court ceases to have exclusive jurisdiction with respect to the Chapter 11 Cases or all matters relating to the exercise of remedies under the Credit Agreement and this Interim Order and the Collateral;

(xxv) the Debtors fail to make any payment to the Prepetition Agent (or its counsel, advisors, professionals or consultants) as required under this Interim Order;

(xxvi) any violation by any Debtor of any other provision of this Interim Order;

(xxvii) termination of the Emera Agreements or any other Material Agreement (as defined in the RSA) without replacements acceptable to the Requisite Consenting Lenders;

(xxviii) the Debtors amend, revise, or modify the requirements to be a Qualified Bidder other than as expressly permitted under the Bid Procedures and Bid Procedures Order;

(xxix) the Requisite Consenting Lenders have the right to terminate the RSA; provided, however, the Requisite Consenting Lenders must deliver written notice to the Debtors describing in reasonable detail the circumstances giving rise to such termination right under the RSA;

(xxx) termination of the RSA; or

(xxxi) the Debtors institute any proceeding or investigation or support the

18

same by any other person who may challenge the status, perfection, non-avoidability and/or validity of the Prepetition Liens or the Adequate Protection Liens.

The Debtors shall promptly provide notice to the Requisite Consenting Lenders (with a copy to counsel for any Creditors' Committee and the U.S. Trustee) of the occurrence of any Termination Event.  On the Termination Date, all Cash Collateral on deposit in the account(s) in which the Cash Collateral is held shall be applied in accordance with the provisions governing the priority of payments set forth in the Prepetition Loan Documents.

7.    Budget.  The Cash Collateral provided by the Prepetition Secured Parties to the Debtors shall at all times be used in accordance with the Approved Budget.

(a)    Generally.  Attached hereto as Exhibit A is a 13-week budget (as it may be amended from time to time with the consent of the Requisite Consenting Lenders, the "Approved Budget"), in form and substance acceptable to the Requisite Consenting Lenders in their reasonable discretion, which reflects on a line-item basis the Debtors' projected receipts and expenditures (including payment of any professional fees) and accrued and unpaid professional fees on a weekly basis and all necessary and required cumulative expenses which the Debtors expect to incur on a weekly basis starting on the Petition Date.  The Approved Budget shall be used by the Prepetition Agent, the Consenting Lenders (as defined in the RSA) and the Debtors for purposes of testing the variances set forth in subparagraph (c) below.

(b)    Updated Budget.  The Debtors shall provide to the Prepetition Agent, the Consenting Lenders, the U.S. Trustee, and any official statutory committee, so as to actually be received by the Prepetition Agent, the Consenting Lenders, the U.S. Trustee, and any such official statutory committee, on or before 5:00 p.m. New York City time on the date that is two (2) weeks following the Petition Date and every second week thereafter, a supplement to the

Approved Budget (or the previously supplemented Approved Budget, as the case may be), covering the 13-week period that commences with the week immediately following (and not reforecasting periods in prior Approved Budgets without the consent of the Requisite Consenting Lenders), consistent with the form and level of detail set forth in the Approved Budget and otherwise in form and substance satisfactory to the Requisite Consenting Lenders in their sole and absolute discretion (each such supplement, an "Updated Budget").  Upon (and subject to) the approval of any such Updated Budget by the Requisite Consenting Lenders in their sole and absolute discretion, such Updated Budget shall then constitute the Approved Budget.

        (c)      Budget Reporting.  The Debtors shall provide to the Prepetition Agent, the Consenting Lenders, the U.S. Trustee, and any official statutory committee, so as to actually be received by the Prepetition Agent and the Consenting Lenders on or before 5:00 p.m. New York City time on the Wednesday of each calendar week commencing with the Wednesday following the second full week after the Petition Date (each such Wednesday, a "Variance Report Date"), a line-by-line variance report (each, a "Variance Report"), in form and substance acceptable to the Requisite Consenting Lenders in their reasonable discretion, setting forth, in reasonable detail, any differences between actual receipts and disbursements for each such line item compared to (i) the Approved Budget applicable to the immediately preceding week (such difference with respect to each line item, a "Line Item Variance") and (ii) the then extant Approved Budget applicable to the cumulative period on and after the Petition Date through the end of the immediately preceding week, together with a statement certifying compliance with the Budget Covenant (as defined below) (with supporting back-up in reasonable detail) and certifying that no disbursements inconsistent with the Budget Covenant have been made, together with a reasonably detailed explanation for any variance.  Notwithstanding the foregoing,

the first Variance Report after the Petition Date shall only cover the prior trailing two-week period and the second Variance Report after the Petition Date shall only cover the prior trailing three-week period.

There shall be a teleconference every other week between the Debtors and the Requisite Consenting Lenders to discuss the Variance Report, including a management discussion and analysis of permanent versus timing differences for any variances from the Approved Budget.

The Debtors shall notify the Prepetition Agent and the Consenting Lenders (i) of any material adverse deviation of the Debtors' financial performance from that set forth in the Approved Budget or any Updated Budget within three (3) days after occurrence of such material adverse deviation and (ii) as soon as reasonably practicable if the professional fees and disbursements incurred by the Debtors and any Creditors' Committee have exceeded or are likely to exceed the budgeted amount for such two-week period by more than five percent (5%).

The Debtors shall also provide to the Prepetition Agent, the Consenting Lenders, the U.S. Trustee, and any statutory committee, so as to actually be received on or before 5:00 p.m. New York time on the date that is three (3) weeks following the Petition Date and every second week thereafter, a professional fee report (the "Professional Fee Report") in form and substance acceptable to the Requisite Consenting Lenders in their reasonable discretion, which sets forth on a line-item basis for each professional and advisor that the Debtors are paying, including without limitation, the Estate Professionals, accountants, financial advisors, investment bankers, and consultants, whether or not retained in these Chapter 11 Cases or otherwise, (A) the fees, costs, and expenses paid to each such professional or advisor and (B) the professional fees invoiced as of the date of the Professional Fee Report but not yet paid.

(d)     Budget Covenant.    Notwithstanding the Approved Budget, the

21

Debtors shall not permit (x) any Line Item Variance with respect to disbursements that is unfavorable to the Consenting Lenders, in the reasonable discretion of the Consenting Lenders, to exceed (i) fifteen percent (15%) for any Line Item Variance concerning professionals' fees and expenses and (ii) twenty percent (20%) for any other Line Item Variance, (y) receipts in an aggregate amount less than eighty-five percent (85%) of the projected receipts during the Budget Period pursuant to the Updated Budget then in effect, and (z) operating disbursements in an aggregate amount greater than fifteen percent (15%) of operating disbursements budgeted during the Budget Period pursuant to the Updated Budget then in effect (such permitted variance, the "Permitted Variance" and, such limitation, the "Budget Covenant").

8.    Adequate Protection Liens.  Pursuant to sections 361 and 363(e) of the Bankruptcy Code, in consideration and solely to the extent of any postpetition Diminution in Value, the Prepetition Agent, for the benefit of itself and the Prepetition Lenders, is hereby granted, in all cases subject to the Carve-Out, continuing, valid, binding, enforceable and automatically perfected postpetition additional and replacement security interests in and liens and mortgages on (collectively, the "Adequate Protection Liens") as follows:

(a)    a first priority automatically perfected security interest in, and lien and mortgage on, any of the Debtors' assets and property that is not subject to valid, perfected and non-avoidable liens on the Petition Date;

(b)    a first priority automatically perfected security interest in, and lien and mortgage on, the Prepetition Collateral and proceeds, rents, products, profits and offspring of such Prepetition Collateral (the "Postpetition Collateral", and together with the Prepetition Collateral, the "Collateral"), without the necessity of the execution of mortgages, security agreements, pledge agreements, financing statements or other

agreements; provided, however, that the security interest in and lien on the Webster Accounts shall be a second lien; and provided, further that the security interest in and lien on the Emera Collateral shall be a second priority lien;

(c)    a junior perfected security interest in and lien and mortgage on all prepetition and postpetition property and assets of the Debtors, whether tangible or intangible, that is subject and subordinate to any and all Permitted Liens to the extent (i) they are valid, perfected and non-avoidable on the Petition Date and (ii) senior to the Prepetition Secured Parties' liens in the Prepetition Collateral;

provided, however, that the Adequate Protection Liens shall be senior to any other liens, including, without limitation, any other adequate protection replacement liens, except that the Adequate Protection Liens shall not be senior to (i) the Webster Liens or the Webster postpetition replacement liens or (ii) the Emera Liens or the Emera postpetition replacement liens; provided, further, that, subject to the Carve-Out, the extent and priority of any Adequate Protection Liens granted to a Secured Party with respect to Postpetition Collateral shall be the same as existed as of the Petition Date with respect to its Prepetition Collateral.  At the Final Hearing, the Debtors and the Prepetition Agent, on behalf of the Prepetition Secured Parties, shall seek an order from the Court that  the Adequate Protection Liens shall be secured by the proceeds of any causes of action arising under sections 502(d), 544, 545, 547, 548, 550 (unless related to an action under 549), 551 (unless related to an action under 549) or 553 of the Bankruptcy Code (the "Avoidance Actions").

9.    Webster Adequate Protection.  Pursuant to sections 361 and 363(e) of the Bankruptcy Code, in consideration and solely to the extent of any Diminution in Value, the Debtors shall grant to Webster postpetition replacement liens on the Webster Accounts and the

continuation of prepetition liens, with the same effect, priority and security on the same terms as existed prepetition.

10.    <u>Emera Adequate Protection</u>.  Pursuant to sections 361 and 363(e) of the Bankruptcy Code, in consideration and solely to the extent of any Diminution in Value, the Debtors shall (a) continue to designate Emera Energy Services Subsidiary No. 1 LLC as Empire Generating's NYISO market-facing entity, in the ordinary course of business, to allow Emera to continue receiving direct payment of Empire Generating's NYISO revenues and to offset those revenues against amounts owed by Empire Generating to Emera for gas supply and (b) grant to Emera postpetition replacement liens on the Emera Collateral, and the continuation of prepetition liens, with the same effect, priority and security on the same terms as existed prepetition.

11.    <u>Enforceability of the Adequate Protection Liens</u>.  The Adequate Protection Liens shall be deemed perfected as of the commencement of the Chapter 11 Cases and shall be valid and enforceable against any trustee appointed in the Chapter 11 Cases or in any successor cases to the Chapter 11 Cases including, but not limited to, any case under chapter 7 of the Bankruptcy Code upon the conversion of any of the Chapter 11 Cases, or in any other proceedings superseding or related to any of the Chapter 11 Cases (collectively, the "<u>Successor Cases</u>").  No claim or lien having a priority superior to or *pari passu* with those granted by this Interim Order to the Prepetition Secured Parties (including, without limitation, liens and security interests, if any, granted in favor of any federal, state, municipal or other governmental unit, commission or board for any liability of the Debtors) shall be granted or allowed while any portion of the Prepetition Obligations remain outstanding, and the Adequate Protection Liens shall not be (a) subject or junior to any lien or security interest that is avoided and preserved for the benefit of the Estates under section 551 of the Bankruptcy Code or (b) subordinated to or

made *pari passu* with any other lien or security interest, whether under section 364(d) of the Bankruptcy Code or otherwise, in each case other than the Carve-Out.  Any provision of any lease or other license, contract or other agreement that requires the consent or approval of one or more landlords or other parties or the payment of any fees or obligations to any governmental entity, in order for any Debtor to pledge, grant, sell, assign or otherwise transfer any such leasehold interest, or the proceeds thereof, or other postpetition collateral related thereto, is hereby deemed to be inconsistent with the applicable provisions of the Bankruptcy Code.  Any such provision shall have no force and effect with respect to the transactions granting postpetition liens in such leasehold interest, or the proceeds of any assignment and/or sale thereof by the Debtors, in favor of the Prepetition Secured Parties in accordance with the terms of this Interim Order.

12.    <u>Adequate Protection Superpriority Claim</u>.  Pursuant to sections 503(b), 507(a) and 507(b) of the Bankruptcy Code and as provided for in section 507(b) of the Bankruptcy Code, upon entry of this Interim Order, the Prepetition Secured Parties are hereby granted an allowed superpriority administrative expense claim in the Chapter 11 Cases (the "<u>Adequate Protection Superpriority Claim</u>"), to the extent of and in an amount equal to any Diminution in Value, which Adequate Protection Superpriority Claim shall (a) be an allowed claim against the Debtors jointly and severally, with priority over any and all administrative expense claims and all other claims against the Debtors or their Estates in the Chapter 11 Cases, at any time existing or arising, of any kind or nature whatsoever, including, without limitation, all other administrative expenses or other claims arising under any other provision of the Bankruptcy Code, including, without limitation, sections 105, 326, 328, 330, 331, 365, 503(b), 507(a), 546(c), 546(d), 726 or 1114 of the Bankruptcy Code, whether or not such expenses of

claims may become secured by a judgment lien or other nonconsensual lien, levy or attachment; and (b) at all times be senior to the rights of the Debtors and their Estates and any trustee or other Estate representative appointed in these Chapter 11 Cases or any Successor Cases.  The allowed Adequate Protection Superpriority Claim shall be payable from and have recourse to all unencumbered prepetition and postpetition property of the Debtors (subject to the preceding sentence).  No cost or expense of administration under sections 105, 503 or 507 of the Bankruptcy Code or otherwise, including any such cost or expense resulting from or arising after the conversion of any of the Chapter 11 Cases under section 1112 of the Bankruptcy Code, shall be senior to, or *pari passu* with, the Adequate Protection Superpriority Claims.  Notwithstanding the foregoing, the Adequate Protection Superpriority Claim shall be subject and subordinate to the Carve-Out.

13.     <u>Adequate Protection Costs and Expenses</u>.  As adequate protection of the interest of the Prepetition Secured Parties in the Prepetition Collateral, the Prepetition Secured Parties are hereby granted payment upon demand of all fees, costs, expenses and other amounts payable to or on behalf of the Prepetition Agent (excluding payments on account of principal and interest, whether accrued or accruing before or after the Petition Date, except as otherwise provided herein) under the terms of the Prepetition Loan Documents and all other reasonable out-of-pocket costs and expenses of the Prepetition Agent in accordance with the terms of the Prepetition Loan Documents (including, without limitation, the reasonable prepetition and postpetition fees and out-of-pocket costs and expenses of Davis Polk & Wardwell LLP, Houlihan Lokey Capital, Inc., and Woodlands Energy Management, LLC, and any other necessary or appropriate counsel, advisors, professionals and/or consultants in connection with advising the Prepetition Agent), subject to receiving a reasonably detailed written invoice therefor (which

may be in summary form and need not include time entries). None of such fees, costs, expenses or other amounts shall be subject to Court approval (subject to the limitations below) or U.S. Trustee guidelines, and no recipient of any such payment shall be required to file with respect thereto any interim or final fee application with this Court; provided however, that copies of any such invoices provided to the Debtors shall be provided contemporaneously to the U.S. Trustee and counsel to the Committee (if any).[3] If the Debtors, the U.S. Trustee, or the Committee (if any) objects to the reasonableness of the fees and expenses of the Prepetition Agent, and such objection cannot be resolved within ten (10) calendar days of receipt of such invoices, the Debtors the U.S. Trustee, or the Committee (if any), as the case may be, shall file with the Court and serve on the Prepetition Agent and counsel for the Consenting Lenders (with a copy to the Debtors) an objection limited to the reasonableness of such fees and expenses and detailing with specificity which fees and/or expenses are being objected to (each, a "Fee Objection"). The professional fees of the Prepetition Agent shall not be subject to the provisions of sections 327, 328, 329 or 331 of the Bankruptcy Code. The Debtors shall pay the fees and expenses of the Prepetition Agent in accordance with the terms and conditions of this Interim Order within fifteen (15) calendar days after receipt of the applicable invoice (a) the full amount invoiced if no Fee Objection has been timely filed, and (b) the undisputed fees, costs, and expenses reflected on any invoice to which a Fee Objection has been timely filed, in each case regardless of whether such amounts are in excess of the amounts set forth in the Approved Budget. All such fees,

---

[3] For the avoidance of doubt, the fees provided for in this order must be reasonable. Although the U.S. Trustee fee guidelines do not specifically apply, professionals shall be required to submit time and expense detail to the U.S. Trustee, as well as any further information or back up documentation requested by the U.S. Trustee to determine the reasonableness of the invoiced amount. Invoices for such fees and expenses provided to any party other than the U.S. Trustee shall not be required to include any information subject to the attorney-client privilege or any information constituting attorney work product, and time and expense detail and other information provided solely to the U.S. Trustee shall be returned or destroyed after the U.S. Trustee has reviewed such material and any Fee Objection has been resolved. Furthermore, the provision of invoices, time entries or other information pursuant to the terms hereof (including pursuant to paragraph 13) shall in no event constitute a waiver of the attorney-client privilege or of any benefits of the attorney work product doctrine.

costs, expenses and other amounts owed or payable to the Prepetition Agent shall be secured by the Prepetition Liens and Adequate Protection Liens, and afforded all of the priorities and protections afforded to the Prepetition Obligations under this Interim Order and the Prepetition Loan Documents.

14.    <u>Access to Debtors' Reports and Information</u>.  The Debtors shall provide to the Prepetition Secured Parties such reports and information required to be delivered pursuant to the Credit Agreement and such other reports and information as may be requested by the Prepetition Secured Parties.  In addition, the Prepetition Secured Parties shall have the right, upon reasonable notice to the Debtors, at any time during normal business hours, to inspect, audit, examine, check, and make copies of, and extract non-privileged information from, the Debtors' records and to obtain company information from the Debtors' management, and the Debtors shall make their records and management available to the Prepetition Secured Parties for such purposes.  Further, the Debtors authorize their independent certified public accountants, financial advisors, investment bankers, and consultants to cooperate, consult with, and provide to the Prepetition Secured Parties all such information as may be reasonably requested with respect to the business, results of operations and financial condition of the Debtors.

15.    <u>Reserve Accounts</u>.  To the extent that the aggregate amount on deposit in the Debtors' revenue account, operating account and O&M account (the "<u>Operating Accounts</u>") is less than $5 million (the "<u>Minimum Operating Amount</u>"), the Debtors are authorized, but not directed, to transfer funds from the Funded L/C Collateral Account into one or more of the Operating Accounts such that, after such transfer, the aggregate amount on deposit in the Operating Accounts equals the Minimum Operating Amount; <u>provided</u> that if the amount on deposit in the Funded L/C Collateral Account is insufficient to achieve the Minimum Operating

Amount then the Debtors are authorized, but not directed, to transfer funds from the Debt Service Reserve Account into one or more of the Operating Accounts such that, after such transfer, the aggregate amount on deposit in the Operating Accounts equals the Minimum Operating Amount. Notwithstanding anything in the foregoing to the contrary, the transfer of funds in this paragraph 15 is only permitted to the extent such funds are used in accordance with the Approved Budget and this Interim Order.

16.    <u>Reservation of Rights of Prepetition Secured Parties</u>.

(a)    Nothing herein shall impair or modify the application of section 507(b) of the Bankruptcy Code in the event that the adequate protection provided to the Prepetition Secured Parties hereunder is insufficient to compensate them for any Diminution in Value of their respective interests in the Prepetition Collateral during the Chapter 11 Cases.

(b)    Except on the terms of this Interim Order, at all times before the Termination Date, the Debtors are hereby enjoined and prohibited from at any time (i) using the Cash Collateral, (ii) using the Prepetition Collateral or (iii) applying to any court for an order (other than the Final Order) authorizing the use of the Cash Collateral or the Prepetition Collateral.

17.    <u>Modification of Automatic Stay</u>.    Subject to paragraph 20 below, the automatic stay imposed under section 362(a) of the Bankruptcy Code is hereby modified as necessary to effectuate all of the terms, rights, benefits, privileges, remedies and provisions of this Interim Order without further notice to any party or motion or application to, order of, or hearing before the Court.

18.    <u>Perfection of Adequate Protection Liens</u>.    This Interim Order shall be sufficient and conclusive evidence of the validity, perfection and priority of all liens granted herein, including the Adequate Protection Liens and the Webster postpetition replacement liens,

29

without the necessity of filing or recording any financing statement, mortgage, notice, or other instrument or document which may otherwise be required under the law or regulation of any jurisdiction or the taking of any other action (including, without limitation, entering into any deposit account control agreement) to validate or perfect (in accordance with applicable non-bankruptcy law) the Adequate Protection Liens, the Webster postpetition replacement liens, or the Emera postpetition replacement liens, as applicable, or to entitle the Prepetition Secured Parties, Webster, or Emera, as applicable, to the priorities granted herein.  Notwithstanding the foregoing, the Prepetition Agent is authorized to file, as it deems necessary, such financing statements, mortgages, notices of liens and other similar documents to perfect in accordance with applicable non-bankruptcy law or to otherwise evidence the Adequate Protection Liens, and all such financing statements, mortgages, notices and other documents shall be deemed to have been filed or recorded as of the Petition Date; provided, however, that no such filing or recordation shall be necessary or required in order to create or perfect the Adequate Protection Liens.  The Debtors are authorized and directed to execute and deliver promptly upon demand to the Prepetition Secured Parties all such financing statements, mortgages, notices and other documents as the Prepetition Agent or the Requisite Consenting Lenders may reasonably request.  The Prepetition Agent may, as it deems necessary, file a photocopy of this Interim Order as a financing statement with any filing or recording office or with any registry of deeds or similar office, in addition to or in lieu of such financing statements, notices of lien or similar documents, and the subject filing or recording officer is authorized to file or record such copy of this Interim Order.  For the avoidance of doubt, (a) the automatic stay imposed under section 362(a) of the Bankruptcy Code is hereby lifted as necessary to allow the Prepetition Agent to take the actions described in this paragraph, and (b) notwithstanding the date of execution,

30

delivery, or filing of any financing statement or other document, the date of attachment and perfection of the Adequate Protection Liens shall be the Petition Date.

19.     Proceeds of Subsequent Financing.  If the Debtors, any trustee, any examiner with enlarged powers, or any responsible officer subsequently appointed in the Chapter 11 Cases, shall obtain credit or incur debt pursuant to sections 364(b), 364(c) or 364(d) of the Bankruptcy Code or in violation of the Prepetition Loan Documents at any time prior to the time at which Repayment in Full has occurred, then, unless otherwise agreed by the Requisite Consenting Lenders in writing in their sole discretion, all the cash proceeds derived from such credit or debt shall immediately be turned over to the Prepetition Agent to be applied in a manner consistent with the Prepetition Loan Documents.

20.     Rights and Remedies Upon Termination Event.  On the Termination Date, (a) the Debtors' rights to use the Cash Collateral on the terms and conditions set forth in this Interim Order shall terminate automatically, (b) the principal of and accrued interest on the Prepetition Obligations, together with all fees and other liabilities constituting the obligations owing to the Prepetition Secured Parties, including, without limitation, any unpaid amounts owing as Adequate Protection, to the extent not already accelerated, shall automatically become immediately due and payable, (c)(i) the Prepetition Agent and each Prepetition Lender may set off amounts in any account of the Debtors maintained with the Prepetition Agent or such Prepetition Lender, respectively, and (ii) Webster may set off amounts in the Webster Accounts solely to the extent of any drawing on the Letters of Credit and for any fees due to Webster in respect of the Letters of Credit if such fees are not paid when due, and (d) the Prepetition Secured Parties may, upon five (5) days' written notice (the "Remedies Notice Period") to counsel to the Debtors (with a copy to counsel for any Creditors' Committee and the U.S.

31

Trustee), exercise any other rights and remedies available under this Interim Order, the Prepetition Loan Documents, or applicable law, including, without limitation, foreclosing upon and selling all or a portion of the Prepetition Collateral; provided that, notwithstanding the foregoing clause (d), during the Remedies Notice Period, the Prepetition Secured Parties may take reasonable steps to preserve and protect the Prepetition Collateral; provided further that the only basis upon which a party in interest may object to, and seek to prevent, the exercise of enforcement remedies by the Prepetition Agent is with respect to whether a Termination Event has or has not occurred.  The actions described in clauses (c) and (d) above (including the actions described in the first proviso to clause (d)) may be taken without further notice (other than the five (5) days' notice set forth above) to any party or further order of or application to the Court as the Prepetition Secured Parties shall, in their discretion, elect, and the automatic stay is hereby deemed modified and vacated to the extent necessary to permit such actions, so long as no order prohibiting such action is entered by the Court during the Remedies Notice Period.  Upon the exercise of any such enforcement rights, the Debtors shall cooperate in the disposition of the Prepetition Collateral and shall not otherwise interfere or actively encourage others to interfere with the Prepetition Secured Parties' enforcement of their rights.  The Prepetition Secured Parties shall be entitled to apply the payments or proceeds of the Prepetition Collateral in accordance with the provisions of the Prepetition Loan Documents.  Any delay or failure of a Prepetition Secured Party to exercise rights under the Prepetition Loan Documents or this Interim Order shall not constitute a waiver of its respective rights hereunder, thereunder or otherwise. Notwithstanding the occurrence of the Termination Date or anything herein, all of the rights, remedies, benefits and protections provided to the Prepetition Secured Parties under this Interim Order shall survive the Termination Date.

21.    <u>Good Faith; No Modification or Stay of this Interim Order</u>.  Based upon

the terms of this Interim Order and the consent of the Consenting Lenders and the Prepetition

Agent, the payments, liens, security interests, superpriority claims and other protections provided

in this Interim Order are fair and reasonable to protect the interests of the Prepetition Secured

Parties.    The Prepetition Agent and the Consenting Lenders have acted in good faith in

connection with their agreement to permit the use of Cash Collateral as approved by this Interim

Order, and their reliance on this Interim Order is in good faith.  If this Interim Order or any of the

provisions hereof are hereafter modified, vacated, stayed, or reversed by subsequent order of the

Court or any other court without the express, written consent of the Prepetition Agent and the

Requisite Consenting Lenders, such modification, vacation, stay or reversal shall not affect (a)

the validity of any obligation, indebtedness or liability incurred by the Debtors to the Prepetition

Agent or any Prepetition Lender pursuant to this Interim Order before the later of (i) the effective

date of such modification, vacation, stay or reversal and (ii) the date of the Prepetition Agent's

and each Prepetition Lender's receipt of notice thereof, (b) the validity and enforceability of the

rights, remedies, liens, security interests and priorities created and authorized by this Interim

Order, or (c) the Prepetition Agent's or any Prepetition Lender's right and ability to collect and

apply all amounts due to it under the Prepetition Loan Documents as approved by this Interim

Order.

Notwithstanding any modification, vacation, stay or reversal of this Interim Order, any

indebtedness, obligation or liability incurred by the Debtors pursuant to this Interim Order

arising prior to the later of the effective date of such modification, vacation, stay or reversal or

the Prepetition Agent's and each Prepetition Lender's receipt of notice thereof, shall be governed

in all respects by the original provisions of this Interim Order, and the Prepetition Secured

Parties shall continue to be entitled to all of the rights, remedies, privileges and benefits, including any payments authorized herein, and all security interests, liens, and priorities granted herein, with respect to all such indebtedness, obligations or liabilities incurred or existing prior to such date, and with respect to the Debtors' use of the Cash Collateral prior to such date.  Without limiting the generality of the foregoing, in the event the Court or any other court hereafter modifies any of the provisions of this Interim Order, such modifications shall not affect the rights, remedies, liens and priorities of the Prepetition Secured Parties, Webster and/or Emera granted pursuant to this Interim Order with respect to the Prepetition Obligations and any Cash Collateral used prior to any such modifications.

22.     Proofs of Claim.  The Prepetition Secured Parties will not be required to file proofs of claim in the Chapter 11 Cases for any claim related to the Prepetition Obligations. Notwithstanding anything to the contrary contained in any order entered by the Court in relation to the establishment of a bar date in the Chapter 11 Cases, the Prepetition Agent, on behalf of itself and the Prepetition Lenders, is hereby authorized and entitled, but not required, to file (and amend and/or supplement, as it sees fit) a proof of claim and/or aggregate proofs of claim in the Chapter 11 Cases for any claim allowed herein.  Any proof of claim filed by the Prepetition Agent shall be deemed to be in addition to and not in lieu of any other proof of claim that may be filed by any of the Prepetition Lenders.  Any order entered by the Court in relation to the establishment of a bar date in the Chapter 11 Cases shall not apply to the Prepetition Secured Parties.

23.     Carve-Out.

(a)      As used in this Interim Order, the "Carve-Out" means:  (i) any statutory fees payable by the Debtors to the Clerk of the Court and to the U.S. Trustee under

section 1930(a) of title 28 of the United States Code, plus interest pursuant to 31 U.S.C. § 3717;

(ii) the reasonable fees and expenses incurred by a chapter 7 trustee appointed by the Court, not

to exceed $25,000; (iii) all accrued and unpaid all accrued and unpaid reasonable and

documented fees, disbursements, costs, and expenses (the "Professional Fees") incurred at any

time before or on the day of the delivery of a written carve-out notice from the Prepetition Agent

(at the discretion of the Requisite Consenting Lenders) to the Debtors of the occurrence and

continuance of a Termination Event and the termination of the consensual use of Cash Collateral,

which written notice shall expressly state that the Carve-Out is triggered (such date, the "Carve-

Out Trigger Date") (and including amounts incurred, but not invoiced prior to the Carve-Out

Trigger Date) with respect to (x) professionals or professional firms retained by such Debtor

pursuant to sections 327, 328 or 363 of the Bankruptcy Code, (y) professionals or professional

firms retained by any committee (if appointed) pursuant to sections 328 or 1103 of the

Bankruptcy Code, or (z) any claims and noticing agent retained in accordance with 28

U.S.C. § 156(c) (collectively, the "Estate Professionals"),  in each case, which Professional Fees

are allowed or approved by the Court at any time up to the amounts provided for in the Approved

Budget; and (iv) the Professional Fees of the Estate Professionals incurred after the Carve-Out

Trigger Date and allowed or approved by the Court, in an aggregate amount not exceeding

$250,000 in the aggregate for all Estate Professionals; provided, however, no portion of the

Carve-Out shall be used to investigate, challenge, object to, contest or raise any defense to, the

validity, security, perfection, priority, extent or enforceability of any amount due under or the

liens or claims granted under or in connection with the Credit Agreement; and provided, further,

that with respect to clauses (iii) and (iv) such fees and expenses shall be net of any unused

retainers held by the respective Estate Professionals.

(b)      <u>No Direct Obligation to Pay Professional Fees and Disbursements</u>. None of the Prepetition Agent or the Prepetition Lenders shall be responsible for the direct payment or reimbursement of any Professional Fees under any chapter of the Bankruptcy Code.

(c)      <u>Payment of Professional Fees Prior to the Carve-Out Trigger Date</u>. So long as the Carve-Out Trigger Date has not occurred: (i) the Debtors shall be permitted to pay professional fees, costs and expenses allowed and payable under sections 328, 330 or 331 of the Bankruptcy Code or other order of the Court, as the same may become due and payable, including on an interim basis; and (ii) such payments shall not reduce, or be deemed to reduce, the Carve-Out.

(d)      <u>Payment of Professional Fees Subsequent to the Carve-Out Event</u>. Upon the occurrence and during the continuation of a Termination Event (each, a "<u>Carve-Out Event</u>"), the right of the Debtors to pay Professional Fees outside the Carve-Out shall terminate. After the occurrence of a Carve-Out Event, the Debtors shall provide immediate notice by email or facsimile to all applicable professionals informing them that a Carve-Out Event has occurred and further advising them that the Debtors' ability to pay such professionals is subject to and limited by the Carve-Out.  At all times (prior and subsequent to a Carve-Out Event), the Professional Fees may be paid only to the extent they are allowed by the Court, or as otherwise permitted pursuant to the compensation procedures approved by the Court.

24.      <u>Disposition of Prepetition Collateral/Application of Proceeds</u>.  The Debtors shall not sell, transfer, lease, encumber or otherwise dispose of any portion of the Prepetition Collateral other than in the ordinary course of business without the prior written consent of the Requisite Consenting Lenders (and no such consent shall be implied from any other action, inaction or acquiescence by the Requisite Consenting Lenders, or from any order of

36

the Court).  To the extent that any Prepetition Collateral is sold, transferred, leased, encumbered or otherwise disposed of as contemplated by the terms of the Prepetition Loan Documents, any proceeds of such sale, lease or other disposition of the Prepetition Collateral shall be applied in a manner consistent with the Prepetition Loan Documents.

25.   <u>Maintenance of Prepetition Collateral</u>.   Until the earliest of (a) the indefeasible repayment in full in cash of all Prepetition Obligations ("<u>Repayment in Full</u>"), (b) the resolution of the Chapter 11 Cases, or (c) the closing of a sale of the applicable Prepetition Collateral, the Debtors shall (i) provide continued maintenance of and appropriate insurance on the Debtors' assets (including the combined cycle dual-fuel power plant located in Rensselaer, New York and owned by Empire Generating), in the amounts consistent with the Debtors' prepetition practices and as set forth in the applicable Prepetition Loan Documents, and (ii) maintain and utilize a cash management system that is the same or substantially similar to the Debtors' cash management system in effect as of the Petition Date, subject to approval by the Court, as modified by any order that may be entered by the Court and that is acceptable to the Requisite Consenting Lenders in their sole and absolute discretion.

26.   <u>Copies of Documents</u>.   The Debtors shall provide the Prepetition Agent and counsel for the Consenting Lenders with copies of all documents provided to any Creditors' Committee, as well as copies of all non-privileged consultants' reports, appraisals, business plans and similar documents as they become available to the Debtors, including, without limitation, any and all audits and other non-privileged reports prepared by the Debtors' accountants.  The Debtors shall provide the Prepetition Agent and counsel for the Consenting Lenders with a description of any documents withheld as privileged and shall give the basis for such assertion of privilege.  In addition, the Debtors shall timely file and serve upon the Prepetition Agent and

37

counsel for the Consenting Lenders all pleadings and other documents filed by the Debtors in the Chapter 11 Cases, including the financial reports required by the U.S. Trustee's office, and shall continue to supply such reports as are required under the Prepetition Loan Documents or as requested by the Prepetition Agent and counsel for the Consenting Lenders.  The Debtors shall comply with all reporting, access and visitation requirements set forth in the Prepetition Loan Documents (including those set forth in Sections 7.01(f) and 7.03 of the Prepetition Credit Agreement).

27.   <u>Reservation of Certain Third Party Rights and Bar of Challenges and Claims</u>.

(a)   Nothing herein shall prejudice the rights of any Creditors' Committee and any other party in interest with requisite standing, other than the Debtors (which have expressly waived their rights in this regard), to:  (i) seek to object to or to challenge the findings herein, the Debtors' Stipulations, or any other stipulations herein, including, but not limited to, those in relation to (A) the validity, extent, priority, characterization or perfection of the security interests and liens of the Prepetition Agent with respect to the Prepetition Collateral, or (B) the validity, allowability, priority, characterization, secured status or amount of the Prepetition Obligations evidenced by the Prepetition Loan Documents; or (ii) otherwise assert any claim or cause of action, including, without limitation, any derivative action, against the Prepetition Secured Parties.  For the avoidance of doubt, the Debtors have herein expressly waived any and all rights to (i) challenge any of the Debtors' Stipulations, including, without limitation, those stipulations as to the priority, extent, validity and perfection of the Prepetition Secured Parties' claims, liens, and interests, of any nature, under the Prepetition Loan Documents or (ii) otherwise assert any claim or cause of action, including, without limitation,

any derivative action, against the Prepetition Secured Parties.

Any party, including any Creditors' Committee, if appointed, must commence an adversary proceeding or contested matter, as required by the applicable Bankruptcy Rules, seeking to bring any claim, counterclaim, objection, challenge, cause of action and/or chose in action against the Prepetition Secured Parties by no later than the earlier of (a) the date of the hearing scheduled to consider confirmation of the Plan and (b) sixty (60) calendar days from the date of entry of this Order (the "<u>Challenge Period</u>").

(b)     The Challenge Period may only be extended (i) with the written consent of the Prepetition Agent and the Requisite Consenting Lenders in their sole discretion, or (ii) by order of the Court for cause shown after notice and an opportunity to be heard, <u>provided</u> that such order is entered before the expiration of any applicable period as set forth in subsection (a) of this paragraph.

(c)     Except to the extent asserted in an adversary proceeding or contested matter (as required by the applicable Bankruptcy Rules) filed during the Challenge Period, upon the expiration of the Challenge Period, to the extent not otherwise waived or barred:  (i) any and all claims, counterclaims, objections, challenges, causes of action and/or choses in action as described in paragraph (a) above sought to be brought by any party (including, without limitation, any Creditors' Committee or any trustee or other Estate representative appointed in the Chapter 11 Cases or any Successor Cases), shall be deemed to be forever waived and barred; and (ii) all of the Debtors' Stipulations, waivers, releases, affirmations and other stipulations as to the priority, extent, validity and perfection of the Prepetition Secured Parties' claims, liens, and interests, of any nature, under the Prepetition Loan Documents, or otherwise incorporated or set forth in this Interim Order, shall be of full force and

effect and forever binding upon the Debtors, the Estates and all creditors, interest holders and other parties in interest in the Chapter 11 Cases.  Without limiting the foregoing, the Prepetition Obligations shall constitute allowed claims, not subject to disallowance or subordination, for all purposes in the Chapter 11 Cases and the Prepetition Secured Parties' liens on and security interests in the Prepetition Collateral shall not be subject to any other or further challenge by any party in interest.

As to any of the findings herein, the Debtors' Stipulations and the other stipulations herein which are expressly challenged as described above, such findings and stipulations shall be binding and preclusive on any Creditors' Committee and any other party in interest except to the extent a final order is entered in favor of the plaintiff sustaining any such challenge or claim in any such timely filed adversary proceeding or contested matter.

Nothing in this Interim Order vests or confers on any Person (as defined in the Bankruptcy Code), including any committee, standing or authority to pursue any cause of action belonging to the Debtors or the Estates.

28.    <u>Limitations on Use of the Cash Collateral and the Carve-Out</u>.

(a)    The Cash Collateral and the Carve-Out may not be used, or sought to be used, (i) in connection with preventing, hindering, or delaying any of the Prepetition Secured Parties' enforcement or realization upon any of the Prepetition Collateral once a Termination Event has occurred (other than with respect to the rights otherwise granted herein with respect to the Remedies Notice Period); or (ii) except as permitted by the terms of this Interim Order, in connection with selling or otherwise disposing of Prepetition Collateral without the prior written consent of the Prepetition Agent and the Requisite Consenting Lenders.

(b)    The Cash Collateral and the Carve-Out also may not be used

directly or indirectly (i) in connection with: (A) investigating, objecting, challenging, litigating, contesting, opposing, marshaling or seeking to subordinate or recharacterize in any way any claims, liens, or Prepetition Collateral (including the Cash Collateral described herein) held by or on behalf of the Prepetition Secured Parties; (B) investigating, asserting, commencing or prosecuting any claims or causes of action of any kind or nature whatsoever, including, without limitation, any Avoidance Actions, against the Prepetition Secured Parties, or any of their respective affiliates, agents, attorneys, advisors, professionals, officers, directors and employees, in each case with respect to the Prepetition Loan Documents or the transactions contemplated therein or thereby or the exercise of enforcement actions and/or remedies thereunder; (C) investigating, prosecuting an objection to, challenging, or contesting or opposing in any manner, or raising any defenses to, the validity, extent, amount, perfection, priority, character or enforceability of any of the Prepetition Obligations or the Prepetition Liens, or any other rights or interests of any of the Prepetition Secured Parties; (D) paying any amount on account of any claims arising prior to the Petition Date unless such payments are (1) approved by an order of the Court (including hereunder) and (2) in accordance with the Approved Budget; or (E) preventing, hindering or otherwise delaying the exercise by the Prepetition Agent or Requisite Consenting Lenders of any rights and/or remedies under this Interim Order, the Prepetition Loan Documents, or applicable law, or the enforcement or realization (whether by foreclosure, credit bid, further order of the Court or otherwise) by the Prepetition Agent upon any of the Prepetition Collateral; (ii) to make any distribution under a plan of reorganization in the Chapter 11 Cases; (iii) to make any payment in settlement of any claim, action or proceeding, before any court, arbitrator or other governmental body without the prior written consent of the Prepetition Agent and the Requisite Consenting Lenders, unless otherwise ordered by the Court; (iv) to pay any fees or

41

similar amounts to any person who has proposed or may propose to purchase interests in the Debtors without the prior written consent of the Prepetition Agent and the Requisite Consenting Lenders, (v) for using or seeking to use any insurance proceeds constituting Prepetition Collateral without the prior consent of the Prepetition Agent and the Requisite Consenting Lenders; or (vi) for incurring indebtedness outside the ordinary course of business without the prior consent of the Prepetition Agent and the Requisite Consenting Lenders.  Notwithstanding the foregoing, the Prepetition Collateral and the Carve-Out are permitted to be used to reimburse any Creditors' Committee in connection with a normal and customary investigation by such committee of the liens and security interests granted to the Prepetition Secured Parties; provided, that the amount of such reimbursement shall be capped at $25,000 (the "Investigation Reimbursement Costs").  For the avoidance of doubt, the line item in the Approved Budget for the fees and expenses of counsel to any Creditors' Committee shall include the Investigation Reimbursement Costs.

(c)    Neither any Prepetition Collateral nor the Carve-Out shall be available to pay any trustee or Estate representative appointed in the Chapter 11 Cases or in any Successor Cases or to pay the fees and expenses of any professionals retained by any such trustee or Estate representative.

29.    Section 506(c) Claims.    At the Final Hearing, the Debtors and the Prepetition Agent, on behalf of the Prepetition Secured Parties, shall seek an order from the Court that  no costs or expenses of administration which have been or may be incurred in the Chapter 11 Cases at any time shall be charged against the Prepetition Secured Parties or any of their claims, or the interests of the Prepetition Secured Parties in the Prepetition Collateral pursuant to sections 105 or 506(c) of the Bankruptcy Code, or otherwise, without the prior

written consent of the Prepetition Agent and the Requisite Consenting Lenders, and no such consent shall be implied from any other action, inaction, or acquiescence by any such agent or lenders.  Notwithstanding anything to the contrary herein, the liens and security interests granted to the Prepetition Secured Parties herein shall not include, apply to or encumber Avoidance Actions; provided, however, that, upon entry of the Final Order, such liens and security interests shall include, apply to and encumber any proceeds of Avoidance Actions.

30.    No Marshaling.    At the Final Hearing, the Debtors and the Prepetition Agent, on behalf of the Prepetition Secured Parties, shall seek an order from the Court that the Prepetition Secured Parties shall not be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the Prepetition Collateral, including, without limitation, the Cash Collateral.

31.    Section 552(b).    At the Final Hearing, the Debtors and the Prepetition Agent, on behalf of the Prepetition Secured Parties, shall seek an order from the Court that the Prepetition Secured Parties shall each be entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code, and the "equities of the case" exception under section 552(b) of the Bankruptcy Code shall not apply to any of the Prepetition Secured Parties with respect to (a) the proceeds, products, offspring or profits of any of the Prepetition Collateral, including, without limitation, the Cash Collateral or (b) the extension of the Adequate Protection Liens to cover the proceeds of the Prepetition Collateral.

32.    Right to Credit Bid.    Subject to Bankruptcy Code section 363(k), the Prepetition Agent (and any designated sub-agent(s)) shall have the unqualified right to "credit bid" up to the full amount of the Prepetition Obligations in connection with any sale or other disposition of all or any portion of the Prepetition Collateral, without the need for further Court

order authorizing the same, including, without limitation, the Sale or sales occurring pursuant to section 363 of the Bankruptcy Code or included as part of any restructuring plan subject to confirmation under section 1129(b)(2)(A)(iii) of the Bankruptcy Code, and shall automatically be deemed a "qualified bidder" with respect to any disposition of Prepetition Collateral under or pursuant to (a) section 363 of the Bankruptcy Code, (b) a plan of reorganization or plan of liquidation under section 1129 of the Bankruptcy Code, or (c) a sale or disposition by a chapter 7 trustee for any of the Debtors under section 725 of the Bankruptcy Code. The Prepetition Agent shall have the right to assign, transfer, sell or otherwise dispose of its rights to credit bid, except as may be prohibited by the Prepetition Loan Documents. A credit bid submitted by the Prepetition Agent (or designated sub-agent(s)) on behalf of the Prepetition Lenders shall be considered a "Qualified Bid" under the Bidding Procedures Order. At the hearing to consider entry of the Bid Procedures Order, the Debtors will request entry of an order that Prepetition Lenders, individually, lack standing to object to a credit bid by the Prepetition Collateral Agent under section 363(k) of the Bankruptcy Code or otherwise. For the avoidance of doubt, without prejudice to any successful challenge brought during the Challenge Period, no plan of reorganization or liquidation, nor any order entered in connection with a sale of any of the Debtors' assets under section 363 of the Bankruptcy Code shall limit or otherwise restrict the right of the Prepetition Agent to credit bid for all or any part of the Prepetition Collateral.

33.   <u>Rights Preserved</u>.   Notwithstanding anything herein to the contrary, the entry of this Interim Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly: (a) the Prepetition Secured Parties' right to seek any other or supplemental relief in respect of the Debtors; (b) any of the rights of any of the Prepetition Secured Parties under the Bankruptcy Code or under non-bankruptcy law, including, without limitation, the right to (i)

44

request a modification of the automatic stay of section 362 of the Bankruptcy Code; (ii) request modified or additional adequate protection; (iii) request dismissal of the Chapter 11 Cases, conversion of any of the Chapter 11 Cases to a case under Chapter 7, or appointment of a Chapter 11 trustee or examiner with expanded powers; or (iv) propose, subject to the provisions of section 1121 of the Bankruptcy Code, a Chapter 11 plan; or (c) any other rights, claims or privileges (whether legal, equitable or otherwise) of any of the Prepetition Secured Parties. Notwithstanding anything herein to the contrary, the entry of this Interim Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly, the Debtors', any Creditors' Committee's or any party in interest's right to oppose any of the relief requested in accordance with the immediately preceding sentence except as expressly set forth in this Interim Order.  Nothing in this Interim Order shall be construed as or deemed to constitute the consent of the Prepetition Secured Parties to the use, sale or lease of the Prepetition Collateral, including the Cash Collateral, on any terms other than as expressly provided herein.

34.    <u>No Waiver by Failure to Seek Relief</u>.  The failure of the Prepetition Secured Parties to seek relief or otherwise exercise their rights and remedies under the Prepetition Loan Documents or applicable law, as the case may be, shall not constitute a waiver of any of the rights hereunder, thereunder, or otherwise of the Prepetition Secured Parties.

35.    <u>Binding Effect of Interim Order</u>.  Immediately upon execution by the Court, the terms and provisions of this Interim Order shall become valid and binding upon and inure to the benefit of the Debtors, the Prepetition Secured Parties, Webster, Emera, all other creditors of the Debtors, any Creditors' Committee or other committee appointed in the Chapter 11 Cases, and all other parties in interest and their respective successors and assigns, including any trustee or other Estate representative appointed in the Chapter 11 Cases or any Successor

45

Cases, <u>provided</u>, that the Prepetition Secured Parties shall have no obligation to allow any trustee or other Estate representative appointed in the Chapter 11 Cases or any Successor Cases to use the Cash Collateral.

36.    <u>No Modification of Interim Order</u>.  Until and unless the Repayment in Full of the Prepetition Obligations, the Debtors irrevocably waive the right to seek, and shall not seek or consent to, directly or indirectly: (a) without the prior written consent of the Prepetition Agent and the Requisite Consenting Lenders, (i) any modification, stay, vacatur or amendment to this Interim Order; (ii) a priority claim for any administrative expense or unsecured claim against the Debtors (now existing or hereafter arising of any kind or nature whatsoever, including, without limitation any administrative expense of the kind specified in sections 503(b), 506(c), 507(a) or 507(b) of the Bankruptcy Code) in the Chapter 11 Cases, equal or superior to the Adequate Protection Superpriority Claims, other than the Carve-Out; or (iii) any lien on any of the Prepetition Collateral or postpetition property with priority equal or superior to the Prepetition Liens or the Adequate Protection Liens.  The Debtors irrevocably waive any right to seek any amendment, modification or extension of this Interim Order without the prior written consent, as provided in the foregoing, of the Prepetition Agent and the Requisite Consenting Lenders and no such consent shall be implied by any other action, inaction or acquiescence of the Prepetition Agent or the Requisite Consenting Lenders.

37.    <u>Setoff and Recoupment</u>.    Notwithstanding anything to the contrary contained herein, nothing in this Interim Order shall limit or impair the nature, extent, validity and/or priority of rights, if any, of any party in interest in the Chapter 11 Cases under sections 545 and 553 of the Bankruptcy Code and/or the equitable doctrine of recoupment.

38.    <u>Limits on Liability of Prepetition Secured Parties</u>.  Nothing in the Webster

Agreements or the Prepetition Loan Documents, as applicable, or any actions taken or omitted to be taken by Webster or the Prepetition Secured Parties, as applicable, in reliance upon such documents shall in any way be construed or interpreted to impose or allow the imposition upon the Prepetition Secured Parties of any liability for any claims arising from any and all activities of the Debtors in the operation of their business following the Petition Date.  So long as the Prepetition Secured Parties comply with their obligations under this Interim Order and their obligations, if any, under applicable law (including the Bankruptcy Code), (a) the Prepetition Secured Parties shall not, in any way or manner, be liable or responsible for (i) the safekeeping of the Prepetition Collateral, (ii) any loss or damage thereto occurring or arising in any manner or fashion from any cause, (iii) any diminution in the value thereof or (iv) any act or default of any carrier, servicer, bailee, custodian, forwarding agency or other person and (b) all risk of loss, damage or destruction of the Prepetition Collateral shall be borne by the Debtors.  In permitting the use of Cash Collateral or in exercising any rights or remedies as and when permitted pursuant to this Interim Order, Webster and/or the Prepetition Secured Parties, as applicable shall not be deemed to be in control of the operations of the Debtors or to be acting as a "controlling person," "responsible person" or "owner or operator" with respect to the operation or management of the Debtors (as such terms, or any similar terms, are used in the United States Comprehensive Environmental Response, Compensation and Liability Act, 29 U.S.C. §§ 9601 *et seq.* as amended, or any similar federal or state statute), nor shall they owe any fiduciary duty to the Debtors, their creditors or Estates, or shall constitute or be deemed to constitute a joint venture or partnership with the Debtors.  Furthermore, nothing in this Interim Order shall in any way be construed or interpreted to impose or allow the imposition upon Webster or the Prepetition Secured Parties, as applicable, of any liability for any claims arising from the prepetition or

postpetition activities of the Debtors and their respective affiliates (as defined in section 101(2) of the Bankruptcy Code).

39.    <u>Survival</u>.    The provisions of this Interim Order and any actions taken pursuant hereto shall survive entry of any order which may be entered: (a) confirming any plan of reorganization in the Chapter 11 Cases; (b) converting the Chapter 11 Cases to cases under Chapter 7 of the Bankruptcy Code; (c) dismissing the Chapter 11 Cases; (d) approving the sale of any Collateral pursuant to section 363(b) of the Bankruptcy Code; or (e) pursuant to which the Court abstains from hearing the Chapter 11 Cases.  Notwithstanding the entry of any such order, the terms and provisions of this Interim Order, including the claims, liens, security interests and other protections granted to the Prepetition Secured Parties pursuant to the Prepetition Loan Documents, shall continue in full force and effect in the Chapter 11 Cases and shall maintain their priority until Repayment in Full has occurred.

Notwithstanding any termination of the Debtors' authority to use the Cash Collateral pursuant to the terms of this Interim Order, all liens, security interests, priorities, rights, remedies and other protections provided to the Prepetition Secured Parties in this Interim Order shall survive such termination and remain in full force and effect with the same continuing priority as described herein with respect to any of the Prepetition Obligations, any claims and obligations arising under this Interim Order that are outstanding on such termination date, and any fees incurred by the Prepetition Secured Parties after termination of this Interim Order in enforcing their rights hereunder.

40.    <u>Release</u>.    At the Final Hearing, the Debtors and the Prepetition Agent, on behalf of the Prepetition Secured Parties, shall seek an order from the Court that the Debtors and the Estates hereby forever, unconditionally and irrevocably release, discharge and acquit

Webster, Ankura Trust Company, LLC (in its individual capacity), and the Consenting Lenders, and each of their respective successors, assigns, affiliates, subsidiaries, parents, officers, shareholders, directors, employees, attorneys and agents, past, present and future, and their respective heirs, predecessors, successors and assigns (collectively, the "Releasees") of and from any and all claims, controversies, disputes, liabilities, obligations, demands, damages, expenses (including, without limitation, reasonable attorneys' fees), debts, liens, actions and causes of action of any and every nature whatsoever, whether arising in law or otherwise, and whether or not known or matured, arising out of or relating to the Collateral or this Interim Order, including, without limitation, (A) any so-called "lender liability" or equitable subordination claims or defenses, (B) any and all claims and causes of action arising under the Bankruptcy Code, and (C) any and all claims and causes of action with respect to the validity, priority, perfection or avoidability of the Prepetition Liens or the Prepetition Obligations and any and all right to contest any Defaults or Events of Default (as such terms or similar terms are defined in the Prepetition Loan Documents).   The Debtors further waive and release any defense, right of counterclaim, right of set-off or deduction to the payment of the Prepetition Obligations, that the Debtors now have or may claim to have against the Releasees, arising out of, connected with or relating to any and all acts, omissions or events occurring prior to the Court entering this Interim Order.

41.    No Third Party Beneficiaries.    No rights are intended to be created hereunder for the benefit of any third party or creditor or any direct or indirect incidental beneficiary except as specifically provided herein.  The Carve-Out shall not be available to any party other than those specifically authorized to receive payment therefrom as provided in paragraph 23 hereof.

49

42.    <u>Scheduling of Final Hearing</u>.  The Final Hearing to consider entry of the

Final Order is scheduled for _____  __, ____ at __:00 a.m./p.m. before the Honorable

_____, United States Bankruptcy Judge, on the __th floor, in Courtroom __, at the

White Plains courthouse of the United States Bankruptcy Court for the Southern District of New

York.  On or before _____  __, ____, the Debtors shall serve, by United States mail, first-class

postage prepaid (or by such other method permitted under the Bankruptcy Rules, Local Rules, or

approved pursuant to any order establishing noticing procedures in these Chapter 11 Cases),

notice of the entry of this Interim Order and of the Final Hearing (the "<u>Final Hearing Notice</u>"),

together with copies of this Interim Order and the Motion, on: (a) the parties having been given

notice of the Interim Hearing; (b) any party which has filed prior to such date a request for

notices with the Court; (c) counsel for any Creditors' Committee, if appointed by such date; and

(d) any other party to whom notice is required to be given pursuant to Bankruptcy Rules 2002

and 4001 and the Local Rules.  The Final Hearing Notice shall state that any party in interest

objecting to the entry of the proposed Final Order must file written objections with the Clerk of

the Court on or before _____  __, ____ at 4:00 p.m. (Eastern Time) and must serve such

objections so that they are received on or before such date by: (i) counsel to the Debtors, Hunton

Andrews Kurth LLP, 200 Park Avenue, New York, NY 10166 (Attn: Peter S. Partee, Sr., Esq.

and Robert A. Rich, Esq.) and Steinhilber Swanson LLP, 112 W. Washington, Suite 850,

Madison, WI 53703 (Attn: Michael P. Richman, Esq.); (ii) counsel to any Creditors' Committee;

(iii) counsel to the Prepetition Agent, Davis Polk & Wardwell LLP, 450 Lexington Avenue, New

York, NY 10017 (Attn: Darren S. Klein, Esq. and Benjamin M. Schak, Esq.); (iv) counsel of

record for each Consenting Lender, Skadden, Arps, Slate, Meagher & Flom LLP, 155 N. Wacker

Drive, Chicago, Illinois 60606 (Attn: Kimberly deBeers, Esq. and Craig Alcorn, Esq.), 920 N.

King St., Wilmington, Delaware (Attn: Carl Tullson, Esq.); (v) counsel to Webster, Emmet,

Marvin & Martin, LLP, 120 Broadway 32nd Floor, New York, NY 10271 (Attn: Howard S.

Schiff, Esq. and Thomas A. Pitta, Esq.) and (vi); the U.S. Trustee, U.S. Department of Justice,

Office of the U.S. Trustee, 201 Varick Street, Room 1006, New York, New York 10014 (Attn:

Andrea B. Schwartz, Esq.).

43.    *Nunc Pro Tunc* Effect of this Interim Order.  This Interim Order shall

constitute findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052 and shall

take effect and be enforceable *nunc pro tunc* to the Petition Date immediately upon approval by

the Court.

44.    Retention of Jurisdiction.  The Court has and will retain jurisdiction to

enforce this Interim Order according to its terms.

Dated: May __, 2019
        White Plains, New York

_____
HONORABLE ROBERT D. DRAIN
UNITED STATES BANKRUPTCY JUDGE

## **EXHIBIT A**

**Approved Budget**

# LIMITED LIABILITY COMPANY AGREEMENT

## OF

## EMPIRE ACQUISITION, LLC

THIS LIMITED LIABILITY COMPANY AGREEMENT (the "Agreement") of Empire Acquisition, LLC (the "Company") dated as of this ___ day of May, 2019, by Ankura Trust Company, LLC, as the sole member of the Company (the "Member").

## RECITAL

The Member has formed the Company as a limited liability company under the laws of the State of Delaware and desires to enter into a written agreement, in accordance with the provisions of the Delaware Limited Liability Company Act and any successor statute, as amended from time to time (the "Act"), governing the affairs of the Company and the conduct of its business.

## ARTICLE 1
### The Limited Liability Company

1.1 Formation. The Member has previously formed the Company as a limited liability company pursuant to the provisions of the Act. A certificate of formation for the Company as described in Section 18-201 of the Act (the "Certificate of Formation") has been filed in the Office of the Secretary of State of the State of Delaware in conformity with the Act.

1.2 Name. The name of the Company shall be "Empire Acquisition, LLC" and its business shall be carried on in such name with such variations and changes as the Member shall determine or deem necessary to comply with requirements of the jurisdictions in which the Company's operations are conducted.

1.3 Business Purpose; Powers. The Company is formed for the purpose of engaging in any lawful business, purpose or activity for which limited liability companies may be formed under the Act. The Company shall possess and may exercise all the powers and privileges granted by the Act or by any other law or by this Agreement, together with any powers incidental thereto, so far as such powers and privileges are necessary or convenient to the conduct, promotion or attainment of the business purposes or activities of the Company.

1.4 Registered Office and Agent. The location of the registered office of the Company shall be 1201 North Market Street, 18th Floor, Wilmington, New Castle County, Delaware 19801. The Company's Registered Agent at such address shall be Delaware Corporation Organizers, Inc.

1.5 <u>Term</u>. Subject to the provisions of <u>Article 6</u> below, the Company shall have perpetual existence.

## ARTICLE 2
<u>The Member</u>

2.1 <u>The Member</u>. The name and address of the Member are as follows:

| <u>Name</u> | <u>Address</u> |
| --- | --- |
| Ankura Trust Company, LLC | 485 Lexington Avenue, 10th Floor<br>New York, NY 10017<br>Attn:  Michael Fey |

2.2 <u>Actions by the Member; Meetings</u>. The Member may approve a matter or take any action at a meeting or without a meeting by the written consent of the Member. Meetings of the Member may be called at any time by the Member.  The taking of any lawful action by the Member on behalf of the Company, including the execution and/or delivery of any instrument, certificate, filing or document by the Member on behalf of the Company, or the adoption by the Member of authorizing resolutions with respect to any matter, shall constitute and evidence the due authorization of such action or matter on behalf of the Company.

2.3 <u>Liability of the Member</u>. All debts, obligations and liabilities of the Company, whether arising in contract, tort or otherwise, shall be solely the debts, obligations and liabilities of the Company, and the Member shall not be obligated personally for any such debt, obligation or liability of the Company solely by reason of being a member.

2.4 <u>Power to Bind the Company</u>. The Member (acting in its capacity as such) shall have the authority to bind the Company to any third party with respect to any matter.

2.5 <u>Admission of Members</u>. Persons or entities may be admitted as members of the Company only upon the prior written approval of the Member at the direction of the Required Lenders (as defined below).

## ARTICLE 3
<u>Management by the Member</u>

3.1 <u>Management of the Company</u>. The management of the Company is fully reserved to the Member, and the Company shall not have "managers," as that term is used in the Act. The powers of the Company shall be exercised by or under the authority of, and the business and affairs of the Company shall be managed under the direction of, the Member, who shall make all decisions and take all actions for the Company. Decisions or actions taken by the Member in accordance with this Agreement shall constitute decisions or action by the Company and shall be binding on the Company. Notwithstanding the foregoing, the Member shall not have the power to delegate any of its authority under this Agreement except in accordance with that certain letter dated as of the date of this Agreement to the Member (as amended, amended and restated, supplemented or otherwise modified from time to time in accordance with the terms

2

thereof, the "Letter of Direction") by (a) the "Required Lenders" under that certain Credit and Guaranty Agreement, dated as of March 14, 2014 (as amended, amended and restated, supplemented or otherwise modified from time to time in accordance with the terms thereof), by and among Empire Generating Co, LLC, as borrower (the "Borrower"), Empire Gen Holdco, LLC ("Holdco"), Empire Gen Holdings, LLC (the "Parent"), the Member, as successor administrative agent and successor collateral agent (in such collective capacities, the "Agent"), and certain lenders and other parties thereto from time to time, and (b) the "Required Secured Parties" necessary to effect an "Act of Secured Parties" under that certain Collateral Agency and Intercreditor Agreement, dated as of March 14, 2014 (as amended, amended and restated, supplemented or otherwise modified from time to time in accordance with the terms thereof), by and among the Member, the Borrower, Parent, Holdco and each other person party thereto from time to time.

3.2 Officers and Related Persons. The Member shall have the authority to appoint and terminate officers of the Company and retain and terminate employees, agents and consultants of the Company and (subject to the limitations in Section 3.1) to delegate such duties to any such officers, employees, agents and consultants as the Member deems appropriate, including the power, acting individually or jointly, to represent and bind the Company in all matters, in accordance with the scope of their respective duties.

## ARTICLE 4
Capital Structure and Contributions

4.1 Capital Structure. The capital structure of the Company shall consist of one class of common interests (the "Common Interests"). All Common Interests shall be identical with each other in every respect. The Member shall own all of the Common Interests issued and outstanding as of the date of this Agreement.

4.2 Capital Contributions. From time to time, the Member may determine that the Company requires capital and may make capital contribution(s) in an amount determined by the Member; provided, that the Member shall have no obligation to make any contributions of capital to the Company. A capital account shall be maintained for the Member, to which contributions and profits shall be credited and against which distributions and losses shall be charged.

## ARTICLE 5
Profits, Losses and Distributions

5.1 Profits and Losses. For financial accounting and tax purposes, the Company's net profits or net losses shall be determined on an annual basis in accordance with the manner determined by the Member. In each year, profits and losses shall be allocated entirely to the Member.

5.2 Distributions. The Member shall determine profits available for distribution and the amount, if any, to be distributed to the Member, and shall authorize and distribute on the

Common Interests, the determined amount of any such distribution when, as and if declared by the Member. The distributions of the Company shall be allocated entirely to the Member.

## ARTICLE 6
### Events of Dissolution

The Company shall be dissolved and its affairs wound up upon the occurrence of any of the following events:

(a) the Member votes for dissolution; or

(b)  a judicial dissolution of the Company under Section 18-802 of the Act.

No other event, including, without limitation, the death, retirement, resignation, expulsion, bankruptcy or dissolution of the Member, shall cause the dissolution of the Company; provided, however, that in the event of any occurrence resulting in the termination of the continued membership of the last remaining member of the Company, the Company shall be dissolved unless, within 90 days following such event, the personal representative of the last remaining member agrees in writing to continue the Company and to the admission of such personal representative (or any other person or entity designated by such personal representative) as a member of the Company, effective upon the event resulting in the termination of the continued membership of the last remaining member of the Company.

## ARTICLE 7
### Transfer of Interests in the Company

7.1 Transfers.  No Transfer (as defined below) may be made prior to the consummation of the 363 Sale (as defined in the Letter of Direction) without the prior written consent of the Required Lenders.  Subject to the foregoing, the Member may sell, assign, transfer, convey, gift, exchange, pledge, hypothecate or otherwise dispose of (each, a "Transfer") any or all of its Common Interests to any person or entity in accordance with Section 4.1 of the Intercreditor Agreement (as defined in the Letter of Direction), the Loan Documents (as defined in the Letter of Direction) and applicable law.

7.2  Cessation of Member Status.  If at any time the Member holds no Common Interests or other equity interests in the Company, the Member will cease to be a member of the Company and will have no further duties or obligations with respect to the Company (but, for the avoidance of doubt, the rights of Covered Persons under Article 8 shall continue with respect to any acts or omissions occurring prior to the Member ceasing to be a member of the Company).

## ARTICLE 8
### Exculpation and Indemnification

8.1 Exculpation. Notwithstanding any other provisions of this Agreement, whether express or implied, or any obligation or duty at law or in equity, none of the Member,

4

nor any officers, directors, stockholders, partners, members, managers, employees, affiliates, representatives or agents of the Member, nor any officer, employee, representative or agent of the Company (individually, a "Covered Person" and, collectively, the "Covered Persons") shall be liable to the Company or any other person for any act or omission (in relation to the Company, its property or the conduct of its business or affairs, this Agreement, any related document or any transaction contemplated hereby or thereby) taken or omitted by a Covered Person in the reasonable belief that such act or omission is in or is not contrary to the best interests of the Company and is within the scope of authority granted to such Covered Person by this Agreement, provided such act or omission does not constitute bad faith, willful misconduct or gross negligence.

8.2 Indemnification. To the fullest extent permitted by law, the Company shall indemnify and hold harmless each Covered Person from and against any and all losses, claims, demands, liabilities, expenses, judgments, fines, settlements and other amounts arising from any and all claims, demands, actions, suits or proceedings, civil, criminal, administrative or investigative ("Claims"), in which the Covered Person may be involved, or threatened to be involved, as a party or otherwise, by reason of the fact that he, she or it is a Covered Person or which relates to or arises out of the Company or its property, business or affairs. A Covered Person shall not be entitled to indemnification under this Section 8.2 with respect to (i) any Claim with respect to which such Covered Person has engaged in bad faith, willful misconduct or gross negligence or (ii) any Claim initiated by such Covered Person unless such Claim (A) was brought to enforce such Covered Person's rights to indemnification hereunder or (B) was authorized or consented to by the Member. Expenses incurred in defending any Claim by (y) the Member or any officer, director, stockholder, partner, member, manager or affiliate of the Member shall be paid by the Company and (z) any other Covered Person may be paid by the Company, but only upon the prior written approval of the Member in its sole and absolute discretion, upon such terms and conditions, if any, as the Member deems appropriate, in each case, in advance of the final disposition of such Claim upon receipt by the Company of an undertaking by or on behalf of such Covered Person to repay such amount if it shall be ultimately determined that such Covered Person is not entitled to be indemnified by the Company as authorized by this Section 8.2.

8.3    Rights Under Other Agreements.  Nothing in this Agreement shall be deemed to limit, amend or modify any rights (including, without limitation, rights of exculpation, indemnification or expense reimbursement) of any Covered Persons under any other agreement, including, without limitation, the Letter of Direction and the Loan Documents (as defined in the Letter of Direction).

8.4    Amendments. Any repeal or modification of this Article 8 shall not adversely affect any rights of any Covered Person pursuant to this Article 8, including the right to indemnification and to the advancement of expenses of a Covered Person, existing at the time of such repeal or modification with respect to any acts or omissions occurring prior to such repeal or modification.

## ARTICLE 9
### Miscellaneous

9.1 <u>Tax Treatment</u>. The Company shall be a disregarded entity for U.S. federal income tax purposes (as well as for any analogous state or local tax purposes), and the Member and the Company shall timely make any and all necessary elections and filings for the Company to be treated as a disregarded entity for U.S. federal income tax purposes (as well as for any analogous state or local tax purposes).

9.2 <u>Amendments</u>. Amendments to this Agreement and to the Certificate of Formation shall be effective only if approved in writing by the Member. An amendment shall become effective as of the date specified in the approval of the Member or if none is specified as of the date of such approval.

9.3 <u>Severability</u>. If any provision of this Agreement is held to be invalid or unenforceable for any reason, such provision shall be ineffective to the extent of such invalidity or unenforceability; provided, however, that the remaining provisions will continue in full force without being impaired or invalidated in any way unless such invalid or unenforceable provision or clause shall be so significant as to materially affect the expectations of the Member regarding this Agreement. Otherwise, any invalid or unenforceable provision shall be replaced by the Member with a valid provision which most closely approximates the intent and economic effect of the invalid or unenforceable provision.

9.4 <u>Governing Law.</u> This Agreement shall be governed by and construed in accordance with the laws of the State of Delaware without regard to the principles of conflicts of laws thereof.

9.5 <u>Limited Liability Company</u>. The Member intends to form a limited liability company and does not intend to form a partnership under the laws of the State of Delaware or any other laws.

## ARTICLE 10
### Letter of Direction

10.1 <u>Letter of Direction</u>.  The Agreement is being entered into by the Member pursuant to the Letter of Direction.  Notwithstanding any other provision of this Agreement, the Member and the Company shall have all requisite power and authority, and are hereby authorized and empowered, to exercise all of the rights and powers, and to perform all of the duties and obligations, of the Agent and the Sub-Agent, respectively, expressly contemplated by the Letter of Direction.  Capitalized terms used but not defined in this <u>Article 10</u> shall have the meanings ascribed to such terms in the Letter of Direction.

10.2  <u>Agency Capacity</u>.  Notwithstanding any other provision of this Agreement, the Member is entering into this Agreement solely in its capacity as the Agent and not in its individual capacity, and each reference herein to the Member shall be deemed to be a reference to Ankura Trust Company, LLC solely in its capacity as the Agent.

6

10.3  <u>Consummation of 363 Sale</u>.  It is contemplated that, in connection with the consummation of the 363 Sale, this Agreement will be amended and restated in its entirety and the equity interests in the Company will be Transferred by the Member in accordance with Section 4.1 of the Intercreditor Agreement, the Loan Documents and applicable law, and as a result of such Transfer, the Member shall cease to own any equity interests in the Company.

**[SIGNATURE PAGE FOLLOWS]**

IN WITNESS WHEREOF, the undersigned has duly executed this Agreement as of the date first above written.

**ANKURA TRUST COMPANY, LLC**


By: _____
Name:
Title:

<u>**Exhibit C**</u>

# PURCHASE AND SALE AGREEMENT

**by and among**

**TTK Empire Power, LLC,**

**as the Seller,**

**Empire Gen Holdings, LLC,**

**as Holdings,**

**Empire Gen Holdco, LLC,**

**as Holdco,**

**Empire Generating Co, LLC,**

**as the Company,**

**and**

**Empire Acquisition, LLC,**

**as the Purchaser,**

**Dated as of May 19, 2019**

# TABLE OF CONTENTS

Page

Article I

DEFINITIONS

1.1       Certain Definitions ...................................................................................2

1.2       Other Definitional and Interpretive Matters ..........................................15

Article II

PURCHASE AND SALE OF ACQUIRED EQUITY

2.1       Purchase and Sale of Acquired Equity....................................................16

Article III

CONSIDERATION

3.1       Consideration .........................................................................................16

3.2       Allocation................................................................................................17

Article IV

CLOSING

4.1       Closing Date............................................................................................17

4.2       Deliveries by the Seller ..........................................................................17

4.3       Deliveries by the Purchaser ....................................................................18

Article V

REPRESENTATIONS AND WARRANTIES OF THE ACQUIRED COMPANIES

5.1       Organization and Good Standing ............................................................19

5.2       Capitalization of the Company ...............................................................19

5.3       Authorization of Agreement ...................................................................20

5.4       Conflicts; Consents of Third Parties .......................................................20

5.5       Compliance with Law; Permits...............................................................21

5.6       Title to Assets .........................................................................................22

5.7       Intellectual Property................................................................................22

5.8       Material Contracts...................................................................................22

5.9       Litigation.................................................................................................24

5.10      Financial Statements; No Undisclosed Liabilities ..................................24

i

5.11       Absence of Certain Changes or Events ............................................................. 24

5.12       Insurance ............................................................................................................ 25

5.13       Taxes .................................................................................................................. 25

5.14       Environmental Matters ...................................................................................... 26

5.15       Employees and Labor Matters .......................................................................... 27

5.16       No Benefit Plans ............................................................................................... 27

5.17       Real Property ..................................................................................................... 27

5.18       Affiliate Transactions ........................................................................................ 28

5.19       Certain Payments .............................................................................................. 29

5.20       Brokers or Financial Advisors .......................................................................... 29

Article VI

REPRESENTATIONS AND WARRANTIES OF THE SELLER

6.1       Organization ....................................................................................................... 29

6.2       Authorization of Agreement .............................................................................. 29

6.3       Conflicts; Consents of Third Parties ................................................................. 30

6.4       Taxes .................................................................................................................. 30

6.5       Ownership of the Acquired Equity .................................................................... 31

6.6       Brokers or Financial Advisors .......................................................................... 31

Article VII

REPRESENTATIONS AND WARRANTIES OF THE PURCHASER

7.1       Organization and Good Standing ....................................................................... 31

7.2       Authorization of Agreement .............................................................................. 31

7.3       Conflicts; Consents of Third Parties ................................................................. 31

7.4       Litigation ............................................................................................................ 32

7.5       No Other Representations or Warranties ........................................................... 32

Article VIII

BANKRUPTCY COURT MATTERS

8.1       Bankruptcy Court Milestones ........................................................................... 32

8.2       Bankruptcy Court Filings .................................................................................. 33

ii

Article IX

COVENANTS

| | | |
|---|---|---|
| 9.1 | Access and Information | 34 |
| 9.2 | Actions Pending the Closing | 34 |
| 9.3 | Consents and Permits | 37 |
| 9.4 | Further Assurances | 38 |
| 9.5 | Publicity | 38 |
| 9.6 | Notification of Certain Matters | 39 |
| 9.7 | Casualty and Insurance | 40 |
| 9.8 | Schedule Update; Disclosure Generally | 40 |
| 9.9 | Use of Names | 40 |
| 9.10 | Confidentiality | 41 |
| 9.11 | Sell Free and Clear | 41 |
| 9.12 | Avoidance Actions | 41 |
| 9.13 | Not a Required Back-up Bidder | 41 |
| 9.14 | Intercompany Arrangements | 41 |
| 9.15 | Acquired Company Release | 41 |

Article X

CONDITIONS TO CLOSING

| | | |
|---|---|---|
| 10.1 | Conditions Precedent to Obligations of the Purchaser | 42 |
| 10.2 | Conditions Precedent to Obligations of the Seller | 43 |
| 10.3 | Conditions Precedent to Obligations of the Purchaser and the Seller | 43 |

Article XI

TERMINATION

| | | |
|---|---|---|
| 11.1 | Termination | 44 |
| 11.2 | Effect of Termination | 46 |
| 11.3 | Break-Up Fee; Expense Reimbursement Amounts | 47 |

Article XII

TAXES

| | | |
|---|---|---|
| 12.1 | Transfer Taxes | 48 |
| 12.2 | Cooperation and Audits | 48 |

1046305.16-CHISR01A - MSW

12.3        Entity Classification ........................................................................................48

## Article XIII

## MISCELLANEOUS

13.1        No Survival of Representations and Warranties ....................................................49

13.2        Expenses ...............................................................................................................49

13.3        Injunctive Relief....................................................................................................49

13.4        Submission to Jurisdiction; Consent to Service of Process ..................................50

**13.5        Waiver of Right to Trial by Jury** ........................................................................50

13.6        Entire Agreement; Amendments and Waivers ......................................................50

13.7        Governing Law ......................................................................................................51

13.8        Notices ...................................................................................................................51

13.9        Severability ...........................................................................................................52

13.10      Assignment ............................................................................................................53

13.11      Non-Recourse ........................................................................................................53

13.12      Counterparts ..........................................................................................................53

13.13      No Presumption .....................................................................................................54

Exhibit List

| Exhibit A | Form of Agent Release |
| Exhibit B | Form of Amended Emera Agreements |
| Exhibit C | Form of Amended O&M Agreement |
| Exhibit D | Form of Bidding Procedures Order |
| Exhibit E | Form of Consenting Lender Release |
| Exhibit F | Form of Membership Interest Transfer Instrument |
| Exhibit G | Form of New Emera Agreement |
| Exhibit H | Form of Purchaser Party Release |
| Exhibit I | Form of Sale Order |
| Exhibit J | Form of Seller Party Release |
| Exhibit K | Form of Transition Services Agreement |
| Exhibit L | Form of Acquired Company Release |
| Exhibit M | Form of Seller Party Release of Acquired Companies |

Seller Disclosure Schedule

# PURCHASE AND SALE AGREEMENT

This PURCHASE AND SALE AGREEMENT (this "<u>Agreement</u>"), dated as of May 19, 2019 (the "<u>Agreement Date</u>"), is entered into by and among Empire Acquisition, LLC, a Delaware limited liability company (the "<u>Purchaser</u>"), TTK Empire Power, LLC, a Delaware limited liability company (the "<u>Seller</u>"), Empire Gen Holdings, LLC, a Delaware limited liability company ("<u>Holdings</u>"), Empire Gen Holdco, LLC, a New York limited liability company ("<u>Holdco</u>"), and Empire Generating Co, LLC, a New York limited liability company (the "<u>Company</u>" and together with Holdco, Holdings and the Seller, the "<u>Debtors</u>").

## RECITALS:

A.   Seller is the sole member of Holdings and owns beneficially and of record all of the issued and outstanding membership interests in Holdings (such interests, the "<u>Acquired Equity</u>"). Holdings is the sole member of Holdco and owns beneficially and of record all of the issued and outstanding membership interests of Holdco, and Holdco is the sole member of the Company and owns beneficially and of record all of the issued and outstanding membership interests of the Company.

B.   The Company owns and operates an approximately 635 net megawatt combined cycle dual-fuel power plant located in Rensselaer, New York (the "<u>Plant</u>").

C.   The Debtors believe, following consultation with their legal and financial advisors and consideration of available alternatives, that, in light of the current circumstances, a sale of the Acquired Equity as provided herein is in the best interest of the Debtors, their creditors and other stakeholders.

D.   The Company, Holdco and Holdings are parties to that certain Credit and Guaranty Agreement (the "<u>Prepetition Credit Agreement</u>"), dated as of March 14, 2014 (as modified, amended, restated, supplemented or otherwise modified from time to time in accordance with the terms thereof), by and among the Company, Holdco, Holdings, the lenders from time to time party thereto (collectively, the "<u>Lenders</u>"), Ankura Trust Company, LLC, in its capacity as successor administrative agent and successor collateral agent (the "<u>Agent</u>"), and certain other parties thereto.

E.   The Company's, Holdco's and Holdings' obligations under the Prepetition Credit Agreement are secured by valid and perfected liens granted under the Prepetition Collateral Documents (as hereinafter defined).

F.   The Company, Holdco and Holdings are in default of their obligations under the Prepetition Credit Agreement, but the Debtors have entered into a series of forbearance agreements and related amendments with Required Lenders (as hereinafter defined), the last of which expires on May 20, 2019 (the "<u>Forbearance Period</u>").

G.     Following consultation with their legal and financial advisors and consideration of available alternatives, the Debtors believe that, to maximize and preserve value for all stakeholders, they must commence voluntary cases (collectively, the "Bankruptcy Cases") under Chapter 11 of the United States Bankruptcy Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code"), prior to the expiration of the Forbearance Period.

H.     Pursuant to that certain Restructuring Support Agreement, dated as of the Agreement Date (the "Restructuring Support Agreement"), the Consenting Lenders (as hereinafter defined) and the Debtors have agreed that, (i) subject to approval of the Bankruptcy Court (as hereinafter defined) after the Debtors' solicitation of other bids in accordance with the Bidding Procedures Order (as hereinafter defined), the Seller shall effectuate a sale of the Acquired Equity to the Purchaser in exchange for a credit bid of all outstanding obligations under the Prepetition Credit Agreement and otherwise on the terms and subject to the conditions of this Agreement in accordance with section 363(f) of the Bankruptcy Code and (ii) contemporaneously, the Debtors shall propose and seek confirmation of a joint Chapter 11 plan for the Debtors that provides for the administration of claims against the Debtors.

I.     Pursuant to the Direction Letter (as hereinafter defined), the Consenting Lenders directed the Agent to credit bid all of the outstanding obligations under the Prepetition Credit Agreement and otherwise to facilitate the transactions contemplated by this Agreement and the Restructuring Support Agreement, and the Agent has agreed to follow the Consenting Lenders' directions in the Direction Letter.

NOW, THEREFORE, in consideration of the premises and the mutual representations, warranties, covenants and agreements contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereby agree as follows:

## ARTICLE I

## DEFINITIONS

1.1     Certain Definitions. For purposes of this Agreement, the following terms, when used herein with initial capital letters, have the meanings specified in this Section 1.1 or in other sections of this Agreement identified in this Section 1.1:

"Acquired Company" means each of the Company, Holdco and Holdings.

"Acquired Companies" means, collectively, the Company, Holdco and Holdings.

"Acquired Equity" has the meaning set forth in the recitals to this Agreement.

"Affiliate" means, with respect to any Person, any other Person that, directly or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such Person, and the term "control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through ownership of voting securities, by contract or otherwise.

"Agent" has the meaning set forth in the recitals to this Agreement.

"Agent Release" means a release by each Acquired Company, in the form attached hereto as Exhibit A, in favor of the Agent.

"Agreement" has the meaning set forth in the preamble to this Agreement.

"Agreement Date" has the meaning set forth in the preamble to this Agreement.

"Alternative Transaction" means, at any time from the Agreement Date until the later of twelve (12) months (a) after the Petition Date and (b) following the Termination Date, the sale, transfer or other disposition, directly or indirectly, including through an asset sale, equity sale, merger, amalgamation or other similar transaction, including a plan of reorganization approved by the Bankruptcy Court, or resulting from the Auction, or otherwise in connection with the liquidation and winding up of any of the Debtors, of a material portion of a Debtor's assets or equity, in a transaction or series of transactions with one or more Person, other than the Purchaser; provided, however, that entry of the Confirmation Order prior to the Closing shall not constitute an Alternative Transaction.

"Amended Emera Agreements " means the Emera Agreements, as amended or amended and restated, in substantially the forms attached hereto as Exhibit B.

"Amended O&M Agreement" means the O&M Agreement, as amended and restated, in substantially the form attached hereto as Exhibit C.

"Ancillary Agreements" means the Membership Interest Transfer Instrument and the Transition Services Agreement.

"Antitrust Authority" has the meaning set forth in Section 9.3(a).

"Antitrust Law" means the HSR Act and any competition, merger control and antitrust Law of any other applicable supranational, national, federal, state, provincial or local Law designed or intended to prohibit, restrict or regulate actions having the purpose or effect of monopolizing or restraining trade or lessening competition of any other country or jurisdiction, to the extent applicable to the transactions contemplated by this Agreement.

"Auction" has the meaning set forth in the Sale Procedures.

"Avoidance Actions" means any and all claims for relief of the Debtors under chapter 5 of the Bankruptcy Code, including section 544 through 553, section 558 and any other applicable provisions of the Bankruptcy Code, or state fraudulent conveyance, fraudulent transfer or similar Laws.

"Back-up Bidder" has the meaning set forth in the Sale Procedures.

"Bankruptcy Cases" has the meaning set forth in the recitals to this Agreement.

"Bankruptcy Code" has the meaning set forth in the recitals to this Agreement.

"Bankruptcy Court" means the United States Bankruptcy Court for the Southern District of New York.

"Bidding Procedures Order" means the form of order attached hereto as Exhibit D, or once entered, the Order of the Bankruptcy Court, which Order shall be substantially in the form attached hereto as Exhibit D, with such changes as may be required by the Bankruptcy Court that are in form and substance reasonably satisfactory to the Purchaser and the Seller.

"Break-Up Fee" has the meaning set forth in Section 11.3(a).

"Business Day" means any day that is not a Saturday, a Sunday or other day of the year on which banking institutions in New York City are required or authorized by Law to be closed.

"CAMS Agreement" means an Asset Management Agreement or similar agreement, to be entered into by the Company and Consolidated Asset Management Services (Texas), LLC, in a form provided by the Purchaser.

"Cash Collateral Orders" has the meaning set forth in the Restructuring Support Agreement.

"Claim" has the meaning set forth in section 101(5) of the Bankruptcy Code.

"Closing" has the meaning set forth in Section 4.1.

"Closing Date" has the meaning set forth in Section 4.1.

"Company" has the meaning set forth in the preamble to this Agreement.

"Company Material Adverse Effect" means any event, change, effect, condition, state of facts, occurrence or circumstance (regardless of whether such event, change, effect, condition, state of facts, occurrence or circumstance constitutes a breach of any representation, warranty or covenant of a Debtor hereunder) which has had or would reasonably be expected to have, individually or when considered together with any other events, changes, effects, conditions, states of facts, occurrences or circumstances: (a) a material adverse effect on or a material adverse change in the Acquired Companies' (taken as a whole) business, assets, properties, liabilities, financial condition, results of operations or prospects; (b) a material adverse change on or a material adverse change in or to the ability of the Debtors to consummate the transactions contemplated by this Agreement, the Ancillary Agreements and each other agreement, document or instrument contemplated hereby or thereby or to perform their obligations under this Agreement, the Ancillary Agreements and each other agreement, document or instrument contemplated hereby or thereby or, to the extent applicable, with respect to all proceedings incidental thereto (including the Bankruptcy Cases); or (c) the effect of preventing or materially delaying the consummation of the transactions contemplated by this Agreement, the Ancillary Agreements and each other agreement, document or instrument contemplated hereby or thereby, in each case other than any event, change, effect, condition, state of facts, occurrence or circumstance to the extent resulting from an Excluded Matter.

"Company Policies" has the meaning set forth in Section 9.7(a).

"<u>Competing Bid</u>" means any bid contemplating an Alternative Transaction, whether pursuant to the Sale Procedures or otherwise.

"<u>Confirmation Order</u>" means an order confirming the Chapter 11 plans contemplated and required by the Restructuring Support Agreement.

"<u>Consenting Lender Release</u>" means a release by a Lender, in the form attached hereto as <u>Exhibit E</u>, in favor of those Seller Released Parties who have executed a Seller Party Release in favor of such Lender and the other Purchaser Released Parties.

"<u>Consenting Lenders</u>" has the meaning set forth in the Restructuring Support Agreement.

"<u>Contract</u>" means any contract, agreement, commitment, promise or undertaking (including any indenture, note, bond or other evidence of Indebtedness, instrument, license, lease, easement, purchase order or other agreement), in each case, that is legally binding, whether written or oral.

"<u>Credit Bid Amount</u>" means a credit bid by the Agent (as defined in the Prepetition Credit Agreement) or a subagent of such Agent under the Prepetition Credit Agreement on behalf of the related Lender Parties (as defined in the Prepetition Credit Agreement) in the full amount of the outstanding obligations under such Prepetition Credit Agreement, as authorized by the Prepetition Loan Documents.

"<u>Debtors</u>" has the meaning set forth in the preamble to this Agreement.

"<u>Direction Letter</u>" means the letter provided to the Agent by the Required Lenders and the Required Secured Parties instructing the Agent to cause the Purchaser to enter into this Agreement, dated May 19, 2019.

"<u>Dollars</u>" or "<u>$</u>" has the meaning set forth in <u>Section 1.2(e)</u>.

"<u>Emera</u>" means Emera Energy Services, Inc.

"<u>Emera Agreements</u>" means, collectively, (a) the International Swap Dealer Association Master Agreement, dated April 1, 2010, between the Company and Emera, (b) the Amended and Restated Schedule to the International Swap Dealer Association Master Agreement, dated as of April 1, 2011, (c) the Amended and Restated Credit Support Annex, dated as of April 1, 2011, (d) the Amended and Restated Transaction Confirmation, dated June 1, 2017, between the Company and Emera, and (e) all other documents evidencing or relating to the foregoing, all of the foregoing as may be amended, amended and restated, supplemented or otherwise modified from time to time in accordance with the terms thereof and in effect prior to the effectiveness of the Amended Emera Agreements.

"<u>Emera Liens</u>" means the Liens on certain of the Company's NYISO accounts receivable and other collateral held by Emera under the Emera Agreements or the Amended Emera Agreements, as applicable.

"Employee Benefit Plan" means each "employee benefit plan" (as such term is defined in Section 3(3) of ERISA), whether or not subject to ERISA, and each other employee benefit plan, program, policy, agreement or arrangement maintained, sponsored or contributed to by any Acquired Company or in respect of which any Acquired Company could have any Liability.

"Environmental Claim" means any action, cause of action, Claim, suit, proceeding, investigation, Order, demand or notice by any Person alleging Liability (including Liability for investigatory costs, governmental response costs, remediation or clean-up costs, natural resources damages, property damages, personal injuries, attorneys' fees, fines or penalties) arising out of, based on, resulting from or relating to (a) the presence, Release or threatened Release of, or exposure to any Hazardous Materials, (b) circumstances forming the basis of any violation, or alleged violation, of any Environmental Law, or (c) any other matters covered or regulated by, or for which Liability is imposed under, Environmental Laws.

"Environmental Law" means any Law or Order in effect at the relevant date or for the relevant period relating to the protection of health or the environment (including ambient air, indoor air, surface water, groundwater, land surfaces, sediment or subsurface strata) or natural resources, releases of or exposure to Hazardous Material or the handling, generation, treatment, transportation, storage, use, arrangement for disposal or disposal, manufacture, distribution, formulation, packaging or labeling of Hazardous Materials, including the Comprehensive Environmental Response, Compensation and Liability Act (42 U.S.C. §§ 9601, et seq.), the Hazardous Materials Transportation Act (49 U.S.C. App. §§ 1801, et seq.), the Resource Conservation and Recovery Act (42 U.S.C. §§ 6901, et seq.), the Clean Water Act (33 U.S.C. §§ 1251, et seq.), the Clean Air Act (42 U.S.C. §§ 7401, et seq.), the Toxic Substances Control Act (15 U.S.C. §§ 2601, et seq.), the Federal Insecticide, Fungicide, and Rodenticide Act (7 U.S.C. §§ 136, et seq.), and the regulations promulgated pursuant thereto and analogous State and local Laws.

"Environmental Permit" means any Permit required under or issued pursuant to any Environmental Law.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended, including the rules and regulations thereunder and any substitute or successor provisions.

"Excluded Matter" means any one or more of the following: (a) the effect of any change in the United States or foreign economies or securities or financial markets in general except to the extent such changes have a disproportionate effect on any Acquired Company relative to other participants in the electric power generation industry; (b) the effect of any change that generally affects the international, national or regional electric generating, transmission or distribution industry except to the extent such changes have a disproportionate effect on any Acquired Company relative to other participants in the electric power generation industry; (c) the effect of any change in markets for commodities or supplies, including electric power, natural gas or fuel and water except to the extent such changes have a disproportionate effect on any Acquired Company relative to other participants in the electric power generation industry; (d) the effect of any change in market design and pricing except to the extent such changes have a disproportionate effect on any Acquired Company relative to other participants in the electric power generation industry; (e) the effect of any change arising in connection with earthquakes,

hostilities, acts of war, sabotage or terrorism or military actions or any escalation or material worsening of any such hostilities, acts of war, sabotage or terrorism or military actions existing or underway as of the date hereof except to the extent such changes have a disproportionate effect on any Acquired Company relative to other participants in the electric power generation industry; (f) the effect of any changes in applicable Laws or accounting rules except to the extent such changes have a disproportionate effect on any Acquired Company relative to other participants in the electric power generation industry; (g) any effect directly attributable to the public announcement of this Agreement in accordance with the terms of this Agreement; or (h) any effect directly resulting from the filing of the Bankruptcy Cases.

"Expense Reimbursement Amounts" has the meaning set forth in Section 11.3(b).

"Expenses" has the meaning set forth in Section 11.3(b).

"FERC" means the Federal Energy Regulatory Commission.

"Financial Statements" has the meaning set forth in Section 5.10(a).

"Forbearance Period" has the meaning set forth in the recitals to this Agreement.

"GAAP" means generally accepted accounting principles in the United States.

"Governing Documents" means the legal document(s) by which any Person (other than an individual) establishes its legal existence or which govern its internal affairs. By way of example the "Governing Documents" of a corporation are its certificate or articles of incorporation and by-laws, the "Governing Documents" of a limited partnership are its limited partnership agreement and certificate of limited partnership, and the "Governing Documents" of a limited liability company are its operating agreement and its certificate of formation.

"Governmental Body" means any government or governmental or regulatory body thereof, or political subdivision thereof, or any agency, authority, department, commission, board, bureau, official or instrumentality of such body, whether foreign, federal, tribal, state, or local, or any agency, instrumentality or authority thereof, or any court or arbitrator thereof (public or private) of competent jurisdiction.

"Hazardous Material" means any substance, material or waste which is regulated by any Governmental Body, including petroleum and its by-products, asbestos, and any material or substance which is defined as a "hazardous waste," "hazardous substance," "hazardous material," "restricted hazardous waste," "industrial waste," "solid waste," "contaminant," "pollutant," "toxic waste" or "toxic substance" or otherwise regulated under any provision of Environmental Law or for which Liability can be imposed under any Environmental Law.

"Holdco" has the meaning set forth in the preamble to this Agreement.

"Holdings" has the meaning set forth in the preamble to this Agreement.

"HSR Act" means the United States Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended.

7

"Indebtedness" of any Person means, without duplication: (a) the principal of and premium (if any) in respect of (i) indebtedness of such Person for money borrowed and (ii) indebtedness evidenced by notes, debentures, bonds or other similar instruments for the payment of which such Person is responsible or liable; (b) all obligations of such Person issued or assumed as the deferred purchase price of property, all conditional sale obligations of such Person and all obligations of such Person under any title retention agreement (but excluding trade accounts payable and other accrued current liabilities arising in the Ordinary Course of Business); (c) all obligations of such Person under leases required to be capitalized in accordance with GAAP; (d) all obligations of such Person for the reimbursement of any obligor on any letter of credit, banker's acceptance or similar credit transaction; (e) any accrued interest, premiums, penalties, breakages, "make whole amounts" and other obligations relating to the foregoing that would be payable in connection with the repayment of the foregoing; (f) all obligations of the type referred to in clauses (a) through (e) of any Persons for the payment of which such Person is responsible or liable, directly or indirectly, as obligor, guarantor, surety or otherwise, including guarantees of such obligations; and (g) all obligations of the type referred to in clauses (a) through (f) of other Persons secured by any Lien on any property or asset of such Person (whether or not such obligation is assumed by such Person).

"Initial Expense Reimbursement Amount" has the meaning set forth in Section 11.3(b).

"Intellectual Property" means all worldwide intellectual property and rights, title and interests arising from or in respect of the following: (a) industrial design registrations and applications therefor, utility models, patents and patent applications (including provisional applications), including continuations, divisionals, continuations in-part, reexaminations and reissues, extensions, renewals and any patents that may be issued with respect to the foregoing; (b) trademarks, service marks, certification marks, collective marks, trade names, business names, slogans, common law trademarks and service marks, acronyms, forms of advertisement, assumed names, d/b/a's, fictitious names, trade dress, logos, designs, devices, signs, symbols, design rights including product design, configuration and packaging rights, internet domain names, icons, symbols or designations, corporate names, and general intangibles of a like nature and other indicia of identity, origin or quality, whether registered, unregistered or arising by Law, and all applications, registrations, and renewals for any of the foregoing, together with the goodwill associated with and symbolized by each of the foregoing (collectively, "Trademarks"); (c) published and unpublished works of authorship in any medium, whether copyrightable or not, whether in final form or not, in all media now known or hereafter created, including writings, graphics, artworks, photographs, compositions, sound recordings, motion pictures and audiovisual works, databases and other compilations of information, computer software, mobile and internet applications and content, source code, object code, algorithms, and other similar materials, all packaging, advertising and promotional materials related to the products, and all copyrights and moral rights therein and thereto, and registrations and applications therefor, and all issuances, renewals, extensions, restorations and reversions thereof, in each case, whether registered or not; and (d) confidential or proprietary information, inventions and invention disclosures (whether patentable or not and whether or not reduced to practice), improvements, unregistered designs, trade secrets, and know-how, including methods, processes, procedures, business plans, strategy, marketing data, marketing studies, advertisements, schematics, concepts, software and databases (including source code, object code and algorithms), formulae, and compositions, drawings, prototypes, models, discoveries, technology, research and

8

development and customer information and lists, together with all rights of action and remedies for past, present and future infringement of any of the foregoing Intellectual Property.

"Intellectual Property License" means: (a) any Contract that contains any grant by any Acquired Company to any third Person of any right to use, publish, perform or exploit any of the Intellectual Property of any Acquired Company; and (b) any Contract (other than a Contract concerning the licensing of generally commercially available software, including "shrink-wrap" and "click-wrap" licenses) that contains any grant by any third Person to any Acquired Company of any right to use, modify, copy, publish, perform or exploit any Intellectual Property of such third Person.

"Intercreditor Agreement" means that certain Collateral Agency and Intercreditor Agreement, dated as of March 14, 2014 (as modified, amended, restated, supplemented or otherwise modified from time to time in accordance with the terms thereof), by and among the Debtors, the Lenders, the Agent, and certain other parties thereto.

"IRC" means the Internal Revenue Code of 1986, as amended.

"Knowledge" with respect to the Debtors means the actual knowledge (without any duty of inquiry or investigation) of the persons listed in Section 1.1 of the Seller Disclosure Schedule.

"Latest Balance Sheet" has the meaning set forth in Section 5.10(a).

"Law" means any law, statute, regulation, rule, code, decree, constitution, ordinance, treaty, rule of common law, decree, directive, policy or other requirements administered or enforced by or on behalf of, any Governmental Body, including any Order.

"Leased Real Property" has the meaning set forth in Section 5.17(b).

"Legal Proceeding" means any claim, demand, litigation, action, cause of action, suit, audit, dispute, review, hearing, charge, indictment, complaint or other judicial or administrative proceeding, at law or in equity, before or by any Governmental Body or arbitration or other similar dispute resolution proceeding.

"Lenders" has the meaning set forth in the recitals to this Agreement.

"Liability" means any debt, loss, liability, claim (including a Claim), commitment, undertaking, damage, Tax, expense, fine, penalty, cost, royalty, deficiency or obligation (including those arising out of any action, such as any settlement or compromise thereof or judgment or award therein), of any nature, whether known or unknown, disclosed or undisclosed, express or implied, primary or secondary, direct or indirect, matured or unmatured, determined or undeterminable, on or off balance sheet, fixed, absolute, contingent, accrued or unaccrued, liquidated or unliquidated, or otherwise and whether due or to become due, and whether in contract, tort, strict liability or otherwise, and whether or not resulting from third party claims.

"Lien" as applied to any Person means, with respect to any property or asset, any mortgage, deed of trust, lien (statutory or otherwise), pledge, hypothecation, security interest, claim, encumbrance, covenant, condition, encroachment or other survey defect, charge, pledge,

easement, instrument, preference, priority, option, conditional sale agreement, covenant, condition or other similar restriction (including restrictions on transfer or use), any other right of a third party (including purchase rights, rights of first offer or refusal and drag or tag along rights) or any other interest in property, of any kind or nature, whether secured or unsecured, choate or inchoate, filed or unfiled, scheduled or unscheduled, recorded or unrecorded, contingent or non-contingent, material or non-material, known or unknown, whether imposed by Law, Contract or otherwise; provided, that "Liens" shall not, for avoidance of doubt, include any restrictions on transfer of securities arising from applicable securities Laws.

"Material Contracts" has the meaning set forth in Section 5.8(a).

"Membership Interest Transfer Instrument" means the Membership Interest Transfer Instrument, in substantially the form attached hereto as Exhibit F.

"Milestones" means those milestones set forth in Section 8.1(a) through Section 8.1(e); provided that any such Milestone may be extended upon mutual written agreement between the Purchaser and the Seller.

"New Emera Agreement" means the Energy Management Agreement, to be entered into by and between Emera Energy Services, Inc. and the Company, in substantially the form attached hereto as Exhibit G.

"NYISO" means the New York Independent System Operator, the not-for-profit organization that manages New York's electrical grid and its competitive wholesale electric market.

"NYPSC Letter of Credit" means Irrevocable Standby Letter of Credit No. 11066, dated January 24, 2019, issued by Webster Bank for the account of the Company, naming the New York State Public Service Commission (the "Commission") as beneficiary, in the stated amount of $7,000,000.

"O&M Agreement" means that certain Services Agreement, dated as of March 3, 2017, by and between the Company and NAES Corporation, as amended, amended and restated, supplemented or otherwise modified from time to time in accordance with its terms and in effect prior to the effectiveness of the Amended O&M Agreement.

"Order" means any order, injunction, judgment, decree, ruling, writ, assessment or arbitration award of a Governmental Body.

"Ordinary Course of Business" means the operation of any Acquired Company's or the Seller's, as applicable, business in the ordinary and usual course, consistent in nature, scope and magnitude with past practice and custom of any Acquired Company or the Seller, as applicable, and taken in the ordinary course of normal, day-to-day operations in compliance with applicable Law in all material respects.

"Other Real Property" has the meaning set forth in Section 5.17(d).

"Other Real Property Agreements" has the meaning set forth in Section 5.17(d).

10

"Other Real Property Interests" has the meaning set forth in Section 5.17(d).

"Permits" means any approvals, authorizations, consents, franchises, licenses, permits, waivers, operating permits, easements, qualifications, grants, concessions, exceptions, rulings, waivers, variances, registrations, certificates or other forms of permission, exemptions, plans and the like, of any Governmental Body.

"Permitted Liens" means: (a) materialmen's, mechanics', carriers', workmen's, warehousemen's, repairmen's and other like Liens arising in the Ordinary Course of Business which (i) are not individually or in the aggregate material to the operation of the Plant and (ii) relate to amounts (A) not yet delinquent or (B) being contested in good faith (and for which adequate reserves are maintained to the extent required by GAAP); (b) Liens for Taxes which (i) are not yet delinquent or (ii) are being contested in good faith (and for which appropriate reserves are maintained to the extent required by GAAP); (c) Liens arising under conditional sales contracts and equipment leases with third parties entered into in the Ordinary Course of Business; (d) zoning, entitlement and other land use and environmental regulations promulgated by any Governmental Body which do not individually or in the aggregate materially interfere with the Company's ability to operate the Plant as currently conducted or to utilize the Plant or the Real Property for their intended purposes; (e) Liens granted or incurred in connection with an Order of the Bankruptcy Court in the Bankruptcy Cases; (f) the Emera Liens, only to the extent granted under the Amended Emera Agreements (if applicable); (g) the PILOT Mortgage; and (h) the Webster Bank Liens.

"Person" means any individual, corporation, limited liability company, partnership, firm, joint venture, association, joint-stock company, trust, unincorporated organization, Governmental Body or other entity.

"Petition Date" means the date of the filing of the Bankruptcy Cases.

"PILOT Mortgage" means the Liens on certain of the Company's Real Property Leases and easements held by Rensselaer County Industrial Agency.

"Plan" has the meaning set forth in the Restructuring Support Agreement.

"Plan Effective Date" has the meaning set forth in the Restructuring Support Agreement.

"Plant" has the meaning set forth in the recitals to this Agreement.

"Prepetition Collateral Documents" means the Prepetition Pledge Agreement, the Prepetition Security Agreement, all related mortgages, consent agreements, depositary agreements, control agreements, and any agreement entered into, or required to be delivered, by the Debtors pursuant to the terms of the foregoing in order to perfect the liens created on the property of the Debtors in favor of the Agent.

"Prepetition Credit Agreement" has the meaning set forth in the recitals to this Agreement.

"Prepetition Depositary Agreement" means the Depositary Agreement, dated as of March 14, 2014 (as modified, amended, restated, supplemented or otherwise modified from time to time in accordance with the terms thereof), by and among the Company, Holdco, Holdings, the Agent, and Deutsche Bank AG New York Branch, as Depositary.

"Prepetition Loan Documents" means the Prepetition Credit Agreement, the Prepetition Security Agreement, the Prepetition Pledge Agreement, the Prepetition Depositary Agreement, all other Prepetition Collateral Documents, and all other documents evidencing or relating to the foregoing, including the Intercreditor Agreement.

"Prepetition Pledge Agreement" means that certain Pledge Agreement, dated as of February 23, 2017 (as modified, amended, restated, supplemented or otherwise modified from time to time in accordance with the terms thereof), between the Seller and the Agent.

"Prepetition Security Agreement" means that certain Pledge and Security Agreement, dated as of March 14, 2014 (as modified, amended, restated, supplemented or otherwise modified from time to time in accordance with the terms thereof), by and among the Company, Holdco, Holdings and the Agent.

"Purchase Consideration" has the meaning set forth in Section 3.1.

"Purchaser" has the meaning set forth in the preamble to this Agreement.

"Purchaser Party Release" means (i) in the case of a Lender, a Consenting Lender Release, (ii) in the case of the Purchaser, a release in the form attached hereto as Exhibit H, in favor of those Seller Released Parties who have executed a Seller Party Release, and (iii) in the case of the Agent and each of the Secured Parties (as applicable), a release contemplated pursuant to the Prepetition Credit Agreement and/or the Intercreditor Agreement.

"Purchaser Released Parties" means (a) the Purchaser, (b) Ankura Trust Company, LLC, in its individual capacity, (c) each Lender that has executed and delivered a Consenting Lender Release effective on the Closing Date, and the Affiliates of each such Lender, (d) Ankura Trust Company, LLC, in its capacity as the Agent, and (e) with respect to each of the foregoing, their respective successors and assigns, and current and former officers, directors, managers, principals, employees, agents, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, solely in their respective capacities as such.

"Purchaser Releasing Parties" means (a) the Purchaser, (b) each Lender that has executed and delivered a Consenting Lender Release effective on the Closing Date, and (c) the Agent, on behalf of each of the Lender Parties (as defined in the Prepetition Credit Agreement) pursuant to section 9.08 of the Prepetition Credit Agreement, and each of the Secured Parties pursuant to section 5 of the Prepetition Pledge Agreement and sections 3.1 and 5.1 of the Intercreditor Agreement.

"Real Property" has the meaning set forth in Section 5.17(d).

"Real Property Leases" has the meaning set forth in Section 5.17(b).

"Regulatory Approvals" means any approvals, licenses, registrations or authorizations of any Governmental Body necessary for the operation of the Plant.

"Release" means any release, spill, emission, leaking, pumping, injection, deposit, disposal, discharge, dispersal, migration or leaching into or through the indoor or outdoor environment, or into or out of any property.

"Representative" means, with respect to any Person, any and all directors, officers, partners, managers, employees, consultants, financial advisors, counsel, accountants and other agents, including potential financing sources of such Person.

"Required Lenders" has the meaning set forth in the Prepetition Credit Agreement.

"Required Secured Parties" has the meaning set forth in the Intercreditor Agreement.

"Restructuring Support Agreement" has the meaning set forth in the recitals to this Agreement.

"Sale Order" means an Order of the Bankruptcy Court authorizing the Sale, which shall be in substantially the form attached hereto as Exhibit I, with such changes as may be required by the Bankruptcy Court that are consistent with the Restructuring Support Agreement and in form and substance acceptable to the Required Lenders, in their sole and absolute discretion, the Company, and, solely to the extent such changes would be adverse to the Agent or any sub-Agent (taking into account all of the Agent's indemnification and other rights under the Prepetition Loan Documents and Prepetition Collateral Document), the Agent.

"Sale Procedures" means the bidding procedures set forth in the Bidding Procedures Order, to be entered by the Bankruptcy Court.

"Secured Parties" has the meaning set forth in the Intercreditor Agreement.

"Seller" has the meaning set forth in the preamble to this Agreement.

"Seller Disclosure Schedule" means the disclosure schedule delivered by the Acquired Companies and the Seller to the Purchaser on the Agreement Date.

"Seller Party Release" means a release by a Seller Released Party, in the form attached hereto as Exhibit J, in favor of the Purchaser Released Parties.

"Seller Released Parties" means (a) the Seller and its Affiliates, subsidiaries, members, partners, and shareholders, including without limitation, (i) Tyr Energy, LLC, (ii) NAES Corporation, (iii) TTK Power, LLC, (iv) Tyr TTK Power, LLC, (v) Tyr Energy, Inc., (vi) ITOCHU Corporation, (vii) ITOCHU International, Inc., (vii) KPIC USA, LLC, (ix) The Kansai Electric Power Co., Inc., (x) TG TTK Power, LLC, (xi) Tokyo Gas America Power, LLC, (xii) Tokyo Gas America, Ltd., and (xiii) Tokyo Gas Co., Ltd., and (b) with respect to each of the foregoing, all of their respective successors and assigns, and current and former officers, directors, managers, principals, employees, agents, financial advisors, attorneys, accountants,

13

investment bankers, consultants, representatives, and other professionals, solely in their respective capacities as such.

"Subsequent Expense Reimbursement Amount" has the meaning set forth in Section 11.3(b).

"Successful Bidder" has the meaning set forth in the Sale Procedures.

"Tax" means: (a) all federal, state, local or foreign taxes, charges, levies, fees, imposts, assessments or similar governmental charges, including all net income, gross receipts, capital, sales, use, ad valorem, value added, transfer, franchise, profits, inventory, capital stock, license, withholding, payroll, employment, social security, escheat, unemployment, excise, severance, stamp, occupation, property and estimated taxes; (b) any item described in clause (a) for which a taxpayer is liable as a transferee or successor, by reason of the regulations under section 1502 of the IRC, or by contract, indemnity or otherwise; and (c) all interest, penalties, fines, additions to tax or additional amounts imposed by any Governmental Body in connection with any item described in clause (a) or (b).

"Tax Return" means all returns, declarations, reports, estimates, information returns and statements required to be filed in respect of any Taxes (including any attachments thereto or amendments thereof).

"Termination Date" has the meaning set forth in Section 11.1.

"TGP Letter of Credit" means Irrevocable Standby Letter of Credit No. 11073, dated March 12, 2019, issued by Webster Bank for the account of the Company, naming the Tennessee Gas Pipeline Company, L.L.C. as beneficiary, in the stated amount of $450,000.

"Transfer Taxes" has the meaning set forth in Section 12.1.

"Transition Services Agreement" means that certain Transition Services Agreement, by and between the Company and Tyr Energy, LLC, in substantially the form attached hereto as Exhibit K.

"UCC" means the Uniform Commercial Code as in effect from time to time in any applicable jurisdiction.

"Webster Bank" means Webster Bank, National Association.

"Webster Bank Letter of Credit Documents" means: (a) the Cash Collateral Agreement, dated of January 24, 2019, by the Company in favor of Webster Bank in connection with the NYPSC Letter of Credit; (b) the Reimbursement Agreement, dated January 24, 2019, pursuant to which the Company agreed, among other things, to pay certain amounts to Webster Bank in connection with the NYPSC Letter of Credit; (c) the Cash Collateral Agreement, dated of March 12, 2019, by the Company in favor of Webster Bank in connection with the TGP Letter of Credit; (d) the Reimbursement Agreement, dated March 12, 2019, pursuant to which the Company agreed, among other things, to pay certain amounts to Webster Bank in connection

14

with the TGP Letter of Credit; and (e) all other documents executed or delivered in connection with the foregoing.

"Webster Bank Liens" means the Liens on the Company's accounts held at Webster Bank to secure the Company's obligations under the Webster Bank Letter of Credit Documents.

"Wind Down Amount" means $30,000, which is the amount anticipated to be necessary to (a) wind down the Seller's bankruptcy estate after the Closing through entry of a final decree closing the Bankruptcy Cases of the Seller and (b) effectuate the corporate dissolution and cancellation of the Seller in accordance with applicable state law.

"Woodlands Agreement" means that certain letter agreement, to be entered into by the Company, on the one hand, and Woodlands Energy Management, LLC, on the other hand, in a form provided by the Purchaser.

     1.2    Other Definitional and Interpretive Matters. Unless otherwise expressly provided, for purposes of this Agreement, the following rules of interpretation shall apply:

     (a)    words in the singular shall include the plural and vice versa, and words of one gender shall include the other genders, in each case, as the context requires;

     (b)    the term "hereof," "herein," "hereinafter" and "herewith" and words of similar import shall, unless otherwise stated, be construed to refer to this Agreement as a whole and not to any particular provision of this Agreement in which such words appear, and Article, Section, paragraph, clause, subclause and Exhibit references in this Agreement are to the corresponding Articles, Sections, paragraphs, clauses, subclauses and Exhibits to this Agreement and the Seller Disclosure Schedule (as applicable) unless otherwise specified;

     (c)    the division of this Agreement into Articles, Sections and other Subdivisions and the insertion of headings are for convenience of reference only and will not affect or be utilized in construing or interpreting this Agreement;

     (d)    the word "including" and words of similar import when used in this Agreement shall mean "including, without limitation," unless otherwise specified and will not be construed to limit any general statement that it follows to the specific or similar items or matters immediately following it;

     (e)    the terms "Dollars" and "$" mean U.S. Dollars, the lawful currency of the United States of America;

     (f)    references herein to a Person in a particular capacity or capacities shall exclude such Person in any other capacity;

     (g)    with respect to the determination of any period of time, the word "from" means "from and including" and the words "to" and "until" each means "to but excluding";

     (h)    the word "or" shall be disjunctive but not exclusive;

(i)    references herein to any Law shall be deemed to refer to such Law as amended, modified, codified, reenacted, replaced, supplemented or superseded in whole or in part and in effect from time to time, including any successor legislation thereto, and also to all rules and regulations promulgated thereunder, and references to any section or other provision of a Law means that section or provision of such Law in effect from time to time and constituting the substantive amendment, modification, codification, reenactment, replacement or supplement of such section or other provision;

(j)    references herein to any Contract mean such Contract as amended, supplemented or modified (including any waiver thereto) in accordance with the terms thereof;

(k)    if the last day for the giving of any notice or the performance of any act required or permitted under this Agreement is a day that is not a Business Day, then the time for the giving of such notice or the performance of such action shall be extended to the next succeeding Business Day; and

(l)    all Exhibits and the Seller Disclosure Schedule annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein, and any capitalized terms used in any Exhibit or section of the Seller Disclosure Schedule but not otherwise defined therein shall be defined as set forth in this Agreement.

## ARTICLE II

## PURCHASE AND SALE OF ACQUIRED EQUITY

2.1    Purchase and Sale of Acquired Equity. On the terms and subject to the conditions set forth in this Agreement, at the Closing, (a) the Purchaser shall purchase, acquire and accept from the Seller, and the Seller shall sell, assign, transfer, convey and deliver to the Purchaser all of the Seller's right, title and interest in, to and under the Acquired Equity, free and clear of all Liens and (b) the Seller shall receive the Purchase Consideration in exchange for its sale, assignment, transfer, conveyance and delivery of the Acquired Equity to the Purchaser.

## ARTICLE III

## CONSIDERATION

3.1    Consideration. The purchase consideration to be paid by the Purchaser, in exchange for the sale and transfer of the Acquired Equity from the Seller to the Purchaser, shall be payable at the Closing, as follows (collectively, the "Purchase Consideration"):

(a)    the Credit Bid Amount (the amount of the Credit Bid Amount is estimated to be $353,436,447.99 in principal amount plus all accrued and unpaid interest, fees and expenses accrued through the Closing Date, other than fees and expenses of the Agent and its professional advisors); and

(b)    cash in the amount of the Wind Down Amount.

16

3.2     Allocation. The Purchaser and the Seller shall treat the sale and transfer of the Acquired Equity as a taxable asset sale for federal income tax purposes, pursuant to which (i) the amount realized by Seller is equal to the Purchase Consideration and (ii) Purchaser's tax basis in the assets of the Acquired Companies is determined by reference to their fair market value, as reasonably determined by Purchaser. The parties intend that no cancellation of indebtedness income shall be recognized as a result of this exchange. The Purchaser and the Seller shall report the sale and transfer of the Acquired Equity pursuant to this Agreement consistent with this Section 3.2. The Purchase Consideration shall be allocated among the assets according to their fair market values and in accordance with Section 1060 of the IRC and other applicable Law, taking into account any other relevant amounts, to the extent required under applicable Law as soon as practicable following the final determination of the amount of the Purchase Consideration. The Purchaser shall determine the final allocation. The Purchaser and the Seller will report the purchase and sale of the Acquired Equity on all applicable Tax Returns consistently with the final allocation, and neither of them will take any position contrary to such allocation unless required by applicable Law. The Purchaser and the Seller agree to provide each other with any information necessary to complete such Tax Returns and to notify each other with respect to the initiation of any action by any taxing authority relating to the allocation required by this Section 3.2 and agree to consult with each other with respect to any such action by any taxing authority.

## ARTICLE IV

## CLOSING

4.1     Closing Date. Subject to the satisfaction of the conditions set forth in Sections 10.1, 10.2 and 10.3 hereof (or the waiver thereof in writing by the party entitled to waive that condition under such sections), the closing of the purchase and sale of the Acquired Equity provided for in Article II hereof (the "Closing") shall take place at 75 Riverside Avenue, Rensselaer, New York 12144 at 10:00 a.m. (prevailing Eastern time) on the date that is no later than five (5) Business Days following the satisfaction (or, to the extent permitted in such Article X, waiver in writing) of all of the conditions to the obligations of the parties set forth in Article X (other than conditions that, by their nature, are to be satisfied at the Closing, but subject to the satisfaction or waiver of such conditions), or at such other time and date or at such other place as is agreed to in writing by the Purchaser and the Seller. The date on which the Closing is held is referred to in this Agreement as the "Closing Date." The transfer of the Acquired Equity shall be deemed to take place and be effective on the Closing Date at 12:01 a.m. (prevailing Eastern time).

4.2     Deliveries by the Seller. At the Closing, the Seller shall deliver, or cause to be delivered, to the Purchaser:

(a)     the Acquired Equity, accompanied by the Membership Interest Transfer Instrument and a duly executed amendment to the limited liability company agreement of Holdings, in each case evidencing the valid transfer of the Acquired Equity to the Purchaser, free and clear of all Liens;

17

(b)     the officer's certificates required to be delivered pursuant to Sections 10.1(a) and 10.1(b);

(c)     (i) the Seller Party Releases, duly executed by each Acquired Company and each of the Seller Released Parties who have executed a Seller Party Release (which shall in any event include a Seller Party Release from the Seller) and (ii) a release, duly executed by each of the Seller Released Parties (other than any Acquired Company) who have executed a Seller Party Release (which shall in any event include a Seller Party Release from the Seller), in the form attached hereto as Exhibit M, in favor of each Acquired Company;

(d)     a certified copy of the Sale Order;

(e)     a certified copy of the Confirmation Order;

(f)     evidence that is satisfactory to the Purchaser that the Energy Management Agreement, dated April 17, 2017, between the Company and Boston Energy Trading and Marketing LLC, has been terminated in accordance with its terms or otherwise with no Liability to the Company;

(g)     the (1) Amended Emera Agreements and (2) New Emera Agreement, in each case duly executed by the parties thereto;

(h)     the Woodlands Agreement, duly executed by the parties thereto;

(i)     the CAMS Agreement, duly executed by the parties thereto;

(j)     the Amended O&M Agreement, duly executed by the parties thereto;

(k)     the Transition Services Agreement, duly executed by the parties thereto;

(l)     a duly executed Internal Revenue Service Form W-9 and non-foreign person affidavit that complies with the requirements of U.S. Treasury Regulations Section 1.1445-2(b)(2), each in form and substance reasonably satisfactory to the Purchaser, from each of (1) TTK Power, LLC, (2) the members of TTK Power, LLC and (3) the Seller;

(m)     the Agent Release, duly executed by each Acquired Company; and

(n)     the minute books of the Acquired Companies, and such other documents regarding the limited liability company organization, existence, authorization and similar matters relating to the Acquired Companies, as the Purchaser may reasonably request.

    4.3     Deliveries by the Purchaser. At the Closing, the Purchaser shall deliver to the Seller:

(a)     the Purchase Consideration, including the Credit Bid Amount and the Wind Down Amount, as approved by the Sale Order;

(b)    the Purchaser Party Releases, duly executed by each of the Purchaser Releasing Parties; and

(c)    the officer's certificates required to be delivered pursuant to Sections 10.2(a) and 10.2(b).

## ARTICLE V

## REPRESENTATIONS AND WARRANTIES OF THE ACQUIRED COMPANIES

Except as set forth in the Seller Disclosure Schedule, the Seller and the Acquired Companies hereby jointly and severally represent and warrant to the Purchaser that:

5.1    Organization and Good Standing. Each of the Company and Holdco is a limited liability company, duly organized, validly existing and in good standing under the Laws of New York. Holdings is a limited liability company, duly organized, validly existing and in good standing under the Laws of Delaware. Each Acquired Company has the requisite limited liability company power and authority to own, lease and operate its properties and to carry on its business as now conducted and as now proposed to be conducted. Each Acquired Company is duly qualified or licensed to do business in each jurisdiction in which the actions to be performed hereunder or in which the nature of its business or the ownership or leasing of its properties makes such qualification or licensing necessary for it to carry on its business as now conducted and as now proposed to be conducted, except where the failure to be so qualified would not, individually or in the aggregate, reasonably be expected to be material to such Acquired Company.

5.2    Capitalization of the Company.

(a)    Section 5.2(a) of the Seller Disclosure Schedule sets forth the capitalization of each Acquired Company, and such equity interests in each Acquired Company have been duly authorized and validly authorized and issued, are fully paid and nonassessable, free of preemptive rights or similar rights under any Contract or Law, and, except as set forth in Section 5.2(a) of the Seller Disclosure Schedule, free and clear of all Liens. Holdings owns beneficially and of record all of the issued and outstanding equity of Holdco, and upon consummation of the transactions contemplated by this Agreement and the applicable Ancillary Agreements, Holdings will continue to own all of the issued and outstanding equity of Holdco, free and clear of all Liens. Holdco owns beneficially and of record all of the issued and outstanding equity of the Company, and upon consummation of the transactions contemplated by this Agreement and the applicable Ancillary Agreements, Holdco will continue to own all of the issued and outstanding equity of the Company, free and clear of all Liens.

(b)    There are no outstanding (i) interests of any Acquired Company convertible into or exchangeable for equity interests of such Acquired Company, (ii) contractual obligations of any Acquired Company or any other Person to repurchase, redeem or otherwise acquire any equity interests of such Acquired Company (other than this Agreement), (iii) options, warrants, purchase rights, subscription rights, conversion rights, exchange rights or other rights, Contracts or commitments to acquire equity interests of any Acquired Company, (iv)

1046305.16-CHISR01A - MSW

stock appreciation, phantom stock profit participation or similar rights with respect to any Acquired Company, (v) voting trusts or similar arrangements with respect to the equity interests of any Acquired Company, or (vi) Indebtedness of any Acquired Company having the right to vote on matters typically voted on by holders of the equity interests of such Acquired Company.

(c)    The Company does not directly or indirectly own any (i) equity interests in any other Person, (ii) interests convertible into or exchangeable for equity interests of any other Person or (iii) options or other rights to acquire equity interests of any other Person. Holdings does not own any (i) equity interests in any other Person, (ii) interests convertible into or exchangeable for equity interests of any other Person or (iii) options or other rights to acquire equity interests of any other Person, except for the equity interests in Holdco. Holdco does not own any (i) equity interests in any other Person, (ii) interests convertible into or exchangeable for equity interests of any other Person or (iii) options or other rights to acquire equity interests of any other Person, except for the equity interests in the Company.

5.3    <u>Authorization of Agreement</u>.  Each Acquired Company has the requisite power and authority to execute and deliver this Agreement, the applicable Ancillary Agreements and each other agreement, document or instrument contemplated hereby or thereby to which it is a party and to perform its obligations hereunder and thereunder and, subject to entry of the Sale Order and such other authorizations as are required by the Bankruptcy Court, to consummate the transactions contemplated hereby and thereby. The execution and delivery of this Agreement, the applicable Ancillary Agreements and each other agreement, document or instrument contemplated hereby or thereby to which it is a party and the consummation of the transactions contemplated hereby and thereby have been duly authorized by all requisite limited liability company or similar action on the part of each Acquired Company. Subject to requisite Bankruptcy Court approval, this Agreement, the applicable Ancillary Agreements and each other agreement, document or instrument contemplated hereby or thereby to which each Acquired Company is a party has been duly and validly executed and delivered, and each agreement, document or instrument contemplated hereby or thereby to be delivered at or prior to Closing shall be duly and validly executed and delivered by such Acquired Company and (assuming the due authorization, execution and delivery by the other parties hereto and the entry of the Sale Order) this Agreement, the applicable Ancillary Agreements and each other agreement, document or instrument contemplated hereby or thereby to which any Acquired Company is a party constitutes legal, valid and binding obligations of such Acquired Company enforceable against such Acquired Company in accordance with its respective terms and provisions, except as such enforceability is limited by general principles of equity.

5.4    <u>Conflicts; Consents of Third Parties</u>.

(a)    The execution and delivery by each Acquired Company of this Agreement, the applicable Ancillary Agreements and each other agreement, document or instrument contemplated hereby or thereby to which such Acquired Company is a party, the consummation of the transactions contemplated hereby and thereby, or compliance by such Acquired Company with any of the provisions hereof or thereof do not conflict with, or result in any violation of or default (with or without notice or lapse of time, or both) under, or give rise to a right of termination or cancellation under any provision of (i) any Acquired Company's Governing Documents; (ii) any Contract or Permit to which any Acquired Company is a party or

20

by which any of the properties or assets of any Acquired Company are bound; (iii) any Order; or (iv) any applicable Law; except (A) in each case, for the Bankruptcy Cases and to the extent that any Bankruptcy Court approval is required, (B) as set forth in <u>Section 5.4(a)</u> of the Seller Disclosure Schedule, and (C) in the case of clauses (ii), (iii) or (iv), for any such conflicts, violations or defaults that would not, individually or in the aggregate, reasonably be expected to have a Company Material Adverse Effect.

(b)    No consent, waiver, approval, Order, Permit or authorization of, or declaration or filing with, or notification to, any Person or Governmental Body is required on the part of any Acquired Company in connection with the execution and delivery of this Agreement, the applicable Ancillary Agreements and each other agreement, document or instrument contemplated hereby or thereby to which such Acquired Company is a party, the compliance by such Acquired Company with any of the provisions hereof or thereof, the consummation of the transactions contemplated hereby or thereby, the taking by such Acquired Company of any other action contemplated hereby or thereby, except (i) as set forth in <u>Section 5.4(b)</u> of the Seller Disclosure Schedule, (ii) for the entry of the Sale Order, the Bidding Procedures Order, the Confirmation Order, and requisite Bankruptcy Court approval, or (iii) where failure to obtain such consent, waiver, approval, Order, Permit or authorization of, or declaration or filing with, or notification to, such Person or Governmental Body would not, individually or in the aggregate, reasonably be expected to be material to any Acquired Company

5.5    <u>Compliance with Law; Permits.</u>

(a)    Except as otherwise specifically directed by the Bankruptcy Court or as set forth in <u>Section 5.5(a)</u> of the Seller Disclosure Schedule and except in the case of clauses (i) or (ii) of this <u>Section 5.5(a)</u> where such conduct, failure to obtain, non-compliance or violations would not, individually or in the aggregate, reasonably be expected to be material to any Acquired Company: (i) each Acquired Company is in compliance with all Laws, Orders and Permits applicable to such Acquired Company; (ii) each Acquired Company has obtained all Regulatory Approvals and has made all necessary filings with all Governmental Bodies having jurisdiction necessary for such Acquired Company to conduct its business; and (iii) no Acquired Company has received any written notice or other communication from a Governmental Body that alleges that any Acquired Company is not in compliance with any Law, Order or Permit, and there are no such notices or communications pending or, to the Knowledge of the Debtors, threatened.

(b)    <u>Section 5.5(b)</u> of the Seller Disclosure Schedule sets forth a true, correct and complete list of all Permits necessary for each Acquired Company to own, lease and operate the Plant and operate its business as currently operated, and each Acquired Company is in possession of all such Permits, except for Permits that would not, individually or in the aggregate, reasonably be expected to be material to such Acquired Company. All Permits held by each Acquired Company are valid and in full force and effect; no suspension or cancellation of any such Permit is pending (other than pursuant to its terms) or, to the Knowledge of the Debtors, threatened, in each case except for such suspensions or cancellations which would not, individually or in the aggregate, reasonably be expected to materially restrict or interfere with such Acquired Company's ability to operate its business as currently conducted.

21

5.6    Title to Assets. Except as set forth in Section 5.6 of the Seller Disclosure Schedule, each Acquired Company has good and valid title to, and owns and possesses all material rights and interests in, including the right to use, each of the assets that are used in, related to, or required to conduct such Acquired Company's business, or, in the case of leased assets, has good and valid leasehold interests in such assets, free and clear of Liens (other than Permitted Liens). The assets (i) owned by each Acquired Company and (ii) leased or licensed, or contracted for, by each Acquired Company pursuant to the Material Contracts listed in Section 5.8 of the Seller Disclosure Schedule, collectively are sufficient for the continued operation of such Acquired Company's business after the Closing, in substantially the same manner as currently operated. Other than NAES Corporation, pursuant to the terms of the O&M Agreement, no Affiliate of any Acquired Company owns any assets that are used in, related to or necessary for the operation of such Acquired Company's business.

5.7    Intellectual Property. Section 5.7 of the Seller Disclosure Schedule sets forth a complete list of all material unregistered Trademarks owned by each Acquired Company and domain name registrations owned by such Acquired Company. None of the Intellectual Property of any Acquired Company is subject to registrations or application for registration.

5.8    Material Contracts.

(a)    Section 5.8(a) of the Seller Disclosure Schedule sets forth a true, correct and complete list of all Contracts (excluding, for the avoidance of doubt, Permits) to which any Acquired Company is a party or to which any Acquired Company or any Acquired Company's assets are bound as of the Agreement Date, whether or not made in the Ordinary Course of Business (collectively, the "Material Contracts"), including:

(i)    Contracts with any Affiliate of any Acquired Company;

(ii)    Contracts with any independent contractor currently providing services to any Acquired Company for aggregate consideration in excess of $200,000;

(iii)    Contracts relating to the acquisition by any Acquired Company of any operating business, real property, capital expenditures (including capital expenditures relating to information technology systems) or securities of any other Person (other than any Acquired Company) (excluding accounts receivable or other forms of trade credit) for aggregate consideration in excess of $100,000 pursuant to which there are remaining liabilities, including contingent liabilities;

(iv)    Contracts relating to Indebtedness;

(v)    Contracts regarding a guaranty, undertaking to be liable for the debts of any Person other than any Acquired Company or provision of an indemnity in respect of liabilities, obligations or commitments of any Person other than any Acquired Company, in each case in excess of $100,000;

(vi)    Contracts (or group of related Contracts) the performance of which, in the twelve (12) months preceding the Agreement Date has resulted in, or in the twelve (12) months following the Agreement would reasonably be expected to result in,

22

consideration or payment in excess of $100,000 per annum to or from any Acquired Company;

(vii)    Contracts pursuant to which any Acquired Company (A) is granted or obtains or agrees to grant or obtain any right to use or otherwise exploit any material Intellectual Property, (B) is restricted in its right to use or register any material Intellectual Property, or (C) permits or agrees to permit any other Person to use, enforce or register any material Intellectual Property, including any license agreements, coexistence agreements and covenants not to sue;

(viii)    Contracts or consent decrees with or from any Governmental Body;

(ix)    Contracts (A) for the purchase, exchange, transmission or sale of electric power in any form, including energy, capacity or any ancillary services, (B) for the sale, purchase, transportation or storage of natural gas or fuel oil, and (C) that are interconnection agreements with the electric transmission provides for the Plant;

(x)    Contracts which are capital leases as determined pursuant to GAAP;

(xi)    Contracts providing for the sale, transfer or other disposition of any material asset or other property owned, leased or held for use by any Acquired Company;

(xii)    Contracts relating to any strategic alliance, joint development, joint marketing, partnership, joint venture or similar arrangement;

(xiii)    Contracts that limit or purport to limit in any respect the ability of any Acquired Company to compete in any line of business or with any Person or in any geographic area or during any period of time;

(xiv)    Contracts relating to any existing derivative or hedging arrangement, or similar transaction, involving any Acquired Company; and

(xv)    any other Contracts to which any Acquired Company is a party or to which it is bound with payments, obligations or expected revenues in excess of $200,000 per annum to or from any Acquired Company.

(b)    Each Acquired Company has made available to the Purchaser true, correct and complete copies of each Material Contract, as amended to date. Each Material Contract is a valid and binding agreement of the applicable Acquired Company, enforceable in accordance with its terms against such Acquired Company and against each other party thereto, and is in full force and effect. No Acquired Company has received written notice of the termination or intent to terminate a Material Contract and, excluding the effect of the filing and administration of the Bankruptcy Cases or the insolvency or financial condition of any Acquired Company, (i) no Acquired Company is in breach of, or default under, in any material respect, any Material

23

Contract, and (ii) to the Knowledge of the Debtors, no other party to any Material Contract is in breach of, or default under, in any material respect, any Material Contract.

5.9     Litigation. Except for the Bankruptcy Cases or as set forth in Section 5.9 of the Seller Disclosure Schedule, there are no Legal Proceedings pending or threatened that affect any Acquired Company, any Acquired Company's assets, or that could reasonably be expected to adversely affect (a) any Acquired Company's ability to operate its business after the Closing in substantially the same manner as it was operated immediately prior to the Agreement Date, (b) the ownership or use by any Acquired Company of its assets after the Closing or (c) the Purchaser's ownership of the Acquired Equity or any Acquired Company.

5.10    Financial Statements; No Undisclosed Liabilities.

(a)     Attached to Section 5.10(a) of the Seller Disclosure Schedule are: (i) the Company's unaudited balance sheet as of March 31, 2019 (the "Latest Balance Sheet"), and the related statement of operations, statement of member's equity and statement of cash flows for the three month period then ended, (ii) the Company's unaudited balance sheet as of, and the related unaudited statement of operations, statement of member's equity and statement of cash flows for the fiscal year ended December 31, 2018, and (iii) the Company's audited balance sheets as of, and the related audited statements of operations, statements of member's equity and statements of cash flows for the fiscal years ended December 31, 2017, and December 31, 2016 (the foregoing clauses (i) through (iii) collectively, the "Financial Statements"). The Financial Statements have been prepared, in each case, in accordance with GAAP consistently applied and present fairly in all material respects the financial condition and results of operations of the Company as of the dates and for the periods referred to therein, except as may be indicated in the notes thereto and subject, in the case of the unaudited financial statements, to (y) the absence of footnote disclosures and other presentation items and (z) changes resulting from normal year-end adjustments (which are expected to be consistent with past practice and not material). The Financial Statements have been prepared throughout the specified period and between periods in a manner consistent with the Company's historical accounting policies.

(b)     No Acquired Company has any Liabilities, except (i) those which are adequately reflected or reserved against in the Latest Balance Sheet as of the Agreement Date, (ii) those which have been incurred in the Ordinary Course of Business since the date of the Latest Balance Sheet or which are not, individually or in the aggregate, material in amount, or (iii) those set forth in Section 5.10(b) of the Seller Disclosure Schedule.

(c)     Since March 3, 2017, neither Holdings nor Holdco have engaged in any business other than, and neither of them has any Liabilities other than those arising in connection with, the ownership of equity interests in Holdco and the Company, respectively.

5.11    Absence of Certain Changes or Events. Since the Latest Balance Sheet date through the Agreement Date, (a) there has not been any change, event, circumstance or effect that, by itself or in conjunction with all other such changes, whether or not arising in the Ordinary Course of Business, has had or would be reasonably expected to have a Company Material Adverse Effect and (b) no Acquired Company has taken any action (or failed to take

24

any action) that would violate any of the covenants set forth in <u>Section 9.2(i)</u> (if such action or inaction had occurred after the date hereof).

5.12    <u>Insurance</u>. Except as would not, individually or in the aggregate, reasonably be expected to be material to any Acquired Company, all insurance policies held by each Acquired Company as of the Agreement Date relating to the business, assets, Liabilities and operations of such Acquired Company are in full force and effect, all premiums with respect thereto have been paid, and no notice of cancellation or termination has been received by any Acquired Company with respect to any such policy.

5.13    <u>Taxes</u>.

(a)    All income and other material Taxes required to be paid by TTK Power, LLC and each Acquired Company or with respect to any of TTK Power, LLC's or such Acquired Company's assets or the equity interests in such Acquired Company have been timely paid in full.

(b)    There are no Liens on any Acquired Company's assets or on the equity interests in any Acquired Company that secure the payment of Taxes (other than Permitted Liens).

(c)    All Tax Returns to be filed by each Acquired Company or with respect to the equity interests in any Acquired Company or any Acquired Company's assets were timely filed (after giving effect to any valid extensions of time in which to make such filings) and all such Tax Returns were true, correct and complete in all material respects.

(d)    No Acquired Company has incurred any Liability for Taxes of any Person as a transferee or successor or by Contract (other than agreements entered into in the Ordinary Course of Business not primarily related to Taxes).

(e)    TTK Power, LLC is and at all times has been treated as a partnership for U.S. federal income tax purposes. Holdings has been since March 3, 2017, and with respect to each other Acquired Company and the Seller, each other Acquired Company and the Seller has at all times, been treated as a disregarded entity for U.S. federal income tax purposes.

(f)    No Tax Returns of TTK Power, LLC or any Acquired Company are currently being audited and there are no pending or, to the Knowledge of the Debtors, threatened actions for the assessment or collection of Taxes owed or owing by such Acquired Company. No power of attorney granted by any Acquired Company with respect to any Taxes is currently in force. No Acquired Company has executed or filed with any Governmental Body any agreement extending the period for assessment or collection of any Taxes.

5.14    Environmental Matters.

(a)    Except as would not, individually or in the aggregate, reasonably be expected to have a Company Material Adverse Effect, each Acquired Company is, and since March 3, 2017, has been, in compliance with all applicable Environmental Laws.

(b)    Except as would not, individually or in the aggregate, reasonably be expected to have a Company Material Adverse Effect, the Company is, and since March 3, 2017, has been, in compliance with all Environmental Permits required in connection with the ownership, conduct or operation of each Acquired Company's assets. All such Environmental Permits are in full force and effect and there is no claim or action currently pending or, to the Knowledge of the Debtors, threatened, that is or would reasonably be expected to result in the cancellation, revocation or other adverse or limiting modification of any such Environmental Permit.

(c)    There is no Environmental Claim pending or, to the Knowledge of the Debtors, threatened against or affecting any Acquired Company, any Acquired Company's assets or the equity interests in any Acquired Company except as would not, individually or in the aggregate, reasonably be expected to have a Company Material Adverse Effect.

(d)    Except as set forth in Section 5.14(d) of the Seller Disclosure Schedule, there are no actions, activities, circumstances, facts, conditions, events or incidents, including the presence of any Hazardous Material, which would be reasonably likely to form the basis of any Environmental Claim against or affecting any Acquired Company or any Acquired Company's assets which would, individually or in the aggregate, reasonably be expected to have a Company Material Adverse Effect.

(e)    Except as would not, individually or in the aggregate, reasonably be expected to be material to any Acquired Company, there has been no Release by any Acquired Company or any Person managing the Plant of any Hazardous Materials in, on, at, under or from, or affecting the Plant or any Leased Real Property which would give rise to Liabilities under Environmental Laws.

(f)    No Acquired Company is a party to any Order under Environmental Law or with respect to the Release of, or exposure to, Hazardous Materials.

(g)    Prior to the Agreement Date, each Acquired Company has made available correct and complete copies of all environmental site assessments and environmental compliance reports with respect to the Plant or the Leased Real Property within the last five (5) years and that are in their possession or control.

(h)    The representations and warranties contained in this Section 5.14 are the sole and exclusive representations and warranties with respect to matters arising out of or relating to Environmental Laws, Environmental Permits or Hazardous Materials.

5.15    <u>Employees and Labor Matters</u>.

(a)    No Acquired Company has, or since March 3, 2017 has ever had, any employees.

(b)    (i) No Acquired Company is a party to, or otherwise covered by, any project labor agreements, neutrality agreements, union contracts, collective bargaining agreements or other agreements with any labor union or other employee representative body, and no such agreements are currently being negotiated by, or on behalf of, any Acquired Company; (ii) to the Knowledge of the Debtors, there are no individuals providing services to any Acquired Company or at the Plant who are represented by a labor union or whose services to any Acquired Company or at the Plant are covered by a union contract, collective bargaining agreement or other agreement with any labor union or other employee representative body; and (iii) there are no union contracts, collective bargaining agreements or other agreements with any labor union or other employee representative which impose any obligations on any Acquired Company or at the Plant.

5.16    <u>No Benefit Plans</u>. No Acquired Company has, nor since March 3, 2017, has ever had, any plan, agreement, program, policy or arrangement (a) which is an Employee Benefit Plan, (b) which is a stock bonus, stock purchase, stock option, restricted stock, stock appreciation right or other equity or equity-based award, (c) which provides for employment, individual consulting, severance, termination, separation, incentive deferred-compensation, change-in-control, retention, bonus or other compensation or (d) which provides for other retirement, profit sharing, welfare-benefit, retiree health, employee loan, vacation, or fringe benefits, in each case, whether written or unwritten and whether or not funded, to which any Acquired Company is party or that is sponsored, maintained, contributed to or required to be contributed to by any Acquired Company for the benefit of any Person (or any dependent or beneficiary thereof) or under which any Acquired Company has or could reasonably be expected to have any Liability.

5.17    <u>Real Property</u>.

(a)    No Acquired Company owns, or since March 3, 2017, has ever owned, any real property.

(b)    <u>Section 5.17(b)</u> of the Seller Disclosure Schedule lists all of the real property that is leased, subleased, licensed or otherwise used or occupied by any Acquired Company (the "<u>Leased Real Property</u>") pursuant to any lease, sublease, license or other use or occupancy agreement (together with any amendments or supplements thereto, the "<u>Real Property Leases</u>"). Each Acquired Company has made available to the Purchaser true and complete copies of each Real Property Lease, as amended or supplemented to date.

(c)    Subject to the approval of the Bankruptcy Court pursuant to the Sale Order and the assumption of the applicable Real Property Leases pursuant thereto, each of the Real Property Leases is a valid and subsisting leasehold interest of the applicable Acquired Company, free of subtenancies and other occupancy rights and Liens (other than Permitted Liens) and, except as limited by the Bankruptcy Code, is a binding obligation of such Acquired Company, enforceable by such Acquired Company in accordance with its terms, and is in full force and

27

effect. Following the assumption of such applicable Real Property Leases by the applicable Acquired Company in accordance with the provisions of section 365 of the Bankruptcy Code and the requisite Order of the Bankruptcy Court, there will be no defaults under and no circumstances or events which, with notice or the passage of time or both, would constitute defaults under the Real Property Leases except, in either instance, for defaults which, individually or in the aggregate, do not or would not reasonably be expected to have a material impact on the use of such property.

(d)     Section 5.17(d) of the Seller Disclosure Schedule sets forth any real property (excluding Leased Real Property) (the "Other Real Property") for which any Acquired Company has the right to use or occupy any material land, buildings, structures, improvements, fixture or other interest in real property and which is used in connection with the operation of the Plant (the Acquired Company's interests in the Other Real Property, the "Other Real Property Interests" and together with the Leased Real Property, the "Real Property" and the agreements pursuant to which any Acquired Company is granted such Other Real Property Interests, the "Other Real Property Agreements"). The applicable Acquired Company has a good and valid perpetual easement interest in, or other good and valid right to use or occupy, the Other Real Property, free and clear of all Liens except Permitted Liens. To the Knowledge of the Debtors, no Person, other than the applicable Acquired Company, has any occupancy or use rights with respect to the Other Real Property which materially adversely affects such Acquired Company's current use of the Other Real Property and each agreement or instrument granting the Other Real Property Interests is in full force and effect and enforceable against the parties thereto in accordance with its terms.

(e)     The Real Property is all of the real property that is used in connection with the operation of the Plant and the conduct of the business of the Acquired Companies. The Plant is located entirely within the Real Property.

(f)     No Acquired Company is a party to or obligated under any option, right of first refusal or other contractual right to sell, dispose of or lease the Plant or any of the Real Property or any portion thereof or interest therein to any Person.

(g)     No Acquired Company has received any written notice in the past two (2) years (i) of any pending, threatened or contemplated condemnation proceeding affecting any of the Real Property or any part thereof or of any sale or other disposition of any of the Real Property or any part thereof in lieu of condemnation, (ii) from any Governmental Body stating or alleging that any improvements located on the Real Property have not been constructed in compliance with applicable Law or are being operated in violation of applicable Law or (iii) from any Governmental Body requiring any material repair, alteration, restoration or improvement in connection with the Real Property.

5.18    Affiliate Transactions. Except as set forth in Section 5.18 of the Seller Disclosure Schedule, no Affiliate of any Acquired Company (a) is a party to any Contract or transaction with any Acquired Company, (b) has any interest in any of any Acquired Company's assets or (c) owns, directly or indirectly, any material interest in any Person that is, or is engaged in business as, a material supplier or customer of any Acquired Company.

28

5.19   Certain Payments. Since March 3, 2017, no Acquired Company has (nor, to the Knowledge of the Debtors, has any of their consultants, representatives or agents) (a) used or is using any corporate funds for any illegal contributions, gifts, entertainment or other unlawful expenses relating to political activity; (b) used or is using any corporate funds for any direct or indirect unlawful payments to any foreign or domestic governmental officials or employees; (c) violated or is violating any provision of the Foreign Corrupt Practices Act of 1977; (d) established or maintained, or is maintaining, any unlawful fund of corporate monies or other properties; or (e) made any bribe, unlawful rebate, payoff, influence payment, kickback or other unlawful payment of any nature.

5.20   Brokers or Financial Advisors. No Person has acted, directly or indirectly, as a broker, agent, finder or financial advisor for any Acquired Company in connection with the transactions contemplated by this Agreement and each agreement, document or instrument contemplated hereby, and no Person is entitled to any fee or commission or like payment in respect thereof, except for RPA Advisors, LLC, whose fees, costs and expenses shall be paid by the Company.

## ARTICLE VI

## **REPRESENTATIONS AND WARRANTIES OF THE SELLER**

Except as set forth in the Seller Disclosure Schedule, the Seller hereby represents and warrants to the Purchaser that:

6.1   Organization. The Seller is an entity duly organized, validly existing and in good standing under the Laws of Delaware. The Seller has the requisite limited liability company power and authority to own the Acquired Equity. The Seller is duly qualified or licensed to do business in each jurisdiction in which the actions to be performed hereunder or in which the nature of its business or the ownership or leasing of its properties makes such qualification or licensing necessary for it to carry on its business as now conducted and as now proposed to be conducted, except where the failure to be so qualified would not, individually or in the aggregate, reasonably be expected to be material to the Seller.

6.2   Authorization of Agreement. The Seller has the requisite power and authority to execute and deliver this Agreement, the applicable Ancillary Agreements and each other agreement, document or instrument contemplated hereby or thereby to which it is a party and to perform its obligations hereunder and thereunder and, subject to entry of the Sale Order and such other authorizations as are required by the Bankruptcy Court, to consummate the transactions contemplated hereby and thereby. The execution and delivery of this Agreement, the applicable Ancillary Agreements and each other agreement, document or instrument contemplated hereby or thereby to which it is a party and the consummation of the transactions contemplated hereby and thereby have been duly authorized by all requisite limited liability company or similar action on the part of the Seller. This Agreement, the applicable Ancillary Agreements and each other agreement, document or instrument contemplated hereby or thereby to which the Seller is a party has been duly and validly executed and delivered, and each agreement, document or instrument contemplated hereby or thereby to be delivered at or prior to Closing shall be duly and validly executed and delivered by the Seller and (assuming the due authorization, execution and delivery

29

by the other parties hereto and the entry of the Sale Order) this Agreement, the applicable Ancillary Agreements and each other agreement, document or instrument contemplated hereby or thereby to which the Seller is a party constitutes legal, valid and binding obligations of the Seller enforceable against the Seller in accordance with its respective terms and provisions, except as such enforceability is limited by general principles of equity.

6.3    Conflicts; Consents of Third Parties.

(a)    The execution and delivery by the Seller of this Agreement, the applicable Ancillary Agreements and each other agreement, document or instrument contemplated hereby or thereby to which the Seller is a party, the consummation of the transactions contemplated hereby and thereby, or compliance by the Seller with any of the provisions hereof or thereof do not conflict with, or result in any violation of or default (with or without notice or lapse of time, or both) under, or give rise to a right of termination or cancellation under any provision of (i) the Seller's Governing Documents; (ii) any Contract or Permit to which the Seller is a party or by which any of the properties or assets of the Seller are bound; (iii) any Order; or (iv) any applicable Law; except (A) in each case, for the Bankruptcy Cases and to the extent that any Bankruptcy Court approval is required, (B) as set forth on Section 6.3(a) of the Seller Disclosure Schedule, and (C) in the case of clauses (ii), (iii) or (iv), for any such conflicts, violations or defaults that would not, individually or in the aggregate, reasonably be expected to have a Company Material Adverse Effect.

(b)    No consent, waiver, approval, Order, Permit or authorization of, or declaration or filing with, or notification to, any Person or Governmental Body is required on the part of the Seller in connection with the execution and delivery of this Agreement, the applicable Ancillary Agreements and each other agreement, document or instrument contemplated hereby or thereby to which the Seller is a party, the compliance by the Seller with any of the provisions hereof or thereof, the consummation of the transactions contemplated hereby or thereby, the taking by the Seller of any other action contemplated hereby or thereby, except for (i) as set forth in Section 5.4(b) of the Seller Disclosure Schedule, (ii) the entry of the Sale Order, the Confirmation Order, and requisite Bankruptcy Court approval, or (iii) where failure to obtain such consent, waiver, approval, Order, Permit or authorization of, or declaration or filing with, or notification to, such Person or Governmental Body would not, individually or in the aggregate, reasonably be expected to be material to the Seller or any Acquired Company.

6.4    Taxes.

(a)    All income and other material Taxes required to be paid with respect to any Acquired Company's assets or the Acquired Equity have been timely paid in full.

(b)    There are no Liens on the Acquired Equity that secure the payment of Taxes (other than Permitted Liens).

(c)    All Tax Returns to be filed with respect to any Acquired Company's assets or the Acquired Equity were timely filed (after giving effect to any valid extensions of time in which to make such filings) and all such Tax Returns were true, correct and complete in all material respects.

(d)    The Seller has at all times been treated as a disregarded entity for U.S. federal income tax purposes.

6.5    <u>Ownership of the Acquired Equity</u>. The Seller owns beneficially and of record all of the Acquired Equity, and upon consummation of the transactions contemplated by this Agreement and the applicable Ancillary Agreements, the Seller shall have transferred to the Purchaser good title to the Acquired Equity, free and clear of all Liens. Other than the Acquired Equity, the Seller has no other assets.

6.6    <u>Brokers or Financial Advisors</u>. No Person has acted, directly or indirectly, as a broker, agent, finder or financial advisor for the Seller in connection with the transactions contemplated by this Agreement and each agreement, document or instrument contemplated hereby, and no Person is entitled to any fee or commission or like payment in respect thereof.

## ARTICLE VII

## <u>REPRESENTATIONS AND WARRANTIES OF THE PURCHASER</u>

The Purchaser hereby represents and warrants to the Seller that:

7.1    <u>Organization and Good Standing</u>. The Purchaser is a limited liability company duly organized, validly existing and in good standing under the Laws of the state of its organization.

7.2    <u>Authorization of Agreement</u>. The Purchaser has the requisite power and authority to execute and deliver this Agreement, the applicable Ancillary Agreements and each other agreement, document or instrument contemplated hereby or thereby to which it is a party and to perform its obligations hereunder and thereunder. The execution and delivery of this Agreement, the applicable Ancillary Agreements and each other agreement, document or instrument contemplated hereby or thereby to which it is a party and the consummation of the transactions contemplated hereby have been duly authorized by all requisite limited liability company or similar action on the part of the Purchaser. This Agreement, the applicable Ancillary Agreements and each other agreement, document or instrument contemplated hereby or thereby to which the Purchaser is a party has been duly and validly executed and delivered, and each agreement, document or instrument contemplated hereby to be delivered at or prior to Closing shall be duly executed and delivered by the Purchaser and (assuming the due authorization, execution and delivery by the other parties hereto) this Agreement, the applicable Ancillary Agreements and each other agreement, document or instrument contemplated hereby or thereby to which the Purchaser is a party constitutes the legal, valid and binding obligations of the Purchaser enforceable against the Purchaser in accordance with its respective terms and provisions, except as such enforceability is limited by general principles of equity.

7.3    <u>Conflicts; Consents of Third Parties</u>.

(a)    The execution and delivery by the Purchaser of this Agreement, the applicable Ancillary Agreements and each other agreement, document or instrument contemplated hereby or thereby to which the Purchaser is a party, the consummation of the transactions contemplated hereby and thereby, or compliance by the Purchaser with any of the

31

provisions hereof or thereof do not conflict with, or result in any violation of or default (with or without notice or lapse of time, or both) under, or give rise to a right of termination or cancellation under any provision of (i) the Purchaser's Governing Documents; (ii) any Contract or Permit to which the Purchaser is a party or by which any of the properties or assets of the Purchaser is bound; (iii) any Order; or (iv) any applicable Law, except (A) as set forth in <u>Section 5.4(b)</u> of the Seller Disclosure Schedule, and (B) in the case of clauses (ii), (iii) or (iv), for any such conflicts, violations or defaults that would not prevent or materially delay the ability of the Purchaser to consummate the transactions contemplated by this Agreement and the applicable Ancillary Agreements.

(b)     No consent, waiver, approval, Order, Permit or authorization of, or declaration or filing with, or notification to, any Person or Governmental Body is required on the part of the Purchaser in connection with the execution and delivery of this Agreement, the applicable Ancillary Agreements and each other agreement, document or instrument contemplated hereby or thereby to which the Purchaser is a party, the compliance by the Purchaser with any of the provisions hereof or thereof, the consummation of the transactions contemplated hereby or thereby, the taking by the Purchaser of any other action contemplated hereby or thereby, except (i) as set forth in <u>Section 5.4(b)</u> of the Seller Disclosure Schedule, (ii) for the entry of the Sale Order and the Confirmation Order or (iii) where failure to obtain such consent, waiver, approval, Order, Permit or authorization of, or declaration or filing with, or notification to, such Person or Governmental Body would not prevent or materially delay the ability of the Purchaser to consummate the transactions contemplated by this Agreement and the applicable Ancillary Agreements.

7.4     <u>Litigation</u>. As of the Agreement Date, there are no Orders or Legal Proceedings pending or, to the knowledge of the Purchaser, threatened against the Purchaser except to the extent such Order or Legal Proceeding would not have a material adverse effect on the ability of the Purchaser to consummate the transactions contemplated by this Agreement and the applicable Ancillary Agreements.

7.5     <u>No Other Representations or Warranties</u>. The Purchaser acknowledges that the Seller is not making any representations or warranties whatsoever, express or implied, in respect of the transactions contemplated by this Agreement beyond those expressly made by the Seller in this Agreement and the applicable Ancillary Agreements, and each other agreement, document or instrument contemplated hereby or thereby.

## ARTICLE VIII

## BANKRUPTCY COURT MATTERS

8.1     <u>Bankruptcy Court Milestones</u>.

(a)     No later than May 19, 2019, the Debtors shall file voluntary petitions for relief under chapter 11 of the Bankruptcy Code in the Bankruptcy Court.

(b)     No later than June 3, 2019, the Bankruptcy Court shall have entered the Bidding Procedures Order.

32

(c)     No later than July 8, 2019, the Auction (if necessary) shall have been held pursuant to the Bidding Procedures Order.

(d)     No later than July 17, 2019, the Bankruptcy Court shall have held the hearing to consider entry of the Sale Order and the Confirmation Order.

(e)     No later than July 18, 2019, the Bankruptcy Court shall have entered the Sale Order and the Confirmation Order.

8.2     <u>Bankruptcy Court Filings</u>.

(a)     In the event that the entry of the Bidding Procedures Order, the Sale Order, or the Confirmation Order is appealed or a stay pending appeal is sought, the Seller shall oppose the appeal or the stay pending appeal and seek the dismissal of any appeal (including a petition for certiorari, motion for rehearing, reargument, reconsideration or revocation). Notwithstanding the foregoing, any resulting changes to this Agreement or any Ancillary Agreement or resulting changes to the Bidding Procedures Order and the Sale Order shall be subject to the Purchaser's approval.

(b)     The Seller shall provide the Purchaser with drafts of any and all pleadings and proposed orders to be filed or submitted in connection with this Agreement and the transactions contemplated hereby sufficiently in advance of the proposed filing date so as to permit the Purchaser sufficient time to review and comment on such drafts, and such pleadings and proposed orders shall be in form and substance reasonably acceptable to the Purchaser. The Seller shall give the Purchaser reasonable advance notice of any hearings regarding the motions required to obtain the issuance of the Sale Order and the Purchaser shall have the right to attend and seek to be heard at any such hearings.

(c)     The parties hereto hereby agree that the bidding procedures to be employed with respect to this Agreement shall be those reflected in the Bidding Procedures Order. The Purchaser agrees and acknowledges that the Seller shall be permitted, and shall be permitted to cause its Representatives, to initiate contact with, solicit or encourage submission of any inquiries, proposals or offers by, respond to any unsolicited inquiries, proposals or offers submitted by, and enter into any discussions or negotiations regarding any of the foregoing with, any Person (in addition to the Purchaser) relating to a Competing Bid pursuant to and to the extent in compliance with the terms of the Bidding Procedures Order; <u>provided</u> that from the Agreement Date until the bid deadline pursuant to the Bidding Procedures Order, or the earlier termination of this Agreement in accordance with the terms hereof, the Seller shall (i) promptly (and in any event within twenty-four (24) hours) notify the Purchaser of any written Competing Bid, (ii) promptly (and in any event within twenty-four (24) hours) notify the Purchaser of the identity of any Person making a written Competing Bid and provide a copy of such Competing Bid and a summary of the material unwritten terms of any Competing Bid and any material updates thereto, and (iii) make available to the Purchaser all written due diligence information made available to the Person making such written Competing Bid or its Representatives that has not been made available to the Purchaser.

## ARTICLE IX

## COVENANTS

9.1     Access and Information. From the Agreement Date through the Closing Date, each Acquired Company and the Seller shall each, upon reasonable prior notice, provide to the Purchaser and the Purchaser's Representatives (including, without limitation, its legal advisors and accountants), access to make such investigation of the properties, businesses and operations of each Acquired Company (including the Plant), including the conduct of environmental assessments of the Leased Real Property and title checks, and such examination of the books and records of each Acquired Company and the Seller as the Purchaser reasonably requests, financial, operating and other data and information of each Acquired Company and the Seller, and access to all the Representatives of each Acquired Company and the Seller as the Purchaser may reasonably request, and to make extracts and copies of such books and records. Any such investigation and examination shall be conducted upon reasonable advance notice and under reasonable circumstances and reasonable business hours and, with respect to each Acquired Company's assets operated by third parties, if any, shall be subject to the consent of such third-party operators, which consent such Acquired Company shall use commercially reasonable efforts to timely obtain. Each Acquired Company and the Seller shall also afford the Purchaser reasonable access, during normal business hours, to the Plant, and to all operations of the Company. No investigation by the Purchaser or its Representatives prior to or after the Agreement Date shall affect or be deemed to modify any of the representations, warranties, covenants or agreements of such Acquired Company or the Seller contained in this Agreement. From the Agreement Date through the Closing Date, each Acquired Company and the Seller shall promptly deliver or make available to the Purchaser all material pleadings, motions, notices, statements, schedules, applications, reports and other papers filed in any other judicial or administrative proceeding related to any Acquired Company, the Plant and the transactions contemplated by this Agreement. Without in any way limiting any party's rights or obligations under this Agreement, as Consenting Lenders or in respect of the agreements in respect of the Bankruptcy Cases or otherwise, the parties understand and agree that nothing contained in this Agreement shall give Purchaser the right to control or direct the business of any Acquired Company prior to the Closing.

9.2     Actions Pending the Closing. Except (1) as required by applicable Law or required by the Bankruptcy Court, (2) as permitted under the Cash Collateral Orders, (3) as otherwise expressly contemplated by this Agreement, or (4) with the prior written consent of the Purchaser, during the period from the Agreement Date to and through the Closing Date (or earlier termination of this Agreement in accordance with the terms hereof), the Seller and each Acquired Company, as applicable, shall:

(a)     conduct its business in the Ordinary Course of Business;

(b)     operate the Plant in substantially the same manner as conducted as of the Agreement Date in the Ordinary Course of Business;

(c)     use its commercially reasonable efforts to (A) maintain and preserve the business organization and management of each Acquired Company intact, and (B) maintain the

34

existing relations with customers, distributors, suppliers, creditors, business partners, service providers and others having business dealings with each Acquired Company in the Ordinary Course of Business;

(d)      pay or deposit all material Taxes on a timely basis in the Ordinary Course of Business during the pendency of the Bankruptcy Cases;

(e)      (i) maintain all of each Acquired Company's assets in good repair, working order and condition (ordinary wear and tear excepted) and from time to time make, or cause to be made, all necessary or appropriate repairs, replacements and improvements thereto in the Ordinary Course of Business, and (ii) defend and protect each Acquired Company's assets from infringement or deterioration;

(f)      pay all undisputed expenses and accounts payable of each Acquired Company and collect all accounts receivable of such Acquired Company in the Ordinary Course of Business and consistent with the Cash Collateral Orders;

(g)      comply with all applicable Laws (including Environmental Laws) in all material respects;

(h)      maintain all material Permits relating to the ownership or operation of each Acquired Company's assets; and

(i)      not take any of the following actions:

(i)      amend its Governing Documents;

(ii)      redeem, repurchase or otherwise acquire any equity interests of an Acquired Company;

(iii)      pay any distributions or dividends with respect to any equity interests of an Acquired Company or the Acquired Equity;

(iv)      issue any equity interests or grant any option to purchase or subscribe for any equity interests;

(v)      make any material loans, advance or capital contributions to or investments in any other Person, other than pursuant to existing Contracts or commitments in the Ordinary Course of Business;

(vi)      permit, offer, agree or commit (in writing or otherwise) to permit, any Acquired Company's assets (whether now owned or hereafter acquired) to become subject, directly or indirectly, to any Lien, except for any Permitted Liens;

(vii)      enter into any Contract for the direct or indirect sale (whether by merger, sale of assets or stock, or otherwise), transfer, financing, assignment, conveyance, lease recapitalization or other disposition of the Plant as a whole;

(viii)    (A) enter into any Real Property Lease, Other Real Property Agreement or any other Contract that would constitute a Material Contract if in effect on the Agreement Date, or (B) assume, materially amend, materially modify or terminate any Real Property Lease, Other Real Property Agreement, or any other Material Contract, or materially modify, waive, release or assign any material rights or claims thereunder, to which any Acquired Company or the Seller is a party or by which the Seller or any Acquired Company is bound and that is used in or related to any Acquired Company's business, or fail to exercise any renewal right with respect to any Material Contract, Other Real Property Agreement or any Real Property Lease that by its terms would otherwise expire;

(ix)    permit the lapse of any right relating to the Intellectual Property of any Acquired Company or any other intangible asset of any Acquired Company;

(x)    establish or amend any Employee Benefit Plan;

(xi)    hire any employee;

(xii)    enter into any Contract to license any Intellectual Property of any Acquired Company or renew, extend, expand or otherwise amend the terms of any existing Intellectual Property License;

(xiii)    merge or consolidate any Acquired Company or the Seller with any other Person, dissolve, liquidate or otherwise terminate any Acquired Company or the Seller's existence;

(xiv)    acquire any business or equity interests of any other Person;

(xv)    incur any Indebtedness;

(xvi)    take (or fail to take) any action that would constitute or result in an Event of Default (as defined in the Cash Collateral Orders);

(xvii)    (A) make, amend or revoke any material Tax election, (B) change any material Tax method of accounting, (C) settle or compromise any material Tax Liability, (D) file or amend any material Tax Return, (E) enter into any "closing agreement" within the meaning of section 7121 of the IRC (or any comparable agreement under state, local or foreign Law) or any Tax sharing, allocation or indemnity agreement, (F) forgo or surrender any right to a claim to a Tax refund, (G) request any private letter ruling or similar ruling from any Governmental Body, (H) consent to waive any statute of limitations with respect to Taxes, or (I) take any action that would result in any Acquired Company or the Seller ceasing to be treated as an entity disregarded as separate from its owner for U.S. federal and state Tax purposes;

(xviii)    make any change in any method of accounting or accounting practice or policy, except as required by GAAP;

36

(xix)    take (or knowingly and intentionally fail to take) any action that would reasonably be expected to make any representation or warranty set forth in <u>Article V</u> or <u>Article VI</u> untrue in any respect; or

(xx)    take, or agree, commit or offer (in writing or otherwise) to take, (i) any actions in violation of this <u>Section 9.2(i)</u> or (ii) any actions outside of the Ordinary Course of Business.

9.3    <u>Consents and Permits</u>.

(a)    From the Agreement Date through the Closing Date, the Seller and the Purchaser shall use reasonable best efforts to take, or cause to be taken, all appropriate action to do, or cause to be done, all things necessary, proper or advisable under applicable Law or otherwise to consummate and make effective the transactions contemplated by this Agreement and the Ancillary Agreements and to confirm the Purchaser's ownership of the Acquired Equity, including to obtain at the earliest practicable date all necessary waivers, consents and approvals from customers and other parties, and effecting all necessary registrations and filings. Without limiting the generality of the foregoing, the parties shall use reasonable best efforts to (i) obtain from Governmental Bodies all consents, approvals, authorizations, qualifications and orders as are necessary for the consummation of the transactions contemplated by this Agreement and the Ancillary Agreements; (ii) promptly (and in no event later than fifteen (15) Business Days after the Agreement Date) make all necessary filings, and thereafter make any other required submissions, with respect to this Agreement required under the HSR Act, the Federal Power Act, the New York Public Service Law or any other applicable Law, including Antitrust Law; (iii) comply at the earliest practicable date with any request under the HSR Act, the Federal Power Act, the New York Public Service Law or other applicable Law, including Antitrust Law, for additional information, documents or other materials received by each of them or any of their respective subsidiaries from the Federal Trade Commission, the Antitrust Division of the United States Department of Justice or any other Governmental Body in respect of such filings (collectively, an "<u>Antitrust Authority</u>"); (iv) cooperate with each other in connection with any such filing or request (including, to the extent permitted by applicable Law, providing copies of all such documents to the non-filing parties prior to filing and considering all reasonable additions, deletions or changes suggested in connection therewith) and in connection with resolving any investigation or other inquiry of any of the Antitrust Authorities, or other regulatory body, under the HSR Act, the Federal Power Act, the New York Public Service Law or other Antitrust Law with respect to any such filing; (v) not extend any waiting period under the HSR Act or enter into any agreement with an Antitrust Authority not to consummate the transactions contemplated hereby; and (vi) defend and resolve any investigation or other inquiry of any Governmental Body under all applicable Laws, including by defending against and contesting administratively and in court any litigation or adverse determination initiated or made by a Governmental Body under applicable Law.

(b)    From the Agreement Date through the Closing Date, each of the parties to this Agreement shall promptly notify such other parties of any communication it or any of its Affiliates receives from any Governmental Body relating to the matters that are the subject of this Agreement and permit the other parties to this Agreement to review in advance any proposed communication by such party to any Governmental Body. No party to this Agreement shall agree

37

to participate in any meeting with any Governmental Body in respect of any filings, investigation or other inquiry unless it consults with the other parties to this Agreement in advance and, to the extent permitted by such Governmental Body, gives such parties and their respective Representatives the opportunity to attend and participate at such meeting. The parties will coordinate and cooperate fully with each other in exchanging such information and providing such assistance as the other parties may reasonably request in connection with the foregoing and in seeking early termination of any applicable waiting periods, including under the HSR Act. Subject to applicable Law, the parties will provide each other with copies of all correspondence, filings or communications between them or any of their Representatives, on the one hand, and any Governmental Body or members of its staff, on the other hand, with respect to this Agreement and the transactions contemplated hereby.

(c)     The Seller and the Purchaser shall use their reasonable best efforts to give and make all notices and reports that the Seller, any Acquired Company or the Purchaser are required to make to the appropriate Governmental Bodies and other Persons with respect to the Permits (including Environmental Permits) that may be necessary for the sale of the Acquired Equity to the Purchaser at the Closing.

(d)     Notwithstanding anything in this Agreement to the contrary, neither Purchaser or its Affiliates, nor the Seller or any Acquired Company, shall be required to (i) offer, negotiate, commit to or effect, by consent decree, hold separate order or otherwise, the sale, divestiture, license or other disposition of any and all of the capital stock, properties, assets, rights, products or businesses of the Purchaser (or any of its Affiliates, if applicable), or any Acquired Company, or (ii) permit or suffer to be imposed any other restrictions on the activities of Purchaser or its Affiliates or any Acquired Company.

9.4     Further Assurances. Subject to the other provisions of this Agreement, the Purchaser and the Seller shall use their reasonable best efforts to (a) take all actions necessary or appropriate to consummate the transactions contemplated by this Agreement, (b) provide the other parties with reasonable cooperation and take such actions as such other parties may be reasonably request in connection with the consummation of the transactions contemplated by this Agreement, (c) at or following the Closing (to the extent applicable), execute and deliver such additional documents, instruments, assignments, conveyances and assurances, and take such further actions as may be reasonably required to carry out the provisions hereof and give effect to the transactions contemplated by this Agreement, and (d) cause the fulfillment at the earliest practicable date of all of the conditions to their respective obligations to consummate the transactions contemplated by this Agreement. Without limiting the foregoing, each of the Purchaser and the Seller shall use its reasonable best efforts to defend any Legal Proceedings which would prevent the condition to Closing described in Section 10.3(a) from being satisfied, including seeking to have any stay or temporary restraining order entered by any court or other Governmental Body with respect thereto vacated or reversed, and shall cooperate with each other in connection with the foregoing.

9.5     Publicity. The initial press release concerning this Agreement and the transactions contemplated hereby shall be in a form agreed to by the parties. Prior to the Closing, none of the parties hereto shall issue any press release concerning this Agreement or the transactions contemplated hereby without obtaining the prior written approval of the other party hereto,

which approval shall not be unreasonably withheld, denied, conditioned or delayed, unless such disclosure is otherwise required by applicable Law or by the Bankruptcy Court with respect to filings to be made with the Bankruptcy Court in connection with this Agreement; provided, however, that the party intending to make such release uses its commercially reasonable efforts consistent with such applicable Law or Bankruptcy Court requirement to consult with the other party with respect to the text thereof to the extent practicable. After the Closing, the parties may issue public announcements regarding the transactions contemplated hereby so long as such announcements, in the case of announcements made by the Seller, do not disclose the specific terms or conditions of this Agreement, except where such terms and conditions have already been disclosed as required by Law, applicable stock exchange regulation or in filings that the Seller has made in the Bankruptcy Court; provided, however, that the Seller shall use its commercially reasonable efforts to consult with the Purchaser with respect to the text thereof to the extent practicable.

　　　9.6　　Notification of Certain Matters.

　　　　　(a)　　From time to time prior to the Closing, the Seller shall promptly deliver written notice to the Purchaser of (i) any event, change, effect, condition, state of facts, or occurrence that comes to the Knowledge of the Debtors that (A) would reasonably be expected to (x) cause a breach of any of the Debtors' covenants under this Agreement, (y) render the satisfaction of the conditions in Section 10.1 or Section 10.3 reasonably unlikely to be fulfilled, or (z) prevent, prohibit or materially delay the Closing, or (B) if occurring or arising or in existence before or on the Agreement Date would have caused a representation or warranty of the Seller or any Acquired Company to be inaccurate or deficient; (ii) any notice or other written communication from any Person alleging that the consent of such Person is or may be required in connection with the consummation of the transactions contemplated by this Agreement; and (iii) the commencement of any Legal Proceedings relating to any Acquired Company, any Acquired Company's assets or the Acquired Equity. The delivery of any notice pursuant to this Section 9.6(a) shall not have any effect on the satisfaction of the condition to closing set forth in Section 10.1(a) or the Purchaser's right to terminate the Agreement pursuant to Article XI, and shall not be deemed to amend or supplement any section of the Seller Disclosure Schedule, limit or otherwise affect any remedies available to the Purchaser or prevent or cure any misrepresentations or breach of warranty.

　　　　　(b)　　From time to time prior to the Closing, the Purchaser shall promptly deliver written notice to the Seller of (i) any event, change, effect, condition, state of facts, or occurrence that comes to the knowledge of the Purchaser that (A) would reasonably be expected to (x) cause a breach of the Purchaser's covenants under this Agreement, (y) render the satisfaction of the conditions in Section 10.2 or Section 10.3 reasonably unlikely to be fulfilled, or (z) prevent, prohibit or materially delay the Closing, (B) would reasonably be expected to constitute or prevent the Purchaser from consummating the transactions contemplated by this Agreement; or (C) that, if occurring or arising or in existence before or on the Agreement Date would have caused a representation or warranty of the Purchaser to be inaccurate or deficient; and (ii) any notice or other written communication from any Person alleging that the consent of such Person is or may be required in connection with the consummation of the transactions contemplated by this Agreement. The delivery of any notice pursuant to this Section 9.6(b) shall not have any effect on the satisfaction of the condition to closing set forth in Section 10.2(a) or

the Seller's right to terminate the Agreement pursuant to <u>Article XI</u>, and shall not be deemed to limit or otherwise affect any remedies available to the Seller or prevent or cure any misrepresentations or breach of warranty.

       9.7    <u>Casualty and Insurance</u>.

       (a)    The Acquired Companies shall maintain until Closing all existing insurance policies (the "<u>Company Policies</u>") relating to the Plant, and the Acquired Companies' other assets, at their sole cost and expense.

       (b)    Notwithstanding any provision of this Agreement to the contrary, if, before the Closing, all or any portion of the assets of any Acquired Company is (a) condemned or taken by eminent domain or (b) damaged or destroyed by fire, flood or other casualty, the Seller shall promptly notify the Purchaser in writing of such fact. In the case of condemnation or taking, the Seller shall promptly assign or pay, as the case may be, any proceeds thereof to the Purchaser at the Closing. In the case of fire, flood or other casualty, the Seller shall promptly assign the insurance proceeds therefrom to the Purchaser at Closing. Notwithstanding the foregoing, this <u>Section 9.7(b)</u> shall not in any way modify the Purchaser's other rights under this Agreement, including any applicable right to terminate the Agreement if any condemnation, taking, damage or other destruction results or resulted in a Company Material Adverse Effect or otherwise causes the failure of any of the Purchaser's conditions to Closing set forth in <u>Article X</u>.

       (c)    The Acquired Companies shall add the Purchaser (or cause the Purchaser to be added) as an additional insured or loss payee, as applicable, on each Company Policy for the duration of each Company Policy as is in effect on the Agreement Date, effective as of the Closing Date. The Purchaser shall be entitled to insurance proceeds paid under such Company Policies arising from and after the Closing Date.

       9.8    <u>Schedule Update; Disclosure Generally</u>. From time to time prior to the Closing, the Seller and each Acquired Company shall promptly supplement or amend any items set forth in <u>Article V</u> or <u>Article VI</u> of the Seller Disclosure Schedule with respect to any matter occurring after the Agreement Date (other than any such matters that Seller or any Affiliate shall have knowingly and intentionally caused to occur, or negligently permitted to occur) which would have been required to be set forth or described in such sections of the Seller Disclosure Schedule had such matter occurred prior to the Agreement Date. Notwithstanding anything to the contrary contained in the Seller Disclosure Schedule or in this Agreement, the information and disclosures contained in any section of the Seller Disclosure Schedule shall be deemed to be disclosed and incorporated by reference in any other section of the Seller Disclosure Schedule as though fully set forth in such section to the extent the applicability of such information and disclosure in such other section is readily apparent on the face of such disclosure.

       9.9    <u>Use of Names</u>. As promptly as practicable upon the Closing (but in no event later than thirty (30) days following the Closing Date), the Seller shall discontinue use of and, as applicable, remove from any buildings, signs, vehicles or other asset or property of the Seller, any Trademarks or names of any Acquired Company and any variations thereof.

9.10    Confidentiality. The Purchaser acknowledges and understands that this Agreement may be publicly filed in the Bankruptcy Court and further made available by the Seller to prospective bidders and that, except as prohibited herein, such disclosure shall not be deemed to violate any confidentiality obligations owing to the Purchaser, whether pursuant to this Agreement or otherwise. The Seller acknowledges and agrees that from and after the Closing, all non-public information relating to any Acquired Company shall be valuable and proprietary to the Purchaser and its Affiliates. The Seller agrees that, from and after the Closing, the Seller shall not, and shall cause its Affiliates not to, disclose to any Person any information relating to the Purchaser and its Affiliates (including, after the Closing, each Acquired Company), or the ownership or operation of the Plant, except as required by Law or as otherwise becomes available in the public domain other than through any action by the Seller or its Affiliates in violation of its obligations under this Section 9.10.

9.11    Sell Free and Clear. The Seller acknowledges and agrees that the Sale Order shall be drafted to provide that (a) on the Closing Date and concurrently with the Closing, all then existing or thereafter arising obligations, Liabilities and Liens, against or created by the Seller, or the bankruptcy estate, to the fullest extent permitted by section 363 of the Bankruptcy Code, shall be fully released from and with respect to the equity interests in each Acquired Company and (b) the Purchaser is not a successor to the Seller or the bankruptcy estate by reason of any theory of Law or equity, and the Purchaser shall not assume or in any way be responsible for any Liability of the Seller or the bankruptcy estate, except as expressly provided in this Agreement. On the Closing Date, the Acquired Equity shall be transferred to the Purchaser free and clear of all obligations, Liabilities and Liens to the fullest extent permitted by section 363 of the Bankruptcy Code.

9.12    Avoidance Actions. During the Bankruptcy Cases, neither the Seller nor any Acquired Company shall commence, assign, convey or abandon any Avoidance Actions against any of the Seller's or any Acquired Company's ordinary course vendors, contract counterparties, or contractor, except that all such Avoidance Actions shall be released in accordance with the Plan.

9.13    Not a Required Back-up Bidder. The Bidding Procedures Order shall provide the Purchaser with the option but not an obligation to act as Back-up Bidder following the Auction (if any) in the event that the Purchaser is not selected as the Successful Bidder.

9.14    Intercompany Arrangements. Except as set forth in Section 9.14 of the Seller Disclosure Schedule, all intercompany and intracompany accounts or Contracts between any Acquired Company, on the one hand, and any of its Affiliates (excluding any Acquired Company), on the other hand, shall be cancelled without any consideration or further Liability to any party and without the need for any further documentation, immediately prior to the Closing.

9.15    Acquired Company Release. At the Closing, each Acquired Company shall, and the Purchaser shall cause each Acquired Company to, execute and deliver a release, in the form set forth as Exhibit L, in favor of each of the Seller Released Parties who have executed a Seller Party Release.

41

## ARTICLE X

## CONDITIONS TO CLOSING

10.1    <u>Conditions Precedent to Obligations of the Purchaser</u>. The obligation of the Purchaser to consummate the transactions contemplated by this Agreement is subject to the fulfillment, at or prior to the Closing, of each of the following conditions (any or all of which may be waived in writing by the Purchaser, in whole or in part, to the extent permitted by applicable Law):

(a)    (i) the representations and warranties of the Seller and each Acquired Company contained in this Agreement or any certificate delivered pursuant hereto that are not qualified by materiality or Company Material Adverse Effect or similar qualification shall be true and correct in all material respects both as of the Agreement Date and as of the Closing, except to the extent expressly made as of a different date, in which case such representations and warranties shall be so true and correct as of such different date, (ii) the representations and warranties of the Seller and each Acquired Company contained in this Agreement that are qualified by materiality or Company Material Adverse Effect or similar qualification shall be true and correct in all respects both as of the Agreement Date and as of the Closing, except to the extent expressly made as of a different date, in which case such representations and warranties shall be so true and correct as of such different date, and (iii) the Purchaser shall have received a certificate signed by an authorized officer of the Seller and each Acquired Company on behalf of the Seller or each Acquired Company, as applicable, dated the Closing Date, to the foregoing effect;

(b)    the Debtors each shall have performed and complied in all material respects with all covenants, obligations and agreements required in this Agreement to be performed or complied with by such Debtor, prior to the Closing, and the Purchaser shall have received a certificate signed by an authorized officer of each of the Debtors on behalf of such Debtor, dated the Closing Date, to the forgoing effect;

(c)    the Purchaser shall have obtained all Regulatory Approvals;

(d)    the Seller or each Acquired Company, as applicable, shall have delivered, or caused to be delivered, to the Purchaser all of the items set forth in <u>Section 4.2</u>;

(e)    immediately prior to the Closing, the Debtors shall be in compliance with the Cash Collateral Orders and budget therein;

(f)    no third party shall have filed any Claim in the Bankruptcy Cases with respect to the equity interests of any Acquired Company, which Claim has not been withdrawn, and the applicable Bar Date (as defined in the Plan) in the Bankruptcy Cases relating to such Claims or interests has passed, or such Claim has been disallowed by a Final Order of the Bankruptcy Court; and

(g)    since the Agreement Date, there shall not have occurred and be continuing any changes, effects or circumstances constituting, or which would reasonably be likely to result in, individually or in the aggregate, a Company Material Adverse Effect.

42

10.2     Conditions Precedent to Obligations of the Seller. The obligations of the Seller to consummate the transactions contemplated by this Agreement are subject to the fulfillment, at or prior to the Closing, of each of the following conditions (any or all of which may be waived in writing by the Seller in whole or in part, to the extent permitted by applicable Law):

(a)     (i) the representations and warranties of the Purchaser contained in this Agreement or any Ancillary Agreement or any certificate delivered pursuant hereto that are not qualified by materiality or similar qualification shall be true and correct in all material respects both as of the Agreement Date and as of the Closing, except to the extent expressly made as of a different date, in which case such representations and warranties shall be so true and correct as of such different date, and (ii) the representations and warranties of the Purchaser contained in this Agreement that are qualified by materiality or similar qualification shall be true and correct in all respects both as of the Agreement Date and as of the Closing, except to the extent expressly made as of a different date, in which case such representations and warranties shall be so true and correct as of such different date, and (iii) the Seller shall have received a certificate signed by an authorized officer of the Purchaser on behalf of the Purchaser dated the Closing Date, to the foregoing effect;

(b)     the Purchaser shall have performed and complied in all material respects with all covenants, obligations and agreements required in this Agreement or any Ancillary Agreement to be performed or complied with by the Purchaser prior to or at the Closing, and the Seller shall have received a certificate signed by an authorized officer of the Purchaser on behalf of the Purchaser dated the Closing Date, to the foregoing effect; and

(c)     the Purchaser shall have delivered to the Seller all of the items set forth in Section 4.3.

10.3     Conditions Precedent to Obligations of the Purchaser and the Seller. The respective obligations of the Purchaser and the Seller to consummate the transactions contemplated by this Agreement are subject to the fulfillment, at or prior to the Closing, of each of the following conditions (any or all of which may be waived in writing by the Purchaser or the Seller, as applicable, in whole or in part, to the extent permitted by applicable Law; provided that such waiver shall only be effective as to the obligations of such waiving party):

(a)     there shall not be in effect any Order or Law by a Governmental Body restraining, enjoining, making illegal or otherwise prohibiting the consummation of the transactions contemplated by this Agreement or the Ancillary Agreements;

(b)     the Bankruptcy Court shall have entered the Bidding Procedures Order;

(c)     the Bankruptcy Court shall have entered each of the Sale Order and the Confirmation Order, and each of the Sale Order and the Confirmation Order shall be in full force and effect and not stayed and shall not have been reversed or modified since the date of entry;

(d)     any waiting period (and any extension thereof) under the HSR Act and any other Antitrust Laws applicable to the transactions contemplated by this Agreement and the Ancillary Agreements shall have expired or shall have been terminated;

(e)    the Seller shall have obtained an order from the Commission under section 70(1) of the New York Public Service Law authorizing the Seller to transfer the Acquired Equity to the Purchaser, and the Purchaser shall have obtained an Order from the Commission under section 70(3) and section 70(4), as applicable, under the New York Public Service Law authorizing the Purchaser to acquire the Acquired Equity;

(f)    the Seller and the Purchaser shall have obtained an Order from FERC pursuant to section 203 of the Federal Power Act, authorizing the Seller to transfer the Acquired Equity to Purchaser;

(g)    the Seller and the Purchaser shall have obtained the consent of the Federal Communications Commission for the transfer of control over the radio station authorization (frequency coordination number: PC20103510011); and

(h)    all conditions to occurrence of the Plan Effective Date, other than the Closing, shall have occurred or been waived pursuant to the terms of the Plan.

## ARTICLE XI

## TERMINATION

11.1    Termination. This Agreement may be terminated at any time prior to the Closing (the date on which this Agreement terminates in accordance with its terms, the "Termination Date"):

(a)    by mutual written consent of the Purchaser and the Seller;

(b)    by either the Purchaser or the Seller, if:

(i)    any Governmental Body shall have effected an Order restraining, enjoining, making illegal or otherwise prohibiting the consummation of the transactions contemplated by this Agreement or the Ancillary Agreements and such Order shall have become final and nonappealable; provided that the party so requesting termination shall have complied in all material respects with Sections 9.3 and Section 9.4 and shall not in any event have requested, encouraged or supported such Order; or

(ii)    (A) the Seller or any Acquired Company enters into a definitive agreement with respect to, or consummates, an Alternative Transaction, or the Purchaser is not the Successful Bidder at the Auction; provided, however, that if the Purchaser has elected to be the Back-up Bidder, then the Purchaser may not terminate this Agreement pursuant to this Section 11.1(b)(ii) for a period of sixty (60) days from the entry of the Sale Order (for the avoidance of doubt, nothing in this Section 11.1(b)(ii) shall restrict the ability of the Purchaser to terminate this Agreement in accordance with any other applicable provision of this Agreement) or (B) the Bankruptcy Court shall have entered an Order authorizing an Alternative Transaction;

(c)    by the Purchaser, if:

44

(i)    the Purchaser is not in material breach of this Agreement and the Seller or any Acquired Company breaches or fails to perform in any respect any of its representations, warranties or covenants contained in this Agreement or any Ancillary Agreement and such breach or failure to perform (A) would give rise to the failure of a condition set forth in Section 10.1 or Section 10.3, or (B) cannot be or has not been cured within thirty (30) days following delivery of Purchaser's written notice of such breach or failure to perform;

(ii)    any Milestone has not been satisfied; provided that the right to terminate this Agreement under this Section 11.1(c)(ii) shall not be available to the Purchaser if the Purchaser was the cause of the failure of such Milestone to have been satisfied; provided, further that if the schedule of the Bankruptcy Court was the sole cause of the failure of a Milestone to have been satisfied the right to terminate this Agreement under this Section 11.1(c)(ii) shall not be available to the Purchaser so long as the Milestone becomes satisfied within a period of time equal to the delay caused by the Bankruptcy Court's schedule;

(iii)    the Closing shall not have occurred by December 31, 2019; provided that the right to terminate this Agreement under this Section 11.1(c)(iii) shall not be available to the Purchaser if the Purchaser was the cause of the failure of the Closing to occur on or prior to such date; provided, further that if the schedule of the Bankruptcy Court was the sole cause of the failure of the Closing to occur on or prior to such date the right to terminate this Agreement under this Section 11.1(c)(iii) shall not be available to the Purchaser for a period of time equal to the delay caused by the Bankruptcy Court's schedule;

(iv)    the Seller or any Acquired Company publicly announces any plan of reorganization or plan of liquidation or supports any such plan (including any such plan filed by a party other than the Purchaser), other than the Plan or the transactions contemplated by this Agreement;

(v)    the Bankruptcy Cases are dismissed or converted to cases under chapter 7 of the Bankruptcy Code, and neither such dismissal nor conversion expressly contemplates the transactions provided for in this Agreement;

(vi)    the Seller or any Acquired Company withdraws or seeks authority to withdraw the motion seeking approval of the Bidding Procedures Order and Sale Order;

(vii)    a "Termination Date" (as defined in the Cash Collateral Orders) occurs and within five (5) Business Days thereof, (A) the Seller has not obtained replacement financing or (B) the Bankruptcy Court has not (1) authorized the Seller to use cash collateral in an amount sufficient to fund the Seller and each Acquired Company through the Closing and (2) enjoined the Agent and the Lenders from exercising remedies under the Prepetition Credit Agreement; or

(viii)   for any reason (including an Order of the Bankruptcy Court), the Purchaser is legally prohibited, pursuant to section 363(k) of the Bankruptcy Code or otherwise, to credit bid the Credit Bid Amount in satisfaction of all or any portion of the Purchase Consideration (other than the Wind Down Amount) as set forth in Section 3.1;

(d)   by the Seller, if:

(i)   the Seller is not in material breach of this Agreement and the Purchaser breaches or fails to perform in any respect any of its representations, warranties or covenants contained in this Agreement or any Ancillary Agreement and such breach or failure to perform (A) would give rise to the failure of a condition set forth in Section 10.2 or Section 10.3, or (B) cannot be or has not been cured within thirty (30) days following delivery of the Seller's written notice of such breach or failure to perform; or

(ii)   the Closing shall not have occurred by December 31, 2019; provided that the right to terminate this Agreement under this Section 11.1(d)(ii) shall not be available to the Seller if the Seller or its Affiliates shall have been the cause of the failure of the Closing to occur on or prior to such date; provided, further that if the schedule of the Bankruptcy Court was the sole cause of the failure of the Closing to occur on or prior to such date the right to terminate this Agreement under this Section 11.1(d)(ii) shall not be available to the Seller for a period of time equal to the delay caused by the Bankruptcy Court's schedule.

The party seeking to terminate this Agreement pursuant to this Section 11.1 (other than Section 11.1(a)) shall, if such party is the Seller, give prompt written notice of such termination to the Purchaser, and if such party is the Purchaser, give prompt written notice of such termination to the Seller.

11.2   Effect of Termination.

(a)   In the event of termination of this Agreement as provided in Section 11.1, this Agreement shall forthwith become void and there shall be no obligation or liability on the part of any party except (i) for the provisions of Section 9.5 relating to public announcements, Section 13.2 relating to fees and expenses, Section 13.8 relating to notices, Section 13.4 relating to submission to jurisdiction, Section 13.10 relating to assignment and third-party beneficiaries, Section 13.7 relating to governing law, and this Article XI and (ii) that nothing herein shall relieve any party from liability for any willful and material breach of this Agreement prior to such termination.

(b)   If this Agreement is terminated in the circumstances set forth in Section 11.3(a) or 11.3(b), then the Seller or any Acquired Company shall pay to Purchaser (or its designee(s) as indicated below) the Break-Up Fee and/or the Expense Reimbursement Amounts, as applicable, subject to and in accordance with Section 11.3(a) or 11.3(b), and the Purchaser's right to enforce payment(s) thereof shall survive the termination of this Agreement.

(c)   If (i) this Agreement is terminated and (ii) following such termination the Acquired Equity or substantially all the assets of any Debtor are acquired in respect of the rights of the Lenders or the Agent through a proceeding under state Law, including without limitation

46

through a public or private sale or strict foreclosure under the UCC, then the Purchaser (and, in accordance with the Restructuring Support Agreement, each of the other Purchaser Releasing Parties) shall, so long as the Debtors cooperate with such proceeding, execute and deliver a Purchaser Party Release to the Seller Released Parties who have executed a Seller Party Release.

(d)    If termination of this Agreement is due solely to a breach by the Purchaser pursuant to Section 11.1(d)(i), the Seller, as its sole remedy, shall be entitled to liquidated damages in the amount of $1 million, which shall be payable by the Purchaser by the forgiveness of Prepetition Credit Agreement Indebtedness. The parties hereby agree that the foregoing dollar amount is a fair and reasonable estimate of the total detriment that the Seller and the Debtors would suffer in the event of the Purchaser's default and failure to complete the transactions contemplated hereby.

11.3    Break-Up Fee; Expense Reimbursement Amounts.

(a)    If this Agreement is terminated pursuant to Section 11.1(b)(ii) and the Debtors consummate an Alternative Transaction, then the Debtors shall pay in cash to the Purchaser, simultaneously with the consummation of an Alternative Transaction, a break-up fee in the amount of $1 million (the "Break-Up Fee"), by wire transfer of immediately available funds to the account specified by the Purchaser to the Seller in writing.

(b)    In addition to the Break-Up Fee payable under Section 11.3(a), if this Agreement is terminated pursuant to Section 11.1(b)(ii) or any provision of Section 11.1(c), (i) then the Debtors shall pay in cash to the Purchaser (or its designees, as indicated below), no later than the date that is two (2) Business Days following receipt of documentation supporting the request for reimbursement of out-of-pocket costs, fees and expenses, an amount equal to the reasonable and documented out-of-pocket costs, fees and expenses incurred by the Purchaser and the Consenting Lenders (including fees and expenses of their respective legal, accounting and financial advisors) in connection with the development, execution, delivery and approval by the Bankruptcy Court of this Agreement and the transactions contemplated hereby (the "Expenses"), which Expenses payable pursuant to this clause (i) shall not exceed $1 million in the aggregate (the "Initial Expense Reimbursement Amount"), and (ii) if the Debtors consummate an Alternative Transaction within 12 months following such termination (whether or not such termination was pursuant to Section 11.1(b)(ii)), then, in addition to the Initial Expense Reimbursement Amount payable pursuant to the foregoing clause (i), the Debtors shall pay in cash to the Purchaser (or its designees, as indicated below), no later than the later of (1) the date such Alternative Transaction is consummated and (2) no later than the date that is two (2) Business Days following receipt of documentation supporting the request for reimbursement for Expenses, an additional amount of Expenses which, in the case of this clause (ii), shall not exceed an additional $1 million, in the aggregate (the "Subsequent Expense Reimbursement Amount"), in each case of clauses (i) and (ii) by wire transfer of immediately available funds to (x) an account specified by the Purchaser to the Seller in writing, with respect to costs, fees and expenses of the Purchaser and (y) one or more accounts specified by the Purchaser for the benefit of the applicable Consenting Lenders, with respect to the costs, fees and expenses of the applicable Consenting Lender. The Initial Expense Reimbursement Amount, collectively with, if applicable, the Subsequent Expense Reimbursement Amount, is referred to herein as the "Expense Reimbursement Amounts".

(c)    The obligations of the Debtors to pay the Break-Up Fee and/or the Expense Reimbursement Amounts as provided herein shall be entitled to superpriority administrative expense status pursuant to sections 503(b)(1) and 507(a)(2) of the Bankruptcy Code, senior to all other general administrative expense claims and superpriority administrative expense claims granted such status pursuant to sections 503(b)(1) and 507(a)(2).

(d)    The Seller agrees and acknowledges that the Purchaser's due diligence, efforts, negotiation, and execution of this Agreement have involved substantial investment of management time and have required significant commitment of financial, legal, and other resources by the Purchaser and its Affiliates, and that such due diligence, efforts, negotiation, and execution have provided value to the Seller and, in the Seller's reasonable business judgment, is necessary for the preservation of the value of the Seller's estate. The Seller further agrees and acknowledges that the Break-Up Fee and Expense Reimbursement Amounts are reasonable in relation to the Purchaser's efforts, the Purchaser's lost opportunities from pursuing this transaction, and the magnitude of the transactions contemplated hereby. The provision of the Break-Up Fee and the Expense Reimbursement Amounts is an integral part of this Agreement, without which the Purchaser would not have entered into this Agreement.

## ARTICLE XII

## TAXES

12.1    <u>Transfer Taxes</u>. All documentary, stamp, transfer, motor vehicle registration, sales, use, excise and other similar non-income Taxes and all filing and recording fees (and any penalties and interest associated with such Taxes and fees) arising from or relating to the consummation of the transactions contemplated by this Agreement (collectively, "<u>Transfer Taxes</u>") shall be borne by the Purchaser, regardless of the party on whom liability is imposed under the provisions of the Laws relating to such Transfer Taxes. The Seller and the Purchaser shall consult and cooperate in timely preparing and making all filings, Tax Returns, reports and forms as may be required to comply with the provisions of the Laws relating to such Transfer Taxes and shall cooperate and otherwise take reasonable best efforts to obtain any available refunds for or exemptions from such Transfer Taxes, including preparing exemption certificates and other instruments as are applicable to claim available exemptions from the payment of Transfer Taxes under applicable Law and executing and delivering such affidavits and forms as are reasonably requested by the other party.

12.2    <u>Cooperation and Audits</u>. The Purchaser shall, and shall cause its Representatives and controlled Affiliates to, and the Seller shall, and shall cause their Representatives and Affiliates to, reasonably cooperate with each other regarding Tax matters (including the execution of appropriate powers of attorney) and shall make available to the other all information, records and documents relating to Taxes as are reasonably requested by the other until the expiration of the applicable statute of limitations and any extension thereof and the conclusion of all Legal Proceedings with respect to such Taxes.

12.3    <u>Entity Classification</u>. The Debtors shall, and the Seller shall cause the Debtors to, each continue to be classified as an entity disregarded as separate from such entity's owner

(within the meaning of Treasury Regulation Section 301.7701-3) for all Tax purposes through the Closing Date.

## ARTICLE XIII

## MISCELLANEOUS

13.1    <u>No Survival of Representations and Warranties</u>. The parties hereto agree that the representations and warranties contained in this Agreement shall not survive the Closing and none of the parties shall have any liability to each other after the Closing for any breach thereof. The parties hereto agree that the covenants contained in this Agreement and the Ancillary Agreements to be performed at or after the Closing shall survive the Closing hereunder until the expiration of the applicable statute of limitations or for such shorter period explicitly specified therein, and each party hereto shall be liable to the other after the Closing for any breach thereof.

13.2    <u>Expenses</u>. Except as otherwise provided in <u>Section 11.3</u>, this Agreement, whether or not the transactions contemplated hereby are consummated, each party shall bear its own expenses. For the avoidance of doubt, any filing fees due under the HSR Act shall be an expense of the Purchaser.

13.3    <u>Injunctive Relief</u>.

(a)    The parties agree that irreparable damage would occur in the event that any of the provisions of this Agreement or the Ancillary Agreements (as applicable) were not performed in accordance with their specific terms or were otherwise breached, and that damages at law may be an inadequate remedy for the breach of any of the covenants, promises and agreements contained in this Agreement or the Ancillary Agreements (as applicable), and, accordingly, any party hereto shall be entitled to injunctive relief or other equitable relief to prevent any such breach, and to specifically enforce specifically the terms and provisions of this Agreement or the Ancillary Agreements (as applicable), including without limitation specific performance of such covenants, promises or agreements or an order enjoining a party from any threatened, or from the continuation of any actual, breach of the covenants, promises or agreements contained in this Agreement or the Ancillary Agreements (as applicable). The rights set forth in this <u>Section 13.3</u> (i) are an integral part of the transactions contemplated by this Agreement and with that right neither the Seller, any Acquired Company nor the Purchaser would have entered into this Agreement and (ii) shall be in addition to any other rights which a party hereto may have at law or in equity pursuant to this Agreement or the Ancillary Agreements (as applicable). The parties hereto hereby acknowledge and agree that any party pursuant an injunction or injunctions or other Order to prevent breaches of this Agreement and to enforce specifically the terms and provisions of this Agreement in accordance with this <u>Section 13.3</u> will not be required to provide any bond or other security in connection with any such Order. Notwithstanding the foregoing, following any termination of this Agreement pursuant to <u>Article XI</u>, no party shall be entitled to seek or obtain specific performance or any other equitable remedy with respect to the enforcement of any other party's obligation to consummate the Closing and any other related obligations.

(b)     The parties hereby agree not to raise any objections to the availability of the equitable remedy of specific performance to prevent or restrain breaches of this Agreement or the Ancillary Agreements (as applicable) by the Purchaser, any Acquired Company or the Seller, as applicable, and to specifically enforce the terms and provisions of this Agreement or the Ancillary Agreements (as applicable) to prevent breaches or threatened breaches of, or to enforce compliance with, the respective covenants and obligations of the Purchaser, any Acquired Company or the Seller, as applicable, under this Agreement or the Ancillary Agreements (as applicable) all in accordance with the terms of this Section 13.3.

13.4     Submission to Jurisdiction; Consent to Service of Process.

(a)     Without limiting any party's right to appeal any Order of the Bankruptcy Court, (i) the Bankruptcy Court shall retain exclusive jurisdiction to enforce the terms of this Agreement and to decide any claims or disputes which may arise or result from, or be connected with, this Agreement, any breach or default hereunder, or the transactions contemplated hereby, and (ii) any and all proceedings related to the foregoing shall be filed and maintained only in the Bankruptcy Court, and the parties hereby consent to and submit to the jurisdiction and venue of the Bankruptcy Court for such purposes and shall receive notices at such locations as indicated in Section 13.8 hereof; provided, however, that if the Bankruptcy Cases have been closed pursuant to section 350 of the Bankruptcy Code, the parties agree to unconditionally and irrevocably submit to the exclusive jurisdiction of the courts of the State of New York and of the federal courts sitting in the borough of Manhattan in the State of New York and any appellate court from any thereof, for the resolution of any such claim or dispute. The parties hereby irrevocably waive, to the fullest extent permitted by applicable Law, any objection which they may now or hereafter have to the laying of venue of any such dispute brought in such court or any defense of inconvenient forum for the maintenance of such dispute. Each of the parties hereto agrees that a judgment in any such dispute may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by Law.

(b)     Each of the parties hereto hereby consents to process being served by any party to this Agreement in any Legal Proceeding by delivery of a copy thereof in accordance with the provisions of Section 13.8.

**13.5     Waiver of Right to Trial by Jury. Each party to this Agreement waives any right to trial by jury in any action, matter or proceeding arising out of or relating to this Agreement or any provision hereof, or the transactions contemplated hereby.**

13.6     Entire Agreement; Amendments and Waivers. This Agreement (including the Seller Disclosure Schedule and Exhibits), the Ancillary Agreements and each other agreement, document or instrument contemplated hereby or thereby represent the entire understanding and agreement between the parties hereto with respect to the subject matter hereof and supersedes all prior discussions and agreements between the parties with respect to the subject matter hereof. Neither this Agreement nor any Ancillary Agreement shall be deemed to contain or imply any restriction, covenant, representation, warranty, agreement or undertaking of any party with respect to the transactions contemplated hereby or thereby other than those expressly set forth herein or therein or in any document required to be delivered hereunder or thereunder, and none shall be deemed to exist or be inferred with respect to the subject matter hereof. Except as

50

otherwise expressly provided herein, this Agreement may be amended, supplemented or changed, and any provision hereof can be waived, only by written instrument making specific reference to this Agreement signed by the party against whom enforcement of any such amendment, supplement, modification or waiver is sought. No action taken pursuant to this Agreement, including any investigation by or on behalf of any party, shall be deemed to constitute a waiver by the party taking such action of compliance with any representation, warranty, covenant or agreement contained herein. The waiver by any party hereto of a breach of any provision of this Agreement shall not operate or be construed as a further or continuing waiver of such breach or as a waiver of any other or subsequent breach. No failure on the part of any party to exercise, and no delay in exercising, any right, power or remedy hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of such right, power or remedy by such party preclude any other or further exercise thereof or the exercise of any other right, power or remedy. All remedies hereunder are cumulative and are not exclusive of any other remedies provided by Law.

13.7    Governing Law. This Agreement shall be construed, performed and enforced in accordance with, and governed by, the Laws of the State of New York (without giving effect to the principles of conflicts of Law thereof), except to the extent that the Laws of such State are superseded by the Bankruptcy Code or other applicable federal Law.

13.8    Notices. All notices and other communications under this Agreement shall be in writing and shall be deemed given (i) when delivered personally by hand, (ii) on the day of transmission if sent via e-mail transmission to the e-mail address(es) given below during regular business hours on a Business Day and, if not sent during regular business hours or on a Business Day, then on the following Business Day or (iii) one (1) Business Day following the day sent by overnight courier (with written confirmation of receipt), in each case to the respective Persons at the following addresses or email addresses (or to such other address or e-mail address as a party may have specified by notice given to the other party pursuant to this provision):

    If to the Seller, to:

        TTK Empire Power, LLC
        c/o Tyr Energy, LLC
        7500 College Blvd., Suite 400
        Overland Park, Kansas 66210
        Attention:    General Counsel
        Email:        tso@tyrenergy.com

    With a copy (which shall not constitute notice) to:

        Hunton Andrews Kurth LLP
        200 Park Avenue
        New York, New York 10166
        Attention:    Peter S. Partee, Sr., Esq.
                      Robert A. Rich, Esq.
        Email:        ppartee@HuntonAK.com
                      rrich2@HuntonAK.com

51

- and -

Steinhilber Swanson LLP
122 W. Washington, Suite 850
Madison, Wisconsin 53703
Attention:      Michael P. Richman, Esq.
Email:          mrichman@steinhilberswanson.com


If to the Purchaser, to:

Empire Acquisition, LLC
c/o Ankura Trust Company, LLC
60 State Street, Suite 700
Boston, MA 02109
Attention:      Michael J. Fey
Email:          Michael.Fey@Ankura.com

With a copy (which shall not constitute notice) to:

Davis Polk & Wardwell LLP
450 Lexington Avenue
New York, NY 10017
Attention:      Darren S. Klein
                Benjamin M. Schak
Email:          Darren.Klein@DavisPolk.com
                Benjamin.Schak@DavisPolk.com

- and -

The Required Lenders of record
c/o Black Diamond Capital Management, L.L.C.
100 Field Drive, Suite 170
Lake Forest, IL 60045
Attention:      Leslie A. Meier
Email:          les@bdcm.com

- and -

Skadden, Arps, Slate, Meagher & Flom LLP
155 N. Wacker Drive
Chicago, IL 60606
Attention:      Kimberly A. deBeers
Email:          Kimberly.debeers@skadden.com


13.9    <u>Severability</u>. If any term or other provision of this Agreement is invalid, illegal, or incapable of being enforced by any Law or public policy, all other terms and provisions of this

Agreement shall nevertheless remain in full force and effect so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any party. Upon such determination that any term or other provision is invalid, illegal, or incapable of being enforced, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in an acceptable manner in order that the transactions contemplated hereby are consummated as originally contemplated to the greatest extent possible.

13.10   Assignment. This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns, and nothing in this Agreement shall create or be deemed to create any third party beneficiary rights in any Person or entity not a party to this Agreement. No assignment of this Agreement or of any rights or obligations hereunder may be made by any Acquired Company, the Seller or the Purchaser (by operation of law or otherwise) without the prior written consent of the other parties hereto and any attempted assignment without the required consents shall be void; provided, however, that the Purchaser may assign some or all of its rights or delegate some or all of its obligations hereunder to one or more of its Affiliates. No assignment of any obligations hereunder shall relieve the parties hereto of any such obligations.

13.11   Non-Recourse. Except as set forth in this Agreement or in the Restructuring Support Agreement, no past, present or future manager, officer, employee, contractor, agent, incorporator, member, partner or equityholder of the parties to this Agreement shall have any liability for any obligations or liabilities of any Acquired Company, the Seller or the Purchaser, as applicable, under this Agreement or any agreement entered into in connection herewith of or for any claim based on, in respect of, or by reason of, the transactions contemplated hereby and thereby. Any claim or cause of action based upon, arising out of, or related to this Agreement or any agreement, document or instrument contemplated hereby may only be brought against Persons that are expressly named as parties hereto or thereto, and then only with respect to the specific obligations set forth herein or therein. Other than the parties hereto, no other party shall have any liability or obligation for any of the representations, warranties, covenants, agreements, obligations or liabilities of any party under this Agreement or the agreements, documents or instruments contemplated hereby or of or for any Legal Proceeding based on, in respect of, or by reason of, the transactions contemplated hereby or thereby (including the breach, termination or failure to consummate such transactions), in each case whether based on contract, tort, fraud, strict liability, other Laws or otherwise and whether by piercing the corporate veil, by a claim by or on behalf of a party hereto or another Person or otherwise. In no event shall any Person be liable to another Person for any punitive damages with respect to the transactions contemplated hereby.

13.12   Counterparts. This Agreement may be executed in counterparts, and by the different parties in separate counterparts, each of which shall be deemed to be an original copy of this Agreement and all of which, when taken together, shall be deemed to constitute one and the same agreement. Delivery of an executed counterpart of a signature page to this Agreement by facsimile or other electronic means (including portable document format) shall be as effective as delivery of a manually executed counterpart of this Agreement.

13.13   <u>No Presumption</u>. The parties to this Agreement agree that this Agreement was negotiated fairly between them at arms' length and that the final terms of this Agreement are the product of the parties' negotiations. Each party represents and warrants that it has sought and received legal counsel of its own choosing with regard to the contents of this Agreement and the rights and obligations affected hereby. The parties agree that this Agreement shall be deemed to have been jointly and equally drafted by them, and that the provisions of this Agreement therefor should not be construed against a party or parties on the grounds that the party or parties drafted or was more responsible for drafting the provisions.

*[Signature pages follow]*

54

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the Agreement Date by their respective officers thereunto duly authorized.

TTK EMPIRE POWER, LLC

By:_____
Name:
Title:

EMPIRE GEN HOLDCO, LLC

By:_____
Name:
Title:

EMPIRE GENERATING CO, LLC

By:_____
Name:
Title:

EMPIRE GEN HOLDINGS, LLC

By:_____
Name:
Title:

EMPIRE ACQUISITION, LLC

By:_____
Name:
Title:

**TTK Power, LLC**

May 19, 2019

**<u>Via Email</u>**

Empire Acquisition, LLC
c/o Ankura Trust Company, LLC
60 State Street, Suite 700
Boston, MA 02109
Attention: Michael J. Fey
Email: Michael.Fey@Ankura.com

Re: <u>Letter Agreement Regarding Certain Tax Matters</u>

Reference is made to that certain Purchase and Sale Agreement (the "<u>Agreement</u>"), dated as of the date hereof, entered into by and among Empire Acquisition, LLC, a Delaware limited liability company (the "<u>Purchaser</u>"), TTK Empire Power, LLC, a Delaware limited liability company (the "<u>Seller</u>"), Empire Gen Holdings, LLC, a Delaware limited liability company ("<u>Holdings</u>"), Empire Gen Holdco, LLC, a New York limited liability company (the "<u>Company</u>," and together with Holdco, Holdings, and the Seller, the "<u>Debtors</u>"), pursuant to which, on the terms and subject to the conditions therein, the Purchaser shall purchase, acquire and accept from the Seller, and the Seller shall sell, assign, transfer, convey and deliver to the Purchaser all of the Seller's right, title and interest in, to and under all of the issued and outstanding membership interests in Holdings, on the terms and subject to the conditions set forth in the Agreement. Capitalized terms used herein but not otherwise defined shall have the meanings ascribed to such terms in the Agreement.

TTK Power, LLC, a Delaware limited liability company treated as a partnership for U.S. federal income Tax purposes ("<u>TTK Power</u>"), is the sole member of the Seller and owns beneficially and of record all of the issued and outstanding membership interest of the Seller.

In order to induce the Purchaser to enter into the Agreement, TTK Power agrees as follows.

(1)   <u>Entity Classification</u>. TTK Power will continue to be classified as a partnership for Tax purposes until its liquidation for Tax purposes. No party (other than the Purchaser with respect to a Tax period or portion of a Tax period beginning after the Closing Date) shall make an election to treat any subsidiary of TTK Power, or otherwise cause any subsidiary of TTK Power to be treated, as an association taxable as a corporation, or otherwise incorporate any of such entities.

(2)   <u>Section 754 Election</u>. TTK Power and any of its subsidiaries that are treated as partnerships for federal and state income Tax purposes shall timely file elections under Section 754 of the IRC for the taxable year of the partnership in which the Closing occurs, if such an election has not already been made.

(3)   <u>Push-Out Election</u>. In the event of a Tax audit, TTK Power and each of its

subsidiaries that is a partnership for U.S. tax purposes shall make the election under Section 6226 of the IRC to "push out" the obligation to pay the amount of any adjustment to its members with respect to the Tax year under audit.

(4)     <u>Other Pre-Closing Taxes</u>. The Purchaser will not be liable for any income Tax or other Tax liabilities from or with respect to TTK Power or any of its subsidiaries for any Tax periods, nor will the Purchaser be liable for any income Tax or other Tax liabilities attributable to the business of any Acquired Company for any period that ends on or before the Closing Date or, with respect to a period that includes the Closing Date, the portion of the period ending on the Closing Date.

This letter agreement shall be construed and enforced in accordance with the laws of the State of New York, without regard to conflict of laws principles thereof or of any other state. All judicial proceedings brought against any party hereto arising out of or relating to this letter agreement shall be brought in any state or federal court of competent jurisdiction in the State, County and City of New York. Each of the parties to this letter agreement irrevocably accepts and submits itself to the jurisdiction of the federal and state courts in each case located within the State, County and City of New York.

This letter agreement may be executed in any number of counterparts, each of which when so executed and delivered shall be deemed an original, but all counterparts together shall constitute but one and the same instrument. Delivery of an executed counterpart hereof by .pdf format or other electronic transmission shall be as effective as delivery of any original executed counterpart hereof.

If the Agreement is terminated then this letter agreement will be automatically terminated simultaneously with the termination of the Agreement, and as of such time this letter agreement will be null and void and will have no further force or effect. Following the Closing, the Acquired Companies shall be third party beneficiaries of the rights and benefits under this letter agreement.

[*Signature page(s) follow*]

Very truly yours,

**TTK POWER, LLC**

By: _____
     Name:
     Title

[Signature page to tax letter agreement]

Acknowledged and agreed by

EMPIRE ACQUISITION, LLC

By: _____
       Name:
       Title

[Signature page to tax letter agreement]

cc:

Davis Polk & Wardwell LLP
450 Lexington Avenue
New York, NY 10017
Attention:      Darren S. Klein
                Benjamin M. Schak
Email:          Darren.Klein@DavisPolk.com
                Benjamin.Schak@DavisPolk.com

- and -

The Required Lenders of record
c/o Black Diamond Capital Management, L.L.C.
100 Field Drive, Suite 170
Lake Forest, IL 60045
Attention:      Leslie A. Meier
Email:          les@bdcm.com

- and -

Skadden, Arps, Slate, Meagher & Flom LLP
155 N. Wacker Drive
Chicago, IL 60606
Attention:      Kimberly A. deBeers
Email:          Kimberly.debeers@skadden.com

## **EXHIBIT G**

**Memorandum and Order, *Crédit Agricole Corp. and Inv. Bank v. Black Diamond Capital Management, LLC*, Case No. 18-07620 (S.D.N.Y. Mar. 22, 2019) [Docket No. 31]**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------X
CRÉDIT AGRICOLE CORPORATE AND     :
INVESTMENT BANK, ARCHIMEDES
FUNDING IV (CAYMAN), LTD., COPPER  :
RIVER CLO LTD., ENDURANCE CLO I,
LTD., GREEN LANE CLO LTD.,              :
KENNECOTT FUNDING LTD.,
LANDMARK V CDO LTD., LANDMARK     :
VI CDO LTD., LANDMARK VII CDO LTD.,
LANDMARK VIII CDO LTD., LATITUDE   :
CLO I, LTD., THL CREDIT LOAN
OPPORTUNITY LTD. (F/K/A MCDONNELL: 
LOAN OPPORTUNITY LTD.), OCEAN
TRAILS CLO I, PERMAL STONE LION     :
FUND LTD., SANDS POINT FUNDING
LTD., STONE LION PORTFOLIO L.P., UBS :
AG, STAMFORD BRANCH, UBS LOAN
FINANCE LLC AND WG HORIZONS        :
CLO I,

                                             :

                   Petitioners,

                                             :

         -against-

                                             :

BLACK DIAMOND CAPITAL
MANAGEMENT, LLC, BDC FINANCE        :
L.L.C., AND BLACK DIAMOND CLO
2006-1 (CAYMAN), LTD., BLACK           :
DIAMOND COMMERCIAL FINANCE,
L.L.C.,                                          :

                   Respondents.     :
-----------------------------------------------------------X
KEVIN NATHANIEL FOX
UNITED STATES MAGISTRATE JUDGE

**MEMORANDUM AND ORDER**

18-CV-7620 (KNF)

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 7/22/19

Before the Court is a: (1) Petition to Vacate or Modify Amended Arbitration Award and

to Confirm Original Award, pursuant to the Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 9, 11,

13 and 207; and (2) Cross-Petition to Confirm Amended Final Arbitration Award, pursuant to 9

U.S.C. §§ 9 and 207.

1

## PETITIONERS' CONTENTIONS

The petitioners contend that, in April 2018,[1] the arbitration panel made a final award to them of "$39.2 million" against the respondents for "bad faith breaches of a credit agreement over a period of eight years leading up to the arbitration." After the respondents' motion to modify the final award, made pursuant to Rule 50 of the American Arbitration Association ["AAA"] Commercial Rules, the arbitration panel issued an amended final award in May 2018,[2] deeming the calculation of statutory pre-judgment interest a computational error and reducing the final award by "$2,177,482," consisting of: "(1) $530,104 resulting from the Panel's reversal of the compounding of interest and (2) $1,647,378 resulting from the Panel's decision to apply pre-payments to principal rather than accrued interest."

The petitioners assert that they received the following distribution payments from the respondents on the condition that each payment "be treated as a pre-payment of any judgment": (a) "$7,172,382," "made on March 18, 2016"; and (b) "$1,310,126," "made on June 30, 2016." The petitioners assert that, in its final award, the arbitration panel "subtracted the pre-payments from principal plus accrued interest"; however, in the amended final award, the arbitration panel "applied those payments to principal." The petitioners maintain that arbitration panel in its final award "followed the New York rule" applying the respondents' "pre-payments against the accruing pre-judgment interest." The petitioners argue that: (1) the final award was a final decision on the merits; and (2) the amended final award did not correct a computational error but constituted a change in the legal standard applied to determine the amount of pre-judgment interest, which exceeded the arbitration panel's powers in a manifest disregard of the law. More specifically, the arbitration panel in its amended final award stated that it did not subtract the pre-

---

[1] The "Final Award" was signed by the arbitrators on April 19, 2018.

[2] The "Amended Final Award" was signed by the arbitrators on May 21, 2018.

2

payments from principal originally and proceeded to subtract the pre-payments from the principal; thus, the arbitration panel was "correcting" a legal error, not a computational error, since "the question of whether to apply pre-payments to interest or principal is clearly a legal question." The petitioners assert that in its final award, the arbitration panel "reached the legally correct answer" to the question of "how to apply the pre-payments," because "there was no agreement between Petitioners and Respondents that their 2016 payments would be applied to principal"; thus, the arbitration panel "properly applied such payments to interest in the Original Award."

The petitioners assert that the arbitration panel not only exceeded its powers but also created an error in the amended final award. They maintain that the portion of the amended final award "that purported to correct the compounding of interest in 2016, resulting in a reduction of \$530,104 in pre-judgment interest" must be vacated because, although "New York courts generally do not compound pre-judgment interest," this "alleged error is legal and not simply a math error." The arbitration panel did not have jurisdiction to revisit the issue of compounding interest because "the rule against compounding interest is a product of case law and cannot serve as the basis for modifying an award based on a claimed 'computational' error."

Alternatively, the petitioners contend that the Court should correct the arbitration panel's "miscalculation of figures" in applying the 2016 pre-payments to the principal amount of the final award. Thus, if the Court finds that the arbitration panel had jurisdiction to revisit the issue of pre-judgment interest because the alleged error was computational, the Court "must correct the Panel's error pursuant to 9 U.S.C. § 11 by increasing the award by, at a minimum, the \$1,647,378 constituting the portion [sic] Panel's reduction of the Original award attributable to applying the prepayments to the principal damages award."

3

In support of the petition, the petitioners submitted a declaration by their attorney with

exhibits, including the pertinent decisions by the arbitration panel. The arbitration panel signed

the final award, on April 19, 2018, stating, in pertinent part:

> For this reason, we have determined to take the average of the three above
> valuations that we find to be the most credible. Where a range of value was given,
> we took the midpoint. Thus, we added $62.5 million (the midpoint of $50-75), $37
> million (the midpoint of $30-45), and $150,871,927 and took the average of the
> three which came to $83,457,309. Claimants' 31.1112% *pro rata* share of
> $83,457,309 is $25,964,570.3176.
> From this figure we then subtracted the cash payments received and
> calculate PJI [pre-judgment interest] accordingly.
> Here is our calculation:
> (1) From July 26, 2011 – February 28, 2016, interest of 9% is calculated on
>     the full amount of $25,964,570.3176, for a total of $10,729,591.9244
>     (or $194,734.277382 per month for 55 months and 3 days). This brings
>     the total, as of March 2016, to $36,694,162.242. From this we
>     subtracted the first payment of $7,200,000 made in March 2016, for a
>     total of $29,494,162.242.
> (2) From March 2016 – June 2016, we calculated three months of interest
>     on the balance of $29,494,162.24 which comes to $663,618.65 for a
>     total of $30,157,780.89. From this we subtracted the June 2016
>     payment of $1.3 million for a total of $28,857,780.89.
> (3) We then calculated the remaining PJI as follows: For the period from
>     June 2016 through and including April 20, 2018, PJI totals
>     $4,903,846.19 (or $216,433.36 per month for 22 months and 20 days).
>     This brings the total award to $33,761,627.08.

On May 21, 2018, the arbitration panel issued an Order Modifying Award, stating, in pertinent

part:

> Rule 50 provides that a party "may request the arbitrator through the AAA, to
> correct any clerical, typographical, or computation errors in the award." However,
> an arbitrator may not "redetermine the merits of any claim already decided."
> Under Rule 8, the Panel has the authority to "interpret and apply" the AAA rules.
> The question here is whether the request to revise the Panel's calculation of interest
> on the Award seeks to correct a computational error or determination of the merits
> of a claim. The Panel concludes that it made a computational error when
> calculating interest and that correcting that error does not involve redetermining the
> merits of any claim already decided. . . . . In its Award, at page 147, the Panel
> explicitly stated that it relied on the agreement by the experts for each side – Finkel
> and Gompers – as the source for applying 9% PJI. In their damages calculations,
> both experts explicitly adopted a simple 9% interest rate to the outstanding amounts

4

*after* subtracting the payments made by Black Diamond. There was never any question as to the calculation of PJI – it was always meant to be simple rather than compounding interest. We inadvertently made a computational error by compounding interest on the remaining balance after partial payment. The Award, itself, confirms that this was a computational error. At page 174 of the Award we awarded damages of $25,964,570.3176. We then stated: "From this figure" we intend to "then subtract[] the cash payments received and calculate PJI accordingly." But rather than simply subtracting the payments from the principal figure and then calculating PJI, we subtracted the payments from the sum of both principal and PJI that had already been calculated and then calculated interest on both principal and PJI. That was a computational error.

Thereafter, the arbitration panel signed the amended final award, on May 21, 2018, stating, in

pertinent part:

> For this reason, we have determined to take the average of the three above valuations that we find to be the most credible. Where a range of value was given, we took the midpoint. Thus, we added $62.5 million (the midpoint of $50-75), $37 million (the midpoint of $30-45), and $150,871,927 and took the average of the three which came to $83,457,309. Claimants' 31.1112% *pro rata* share of $83,457,309 is $25,964,570.32.
> From this figure we then subtracted the cash payments received and calculate PJI accordingly.
> Here is our calculation:
> (1) From July 26, 2011 – February 28, 2016, interest of 9% is calculated on the full amount of $25,964,570.32, for a total of $10,710,385.26.
> (2) From the principal amount of $25,964,570.32 we subtracted the first payment of $7,200,000 made in March 2016, for a total of $18,764,570.32. From March 2016 – June 2016, we calculated three months of interest on $18,764,570.32 which comes to $422,202.83.
> (3) From the remaining principal amount of $18,764,570.32, we subtracted the June, 2016 payment of $1,300,000 to obtain a new balance of $17,464,570.32.
> (4) We then calculated the remaining PJI as follows: For the period from June 2016 through and including April 21, 2018, 22 months and 20 days, PJI totals $2,967,780.75.
> (5) This brings the total interest to $14,119,575.51, which when added to the principal amount of $17,464,570.32, comes to a total of $31,584,145.83.

5

## RESPONDENTS' CONTENTIONS

The respondents contend that the arbitration panel did not exceed its authority in interpreting the respondents' "Rule 50 motion and issuing the Amended Final Award" because "the parties expressly agreed that the Commercial Rules governed and were incorporated in their Arbitration Agreement," and those rules "grant the Panel the 'power to rule on [its] own jurisdiction' and the power to 'interpret and apply the[] rules insofar as they relate to the arbitrator's powers and duties.'" According to the respondents, the arbitration panel "relied on its Rule 8 authority in concluding that it inadvertently 'made a computational error when calculating interest.'" The arbitration panel's interpretation of Rule 50 was correct because "[i]n New York state court, PJI computations are ministerial and usually performed by the clerk using a formula published on the court's website." Moreover, no manifest disregard of the law occurred because the arbitration panel rejected the petitioners' arguments and authorities "regarding whether prepayments should be applied first to accrued interest or the principal damages amount." The respondents assert that no basis exists to modify the amended final award because "there was no oversight" as "Petitioners argued that pre-payments should apply to interest before principal when responding to the Rule 50 Motion, and the Panel specifically rejected this method when recalculating the Initial Award." The respondents request that the amended final award be confirmed.

## PETITIONERS' REPLY

The petitioners assert that the arbitration panel manifestly disregarded the limits of its jurisdiction in modifying the award because it "acknowledged that an erroneous application of the pre-payments 'would constitute a mistake of law, as demonstrated by the very case law [Petitioners] have invoked, and we have no jurisdiction to correct a mistake of law,'" yet, it

6

"proceeded to change the application of the pre-payments from interest to principal in its

Amended Award." Since the arbitration panel "acknowledged that it lacked the jurisdiction to

modify the application of the pre-payments based on this principle, but did so anyway, there can

also be no dispute that the Panel 'knew about the existence of a clearly governing legal principle

but decided to ignore it or pay no attention to it.'"

The petitioners contend that the respondents "misleadingly state that '[t]he parties

expressly agreed that the [AAA] Commercial Rules governed and were incorporated in their

Arbitration Agreement,'" whereas the parties "did not incorporate the rules in full and expressly

agreed that, in the event a conflict between the AAA Commercial Rules and the terms of the

Arbitration Agreement, the terms of the Agreement would control." As two provisions of the

parties' agreement conflict with the AAA Commercial Rules, the FAA supersedes any

conflicting rule that would deprive the court of its power to vacate an award on the grounds that

the arbitrators exceeded their power. Alternatively, the amended final award should be modified

by correcting the error "in applying the pre-payments to principal as opposed to interest." "It is

undisputed that applying the pre-payments to interest instead of principal would increase the

Amended Award by $1,647.378."

### RESPONDENTS' REPLY

The respondents assert that the arbitration panel had authority "to correct the

computational error in the Initial Award that resulted in erroneously awarding compound interest

to Petitioners," and "[t]hat correction is not subject to second-guessing." Moreover, the

arbitration panel did not change the application of payments, because it stated: "At page 174 of

the [Initial] Award we awarded damages of $25,964,570.3176. We then stated: 'From this

figure' we intend to 'then subtract [] the cash payments received and calculate PJI accordingly.'"

7

The respondents assert that "this figure" was a reference to the principal amount and the

arbitration panel's "holding with respect to this issue never changed." The respondents contend

that during the arbitration hearing, the petitioners never asked the arbitration panel to apply the

payments to interest and "sought to change how the payments were applied for the first time after

the hearing had concluded and after Respondents had requested the Panel to correct its

computational error." Moreover, the arbitration panel rejected the petitioners' legal argument

and the petitioners now ask that the Court "reverse a substantive determination that the Panel

made three times: in the Initial Award, in its May 21 Order, and in the Final Award." According

to the respondents, the arbitration panel: (i) "corrected its computational interest error to render

the Amended Final Award *consistent* with the Panel's holding in the Initial Award, the position

of both parties in the Arbitration, and its power under the Commercial Rules"; and (ii) "declined

Petitioners' invitation to adopt a new legal approach to the application of payments that was

*inconsistent* with the Panel's holding in the Initial Award, the position of both parties in the

Arbitration, and Petitioners' own interpretation of the Commercial Rules." The respondents

assert that "[t]he Panel's application of payments was an issue of substance that the Panel

resolved" and it "concluded that it was without power to change its decision to apply payments

to principal in the Initial Award, and that changing it was unwarranted."

## LEGAL STANDARD

Under the Convention on the Recognition and Enforcement of Foreign Arbitral Awards

(the "Convention"), also known as the New York Convention,

> any party to the arbitration may apply to any court having jurisdiction under this
> chapter for an order confirming the award as against any other party to the
> arbitration. The court shall confirm the award unless it finds one of the grounds for

8

refusal or deferral of recognition or enforcement of the award specified in the said
Convention.

9 U.S.C. § 207.

The Convention applies to the arbitral award in this case because the parties' agreement to
arbitrate is not entirely between citizens of the United States and the arbitration proceeding
occurred in the United States. See Zeiler v. Deitsch, 500 F.3d 157, 164 (2d Cir. 2007). "[T]he
court may apply FAA standards to a motion to vacate a nondomestic award rendered in the
United States." Yusuf Ahmed Alghanim & Sons v. Toys "R" Us, Inc., 126 F.3d 15, 21 (2d Cir.
1997). "[T]he FAA and the New York Convention work in tandem, and they have overlapping
coverage to the extent that they do not conflict." Scandinavian Reinsurance v. Saint Paul, 668
F.3d 60, 71 (2d Cir. 2012) (citation omitted).

The FAA provides:

If the parties in their agreement have agreed that a judgment of the court shall be
entered upon the award made pursuant to the arbitration, and shall specify the court,
then at any time within one year after the award is made any party to the arbitration
may apply to the court so specified for an order confirming the award, and
thereupon the court must grant such an order unless the award is vacated, modified,
or corrected as prescribed in section 10 and 11 of this title.

9 U.S.C. § 9.

"[T]he United States court in and for the district wherein the award was made may make an
order vacating the award upon the application of any party to the arbitration . . . . where the
arbitrators exceeded their powers." 9 U.S.C. § 10(a)(4). The court may also "make an order
modifying or correcting the award upon the application of any party to the arbitration . . .
[w]here there was an evident material miscalculation of figures." 9 U.S.C. § 11(a).

Additionally, in this circuit, "the court may set aside an arbitration award if it was
rendered in 'manifest disregard of the law.'" Schwartz v. Merrill Lynch & Co., Inc., 665 F.3d

9

444, 451 (2d Cir. 2011) (citation omitted). To satisfy the manifest disregard of the law standard,

the movant must show that: (1) "the governing law alleged to have been ignored by the

arbitrators was well defined, explicit, and clearly applicable"; and (2) "the arbitrator knew about

'the existence of a clearly governing legal principle but decided to ignore it or pay no attention to

it.'" Id. at 452 (citation omitted).

> "[M]ere error in the law or failure on the part of the arbitrator [] to understand or
> apply the law" is not sufficient to establish manifest disregard of the law. For an
> award to be in "manifest disregard of the law," [t]he error must have been obvious
> and capable of being readily and instantly perceived by the average person qualified
> to serve as an arbitrator. Moreover, the term "disregard" implies that the arbitrator
> appreciates the existence of a clearly governing legal principle but decides to ignore
> or pay no attention to it.
>
> Yusuf Ahmed Alghanim & Sons, 126 F.3d at 23-24 (citations omitted).

"[T]he Second Circuit does not recognize manifest disregard of the evidence as proper ground

for vacating an arbitrator's award." Wallace v. Buttar, 378 F.3d 182, 193 (2d Cir. 2004) (citation

omitted). "A federal court may not conduct a reassessment of the evidentiary record," and "'[i]f

a ground for the arbitrator's decision can be inferred from the facts of the case, the award should

be confirmed.' Only this approach to the evidentiary record is consistent with the 'great

deference' which must be paid to arbitral panels by federal courts." Id. (citations omitted).

"[T]he manifest disregard of law doctrine [is used] to vacate arbitral awards only in the most

egregious instances of misapplication of legal principles." Id. at 190.

> Normally, confirmation of an arbitration award is "a summary proceeding that
> merely makes what is already a final arbitration award a judgment of the court,"
> and the court "must grant" the award "unless the award is vacated, modified, or
> corrected." 9 U.S.C. § 9. The arbitrator's rationale for an award need not be
> explained, and the award should be confirmed "'if a ground for the arbitrator's
> decision can be inferred from the facts of the case[.]'" Only "a barely colorable
> justification for the outcome reached" by the arbitrators is necessary to confirm the

10

award. A party moving to vacate an arbitration award has the burden of proof, and the showing required to avoid confirmation is very high.

D.H. Blair & Co. v. Gottdiener, 462 F.3d 95, 110 (2d Cir. 2006) (internal citations omitted).

## APPLICATION OF LEGAL STANDARD

The arbitration panel concluded, in its May 21, 2018 Order Modifying Award, that "it made a computational error when calculating interest" by "compounding interest on the remaining balance after partial payment." "[R]ather than simply subtracting the payments from the principal figure and then calculating PJI, we subtracted the payments from the sum of both principal and PJI that had already been calculated and then calculated interest on both principal and PJI. That was a computational error." Below is a comparison of the "calculation" the arbitration panel performed in the Final Award and the Amended Final Award.

*Calculation of 9% Interest on the Principal Amount "From July 26, 2011–February 28, 2016"*

| Final Award | From July 26, 2011–February 28, 2016 Interest of 9% on $25,964,570.3176 | $10,729,591.9244 (or $194,734.277382 per month for 55 months and 3 days) |
|---|---|---|
| Amended Final Award | From July 26, 2011–February 28, 2016 Interest of 9% on $25,964,570.32 | $10,710,385.26 |

If the arbitration panel was only correcting "a computational error," its "calculation" should have been the same in the final award and the amended final award; however, it is not. In its final award, the arbitration panel calculated correctly that 9% annual interest on the principal amount of $25,964,570.3176 is $10,729,591.9244, based on "$194,734.277382 per month for 55 months and 3 days." The arbitration panel did not explain in the final award why it decided: (a) to calculate 9% annual interest based on the time period "[f]rom July 26, 2011 – February 28, 2016," which it stated contains "55 months and 3 days," excluding February 29, 2016, which would have added one day to the calculation of interest; and (b) not to calculate 9% annual

11

interest for the period "[f]rom July 26, 2011" until the date when the first distribution payment of $7,172,382 was made, March 18, 2016, rather than "February 28, 2016." Notwithstanding this failure, the amount of interest calculated for the same time period, "[f]rom July 26, 2011 – February 28, 2016," on the same principal amount, is not the same in the final award and the amended final award—the final award indicates $10,729,591.9244, whereas the amended final award indicates $10,710.385.26. If, as the arbitration panel contends, "it made a computational error when calculating interest" by "compounding interest on the remaining balance after partial payment," the calculation of 9% annual interest for the same time period on the principal amount, $25,964,570.3176 in the final award that was rounded up by the arbitration panel to $25,964,570.32 in the amended final award, did not involve "compounding interest on the remaining balance after partial payment"; thus, 9% annual interest on the principal amount of $25,964,570.3176, rounded up to $25,964,570.32, should have been the same in the final award and the amended final award. It is not.

It appears that the arbitration panel, in its amended final award, reached the amount of "$10,710,385.26" by: (i) calculating 9% annual interest on the principal amount of $25,964,570.32, which is $2,336,811.32; (ii) dividing $2,336,811.32 by 12 months, resulting in a monthly interest of $194,734.27; and (iii) multiplying monthly interest of $194,734.27 by 55 months, resulting in $10,710,384.85, which is an amount proximate to $10,710,385.26, the amount stated in the amended final award by the arbitration panel. No explanation was provided by the arbitration panel for the discrepancy between the amount of 9% annual interest calculated on the same principal amount for the same period of time in the final award and that calculated in the amended final award. Since that calculation did not involve correcting any evident material miscalculation of figures, and the arbitration panel reduced, inexplicably, the amount of interest

12

based on the principal amount for the same period of time and before applying any distribution

payment, the Court concludes that the arbitration panel's calculation in the amended final award,

on its face, did not involve correcting "a computational error." The Court finds that the

arbitration panel's calculation in the amended final award exceeded the arbitration panel's

powers, pursuant to 9 U.S.C. §10(a)(4).

*Application of Distribution Payments*

|  | Amount from which $7,200,000 March 2016 distribution payment was subtracted | Amount from which $1,300,000 June 2016 distribution payment was subtracted |
|---|---|---|
| Final Award | $36,694,162.242 (sum of $25,964,570.3176, the principal amount, plus $10,729,591.9244, which is 9% annual interest on the principal amount from July 26, 2011– February 28, 2016) | $30,157,780.89 (sum of $29,494,162.24, the remaining balance obtained after subtracting $7,200,000 from $36,694,162.242, plus $663,618.65, which is 9% interest on the remaining balance from March 2016-June 2016) |
| Amended Final Award | $25,964,570.32 (the initial principal amount) | $18,764,570.32 (the principal amount remaining after subtracting the March 2016 distribution payment of $7,200,000 from the initial principal amount) |

It is apparent from the above comparison of the arbitration panel's subtraction of the

March 2016 distribution payment of $7,200,000 that, in the final award, the subtraction was

made from $36,694,162.242, which is the amount representing the sum of the initial principal of

$25,964,570.3176 and $10,729,591.9244, the 9% interest on the initial principal for the period

July 26, 2011– February 28, 2016, whereas in the amended final award, the subtraction was

made from $25,964,570.32, the initial principal amount. It is also apparent from the above

comparison of the arbitration panel's subtraction of the June 2016 distribution payment of

$1,300,000 that, in the final award, the subtraction was made from the amount representing the

sum of the remaining balance of $30,157,780.892 (obtained by adding $663,618.65, which is 9%

interest for the period March 2016-June 2016 to $29,494,162.242, the remaining balance after

13

the first subtraction), whereas in the amended final award, the subtraction was made from

$18,764,570.32, the principal amount remaining after subtracting the March 2016 distribution

payment of $7,200,000 from the initial principal amount of $25,964,570.32.  Whether

distribution payments should be deducted from: (i) the sum of the principal amount and interest

on the principal amount; (ii) the principal amount only; (iii) the interest amount only; or (iv)

some other amount, is not a computational issue; rather, it is a substantive issue of law that must

be determined before proceeding to calculate.  The arbitration panel in its final award determined

to subtract the March 2016 and the June 2016 distribution payments from the sum of the

principal amount and the interest amount, for the periods of "July 26, 2011– February 28, 2016,"

and "March 2016 – June 2016."  In its amended final award, the arbitration panel changed course

and determined to subtract the March 2016 and the June 2016 distribution payments from the

principal amounts only.  Changing course in the amended final award respecting the application

of the March 2016 and the June 2016 distribution payments did not constitute correcting "a

computational error."

The arbitration panel explained in its Order Modifying Award: "In its Award, at page

147, the Panel explicitly stated that it relied on the agreement by the experts for each side –

Finkel and Gompers – as the source for applying 9% PJI."  Page 147 of the final award contains

the following relevant text:

> Before turning to an examination of each expert's opinion, we note that both experts
> began by fixing the value of *all* of the assets purchased at the sale.  Both then
> calculated the Claimant's agreed upon 31.1112% of that total, applied pre-judgment
> interest (PJI) at the agreed rate of 9% per annum, and then subtracted the amounts
> already received by the Claimants through various distributions by Respondents.

It is apparent from the relevant text on page 147 of the final award referenced by the arbitration

panel that the arbitration panel noted how the parties' respective experts performed their

14

calculations, "[b]efore turning to an examination of each expert's opinion." Nowhere on page

147 of the final award did the arbitration panel "explicitly state[] it relied on the agreement by

the experts for each side . . . as the source for applying 9% PJI." Moreover, the arbitration

panel's noting of the method used by both experts to perform their calculations on page 147,

namely, (i) calculate the principal amount, (ii) apply the pre-judgment interest at the agreed rate

of 9% per annum, (iii) "and then subtract[] the amounts already received by the Claimants

through various distributions by Respondents," contradicts what the arbitration panel stated in its

Order Modifying Award, namely: "In their damages calculations, both experts explicitly adopted

a simple 9% interest rate to the outstanding amounts *after* subtracting the payments made by

Black Diamond." The arbitration panel's notation on page 147 of the final award is consistent

with the arbitration panel's calculation performed in the final award.

The arbitration panel explained in its Order Modifying Award that, from the principal

award of "$25,964,570.3176," it "intend[ed] to "then subtract[] the cash payments received and

calculate PJI accordingly." However, the arbitration panel exceeded its powers when it modified

the calculation made in the final award that did not contain any evident material miscalculation

of figures to conform it to the calculation it "intend[ed]" to perform that contained substantive

changes in the calculation method. Such a modification does not constitute "a computational

error"; rather, it involves a substantive issue of law concerning the method of calculation,

including the application of distribution payments. The Court finds that the arbitration panel's

calculation in the amended final award exceeded the arbitration panel's powers, pursuant to 9

U.S.C. § 10(a)(4).

15

### *Determination of the Merits of the Claimants' Argument*

In the Order Modifying Award, the arbitration panel stated that "Claimants also argue

that . . . any payments made should be subtracted first from PJI, rather than from the principal,"

noting that "this legal argument was never raised before by Claimants and it is too late to do so

now." The arbitration panel stated that, "if this position were meritorious – which we do not

believe it is – it would constitute a mistake of law, as demonstrated by the very case law

Claimants have invoked, and we have no jurisdiction to correct a mistake of law." However, the

arbitration panel proceeded to do exactly what it acknowledged the law prohibited it from doing:

determining the merits of the claimants' argument:

> [A]s a substantive matter, we disagree that this would be an appropriate way to
> calculate PJI. *See, e.g., Barry v. Atkinson,* 1999 WL 997151, at *2 (S.D.N.Y. Nov.
> 3, 1999) ("Under New York law, a plaintiff is entitled to prejudgment interest at a
> simple rate of nine (9) percent per annum from the time of breach until the entry of
> judgment. At the time of breach, plaintiffs' actual damages totaled $487,500.
> Absent a set-off, plaintiffs would be entitled to interest on this amount,
> commencing on January 6, 1994, and continuing until the entry of judgment on
> August 17, 1999. Defendant did, however, make a partial payment to plaintiffs on
> August 24, 1994, in the amount of $232,500. Accordingly, the basis of defendant's
> interest obligation was $487,500 from January 6, 1994, and $255,000 from August
> 25, 1994, to August 17, 1992.") (citations omitted).   In short, we reject this
> argument.                                                                       .

Moreover, the arbitration panel not only exceeded its powers when it changed course in

the amended final award by subtracting distribution payments from the principal amount only,

and not from the sum of the principal amount and interest amount, as it had done in the final

award, it also exhibited manifest disregard of the law prohibiting the arbitration panel from

acting as it did. The arbitration panel acknowledged, in the Order Modifying Award, that the

issue whether "any payments made should be subtracted first from PJI, rather than from the

principal" was a "legal argument," "as demonstrated by the very case law Claimants invoked,"

16

and concluded that it had "no jurisdiction to correct a mistake of law." Rather than leaving the

matter at that point, the arbitration panel proceeded to do what it said it had no jurisdiction to do

– determine that the distribution payments should be subtracted from the principal and reject the

claimants' argument. The arbitration panel acknowledged the well-defined, explicit and clearly

applicable law prohibiting the arbitration panel from exercising jurisdiction over an issue of law

already determined in the final award and raised for the first time after the final award issued, but

decided to ignore it and proceeded to: (a) discuss the merits of the substantive argument raised

by the claimants; (b) reject the claimants' legal argument; and (c) reverse its determination made

in the final award by subtracting the distribution payments from the principal. The Court finds

that the arbitration panel acted in manifest disregard of the law.

*Calculation of Interest*

|  | 9% per year interest from July 26, 2011–February 28, 2016 | 9% per year interest from March 2016–June 2016 | 9% per year interest from June 2016 through and Including April 20, 2018 |
|---|---|---|---|
| Final Award | $10,729,591.9244 | $663,618.65 | $4,903,846.19 |
| Amended Final Award | $10,710,385.26 | $422,202.83 | $2,967,780.75 |

Notwithstanding that the arbitration panel in both the final award and the amended final

award calculated interest twice for the month of June 2016, without explanation, the differences

in the amount of interest for each of the three time periods between the final award and the

amended final award are not due to any evident material miscalculation of figures; rather, they

are based solely on the fact that in its final award the arbitration panel applied 9% per year

compounded interest, after applying 9% per year simple interest on the initial principal amount

of $25,964,570.3176, whereas in the amended final award, it applied 9% per year simple interest

on the principal amount only, apart from double-counting the interest for June 2016. Whether

interest should be simple or compound is an issue of law that the arbitration panel determined

17

when it calculated interest in the final award. The arbitration panel not only exceeded its powers when it changed course in the amended final award, it also exhibited manifest disregard of the law prohibiting the arbitrators from acting as they did because the arbitration panel acknowledged the well-defined, explicit and clearly applicable law prohibiting it from exercising jurisdiction over an issue of law already determined in the final award and raised for the first time after the final award issued, but decided to ignore it and proceeded to: (a) discuss the merits of the substantive argument raised by the claimants; (b) reject the claimants' legal argument; and (c) reverse its determination made in the final award by changing the type of interest it applied in its calculation. The Court finds that the arbitration panel acted in manifest disregard of the law.

## CONCLUSION

For the foregoing reasons: (1) the petition to vacate the amended final award and to confirm the final award, Docket Entry No. 2, is granted; and (2) the cross-petition to confirm the amended final award, Docket Entry No. 17, is denied.

Dated:   New York, New York          SO ORDERED:
         March 22, 2019

                                     Kevin Nathaniel Fox
                                     KEVIN NATHANIEL FOX
                                     UNITED STATES MAGISTRATE JUDGE

18

## EXHIBIT H

**Final Arbitration Award, *Crédit Agricole Corp. and Inv. Bank v. Black Diamond Capital Management, LLC*, Case No. 18-07620 (S.D.N.Y. Sept. 4, 2018) [Docket No. 11-1]**

# AMERICAN ARBITRATION ASSOCIATION

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -  x

|  |  |  |
|---|---|---|
| CREDIT AGRICOLE CORPORATE AND INVESTMENT BANK NEW YORK BRANCH, f/k/a CALYON NEW YORK BRANCH; ARCHIMEDES FUNDING IV (CAYMAN), LTD.; COPPER RIVER CLO LTD.; ENDURANCE CLO I, LTD.; GREEN LANE CLO LTD.; KENNECOTT FUNDING LTD.; LANDMARK III CDO LTD.; LANDMARK IV CDO LTD.; LANDMARK V CDO LTD.; LANDMARK VI CDO LTD.; LANDMARK VII CDO LTD.; LANDMARK VIII CLO LTD.; LATITUDE CLO I, LTD.; THL CREDIT LOAN OPPORTUNITY LTD., f/k/a McDONNELL LOAN OPPORTUNITY, LTD.; OCEAN TRAILS CLO I; PERMAL STONE LION FUND LTD.; SANDS POINT FUNDING LTD.; STONE LION PORTFOLIO L.P.; UBS AG, STAMFORD BRANCH; UBS LOAN FINANCE LLC; and WG HORIZONS CLO I, | : | AAA Case No. 01-17-0007-1196 |

Claimants,                     :

-against-                     :

BLACK DIAMOND CAPITAL MANAGEMENT,   :
L.L.C.; BDC FINANCE LLC; BLACK DIAMOND
COMMERCIAL FINANCE, L.L.C.; and BLACK   :
DIAMOND CLO 2006-1 (CAYMAN), LTD.,

                                    :

Respondents.     :

                                    :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -  x

## Final Award

# <u>TABLE OF CONTENTS</u>

**I.  PROCEDURAL AND FACTUAL BACKGROUND** ...................1

    A.   Arbitration Agreement ..............................................3

    B.   Background and Chronology of Key Events ..........................5

        1.   GSC, the Credit Documents, and Pre-Bankruptcy Restructuring Efforts ...........................................5

            a.   GSC and the Credit Documents ...........................5

            b.   GSC's Default and Attempts at Pre-Bankruptcy Restructuring ...........................................8

            c.   Black Diamond Buys a Controlling Stake ..........11

        2.   The Bankruptcy Proceedings, Auction, and Sale ........14

            a.   Filing and Bidding Procedures Order ................14

            b.   The Auction ...........................................16

            c.   The NCLs' Emergency Motion to Disallow Joint Bid and the State Court Litigation ......................21

            d.   Asset Purchase Agreements and NCLs' Motion for Appointment of a Trustee .............................22

            e.   Sale Hearing ...........................................32

            f.   Closing ...............................................35

         3.   Post-Closing ...........................................38

            a.   Tax Filings ...........................................38

            b.   Transfers and Distributions to the Claimants .....39

    C.   State Court Litigation ...........................................40

**II.  THE TRIBUNAL FINDS THAT RESPONDENTS DID NOT BREACH THE CONTRACT** ...........................................42

    A.   Legal Standard ...............................................42

-i-

B.   The Tribunal Finds that BD Lenders Did Not Breach
     Section 14.7 of the Credit Agreement (Count VI)...............43

     1.   Section 14.7(b) of the Credit Agreement...................43
     2.   The Bidding Rules Applicable to the Auction............47
     3.   Capstone's Contentious Relationship with BDCM .....48
     4.   The Auction.................................................................49
     5.   Capstone's Desire to Stimulate Higher Bidding..........51
     6.   Capstone Unilaterally Allowed "Revenue
          Sharing" Bids by Sankaty to Spur Higher Bidding .....52
     7.   Mr. Manzo Conceives the Concept of Joint
          Bidding.......................................................................54
     8.   The Role of the NCLs in Determining Whether
          Joint Bids Would Be Allowed ....................................54

          a.   The NCLs Were Given a Veto Over Joint Bidding54
          b.   The NCLs Were Specifically Warned Joint
               Bidding Could Produce a Disproportionate
               Allocation..........................................................55
          c.   The NCLs' Decision to Allow Joint Bidding .....57
          d.   The NCLs Decision to Allow Joint Bidding Albeit
               with Reservations...............................................60
          e.   The Impact of the NCLs Consent on the Auction62
          f.   The Joint Bidding...............................................64
          g.   Capstone's Initial View of the Allocation ..........68

     9.   Analysis.....................................................................69

C.   The Tribunal Finds That the Agent Did Not Breach
     Section 12.5 of the Credit Agreement and Section 6.1
     of the Security Agreement (Count IV).................................87

     1.   Legal Standard ..........................................................87
     2.   Claims Against the Agent ..........................................89
     3.   Discussion .................................................................94

ii

D.  The Tribunal Finds That Respondents Did Not Breach
Section 14.12 of the Credit Agreement (Count VI
Against BD Lenders and Count IV Against the Agent) .....101

1.  Claim .................................................................101
2.  Trial Court .........................................................107
3.  Findings of Fact..................................................108
4.  Conclusions of Law............................................121

**III. THE TRIBUNAL FINDS THAT BD LENDERS
BREACHED THE IMPLIED COVENANT OF GOOD
FAITH AND FAIR DEALING (COUNT VII) BUT THE
AGENT DID NOT BREACH THIS IMPLIED
COVENANT (COUNT V) ........................................123**

A.  Legal Standard...................................................123
B.  The Implied Covenant Claims ...........................126

1.  Count VII Against BD Lenders ................................126
2.  Count V Against the Agent.......................................127

C.  Discussion .........................................................129

1.  The Claim Against the BD Lenders.........................129
2.  Are the Breach of the Implied Covenant Claims
Duplicative? ..............................................................129
3.  Are the Breach of the Implied Covenant Claims
Barred by the Appellate Division Decision? .............133
4.  Did the BD Lenders Engage in Conduct that
Denied Claimants the Right to Receive the Fruits
of the Contract? .........................................................134
5.  Did the BD Lenders Exercise Their Contractually-
Afforded Discretion Arbitrarily and Capriciously?...137
6.  Did the Agent Breach the Implied Covenant of
Good Faith and Fair Dealing?...................................141

D.  Findings of Fact and Conclusions of Law ...........144

iii

## IV. THE TRIBUNAL AWARDS DAMAGES TO CLAIMANTS ................................................................144

    A.    Legal Standard ..................................................144
    B.    Expert Reports ..................................................146

           1.    James K. Finkel – Claimants' Expert – Qualifications and Opinions ....................147

               a.    Summary of Qualifications ...............147
               b.    Summary of Opinions ......................149

           2.    Dr. Paul Gompers – Respondents' Expert – Qualifications and Opinions ....................152

               a.    Summary of Qualifications ...............152
               b.    Summary of Opinions ......................154

    C.    Analysis and Findings of Facts .........................156
    D.    Calculation of Damages ....................................165

## V. CONCLUSION ........................................................175

NY 76962594v5

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

## Cases

*Abacus Fed. Sav. Bank v. ADT Sec. Servs., Inc.*,
  18 N.Y.3d 675 (2012) ............................................................88, 89, 98

*Berley Indus., Inc. v. City of New York*,
  45 N.Y.2d 683 (1978) .....................................................................145

*In re Chrysler LLC*,
  576 F.3d 108 (2d Cir.), *cert. granted, judgment vacated
  sub nom. Indiana State Police Pension Tr. v. Chrysler
  LLC*, 558 U.S. 1087 (2009), *and vacated sub nom. In re
  Chrysler, LLC*, 592 F.3d 370 (2d Cir. 2010) (Bankr.
  S.D.N.Y. 2009) ............................................................109, 111, 112

*Coniber v. Center Point Transfer Station, Inc.*,
  137 A.D.3d 1604 (4th Dep't 2016)...................................................145

*Credit Agricole Corporate and Investment Bank v. BDC
  Finance*,
  No. 651989/2010 (Sup. Ct. N.Y. Co.) ...........................................1, 35

*Credit Agricole Corporate and Investment Bank v. BDC
  Finance*...............................................................................................3

*Credit Agricole v. BDC Finance*,
  2017 N.Y. Misc. LEXIS 226 (Sup. Ct. N.Y. Co. Jan. 20,
  2017) ................................................................................................41

*Credit Agricole v. BDC Finance*,
  2017 N.Y. Misc. LEXIS 653 (Sup. Ct. N.Y. Co. Feb. 23,
  2017) ................................................................................................42

*Credit Agricole v. BDC Finance, LLC*,
  135 A.D.3d 561 (1st Dep't 2016).......................................................41

-v-

*Cross & Cross Props., Ltd. v. Everett Allied Co.*,
  886 F.2d 497 (2d Cir. 1989) ............................................................. 124

*Dalton v. Educational Testing Serv.*,
  87 N.Y.2d 384 (1995) ............................................................. 123, 124

*Demetre v. HMS Holdings Corp.*,
  127 A.D.3d 493 (1st Dep't 2015) ..................................................... 123

*Diamond Servs. Mgmt. LLC v. Fable Jewelry Co.*,
  2012 WL 5871616 (S.D.N.Y. Nov. 20, 2012) ................................. 125

*Ellington v. EMI Music, Inc.*,
  24 N.Y.3d 239 (2014) ....................................................................... 70

*In re GWLS Holdings, Inc.*,
  2009 WL 453110 (Bankr. D. Del. Feb. 23, 2009)......................*passim*

*Hirsch v. Food Resources, Inc.*,
  24 A.D.3d 293 (1st Dep't 2005) ...................................................... 124

*Kalisch-Jarcho, Inc. v. City of New York*,
  58 N.Y.2d 377 (1983) ........................................................................ 88

*Logan Advisors, LLC v. Patriarch Partners, LLC*,
  63 A.D.3d 440 (1st Dep't 2009) ...................................................... 124

*M/A-Com Secs. Corp. v. Galesi*,
  904 F.2d 134 (2d Cir. 1990) ............................................................ 125

*MeehanCombs Glob. Credit Opportunities. M.F., LP v.
  Caesars Entm't Corp.*,
  162 F. Supp. 3d 200, 208 (S.D.N.Y. 2015) ....................................... 42

*In re Metaldyne Corp.*,
  409 B.R. 671 (Bankr. S.D.N.Y.), *aff'd*, 421 B.R. 620
  (S.D.N.Y. 2009) ..........................................................................*passim*

NY 76962594v5

*Metropolitan Life Ins. Co. v. Noble Lowndes Int'l, Inc.*,
   84 N.Y.2d 430 (1994) ............................................................. 87, 89, 91

*Mill Finance, LLC v. Gillett*,
   122 A.D.3d 98 (1st Dep't 2014) ..................................................... 127

*Nomura Home Equity Loan, Inc., Series 2006-FM2, by*
   *HSBC Bank USA, Nat'l Ass'n v. Nomura Credit &*
   *Capital, Inc.*,
   30 N.Y.3d 572 (2017) ................................................................... 87

*Process America, Inc. v. Cynergy Holdings*,
   839 F.3d 125 (2d Cir. 2016) .......................................................... 145

*Prudential Ins Co. of America v. WestLB AG*,
   37 Misc. 3d 1208(A) (Sup. Ct. N.Y. Co. 2012) ...........................*passim*

*Rexnord Holdings v. Bidermann*,
   21 F.3d 522 (2d Cir. 1994) ............................................................ 42

*Rowe v. Great Atl. & Pac. Tea Co.*,
   46 N.Y.2d 62 (1978) ............................................................. 123, 124

*Sardis v. Frankel*,
   113 A.D.3d 135 (1st Dep't 2014) ..................................................... 43

*Sharma v. Skaarup Ship Mgmt. Corp.*,
   916 F.2d 820 (2d Cir. 1990) .......................................................... 145

*Spectra Audio Research, Inc. v. Chon*,
   62 A.D.3d 561 (1st Dep't 2009) ..................................................... 146

*Van Valkenburgh, Nooger & Neville, Inc. v. Hayden*
   *Publishing Co.*,
   30 N.Y.2d 34 (1972) ...................................................... 125, 126, 140

**Statutes**

CPLR 5004 ................................................................................... 5

NY 76962594v5

11 U.S.C. § 363 ...................................................................*passim*

11 U.S.C. § 1104(b).......................................................................25

11 U.S.C. § 1104(a)(2) ..................................................................28

Federal Arbitration Act ................................................................4

Investment Advisors Act of 1940 .............................................10

NY 76962594v5

The undersigned arbitrators, having been designated in accordance with an agreement to arbitrate entered into by Claimants and Respondents on October 10, 2017 (the "Arbitration Agreement"), and having examined the submissions, proof and allegations of the parties, finds, concludes and issues this Final Award for the reasons fully set forth below.

## I.   PROCEDURAL AND FACTUAL BACKGROUND

Claimants, a portion of the Secured Lenders under certain Credit Documents, assert claims for breach of contract and breach of the implied covenant of good faith and fair dealing against Respondents based principally on what they perceive to be an unfair allocation of proceeds of the Collateral securing the Loan following a sale of the assets under section 363 of the Bankruptcy Code.  *See generally* JX 16 (9/28/11 Amended Complaint in *Credit Agricole Corporate and Investment Bank v. BDC Finance*, No. 651989/2010 (Sup. Ct. N.Y. Co.)).[1]   Respondents Black Diamond Capital Management, L.L.C.

---

[1] The claims of plaintiffs in the State Court Litigation against GSC Acquisition Holdings LLC are not covered by the Arbitration Agreement.  *See id*.

("BDCM"), BDC Finance LLC ("BDC Finance"), and Black Diamond CLO 2006-1 (Cayman), Ltd. ("BD CLO"; together with BDCM and BDC Finance, "BD Lenders") are lenders under the Credit Documents. *Id.* ¶ 53. Respondent Black Diamond Commercial Finance, L.L.C. ("BDCF" or "Agent"), an affiliate of BDCM, is the Administrative and Collateral Agent under the Credit Documents.[2] *See id.* ¶ 1. BD Lenders together with Agent, are hereafter designated as "Respondents."

Claimants allege that BD Lenders breached provisions of the Credit Documents requiring (1) *pro rata* sharing of proceeds of any disposition of the Collateral and (2) unanimous consent for the release of substantially all Collateral by structuring the transaction, and directing the Agent to acquire the Collateral, on terms that disproportionately favor BD Lenders without Claimants' consent. Claimants further allege that the Agent breached other provisions of the Credit Documents requiring the Agent to act for the benefit of all Lenders. Respondents

---

[2] Credit Documents refers to the Second Amended and Restated Pledge and Security Agreement ("JX 1" or "Security Agreement") and Fourth Amended and Restated Credit Agreement ("JX 2" or "Credit Agreement").

NY 76962594v5

deny they breached the Credit Documents or the implied covenant of good faith and fair dealing.

The Hearing in this matter took place from January 24 through February 7, 2018. Following the Hearing, the parties submitted Proposed Findings of Fact and Conclusions of Law. Closing Arguments were held on March 5, 2018. By agreement of the parties, the Final Award is due on April 20, 2018. The Hearing was closed on March 21, 2018.

The parties' written submissions, along with the testimonial and documentary evidence, have been thoroughly considered. Our findings of fact and conclusions of law are set forth below. To the extent that the recitation of facts set forth below differs from any party's position, it is the result of determinations as to credibility, relevance, burden of proof, and weight of the evidence.

## A.   Arbitration Agreement

On October 10, 2017, the parties agreed to binding arbitration of the claims pending in the litigation captioned *Credit Agricole Corporate and Investment Bank v. BDC Finance* (the "State Court

NY 76962594v5

Litigation"), an action that has been pending since 2010. *See* Arbitration Agreement ¶ 1. The existing pleadings in the State Court Litigation are the operative pleadings in this Arbitration and a separate arbitration demand has not been filed. *See id*. ¶ 10.

This Arbitration is subject to the Federal Arbitration Act and is governed by the Commercial Arbitration Rules, including the procedures for Large, Complex, Commercial Disputes, of the American Arbitration Association. *See id*. ¶ 2. "The applicable law governing the substance of the State Court Litigation . . . [i]s not altered by the agreement to arbitrate." *Id.* "All final, non-appealable decisions by the State Court and the [Appellate Division] First Department shall be the law of the Arbitration[,]" and the trials court's opinions on summary judgment dated January 23, 2017 and February 24, 2017 "shall govern the Arbitration." *Id.* ¶ 3. New York law otherwise applies. *See id*.

The parties have requested a reasoned award to be made by a majority of the Arbitrators pursuant to R-44, R-46(a), and R-47 of the AAA Commercial Rules. *See id*. ¶ 6. Under the Arbitration Agreement the award was to be made no later than March 31, 2018 (*see id*. ¶ 5), but

-4-

the parties later agreed that the award was due no later than April 20, 2018.    The CPLR provisions "relating to pre-judgment interest (including, without limitation, CPLR 5004) shall apply to any award in the Arbitration." *Id.* ¶ 2.  Finally, each party is to bear its own attorney's fees and disbursements, the cost of its Party-Appointed Arbitrator, and one-half the cost of the Chair.  *See id.* ¶ 9.

## B.    Background and Chronology of Key Events

### 1.    GSC, the Credit Documents, and Pre-Bankruptcy Restructuring Efforts

#### a.    GSC and the Credit Documents

"GSC," a nonparty to this Arbitration, is a group of entities that provided investment and advisory services prior to its August 31, 2010 filing of a petition for relief under Chapter 11 of the Bankruptcy Code.  GSC received financing from certain lenders, including a number of the Claimants, under a syndicated secured credit facility (the "Loan").  The Loan is governed by the Security Agreement and the Credit Agreement.

GSC's main assets were management contract rights and/or equity investments in four types of Funds:    Private Equity Funds,

-5-

Mezzanine Debt Funds, Collateralized Loan Obligation ("CLO") Funds, and ABS Collateralized Debt Obligation ("CDO") Funds. *See* Declaration of Mark Koneval ("Koneval WD") ¶ 9; Declaration of Stephen Deckoff ("Deckoff WD") ¶ 5; DX 94 (Notice of Filing of Disclosure Statement for the Joint Chapter 11 Plan of GSC Group, Inc. and its Affiliated Debtors Proposed by the Non-Controlling Lender Group), Ex. A ("Disclosure Statement"), at 23.[3]

The Funds were governed by certain contracts, including management agreements, under which GSC provided management services to the Funds. In return for those services, GSC received managements fees based on Fund capital and incentive fees based on Fund performance. *See* Koneval WD ¶ 10.

---

[3] "Koneval WD" refers to the 1/17/18 Direct Testimony of Mark Koneval, Managing Director in the Loans Syndication Group at Credit Agricole Corporate and Investment Bank, a subsidiary of Credit Agricole, S.A.; "Deckoff WD" refers to the 1/17/18 Direct Testimony of Stephen H. Deckoff, founding principal of BDCM and affiliated entities ("Black Diamond") by Affidavit. Hereafter "DX 94" will be used to refer to the Disclosure Statement.

-6-

The Credit Agreement provided for a "Revolving Commitment" of $56,500,000 and "Term Loans" of $192,600,000.[4] The Credit Agreement was secured by liens in substantially all of GSC's assets—including the management agreements and GSC's equity and partnership interests in the Funds—pursuant to the Security Agreement. *See* JX 1 § 1.1(ii), (v), (vi). The Credit Documents are governed by New York law. *See* JX 2 § 14.9; JX 1 § 9.9.

The Credit Documents vested the authority to take action, with limited exceptions, in the "Required Banks," lenders holding a majority of the interests in the Loans, and the Administrative and Collateral Agent appointed by the Required Banks. *See* JX 2 §§ 4.2(h), 12.5; JX 1 §§ 6.1(1), 9.10(b). Upon an event of default ("EOD"), the Required Banks were authorized to enforce the security interests created by the Security Agreement. Section 12.1 of the Credit Agreement

---

[4] The Lenders under the Credit Agreement included, among others, UBS AG ("UBS"), as Issuing Bank, and Calyon New York Bank ("Credit Agricole"), certain CDO funds managed by Apidos Capital Management, LLC ("Apidos"), certain funds managed by Guggenheim ("Guggenheim"), and the Bank of Scotland ("Bank of Scotland" or "HBOS"). Claimants, who are signatories, include Credit Agricole, Green Lane, Kennecott, Sands Point, and UBS. *See* Schedule A to JX 2.

empowered the Agent to "exercise such powers and perform such duties as are expressly delegated to the . . . Agent by the terms of this agreement and the other Credit Documents, together with such other powers as are reasonably incidental thereto."  Section 10.13 states that the "Agent may, and upon the written request of the Required Banks, shall, by written notice to the Borrower, take any or all of the following actions, … (iii) enforce, as Collateral Agent, all of the Liens and security interests created pursuant to the Security [Agreement]."

Section 6.1 of the Security Agreement provides "this Agreement may be enforced only by the action of the [ ] Agent, in each case acting upon the instructions of the Required Banks."  This section further provides that the Agent is "entitled to exercise all of the rights, powers and remedies . . . for the protection and enforcement of its rights in respect of the Collateral" upon an EOD.

### b.   GSC's Default and Attempts at Pre-Bankruptcy Restructuring

GSC defaulted on the Loans in April 2009 following the economic downturn in 2008-2009, and UBS, then the Agent, declared an

NY 76962594v5

EOD. *See* Koneval WD ¶¶ 18-21; DX 94 at 12-13. Following the default, the estimated market value of GSC's loans dropped from 50¢ to 25¢ on the dollar, and as late as November 2010 traded between 20¢ and 24¢ on the dollar. *See* Ex. 2 to 12/15/17 Report of Dr. Paul Gompers, Respondents' expert on damages ("Gompers Rept."); DX 137 (11/7/14 Deposition of Matthew Bloom, Managing Director at Guggenheim Partners), at 209-210.

Following the EOD, the Lenders formed a Steering Committee and sought to restructure the Loan.[5] These negotiations lasted roughly fifteen months without success. *See* DX 137 at 169-171; Arbitration Hearing Transcript ("Hr. Tr.") at 167-168 (testimony of Heidimarie Skor, Director and Senior Credit Analyst at Five Arrows Managers North America LLC, a subsidiary of Rothschild North America Holdings, Inc.).[6] The Steering Committee's principal proposal

---

[5] The Steering Committee included Credit Agricole, Guggenheim, Apidos, and Bank of Scotland. It did not include Black Diamond. An affiliate of Guggenheim became the Agent under the Credit Documents.

[6] During this time the Steering Committee's counsel and financial advisor generated fees of over $5.8 and just under $2 million, respectively, and between GSC and the Steering Committee, the total professional fees exceeded $21 million.

was a revenue-sharing arrangement in which the Lenders would receive a percentage of GSC's future management fees and investment returns. *See* DX 94 at 12.

In May 2010, BDCM made a proposal to the Steering Committee and GSC to act as subservicer to GSC. *See* Koneval WD ¶ 25; CX 39 (5/10/10 email from Samuel Goldfarb, General Counsel of BDCM, attaching Draft Services Agreement between GSCP (NJ), L.P. and BDCM ("Draft Services Agreement")). The Draft Services Agreement provided that BDCM would receive roughly 65% of senior and subordinated fees that GSC then earned on the Funds. *See* DX 14 (Draft Services Agreement) at 1, 9-10. Among other reasons, this proposal was rejected due to concerns about compliance with the Investment Advisors Act of 1940. *See* DX 94 at 13.

The Steering Committee and GSC then began negotiating an agreement to sell GSC's assets in a Chapter 11 bankruptcy proceeding. *See id.* Under the proposed term sheet, the then-Required Banks would

---

*See* DX 86 (GSC Group Pre-Petition Restructuring Professional Fees from February 2009 through August 31, 2010).

NY 76962594v5

have had approval rights over significant terms of the sale, including the identity of the buyer. *See* Respondents' Pre-Hearing Brief at 9 (citing DX 15 (6/7/10 Draft Restructuring Proposal)).

### c.   Black Diamond Buys a Controlling Stake

On June 23, 2010, BD Lenders bought a controlling stake in the Loan, when Bank of Scotland, a member of the Steering Committee, sold its 48% position to BDCM and BDCF for 21¢ on the dollar. *See* Deckoff WD ¶¶ 14-15; DX 94 at 13.[7]  As a result of this transaction, BD Lenders became the Required Banks.  The other lenders, some of whom are Claimants, will be referred to as the "Non-Controlling Lenders" or "NCLs."

Guggenheim resigned as Agent, and BD Lenders appointed BDCF as Administrative Agent under the Credit Agreement and Collateral Agent under the Security Agreement. *See* Declaration of Mounir Nahas ("Nahas WD") ¶ 15; DX 20 (Guggenheim Resignation

---

[7] In 2006, BD CLO became a lender under the Credit Documents when it purchased a small percentage of GSC's debt.  BD Lenders' next purchases came in January and February 2010, when on each date BDC Finance bought small amounts of GSC debt. These small percentages, together with the 48% stake purchased in June 2010, totaled just over 50% of GSC's debt. *See* Deckoff WD ¶¶ 12-16.

-11-

Notice); DX 23 (Agency Assignment Agreement).[8]  BDCF had only one employee, Hugo Gravenhorst.  *See* Claimants' Proposed Findings of Fact and Conclusions of Law ("CL FOF") ¶ 75.  In November 2010, BD Lenders purchased another 1.3% interest in the Loan, bringing its total ownership stake to roughly 51%.  *See* Deckoff WD ¶ 16.

        In late July 2010, Alfred C. Eckert, GSC's then-Chairman and Chief Executive Officer, and Peter R. Frank, its then-Senior Managing Director and President, entered into new employment agreements with GSC, which included certain incentives to be paid upon the completion of a sale of GSC's assets pursuant to section 363 of the Bankruptcy Code.  *See* DX 94 at 15.  On July 10, 2010, Eckert entered into a consulting agreement with BDCM that was to commence "upon completion, following Bankruptcy Court approval, of a Section 363 sale of the assets of the GSC Group, Inc. in which the company (*i.e.* BDCM), or its affiliates, . . . is the winning bidder of a substantial portion of the assets of GSC . . . ."  *Id.* (internal quotation marks omitted).  In August,

---

[8] "Nahas WD" refers to the 1/17/18 Direct Testimony of Mounir Nahas, Principal and Chief Operating Officer of BDCM, by Affidavit.

NY 76962594v5

Frank entered an employment agreement that would make him a senior managing director of BDCM provided that certain identified GSC Funds were acquired by BDCM or its affiliates in a section 363 sale. *See id.* at 16.

In August 2010, ING, which held more than 8% of the Loans, entered into a cooperation agreement with BDCM under which it agreed to support BD Lenders in any cash or credit bid for GSC assets and agreed that BDCM was entitled to management fees for managing GSC's Funds. In exchange, ING was to receive a share of the proceeds from non-management agreement assets. *See* Nahas WD ¶ 17; DX 24 (ING Agreement) ¶¶ 1, 5. BDCM offered the same deal to Credit Agricole but its offer was rejected. *See* Nahas WD ¶ 18. Including ING's stake in the Loans, holders of approximately 60% of the Loans supported BDCM's efforts to manage the Funds.

In August 2010, BD Lenders offered $5 million to GSC for its assets. After consulting with its financial advisor, Capstone Advisory Group, LLC ("Capstone"), GSC rejected the offer. At that time,

Capstone had made an initial assessment that GSC's assets had a value in the range of $50 to $75 million.  *See* DX 94 at 29-30 & n.10.

### 2.    The Bankruptcy Proceedings, Auction, and Sale

### a.    Filing and Bidding Procedures Order

Certain GSC entities filed for Chapter 11 protection on August 31, 2010.  At the time of filing, GSC owed approximately $209.6 million under the Credit Agreement and $10.2 million under a swap agreement with Credit Agricole.  *See* JX 15 (7/18/11 Bankruptcy Court Sale Opinion).  On September 2, 2010, GSC made an emergency motion to establish bidding procedures to sell its assets pursuant to section 363 of the Bankruptcy Code and sought to hold the Auction on October 7, 2010.  See DX 94 at 16.

The NCLs filed an objection to GSC's motion, arguing that the proposed sale milestones were too short and would chill interest in the proposed Auction.  *See id*. at 17; DX 34 (9/14/10 Objection of NCL Group to Debtors' Motion) at 6.  In addition, the NCLs argued that "the Court should require the agent to act solely at the direction of a majority of the non-controlling Lender Group (excluding any non-controlling

-14-

lender which directly or through an affiliate submits bids for the Assets)
in exercising the right to credit bid." DX 34 at 5. Following a hearing
on the motion, however, the NCLs consented to the terms of the Bidding
Procedures, under which the Agent was entitled to credit bid at the
Auction "in accordance with the terms of the" Credit Documents. DX
36 at 4 ("Bidding Procedures Order"). *See also* Koneval WD ¶ 45
(admitting that the NCLs consented to the Agent's credit bidding).

Under the Bidding Procedures, GSC had sole discretion to
determine the "highest or otherwise best" bid, which was to take the
form of cash, a credit bid by the Agent, or non-cash property that "has a
readily ascertainable market value." DX 36 Ex. C ("Bidding
Procedures") §§ 6, 8. The Bidding Procedures required that a "Qualified
Bidder" and a "Qualified Bid" meet certain requirements, including that
bidders pay a deposit of $1 million to participate in the Auction. *Id.* Ex.
C § 6. Under the Bidding Procedure Order, Black Diamond had the
right to direct credit bids, and the NCLs had the right to attend the

-15-

Auction, bid, and challenge any misuse of the credit bid. *See id*. at 4.[9]

In addition, the Procedures stated that each Lender had the right to make

a cash bid for any lot at any phase of the Auction. *See id*. Ex. C § 6(k).

The Bankruptcy Court extended the sale milestones when it

approved the Bidding Procedures. The Auction was to be conducted on

or before October 26, 2010, and the sale hearing was to be held on

December 6, 2010. *See id.* at 7, 8.

### b.    The Auction

Prior to the Auction, Capstone identified over one hundred

potential purchasers, eighty of whom signed confidentiality agreements

and received access to the due diligence room.  *See* DX 72 (12/3/10

Supplemental Declaration of Robert Manzo, Executive Director with

Capstone, in Support of Sale of Substantially All of GSC's Assets

("Manzo Supp. Decl.")) ¶¶ 20-21.  Following a five-week due diligence

period, GSC received Qualified Bids from eleven bidders, only one of

which (Apidos) was an NCL.  *See* Deckoff WD ¶ 29.  The other bidders

---

[9] Claimants were also permitted to have their legal counsel and their financial
advisor attend. *See* Hr. Tr. at 199 (Koneval).

included BDCM, Sankaty Advisors, LLC ("Sankaty"), Saratoga

Acquisition Co., LLC ("Saratoga"), Compass Partners International

("Compass"), Ares Management Ltd. ("Ares"), and Versa Capital

Management, Inc. ("Versa").

GSC and Capstone conducted the Auction from October 26

through approximately 4 a.m. on October 29, 2010. Mr. Manzo served

as the primary auctioneer, aided by GSC's counsel, Kaye Scholer. The

NCLs were represented at the Auction by Mr. Koneval, their bankruptcy

counsel, and their financial advisor. *See* Hr. Tr. at 199:5-12 (Koneval);

DX 127 (Aggregate List of GSC Auction Attendees).

The first phase, which excluded credit bidding, ended with

BDCM, as sole bidder, bidding $5 million. *See* JX 6 (Capstone Bid

Summaries) at BDCM-NY-E-00052464. In the second phase, GSC's

assets were segregated into forty-four lots, and bids were submitted for

combinations of lots. *See id*. at BDCM-NY-E-00052464-465. Late on

the first day, Capstone began accepting revenue-sharing bids. *See* JX 3

(10/26/10 Transcript of Proceedings of Auction of GSC Group, Inc. –

Day 1) at 62-62, 76. BDCM and the Agent objected to these bids as

-17-

inconsistent with the bidding procedures. *See id*. at 72-74; JX 5 (10/28/10 Transcript of Proceedings of Auction of GSC Group, Inc. – Days 3-4), at 4-6 (objecting to "any such bid [being] approved"), 37 (noting "standing objection"); Deckoff WD ¶ 42. In addition, Capstone began accepting non-recourse notes as bid consideration. *See* JX 4 (10/27/10 Transcript of Proceedings of Auction of GSC Group, Inc. – Day 2), at 5-6; JX 6 at BDCM-NY-E-00052480, 542.

On the second day, Mr. Manzo approached representatives of the NCLs and their counsel stating his belief that certain of the non-lender qualified bidders at the Auction would provide more competitive bids if they were permitted to submit joint bids. *See* Koneval WD ¶ 48. However, Mr. Manzo indicated that he would not permit joint bidding unless the NCLs agreed. *See id*. He also warned the NCLs several times that a BDCM joint bid with the Agent could result in a disproportionate allocation of Collateral between assets acquired with cash and assets acquired with a credit bid. *See* DX 77 (12/22/10 Hearing Transcript regarding Motion to Appoint Trustee ("12/22/10 Tr.")) at 352-353 (Manzo).

NY 76962594v5

The NCLs consulted with their counsel and financial advisor and agreed to consent to joint bidding by executing a written consent (the "Consent Letter"). *See* Koneval WD ¶ 49; DX 44 (10/27/10 Consent Letter). The Consent Letter included a reservation of rights by the NCLs of "all claims and causes of action . . . against the Agent and BDCM for the improper use by the Agent of the credit bid to the detriment of the Non-Controlling Lender Group." DX 44. Respondents contend they were unaware of this reservation of rights at the time of the Auction. *See*, *e.g.*, Deckoff WD ¶¶ 48-49; Nahas WD ¶ 22.

In the first round of joint bidding, BDCM bid $5 million in cash and a $6 million note for certain assets (the "Cash Bid Assets" or "Cash Bid Allocable Items") and the Agent together with BDCM jointly submitted a $130 million credit bid for other assets (the "Credit Bid Assets" or "Credit Bid Allocable Items"). *See* JX 4 at 45-50; JX 6 at BDCM-NY-E-00052476.

After four rounds of bidding under the modified bidding procedures, three bidders had submitted bids for all assets — Saratoga, Sankaty, and Black Diamond. The highest bid was $190 million by

-19-

Black Diamond, consisting of $11 million for the Cash Bid Assets and a $179 million credit bid for the Credit Bid Assets. Saratoga's bid was all revenue-sharing except for a $5 million non-recourse note and was valued by Capstone at $170.8 million. Capstone valued Sankaty's bid, which was entirely revenue-sharing, at $165.8 million. *See* JX 6 at BDCM-NY-E-000524538.

Mr. Manzo then determined that in the fifth and final round, bids would be submitted in closed envelopes and the highest qualified bid would be declared the winner. *See* JX 5 at 72-73. Three final bids were made: Saratoga placed a bid that Capstone valued at $175.8 million; Sankaty placed a bid that Capstone initially valued at 193.7 million (and later valued at $183 million); BDCM and the Agent placed a joint bid that Capstone valued at $235 million, comprised of $5 million cash and a $6 million note (the "Cash Bid"), and a credit bid of $224 million (the "Credit Bid"). *See id*. at 72-80; JX 6 at BDCM-NY-E-000524550; DX 97 (7/6/11 Transcript of Interim Hearing re Motion Authorizing Sale of Assets) at 274 (Manzo). GSC selected Respondents' joint bid as the successful bid. *See* DX 94 at 19. The joint

-20-

bid identified which assets were purchased with the Credit Bid and which were purchased with the Cash Bid. *See* JX 6 at BDCM-NY-E-000524550. The parties dispute whether the NCLs objected to any of Respondents' five joint bids during the Auction.

### c. The NCLs' Emergency Motion to Disallow Joint Bid and the State Court Litigation

On the same day the Auction ended, the NCLs made an emergency motion to disallow the joint bid alleging bad faith in not letting other bidders join with the Agent in credit bidding. *See* DX 51 (10/29/10 Emergency Motion of Non-Controlling Lender Group for Relief Under Section 363(k) Disqualifying Credit Bids Submitted by Black Diamond) (citing JX 2 § 14.7(b)). The Bankruptcy Court denied the NCLs' motion, but gave them leave to pursue an adversary proceeding or to raise objections at the sale hearing scheduled for December 6, 2010. *See* DX 53 (11/1/10 Hearing Transcript) at 38 (Gonzalez, J.). Two weeks later, on November 13, 2010, Claimants filed the State Court Litigation by filing a summons with notice.

NY 76962594v5

### d.   Asset Purchase Agreements and NCLs' Motion for Appointment of a Trustee

The joint bid was memorialized in an Asset Purchase Agreement ("APA 1") dated October 31, 2010 between GSC Acquisition Partners, LLC ("GSCAP"), an entity established and controlled by BD Lenders, and the Debtors.  JX 7 (APA 1).  Section 2.6 of APA 1 provides that the assets acquired would be allocated pursuant to Exhibits G and H, which divided the assets into the Credit Bid Allocable Items and Cash Bid Allocable Items.  *Id.*  APA 1 directed the Agent to establish an entity to receive the Credit Bid Allocable Items on behalf of the secured lenders as "Designated Purchaser."  *Id.* § 2.6(b).  The entity eventually created was GSC Acquisition Holdings, LLC ("GSCAH").

All of the assets to be acquired under APA 1 were part of the Collateral pledged to secure the Loans.  *See*, *e.g.*, Koneval WD ¶ 69.  BD Lenders also transmitted a Credit Bid Direction Letter to the Agent on October 31, 2010.  *See* JX 8 (10/31/20 Credit Bid Direction Letter).

-22-

On November 18, 2010, the Debtors filed APA 1 along with
a Proposed Sale Order with the Bankruptcy Court. *See* DX 57 (11/18/10
Notice of Filing of Asset Purchase Agreement and all exhibits and
schedules thereto and Proposed Order). As per the Bidding Procedures
Order, the sale hearing was scheduled for December 6, 2010. *See* DX
94 at 19.

On December 3, 2010, APA 1 was modified to increase the
Cash Bid to $11.7 million, to, among other things, include ownership of
the non-debtor UK entity, GSC Group Limited. *See* JX 9 (12/3/10
Notice of Filing Amendment to Asset Purchase Agreement). In
addition, the modification "settled a purported dispute over whether
BDCM was entitled to certain earnings from the Debtors' management
contracts generated prior to the time that Black Diamond would take
over management control." JX 15 (7/18/11 Sale Opinion) at 14 (citing
Manzo Supp. Decl. ¶ 48). Specifically, "[t]he Amendment resolved the
dispute by awarding Black Diamond $5.2 million, representing 100% of
the amounts earned during the two-month period from the Auction date

-23-

to the projected closing date of the APA under management contracts bought at the Auction." *Id.* (citing Supp. Manzo Decl. ¶ 49).

On December 6, 2010, the date of the scheduled sale hearing, the NCLs requested, and received, an adjournment on grounds primarily relating to insufficient opportunity to conduct discovery related to the modification to APA 1 and the relationship between GSC's principals, Eckert and Frank. *See* DX 94 at 22. During discovery the NCLs learned about an Option Agreement between Deckoff and Eckert entered into on December 4, 2010. *See id.* Under the Option Agreement, BDCM would pay Eckert $500,000 for an option to purchase $1.5 million of 49% of Eckert's common stock in GSCAP and his $2 million claim against one of the Debtors related to his unpaid 2008 bonus. *See id.*

On December 18, 2010, APA 1 was again modified so that GSCAP assigned its right to assume the Cash Bid Assets to GSCAH, an entity controlled by both the Agent and GSCAP. *See* JX 10 ("December 18 Letter"). That same day, GSCAH, by the Agent, executed a Counterpart to the Asset Purchase Agreement, under which GSCAH

NY 76962594v5

became the "Designated Purchaser" under Amended APA 1.  CX 67 (12/18/10 Counterpart to Asset Purchase Agreement).

As discussed elsewhere in this Final Award, the Panel finds that one purpose of the December 18 amendment to APA 1 was to eliminate any possible appearance that GSC had a role in allocating assets between BD Lenders and the Agent.  *See*, *e.g.*, DX 148 (6/26/11 Manzo Dep.) at 104 (explaining he did not want GSC to allocate assets and that he believed allocation was something for the "purchasing entity to worry about").  A second purpose of the December 18 Letter was to avoid requiring the court to approve the allocation of assets between the Cash and Credit Bids.  *See* DX 98 (7/7/11 Hearing Transcript re Motion Authorizing Sale of Assets) at 115.  It did not, however, undo the allocation between the Credit Bid and Cash Bid Allocable Assets under APA 1.

On December 20, 2010, the NCLs filed a motion seeking the appointment of a Chapter 11 trustee.  *See* DX 94 at 22; CX 63 (12/16/10 Motion of the Non-Controlling Lender Group for Order Appointing Trustee Pursuant to 11 U.S.C. § 1104(b) ("Trustee Motion")).   The

-25-

motion cited various agreements reached between Eckert and BD Lenders as evidence that there was a conflict of interest between BD Lenders and GSC's management, such that the Debtors did not have a trustworthy fiduciary to manage the property and affairs of the Debtors or to administer their estates. *See generally* CX 63.

A hearing on the Trustee Motion was held on December 22, 2010, at which Messrs. Eckert, Frank, and Deckoff testified. *See* Koneval WD ¶ 77. On December 26, 2010, the Debtors terminated APA 1, stating that their fiduciary duties, "prevent [them] from continuing to pursue the transactions contemplated by [APA 1]. Accordingly, [Debtors] hereby terminate, repudiate, and rescind the APA and the transactions contemplated thereby." CX 70 (Letter from the GSC Group, Inc. to GSCAP and GSCAH); *see also* Koneval WD ¶ 77.

On December 27, 2010, Respondents offered the NCLs a "plain vanilla" 100% credit bid to acquire GSC's assets, which was memorialized in a proposed Asset Purchase Agreement. *See* Nahas WD ¶ 24; Koneval WD ¶ 78; DX 78 (12/27/10 email from Black Diamond's

-26-

counsel, Dan McGuire, attaching draft APA and Form of Assumption and Assignment Agreement); CX 72 (12/27/10 draft APA).  The offer, which was set to expire on December 29, 2010, was not accepted by the NCLs based on their view that they would not be entitled to a share of the management fees, which would instead be paid to the new manager for the GSC Funds, presumably BDCM, to be appointed by BD Lenders in their capacity as Required Banks.  *See* Hr. Tr. at 238-239 (Mr. Koneval testifying as to DX 181, an email dated March 2011, explaining why he did not consider the plain vanilla credit bid a better option).

On January 4, 2011, the NCLs offered a counterproposal wherein the Agent would acquire all Collateral through a credit bid and hold those assets at GSCAH.  *See* Koneval WD ¶ 81 (citing CX 260 (1/5/11 email from NCLs' counsel attaching counterproposal permitting BDCM to acquire and manage all assets under certain conditions).  Under that proposal, BDCM would have been required to manage the GSC assets for 40% of senior fees, the same rate Sankaty had proposed at the Auction.  *See* CX 260 at 3.  The counterproposal was rejected. *See* Respondents' Proposed Findings of Fact and Conclusions of Law

-27-

("RFOF" or "RCOL") pp 13-14 (stating in part that, "The counterproposal was rejected because it required BDCM to manage for the same 40% of senior fees that Sankaty had proposed and added several onerous terms, including that (a) [BD Lenders] would have to secure all payments to Claimants with interest-bearing promissory notes and (b) a majority of Claimants would have veto rights over certain decisions.").

On January 5, 2011, the Bankruptcy Court found cause under section 1104(a)(2) of the Bankruptcy Code for the immediate appointment of a Chapter 11 trustee. The Bankruptcy Court explained that, "[t]he pre and post-petition actions of debtors controlling management, Mr. Eckert, regarding the sale process, including his relationship with Black Diamond, raises numerous concerns about the process and a fulfillment of his fiduciary duties regarding that process." DX 94 at 23 (internal quotation marks omitted). On January 7, 2011, then-retired Bankruptcy Judge James Garrity, Jr. was appointed as trustee.

NY 76962594v5

In a January 25, 2011 letter to the Trustee, BD Lenders offered to close APA 1 and to cause the Agent to credit bid the remainder of the secured creditors' claim for certain Collateral not acquired in APA 1. *See* Koneval WD ¶ 85. Then, in a February 21, 2011 letter to the Trustee, BD Lenders proposed, among other things, to indemnify GSC for up to $20 million in tax liabilities arising from the purchase of the Assets. *See id*. The proposal also indicated that $4 million would be available for distribution to unsecured creditors.

At a hearing before the Bankruptcy Court on March 23, 2011, the Trustee indicated he was considering proceeding with the transaction based on the Auction results, as well as a related transaction to "satisfy the remainder of the secured creditor's claims." CX 80 (3/23/11 Transcript of Hearing), at 11-12 (Trustee's counsel); *see* DX 97 at 34, 36 (Trustee). On April 25, 2011, the NCLs filed a Joint Chapter 11 Plan for GSC Group, Inc. and Its Affiliated Debtors by the Non-Controlling Lender Group and a Disclosure Statement, to compete with the Trustee's plan to proceed with the section 363 sale. *See* CX 85. The Plan eventually included a non-binding Term Sheet from Sankaty to

-29-

serve as sub-advisor to GSC on the same economic terms Sankaty had proposed in its losing bid at the Auction. *See* CX 91 (6/10/11 Term Sheet for Subadvisory Agreements between GSC Group and Sankaty Advisors LLC).

On May 23, 2011, BD Lenders and the Trustee filed separate objections to the NCLs' proposed plan. The Trustee requested an adjournment of a hearing to consider approval of the Disclosure Statement, noting "that he was in the process of negotiating the final terms of a transaction to sell substantially all of the Debtors' assets to BDCM pursuant to its winning bid at the Auction and that the proposed transaction should be considered first." JX 15 at 19.

That same day, May 23, 2011, GSCAH, BDCM, and the Trustee (on behalf of GSC) entered into a Side Letter "reaffirm[ing] and acknowledg[ing] that APA 1 . . . remains in full force and effect and any purported termination" was "void" and of "no effect." JX 11 (5/23/11 Executed Side Letter to APA 1 with all Exhibits, Appendices, Attachments and Schedules appended thereto (the "Side Letter"). In the Side Letter GSCAH also stated that to the extent that it retained BDCM

-30-

or any affiliate to manage assets that GSCAH would acquire, the fees GSCAH would pay in respect of management services would not exceed applicable market rates. *See id*.

In addition, GSCAH and the Trustee entered into a separate asset purchase agreement ("APA 2").   JX 12 (5/23/11 APA 2 with exhibits).  In APA 2, GSCAH agreed that the Agent would credit bid the remainder of the secured claim for amounts owing on the Loans plus interest, approximately $33 million, in exchange for certain of the remaining assets not acquired in connection with APA 1.  Mr. Manzo valued the assets sold pursuant to APA 2 at $19 million. *See* DX 98 at 56 (Manzo) (stating that his previous valuation of the APA 2 assets was incorrect); *see also* CX 90 (6/7/11 Manzo Decl. Manzo) ¶ 12 (initially valuing the APA 2 assets between $35.4 and $40.3 million).

Finally, also on May 23, 2011, BD Lenders executed a Credit Bid Direction Letter addressed to the Agent.   *See* JX 13.  This letter directed that at the Closing the Agent "(1) credit the amount of the Remaining Obligations in respect of the purchase of the Acquired Assets, (ii) cause the Purchaser [i.e. GSCAH] to acquire the Acquired

Assets and the Assumed Obligations, and (iii) deliver the Payoff Letter
to the Sellers."

### e. Sale Hearing

In June, 2011, the Trustee filed a motion seeking approval of
the sale embodied in APA 1, APA 2, and the Side Letter. *See* DX 92
(6/8/11 Trustee's Motion for Entry of An Order Authorizing Sale of
Assets with exhibits). The Trustee's motion also reflected that a Tax
Indemnification Agreement had been agreed to requiring BDCM to
indemnify the estates against certain potential tax liabilities that might
arise as a result of the consummation of APA 1 and APA 2. *See id.* ¶ 25.
Among other things, the Trustee stated that he had not found any fraud
or collusion in connection with the Auction (*id.* ¶¶ 72, 73), and that
BDCM's aggressive conduct "does not justify a finding of bad faith."
*Id.* ¶ 78.

The NCLs objected to the Trustee's motion on numerous
grounds. The Bankruptcy Court held a hearing on the motion on July 7,
2011. On July 11, 2011 the Bankruptcy Court entered an order
authorizing the sale. *See* JX 14 ("Sale Order"). Among other things, the

-32-

Sale Order provides that "nothing in this Order or any opinion issued by the Court related thereto shall (i) constitute a finding by the Court of any kind regarding any of the State Court Parties . . . with respect to their respective rights, remedies, causes of actions and claims vis-à-vis any other State Court Parties." *Id.* at Finding K.

On July 18, 2011, the Bankruptcy Court issued a reasoned decision explaining its approval of the Sale. In approving the sale, the Bankruptcy Court rejected the NCLs' argument that BD Lenders were not entitled to a finding of good faith because they and the Agent had allegedly colluded with each other in various ways. The Bankruptcy Court explained:

> The joint bidding procedures were authorized by the Debtors and consented to by the Non-Controlling Lenders. The sale of the assets was done in accordance with the bidding procedures and modifications thereto consented to by the Non-Controlling Lenders. Moreover, the submitted joint bid increased the price of the sale. The joint bid was between $40-50 million more than the next highest bid.

JX 15 at 77. Furthermore, the Bankruptcy Court found that the NCLs' proposed Plan

-33-

provided no benefit to the estate, and it effectively
would have moved the State Court litigation
between the Non-Controlling Lenders and
[Respondents] into the confirmation process in the
form of designation of vote litigation. The dispute
over allocation of the Sale assets was found to be
better heard in State Court, where, since the
inception of this case, the parties had agreed it
would be best heard, and where that dispute is
currently pending. Hearing that dispute, among
other issues in the context of a contested
confirmation, would not only have placed the Sale
at risk, but it would also have placed the Debtors'
liquidity, *inter alia*, at risk, without which the
Debtors ultimately would have been unable to
survive.

*Id.* at 83.

The Bankruptcy Court also made clear that the NCLs had

reserved their rights with respect to the claims asserted in the State Court

Litigation. In addition, the court made several statements as to the

allocation of assets under the proposed transactions. *See id*. at 40

("Although Section 2.6 of the Initial APA divided the assets into Cash

Bid Allocable and Credit Bid Allocable Items, that allocation was

undone by the Letter Agreements. (Form of Assignment and

Assumption Agreement, Ex. B to APA 1; Counterpart, Ex. D-2 to Sale

NY 76962594v5

Motion.)   There is currently no allocation of the assets under the Proposed Transactions.  (Deckoff Dep. 176:14-24, 177:12-16.)   That allocation will take place after the Sale Hearing and prior to closing. (Deckoff Dep. 167:22-24, 169:24.)"); *id.* at 28-29 ("The Trustee and [Respondents] incorporated the Initial APA in APA 1 and thereafter affirmed in the Side Letter that the Initial APA is in full force and effect.").

On July 21, 2011, Mr. Deckoff filed an affidavit in the State Court stating that each NCL would be allocated its *pro rata* share of (i) the Credit Bid Assets and (ii) the cash and note consideration for the Cash Bid Assets.  *See* CX 101 (7/21/11 Deckoff Affidavit in support of Defendants' Opposition to Plaintiffs' Motion for Order of Attachment and Appointment of Receiver, *Credit Agricole v. BDC Finance, LLC*, No. 651989/2010).

### f.   Closing

On July 26, 2011, the Agent delivered the Payoff Letter to GSC (*see* CX 108 (7/26/11 Payoff Letter from BDCF to GSC)), and the Sale closed pursuant to the Sale Order, APA 1, and APA 2.  Under the

-35-

Amended and Restated LLC Agreement for GSCAH ("LLC Agreement"), interests in GSCAH were divided into Class A, B, and C shares. *See* DX 101 (7/26/11 LLC Agreement), § 3.1(b). Specifically, Class A interests were issued to the Agent on behalf of the Secured Creditors in exchange for the Credit Bid pursuant to the Sale Order. *See id.* And Class B and Class C interests were issued to GSCAP, the entity owned by BDCM and ING. *See id.*

The Agent issued the Credit Bid to GSC in return for GSC issuing the Credit Bid Assets to GSCAH, and GSCAH issued Class A interests to the Agent on behalf of the Secured Creditors. *See* JX 13 at 1, § 2(i); CX 108 at 1; DX 103 (7/26/11 Direction Letter from Required Bank to BDCF, directing Agent to accept GSCAH Class A interests in consideration of the credit bids as described in APA 1 and APA 2). In exchange for the consideration paid for the Cash Bid Assets, GSCAH issued Class B and C interests tracking the Cash Bid Assets to GSCAP. *See* Nahas WD ¶ 32; DX 101 § 3.1(a)(ii)-(iii).

Pursuant to the Sale Order, the Agent received the cash and the promissory note for the Cash Bid Assets on behalf of all Lenders.

-36-

*See* JX 14 ¶ 26; DX 102 (7/26/11 Assignment and Assumption Agreement between GSC and BDCF, assigning GSC's rights and obligations as holder of the note to BDCF).[10]   Under the LLC Agreement, the liability for the promissory note was allocated to the Class B and Class C members, and GSCAP guaranteed payment of the promissory note to the Agent to the extent of insufficient Class B and C Assets to make payment when due.  *See* DX 101 § 4.1, Sched. A.

At Closing, GSCAH entered into an investment management agreement with BDCM under which BDCM would provide all investment management and administrative services in exchange for 100% of the fees due under the management agreements (as renegotiated by BDCM to obtain investor consents).  *See* DX 100 (7/26/11 Advisory and Administrative Services Agreement); RFOF ¶ 67.

---

[10] *See* Nahas WD ¶ 37 (explaining that (1) at the Closing BDCM and BDC Finance transferred $4 million to GSCAP, which then transferred the funds to GSCAH, which then transferred the funds to the Agent on behalf of all Lenders; (2) on July 27, 2011, GSC transferred the $1 million Auction deposit plus $269.09 interest to the Agent on behalf of all Lenders; and (3) on August 3, 2011, the $5,000,269.09 was placed by the Agent in a segregated account for the benefit of all Lenders).

NY 76962594v5

GSCAH received $26 million in cash at closing. *See* Nahas WD ¶ 48. GSCAH used $20 million to fund a Letter of Credit as security for the $40 million Tax Indemnification Agreement. *See id*. The remainder was allocated "based on the source of the cash." *Id.* Because the tax indemnity will expire, GSCAH will distribute the $17,340,000 allocated to Class A interests in May 2018; Claimants' *pro rata* share is $5.4 million.

### 3.   Post-Closing

#### a.   Tax Filings

In May 2012, GSC filed three Form 8594 Asset Acquisition Statements with the IRS setting forth a combined purchase price of $223.5 million. *See id.* ¶ 64; CX 201 (Asset Acquisition Statements filed with the IRS on behalf of GSCAH). Claimants allege that the values in the Form 8954 statements reflect the value of the Assets acquired from GSC. Respondents contend that the Trustee insisted on using Capstone's analysis "to establish the entries on the sellers' Form 8594 filings in order to minimize the Debtors' potential tax liability"

(Nahas WD ¶ 67), and that "[BD Lenders] agreed to use [the numbers on the Form 8594] for tax purposes only." *Id.* ¶ 66.

### b.      Transfers and Distributions to the Claimants

In March 2016, GSCAH distributed to Class A Shareholders (i) $9.9 million, which equaled "net cash proceeds generated since the closing of the transaction in July 2011" by the Class A Assets, and (ii) $11.9 million, which represented the $6.7 million face value of the note plus accrued interest of $5.2 million, and $1.2 million of the $5 million cash paid by BDCM at closing (reduced by the Agent's expenses for the sale). *See* DX 120 (3/15/16 Stipulation and Order Concerning Distribution from GSCAH). The Claimants' ratable share of these distributions was $7.2 million. *See* Gompers Rept. ¶ 172.

GSCAH also made in-kind distributions of membership and LP interests in certain GSC Funds that it valued at $9 million. *See* DX 118 (2/9/16 GSCAH Distribution Notice). While Claimants purported to reject the in-kind distributions, they kept the documentation and, when those interests generated a cash distribution of $4.2 million in June 2016 the claimants accepted their $1,310,126 *pro rata* share. *See* DX

121 (6/30/16 email from Samuel Goldfarb to Colin West, counsel for Claimants, describing *pro rata* distributions made to Claimants totaling $1,310,126).

### C.   State Court Litigation

The Claimants filed the State Court Litigation on November 13, 2010 by filing a summons with notice. *See* DX 94 at 19. On May 17, 2011, Claimants filed their first complaint. *See id.* at 23. They filed their Amended Complaint on September 28, 2011. As is relevant here, Count IV alleges that the Agent breached section 6.1 of the Security Agreement and section 12.5 of the Credit Agreement because the Agent failed to act "for the benefit of the Secured Creditors." Count IV further alleges that the Agent breached section 14.12 of the Credit Agreement by releasing the liens on the Collateral "in exchange for nothing" without the unanimous consent of the Secured Creditors. JX 16 ¶¶ 121, 123, 124. Count VI alleges that the BD Lenders breached the *pro rata* sharing and consent provisions, sections 14.7(b) and 14.12 of the Credit Agreement. *See id.* ¶¶ 132-144. In Counts V and VII, Claimants allege

NY 76962594v5

that the Agent and BD Lenders, respectively, breached the implied covenant of good faith and fair dealing. *See id.* ¶¶ 127-131; 145-149.

On July 16, 2014, the trial court issued a decision which granted Respondents' motion to dismiss GSCAP as a defendant, and denied Respondents' motion to dismiss the implied covenant of good faith and fair dealing claims on grounds that the claims were duplicative of the breach of contract claims. *See* JX 20. On January 1, 2016, the Appellate Division, First Department affirmed the trial court's ruling on the implied covenant of good faith and fair dealing claims. *See* JX 21 (*Credit Agricole v. BDC Finance, LLC*, 135 A.D.3d 561 (1st Dep't 2016)).

On January 23, 2017, the trial court issued a decision which, in relevant part, denied Respondents' motion for summary judgment on Counts VI and VII (against BD Lenders), and Claimants' motion for summary judgment on Count IV (against the Agent), and Counts VI and VII (against BD Lenders). *See* JX 24 (*Credit Agricole v. BDC Finance*, 2017 N.Y. Misc. LEXIS 226 (Sup. Ct. N.Y. Co. Jan. 20, 2017)). On February 24, 2017, the trial court issued a decision which, in relevant

NY 76962594v5

part, denied the Agent's motion for summary judgment on Counts IV
and V. *See* JX 25 (*Credit Agricole v. BDC Finance*, 2017 N.Y. Misc.
LEXIS 653 (Sup. Ct. N.Y. Co. Feb. 23, 2017).

## II.   THE TRIBUNAL FINDS THAT RESPONDENTS DID NOT BREACH THE CONTRACT

### A.   Legal Standard

Under New York law, an action for breach of contract
requires proof of (1) a contract; (2) performance of the contract by one
party; (3) breach by the other party; and (4) damages. *Rexnord Holdings
v. Bidermann*, 21 F.3d 522, 525 (2d Cir. 1994). A contract "'that is
complete, clear and unambiguous on its face must be enforced according
to the plain meaning of its terms.'" *MeehanCombs Glob. Credit
Opportunities. M.F., LP v. Caesars Entm't Corp.*, 162 F. Supp. 3d 200,
208 (S.D.N.Y. 2015) (quoting *Greenfield v. Philles Records, Inc.*, 98
N.Y.2d 562, 569 (2002)). "Similarly, the plain meaning of words and
phrases should be read to give force and effect to all of a contract's
provisions." *In re GWLS Holdings, Inc.*, No. 2009 WL 453110, at *4

(Bankr. D. Del. Feb. 23, 2009) (internal quotation marks and brackets omitted; interpreting and citing New York law).

"Contract language is unambiguous if the language has a definite and precise meaning and no reasonable person could disagree on this meaning." *In re Metaldyne Corp.*, 409 B.R. 671, 677 (Bankr. S.D.N.Y.), *aff'd*, 421 B.R. 620 (S.D.N.Y. 2009). "To determine whether a contract provision is ambiguous, courts may review related agreements entered contemporaneously." *Metaldyne*, 409 B.R. at 677.

## B. The Tribunal Finds that BD Lenders Did Not Breach Section 14.7 of the Credit Agreement (Count VI)

### 1. Section 14.7(b) of the Credit Agreement

In seeking to enforce their construction of Section 14.7(b), Claimants bear the burden to establish at trial that a binding agreement was made and to prove its terms. *See Sardis v. Frankel*, 113 A.D.3d 135, 147 (1st Dep't 2014). Section 14.7 provides:

> 14.7 Payments Pro Rata (a) The Administrative Agent agrees that promptly after its receipt of each payment from or on behalf of the Borrower in respect of any Obligations of the Borrower, it shall distribute such payment to the Banks (other than any Bank that has consented in

-43-

writing to waive its pro rata share of such payment) pro rata based upon their respective shares, if any, of the Obligations with respect to which such payment was received.

(b)   Each of the Banks agrees that, if it should receive any amount hereunder (whether by voluntary payment, by realization upon security, by the exercise of the right of setoff or banker's lien, by counterclaim or cross action, by the enforcement of any right under the Credit Documents, or otherwise) which is applicable to the payment of the principal of, or interest on, the Loans or Fees, of a sum which with respect to the related sum or sums received by other Banks is in a greater proportion than the total of such Obligation then owed and due to such Bank bears to the total of such Obligation then owed and due to all of the Banks immediately prior to such receipt, then such Bank receiving such excess payment shall purchase for cash without recourse or warranty from the other Banks an interest in the Obligations of the Borrower to such Banks in such amount as shall result in a proportional participation by all of the Banks in such amount, *provided* that if all or any portion of such excess amount is thereafter recovered from such Bank, such purchase shall be rescinded and the purchase price restored to the extent of such recovery, but without interest.

Section 14.7 is part of a detailed and complex Credit
Agreement typically used in the banking industry by sophisticated banks
and their highly skilled legal counsel:

> Documentation for transactions of this type is
> typically heavily negotiated and goes through
> many drafts before it is signed. The wording is
> typically carefully drafted and reviewed by all
> parties with highly experienced and skilled
> counsel, and in many cases individual lenders
> considering whether to join a transaction have the
> documentation reviewed by their own outside or
> in-house counsel. Many of the common terms and
> concepts are relied upon by market participants
> and expected to be consistently understood and
> applied in similar transactions. Parties entering
> into transactions may have expectations as to what
> terms and conditions the documentation should
> contain, but in my experience once the
> documentation is signed it is that documentation
> that informs party expectations for the duration of
> the transaction.

Expert Report of Richard M. Gray, Respondents' Expert, (DX 124 or
"Gray Rept.") ¶20.

Claimants argue that the plain language of section 14.7(b)
entitles them to a *pro rata* share of *all* the assets acquired in the Auction
whether by individual cash bid or by the Agent's credit bid. *See* CL

-45-

FOF ¶ 81.  To be sure, BDCM's individual bid, consisting of cash and a note, was submitted as part of a winning joint bid, along with the Agent's credit bid.  But BDCM's bid was made in its individual capacity and specifically designated the particular Cash Bid Assets it was purchasing for its cash and note.  Likewise, the Agent's credit bid also designated the particular assets on which it was bidding on behalf of all Lenders, comprising the balance of the Debtors' assets being auctioned not encompassed in the Cash Bid Assets.  Despite the fact that the word "transaction" does not appear in section 14.7(b), Claimants advance an expansive interpretation of the section contending that once a transaction involves a credit bid, any and all assets acquired by any Lender in the same transaction are subject to the section's sharing obligation.

In order to determine whether section 14.7(b) requires BDCM to share the property it acquired with its individual bid, which became part of the joint bid with the Agent, we look first to the Bidding Procedures Order, and the circumstances under which the joint bid was made, including the effect of the NCLs' written agreement to allow joint bidding.

## 2.      The Bidding Rules Applicable to the Auction

On September 2, 2010, within days after GSC filed its
Petition pursuant to Chapter 11, it filed an emergency motion for an
order approving bidding procedures pursuant to section 363(b) of the
Bankruptcy Code.  In objecting to that motion, the NCLs requested that
the court override sections of the Credit Documents providing that only
the Required Banks may instruct the Agent.  In seeking a judicial rewrite
of the Credit Documents the NCLs argued "the Court should require the
agent to act solely at the direction *of a majority of the non-controlling
Lender Group* (excluding any non-controlling Lender which directly or
through an affiliate submits bids for the Asset) in exercising the right to
credit bid.".  DX 34 at 5 (emphasis added).  Shortly after a hearing held
on September 3, 2010, the NCLs agreed to the terms of a consensual
bidding order.  *See* DX 77 at 345.  The Bidding Procedures Order,
entered by the Bankruptcy Court on September 23, 2010, did not include
the NCLs' request.  *See* DX 36.

The Bidding Procedure Order imbued the Debtors with the
sole discretion to reject any bid that they in their sole discretion believed

-47-

was inadequate or insufficient.  It also provided that any cash bid from any Lender shall be a "Qualified Bid" and "allowed every Lender to make a cash bid for any lot . . . at each phase of the auction" *id*. Ex. C § 6(k), thereby allowing BDCM to cash bid.  The Bidding Procedure Order, in accord with the Credit Documents, allowed only the Agent to exercise a credit bid at the Auction.  Significantly, the Bidding Procedure Order did *not* alter the authority of the Required Bank to instruct the Agent.  As to any non-cash bids by any bidder, the Bidding Procedure Order provided that the Debtors could consider them "only if such non-cash property has a readily ascertainable market value."  *Id.* Ex. C §§ 6, 8.  Non-lender bidders were required to provide, on request, information about their "financial wherewithal and other information to show ability to consummate the transaction."  *Id.* Ex. C.  Such bidders were also required to deposit $1 million.  *See id*. Ex. C § 6(i).

### 3.  Capstone's Contentious Relationship with BDCM

In his testimony at the hearing on the motion to appoint a trustee, Mr. Manzo described BDCM as "proactive, aggressive and difficult."  DX 77 at 361:22-362:6.  Mr. Manzo also acknowledged that

NY 76962594v5

he was "equally combative." *Id.* at 362:22-23.  As such, it is hardly surprising that BDCM's negotiations with Mr. Manzo were highly contentious.   Mr. Manzo provided the following description of the negotiations with BDCM leading up to the Auction:

> GSC and Black Diamond and their respective advisors negotiated vigorously in a process that included in-person meetings and innumerable phone calls, in order to obtain the best terms for the Debtors' estates. I participated in all of these discussions on behalf of GSC, including one marathon session that concluded an hour before the Debtors filed these cases. *These discussions were hard fought and at times contentious*.

DX 72 ¶ 15 (emphasis added).

### 4.    The Auction

Mr. Manzo testified that at the Auction, "we tried to get at all times the absolute maximum value that we could for all the assets being sold on behalf of the entire estate, including the Secured Creditors."  DX 145 (12/2/10 Manzo Dep.) at 62:18-21.  Capstone, for its part, had no interest in assessing the appropriate allocation between the Agent and BDCM:

> [B]ut I didn't run an auction to determine what the appropriate split of assets were between a credit bid and a cash and/or note bid. To me on the Company side we were absolutely indifferent how any consortium of bidders decided to allocate assets between themselves. In our view that was their business, not business as between the Debtor and those joint parties bidding.

*Id.* at 61:2-9.

Mr. Manzo viewed maximizing the value received for the estate to be his singular objective at the Auction, and he believed it was only a matter of time before the Agent would credit bid. *See* DX 77 at 347:15-17 (Manzo) ("eventually the Agent would go ahead and bid with their credit currency").

The NCLs, who were represented at the Auction by bankruptcy counsel as well as their financial advisor, knew that the Bidding Procedure Order permitted the Agent to credit bid and that this meant there was "$240 million dollar[s] of self-currency that the Agent had." *Id.* at 347:20-21 (Manzo).

-50-

## 5.   Capstone's Desire to Stimulate Higher Bidding

Based on the initial round of bids Mr. Manzo concluded there was little, if any, interest by bidders in purchasing the entire group of assets.   Given Capstone's objective of driving up bids, Mr. Manzo believed he needed to stimulate bidding:   "And it's at least our experience in these matters that to the extent you can stimulate bidders to go ahead and to bid on assets in their entirety, often times that produces a higher economic return."  DX 97 at 267:10-13.

Mr. Manzo expressed concern that if the Auction ended without much, if any, interest by bidders other than BDCM, a low credit bid would acquire the assets or the Auction would fail which was the last thing he wanted.  *See* DX 148 at 136:6-8 (affirming that "a failed auction would be disastrous to GSC").  As Mr. Manzo put it, "we were looking to stimulate interest with other parties . . . ."  DX 97 at 268:25-269:1.  As a result, Mr. Manzo sought to increase the amount of the credit bid by the Agent in order to eliminate the secured debt and possibly enable a distribution to unsecured creditors and even equity holders.

-51-

### 6.    Capstone Unilaterally Allowed "Revenue Sharing" Bids by Sankaty to Spur Higher Bidding

On October 26, 2010, the first day of bidding, Mr. Manzo accepted a bid from Sankaty Advisors on a number of lots using a revenue sharing bid, and declared it to be the winning bid.    After accepting that bid Mr. Manzo turned to the Agent and BDCM, "with that we would ask the agent and [BDCM] to decide if they are prepared [to bid]."  JX 3 at 62:24-63:1.

A long discussion of the revenue sharing bid ensued.  In response to the Sankaty revenue sharing bid, BDCM asked a series of questions that probed various aspects of that bid and how it was valued. Capstone's counsel refused to answer virtually every question. *See* JX 3 at 65-72.    As a result, counsel for BDCM declined to bid and vehemently objected to the Sankaty bid.    Although the Bidding Procedure Order required non-cash property to be considered only if it had "a readily ascertainable value," Capstone unilaterally allowed revenue sharing proposals by Sankaty even though the values placed on

NY 76962594v5

such bids were "estimates" not tied to any "metrics." DX 145 at 97:12-17.

Introducing these revenue sharing bids was designed to prompt the Agent to maximize the amount of its Credit Bid. *See* DX 77 at 350. Mr. Manzo testified that he accomplished this by provoking higher revenue sharing bids by sharing his analyses of those bids with other such bidders:

> [W]e also shared it [Capstone's valuation model and analyses of "revenue sharing" bids] with the bidders themselves, because we wanted them to know how we were valuing their bid, so that we made sure that they didn't believe they were bidding more and then have our valuation turn out to be less. *So we wanted to give them the full benefit of understanding our methodology, in an effort to get them to increase their bids. And they did for several rounds*.

*Id.* at 350:20-351:1 (emphasis added). Once revenue sharing bids were allowed, the decision put "any cash bidding to an end as any bidder was plainly incentivized to bid higher with a sharing bid than if it were

transacting in cash." CL FOF ¶ 21.  Nonetheless, some cash bidding did

continue.[11]

### 7.     Mr. Manzo Conceives the Concept of Joint Bidding

The revenue sharing bids were not the only way Capstone

attempted to stimulate higher bidding to compete with the Agent's

potential credit bid.  Mr. Manzo testified:

> [W]e thought that eventually in the overall
> bidding process that the Agent would likely credit
> bid and to be able to have a comparable bid to be
> able to compete with the Agent's credit bid, it was
> our suggestion to the Company that, in fact, we
> permit joint bidding between any of the parties
> who were in attendance the Auction.

DX 97 at 267:16-21.  This was the basis of Capstone's determination to

allow joint bids.  *See id.* at 267:14-15.

### 8.     The Role of the NCLs in Determining Whether Joint Bids Would Be Allowed

#### a.     The NCLs Were Given a Veto Over Joint Bidding

After Mr. Manzo conceived of joint bidding, he discussed it

with GSC's counsel, who agreed to allow joint bidding but only if the

---

[11] *See, e.g.*, JX 6 at 80 & 88-89 (describing cash bids by Versa and Ares).

NY 76962594v5

NCLs consented to it.  Mr. Manzo testified that he thought of joint
bidding, but his counsel advised that:  "*Non-controlling lenders though,
they control this decision, not us*."  DX 145 at 151:5-6 (emphasis added).
Mr. Manzo and his counsel approached representatives of the NCLs and
informed them that the Debtors would not permit joint bidding unless
the NCLs agreed.  *See* DX 77 at 348:13-15; 352:6-8.  According to Mr.
Manzo, a key reason for seeking the NCLs' approval to joint bidding
was that he was "mindful that the last thing I wanted to do was have a
failed auction, that is, an auction where we permitted certain things to
happen that later on, they would object to and see — and attempt to stop
the sale from being approved by this Court."  *Id.* at 351:23–352:4.  Thus,
Mr. Manzo effectively gave the NCLs a veto over joint bidding.

> **b.    The NCLs Were Specifically Warned Joint Bidding Could Produce a Disproportionate Allocation**

Mr. Manzo spoke to Mr. Koneval and the NCLs' counsel and
financial advisors, stating that:

> we laid out what we viewed to be the pros and
> cons [of joint bidding].  I reiterated the cons
> many, many times — four or five times. . . . The

> cons were that this could create an environment where collusive bidding on the Black Diamond/Agent side could result in a situation that the Non-Controlling Lenders might find would produce less value for the credit bid and therefore it was something they should be aware of.

DX 145 at 149:25–150:9.  Mr. Manzo specifically warned the NCLs of what could happen if they agreed to joint bidding:

> [I]t was my view there would be [a] high likelihood that the allocation of assets would not be an equitable allocation and informed — actually after the agreement was signed again I said to Mark Koneval are you sure you understand this.  *I fully expect when you see the allocation you're not going to like it.  He said, yes, I know*.

*Id.* at 195:24-196:23 (emphasis added).

In response to a direct question from Judge Gonzalez at the hearing on the NCLs' motion to appoint a trustee, Mr. Manzo explained:

> I recall saying to the principals . . . who were there as well as White & Case . . . that if a joint bid was developed, that the allocation, potentially between the Agent on the credit bid side and the Black Diamond piece on whatever currency they chose to bid in a joint bid, might be shared between them in a disproportionate manner.  And I wanted to make sure the non-controlling lenders realized that, in fact, if we permitted joint bidding

NY 76962594v5

> that could occur, and explained that to them four,
> five times, including after they executed the
> agreement I went back and said, you now realize
> this is a real risk, so before I go back into that
> auction room with Mr. Solow are you sure you're
> comfortable with us proceeding with joint
> bidding. And he said they were.

DX 77 at 352:17-353:8.

### c. The NCLs' Decision to Allow Joint Bidding

It is undisputed that the NCLs were highly sophisticated and extremely well-represented at the Auction. Mr. Koneval, the self-described "ringleader" of the NCLs, is employed by Credit Agricole, the sixth or seventh largest bank in the world. *See* DX 141 (11/25/14 Koneval Dep.) at 38:20-24. He had been intimately involved in the Steering Committee that had unsuccessfully attempted for more than a year to restructure the Loan. *See* Koneval WD ¶¶ 18, 25. At the Auction, Mr. Koneval was accompanied by his financial advisor (*see* DX 146 (12/5/10 Gooden Dep.) at 6:22-23; 78:16-23) and his lawyers, to assist him in his decision-making. *See id*.

Early on the NCLs expressed their opposition to any outcome that would result in BDCM managing the GSC Funds. *See* DX 141 at

252:2-23 ("I don't think we were interested in entering into any sort of transaction with Black Diamond. . . . I don't think the bank had a very good view of Black Diamond. . . ."). This view was later made clear to the Trustee:    "[T]he non-controlling Lender Group was equally aggressive . . . and they made it very clear to me from the beginning that they would not, under any set of circumstances, consensually agree to having [BDCM] manage the assets." DX 97 at 13:7-12 (Garrity).

The NCLs were especially concerned that BD Lenders could acquire control of the Collateral through its right as the Required Banks to instruct the Agent to credit bid. Mr. Koneval was aware the Agent could credit bid as much as $240 million. *See* Hr. Tr. at 282:9-11 (Koneval). As Mr. Koneval stated in a March 7, 2011 email:

> Were the vanilla credit bid for all assets on behalf of the bank group to stand, [Black Diamond] as agent will be able to assign the management of the contracts to any 3rd party and pay them whatever they want. They will assign the assets to themselves and pay themselves most of the fees. The NCL's will get very little.

DX 181 (3/7/11 email from Mr. Koneval to Ms. Yip and Mr. Wong).

-58-

By the morning of October 27, 2010 — before the start of the second day of the Auction — Mr. Koneval had already instructed his lawyers to draft court papers in an attempt to thwart BDCM's use of a credit bid to trump cash bids by other bidders. As Mr. Koneval reported in an email sent at 8:26 a.m., "the potential for a very large recovery is here by *cobbling together 3 of the very interested bidders* but won't be realized if BD[CM] trumps every real cash bid with a credit bid so they can get another bite at the apple. *I think this possibility is high enough that I have [my attorneys] working on papers now.*" DX 46 (10/27/10 email from Mr. Koneval to Mr. Sidrane) (emphasis added).

Given Mr. Koneval's concern about BD Lenders acquiring all the Collateral through a credit bid, and his avowed desire to "cobble together" a group of "interested bidders," joint bidding could provide the NCLs with a potential counterweight to BDCM's formidable amount of credit currency. Even before the NCLs consented to joint bidding, they appear to have brought their own bidder — Sankaty — to the Auction, who in turn proposed revenue sharing bids. As revealed in an email from Mr. Koneval to Apidos dated December 11, 2010, "*[t]he only*

-59-

*reason Sankaty was at the Auction and held in for 4 miserable days and gave the outsized $194mm bid was Ted Gooden* [NCLs financial advisor from Berkshire]. . . ."  DX 76 (12/11/10 email from Mr. Koneval to Ms. Bergstresser and Ms. Dragonetti) (emphasis added).

### d. The NCLs Decision to Allow Joint Bidding Albeit with Reservations

In sum, the record reveals that the NCLs (i) knew the Agent had the capacity to credit bid far more than the Collateral was worth;[12] (ii) were implacably opposed to BDCM and the Agent acquiring the Collateral even with a plain vanilla bid; and (iii) their only chance to block BDCM and the Agent was by "cobbl[ing] together" a joint bid by Sankaty and other bidders — possibly including the Agent; and (iv) without a change in the rules, joint bidding was not permitted and bidders could not collude or even communicate with one another.

Given this context, it is not surprising that the NCLs were receptive to the change in the Bidding Procedures.  Capstone insisted on

---

[12] Prior to the Auction, Capstone concluded that the "best case scenario" could "potentially reach approximately $140 million."  DX 94 at 30.  This figure is approximately $100 million less than the amount of the secured debt available for the Agent to credit bid.

a written agreement and the NCLs were actively involved in drafting the written consent.  *See, e.g.*, Koneval WD ¶¶ 48-49.  Over a period of hours, drafts were exchanged between counsel for the NCLs and for the Debtors, resulting in the signed Consent Letter.  *See* DX 77 at 366-368. Capstone and the NCLs both had strong reasons to allow joint bidding. The NCLs wanted some other group "cobbled together" to outbid BDCM and the Agent, and Mr. Manzo testified that he wanted the same thing:

> [I]t became very clear to us that there was an opportunity to get individual auction bidders to join forces together, and in doing so, it might result in an increase in the overall bid to GSC. *And we thought that was important because it was my belief that eventually the agent would go ahead and bid with their credit currency. And unless we permitted other bidders to join forces together, individually, the bidders would not be able to meet or exceed an individual credit bid from the agent, given the 240 million dollar[s] of self-currency that the agent had.*

DX 77 at 347:8-21 (emphasis added).

In the Consent Letter, the NCLs unequivocally acknowledged they were informed they had been given the complete

-61-

power to veto joint bidding: "We have advised you [the NCLs] that we will not agree to the modifications referenced herein unless you consent to a joint bid by the Agent and BDCM." DX 44 at 1. Finally, the Letter states, "you have advised us that, based on the foregoing, you consent to the modification of the bidding procedures referenced herein (including a joint bid by the Agent and BDCM)." *Id.*

### e. The Impact of the NCLs Consent on the Auction

All parties understood that absent joint bidding BDCM could have instructed the Agent to make a credit bid that significantly "overbid" for certain assets while simultaneously underbidding individually for certain other assets. In that event, Mr. Manzo could have accepted the overvalued credit bid because GSC would sell lower valued assets for a higher valued credit bid. At the same time, Mr. Manzo could reject the undervalued cash bid. *See* CL FOF ¶ 27 n.9. As Claimants acknowledge,

> Had the bids been severable [as they were before "joint bidding" was allowed and would have remained if the NCLs declined to consent], [BDCM] would have faced the risk that GSC

NY 76962594v5

> would decline to sell the cash bid assets for $11
> million but still seek to compel the delivery of a
> $224 million credit bid for assets with a tiny
> fraction of that amount.

*Id.*  The NCLs' consent to joint bidding changed this Auction dynamic because "the Black Diamond Joint Bid 'was not a bid that could be taken apart.'"  *Id.* (quoting CX 61 (12/12/10 Deckoff Dep.) at 216:2-3).

In this context, we conclude that Claimants knowingly acceded to joint bidding between BDCM and the Agent in exchange for the opportunity to "cobble together" their own group with the aid of Sankaty in an attempt to outbid BDCM.  The NCLs could have minimized a risk of a possible misallocation by conditioning their consent to joint bidding on BDCM's agreement that no cash bid by BDCM could be jointly submitted with the Agent for any lot that did not exceed the highest cash bid another bidder had previously made, or by requiring the Agent to joint bid with other bidders.  But the NCLs did not attempt to obtain any such limitations or conditions on joint bidding by the Agent and BDCM.

NY 76962594v5

Instead, the NCLs negotiated an acknowledgement by the

Debtors of its "reservation of rights," providing:

> We note, however, that you reserve all claims and
> causes of action that you may have against the
> Agent and BDCM for the improper use by the
> Agent of the credit bid to the detriment of the
> Non-Controlling Lender Group and that you
> consent to the modifications referenced herein
> should not be construed as a waiver of any such
> claims or cause of action.

DX 44 at 1.

The NCLs also obtained an acknowledgement of their

position that "the acceptability of a bidder/manager to the investors is a

significant factor in determining which bid is the best bid . . . which the

Debtors believe may be one of a number of factors relevant to a

determination of which bid is the best bid." *Id.* at 1-2.

### f.    The Joint Bidding

After the Consent Letter was signed, the Auction resumed at

1:45 p.m. and Mr. Manzo announced the change to the Bidding

Procedures and encouraged all the bidders to consider joint bids:

> [W]e're permitting any of the bidders, that is any
> of the lending bidders, that is the Agent, Black

-64-

> Diamond Capital Management, who is the syndicate, or any of the other bidders who are here to speak freely with each other and develop a bid to the extent they would like to, a joint bid. It's totally okay with us.
>
> That could mean that bidders who are not lenders [if, for example] the credit[or] or the Agent want to talk together, they are free to do it and develop a joint bid if they would like.
>
> If Black Diamond and the Agent want to pursue that, they're free to. . . .

JX 4 at 14:10-25.

The first joint bid by BDCM and the Agent consisted of $11 million in cash and note by BDCM (for all property not designated specifically in the credit bid)[13] along with a $130 million credit bid by the Agent for certain specified lots. *See id.* at 45-47. Sankaty submitted a revenue sharing bid to manage all lots of GSC's assets in exchange for certain fees.

The Auction was adjourned while Capstone valued the various bids and reconvened on October 28, 2010 at 9:00 a.m. Mr.

---

[13] BDCM had a higher alternative cash bid consisting of $10 million in cash and an $11 million note on terms and conditions similar to those offered by Compass and Versa. *See* JX 4 at 46:17-25.

NY 76962594v5

Manzo announced that the Sankaty bid had been selected to be the "superior bid" for "a value to the estate of $139.6 million." JX 5 at 4. BD Lenders objected that the Bidding Procedures did not permit revenue sharing bids.

In the next round of bidding to determine if the Sankaty winning bid would be exceeded, BDCM and the Agent submitted a joint bid consisting of a credit bid of $141 million together with a cash/note bid of $11 million from BDCM. *See* JX 5 at 21:17-25:5. By the fourth round of bidding, BDCM led with a joint bid with the Agent of $190 million. At that point, for the avowed purpose "to drive the purchase [price] even higher" (DX 72 ¶ 37), Mr. Manzo called for best and final sealed bids from remaining bulk bidders for all assets being auctioned,[14] which included Respondents, Sankaty and Saratoga. *See* JX 5 at 71:24-73:24. Mr. Manzo noted that the Agent is always able to credit bid even

---

[14] Over the objections of the Agent and BDCM, GSC had previously removed certain assets from the Auction. *See* JX 4 at 24:5-7. On May 23, 2017, certain of these assets were acquired by the Agent from the Trustee in APA 2 by using the balance of the credit bid not exercised at the Auction.

after the Auction has ended.  *See id*. at 73.  BD Lenders objected to the procedure as it forced it to bid against itself.  *See id*. at 76.

In the final round of bidding at 4:00 a.m. on October 29, 2010, Sankaty bid on "all lots" in exchange for all revenue going to GSC except for 40% of the senior fees, which were not guaranteed and not dependent on meeting any metrics, which Capstone initially valued at $193.7 million.  *See* DX 52 (Sankaty Final Bid).  BDCM and the Agent submitted a joint bid totaling $235 million, consisting of $11 million ($5 million cash/ $6 million note) and a $224 million Credit Bid.  Respondents' joint bid was chosen as the best bid, beating out Sankaty's revenue sharing bid.

During the Auction, the NCLs' financial advisor lobbied Capstone to use lower discount rates to place a higher value on Sankaty's revenue sharing bids even though the final Sankaty bid contained no incentive compensation.  As Mr. Manzo acknowledged, using the lower discount rate would have increased the value of the Sankaty bid by $17 million.  *See* DX 72 ¶ 38 n.11.

-67-

### g.   Capstone's Initial View of the Allocation

Mr. Manzo was indifferent to the manner in which the assets being acquired were allocated between the Cash Bid Assets and the Credit Bid Assets.   Nevertheless, given his familiarity with GSC's assets, Mr. Manzo was well aware of the significantly disproportionate allocation of value in favor of the Cash Bid Assets.   At the time of the Auction, Mr. Manzo understood the best possible scenario would fetch approximately $140 million for all GSC assets included in the Auction. *See* DX 94 at 30.   On December 2, 2010 — more than a month after the Auction — Mr. Manzo testified that his initial analysis of the allocation of asset values was $82.5 million to the Cash Bid Assets and $55.9 million for the Credit Bid Assets. *See* DX 145 at 47:14-21.   Peter Frank, GSC's former President, testified to his view that the allocation was not "fair" to the Lenders.   DX 77 at 112:13-16.   As Mr. Manzo subsequently testified about the allocation, "it's a wonderful allocation for the Black Diamond Management Company and [a] terrible allocation for the Lender Group as a whole."   DX 148 at 231:3-6.

NY 76962594v5

9.    **Analysis**

Claimants' interpretation of section 14.7(b) is not supported by the text of this provision.  Under Claimants' expansive reading the Cash Bid Assets would be subject to sharing whether or not BDCM bid separately for certain lots or bid jointly with the Agent for all the assets.

Whatever merit there is in Claimants' position that the allocation of assets between the Cash and Credit Bid was disproportionate, we do not agree that section 14.7(b) applies to assets purchased by BDCM for cash at the Auction.  As noted earlier, section 14.7(b) requires sharing only if an amount is received "which is applicable to the payment of the principal of, or interest on, the loans. . . ."   Provisions like section 14.7 are embedded in loan documents, drafted by industry experts, to assure that creditors share payments received by the debtor *as repayment of the loan*.  But section 14.7(b) does not prevent a lender from buying assets, on its own behalf, at a section 363 sale.  Claimants offer insufficient evidence that section 14.7(b) was intended to apply to BDCM's individual Auction purchase,

NY 76962594v5

as opposed to a purchase by the Agent, acting on behalf of all Lenders, which reduces the balance due on the Loan.

On the contrary, the record reveals a practical construction by all the Auction participants that leads to the opposite conclusion. *See*, *e.g.*, *Ellington v. EMI Music, Inc.*, 24 N.Y.3d 239, 248 (2014) (Smith, J. concurring) ("what persuades me . . . here is the parties' practical construction of the agreement"). The Bidding Procedure Order approved by the court and acquiesced in by the NCLs permitted individual bidding by any Lender and automatically qualified that Lender to bid. This was plainly designed to increase the pool of potential bidders in an effort to maximize recovery for the creditors of the estate.

At the same time, the Bidding Procedures provided for credit bidding by the Agent at the direction of the Required Banks. Capstone announced at the Auction that BDCM and the Agent were free to submit bids and accepted the individual bids by BDCM. The NCLs never raised any claim at the Auction that joint bidding by BDCM and the Agent triggered section 14.7(b) or required BDCM to share the

-70-

Collateral it purchased with them even though the Bidding Procedure
Order specifically gave the NCLs the right to object at the Auction.

Claimants' effort to add the term "transaction" to section
14.7(b), would lead to the result that once a credit bid was made by the
Agent for any lot, the sharing provision would require that any other
Lender's separate Collateral purchase also be shared ratably.  Such a
construction would convert an individual bid by any Lender into a bid
on behalf of all Lenders.  Indeed, the NCLs had previously contended in
the Bankruptcy Court that the Agent should have joined with other
bidders, like Apidos, a Lender, and that its failure to do so depressed
asset values.

At bottom, Claimants' broad interpretation of section 14.7(b)
boils down to their opposition to joint bidding by BDCM and the Agent.
They contend  that "as a matter of economic reality, the Class B and
Class C Assets [the Cash Bid Assets purchased by BDCM in the joint
bid] were acquired . . . using the credit bid" and that "Respondents do
not dispute that the credit bid *was essential to their acquisition of the
Class B and C Assets*."  CL FOF ¶¶ 82-83 (emphasis added).  But even

NY 76962594v5

if the Credit Bid were essential to BD Lenders' ability to prevail as a cash purchaser at the Auction, this does not transform BD Lenders' cash purchase into a payment on account of the Loan.  Claimants have cited no authority that supports recasting a cash bid into a payment on account of a loan just because it is a component of a joint cash and credit bid.[15]

We conclude that such a result is inappropriate.  *First*, the NCLs consented to allowing BDCM to jointly bid with the Agent, and it is inherent in any joint bid that each component of the joint bid only prevails if the joint bid prevails.  While we recognize that this consent was tempered by the reservation of rights retained by the NCLs to challenge BDCM's instructions to the Agent, its misuse of the Credit

---

[15] We note that Claimants' reliance on *Prudential Ins Co. of America v. WestLB AG*, 37 Misc. 3d 1208(A), (Sup. Ct. N.Y. Co. 2012) is misplaced.  As Justice Jaffe correctly determined, "In *Prudential*, there was no dispute that the collateral was purchased with the credit bid." *Id*. at 16.  The issue in *Prudential* was whether the administrative agent had the discretion to distribute the proceeds of a credit bid unequally to favor certain of the secured creditors that had provided "exit financing" to maximize the value of the purchased assets.  The court merely held that the agent could not unilaterally alter the right to *pro rata* distribution of the collateral admittedly acquired with the credit bid.  It does not address, much less support, Claimants' position here that collateral purchased individually by BDCM at a section 363 auction for cash and a note must be shared ratably.

NY 76962594v5

Bid, and the resulting misallocation, Claimants' argument would render their consent to the process of joint bidding meaningless.

The economic reality of the transaction was that the joint bid had two distinct components, the Cash Bid and the Credit Bid. This conclusion is supported by the Trustee who testified that in proceeding with APA 1 and the Side Letter he was giving effect to the dual cash and credit bids that prevailed at the Auction. *See* DX 147 (6/24/11 Garrity Dep.) at 51-52 (indicating that in so proceeding he was respecting the outcome of the auction). The Trustee, appointed at the behest of the NCLs to give them a "fair shake," also testified that he determined to give effect to the joint bid based on the NCLs' consent to joint bidding. *See id.* at 51:18-52:22.

In sum, Claimants have failed to discharge their burden to prove that section 14.7(b) was intended to transform the Collateral purchased with BDCM's individual bid as part of a joint bid into a payment "on account of the loan," or to serve as a tool to rectify a disproportionate allocation between the cash and credit bid. Such a use of section 14.7 would also create the precise threat Mr. Manzo intended

NY 76962594v5

to eliminate by obtaining the NCLs' consent to joint bidding. Claimants' invocation of section 14.7(b) as a vehicle to rectify a disproportionate allocation within the joint bid would render its consent to joint bidding a nullity. *See* DX 147 at 63:14-64:7. Indeed, we agree with the observations of both Justice Jaffe and Judge Gonzalez who noted that the NCLs "did not reserve the right to withdraw consent to the joint bid." JX 24 at 12 (Justice Jaffe describing Bankruptcy Court's July 18 decision).

We next find that Claimants have not shown that the December 18 Letter ultimately "eliminated any allocation of assets." CL FOF ¶ 84 (citing *id.* ¶¶ 33-36). As originally conceived under APA 1, the Cash Bid Assets and the Credit Bid Assets would have been delivered to two separate entities – GSCAP and an entity to be designated by the Agent, which later became GSCAH.. This required GSC to convey assets to each of the two entities. The December 18 Letter merely substituted a single entity to hold both the Cash Bid Allocable Items and the Credit Bid Allocable Items. Specifically, the December 18 Letter modified APA 1 to assign the rights of GSCAP, as

-74-

the purchaser of the Cash Bid Allocable Items under APA 1, to GSCAH, which would also receive the Credit Bid Assets. *See* JX 10 ("GSCAP hereby assigns to Designated Purchaser [GSCAH] its rights to assume and have assigned to it by Sellers the Cash Bid Allocable Items such that, at the Closing, all of the Cash Bid Allocable Items . . . shall be assigned to and assumed by the Designated Purchaser [GSCAH].")

Significantly, the December 18 Letter does not mention, much less alter, the *allocation* of the Credit Bid Assets or Cash Bid Assets as reflected in the joint bid. Unlike section 2.6(b) of APA 1, which states that the entity designated by the Agent would receive the Credit Bid Assets "for the benefit of the Senior Secured Creditors" (JX 7 § 2.6(b)), the December 18 Letter does not provide that GSCAH would receive the Cash Bid Assets "for the benefit of the Senior Secured Creditors." JX 10. Moreover, both the Agent *and* GSCAP are members of GSCAH. This meant that GSCAH's receipt of both the Cash and Credit Bid Assets, is not the same as the Agent receiving those assets solely for the benefit of the Lenders. In this regard, we also note that the NCLs' June 28, 2011 Disclosure Statement in support of a vote on the

-75-

Sankaty plan, which contains a comprehensive chronology of events,

does not describe the December 18 Letter as "undoing" the allocation.

Mr. Manzo explained that because GSC had nothing to do

with the allocation he did not want GSC to convey the assets to two

distinct entities:

> Q.    Right. And those are the letter agreements
> that were filed on December 18th; is that right?
>
> A.    I'd have to take a look.  But my recollection
> is that we talked about the *fact that we, the
> Company, didn't want to be allocating assets from
> our -- from the Debtors to two separate buying
> groups.*
>
> We wanted to convert -- *we wanted to
> convey the assets from the debtor to one entity
> with no allocation as to who owned those assets
> as between Agent and third party.  And our view
> was that that was the affair[] of that purchasing
> entity to worry about allocation and things of that
> nature.*
>
> Q.    And that structure is present in the bid that's
> proposed today, right?
>
> A.    Yes.  One entity without an allocation, that's
> correct.

DX 148 at 104:7-25 (emphasis added).  Mr. Deckoff also confirmed that

GSC "encouraged" the single entity to make it "cleaner and easier for

-76-

the judge to approve." CX 95 (7/1/11 Deckoff Dep.) at 40:11-16.  Mr.
Manzo acknowledged that he was never told that the December 18
Letter somehow canceled the joint bid. *See* DX 97 at 343:20-344:4.

There is a vast difference between eliminating GSC's
*participation* in allocating assets between the Credit and Cash Bids and
"undoing" the allocation between those bids.  Using a single entity
accomplished the former and had nothing to do with the latter.  In
keeping with Mr. Manzo's single entity concept, the Debtors argued that
there was "no allocation" which, from their perspective, was the purpose
of the single entity concept.[16]  In short, nothing in the December 18
Letter altered the allocation embedded in the joint bid.

Claimants' contention that the allocation was "undone" by
the December 18 Letter conflates two separate concepts -- the use of a

---

[16] Claimants appear to recognize that it was the Debtors' counsel, not BDCM, who
insisted there was "no allocation" because a single entity would receive both the
cash and credit assets.  Given the contentious relationship Mr. Manzo and GSC had
with BDCM, they were not purporting to speak for BDCM and statements by
BDCM's  counsel that BDCM "[was] not on trial today," that he was "not going to
stand up and refute everything that's said about Black Diamond," and they
"reserved all [their] rights," DX 77 at 25:15-20, demonstrates that Black Diamond
did not agree, through silence, with GSC's statement.  At that point in time the sale
was not approved and a Trustee was appointed at  the behest of the NCLs.

NY 76962594v5

single entity to receive all assets and the "undoing" of the joint bid. At the July 6, 2011 Bankruptcy Court hearing, the Trustee testified that: "I understand they are going to keep that allocation [in the joint bid] or something like that, yes." DX 97 at 199:14-15. The NCLs' counsel confirmed to the court that it was aware of that testimony: "the [T]rustee testified he believes the allocation's going to be based on the joint bid." DX 98 at 96:21-22.

The May 23, 2011 Side Letter unequivocally states that both the Designated Purchaser [i.e. GSCAH] and the Seller "hereby reaffirm and acknowledge that APA 1 as amended by this Side Letter is and remains in full force and effect and any purported termination thereof by any party thereto prior to the date hereof shall be void and of no effect." JX 11 at 1. The Side Letter does not reference the December 18 Letter. Indeed, in defining the "Transaction Documents" the Sale Order does not include the December 18 Letter within that definition. Instead, it authorizes the Trustee to consummate the transactions "in accordance with the terms and conditions of APA 1 and APA 2 and the other

Transaction Documents."[17]    JX 14 at 13.    And APA 1 clearly

differentiates between the Credit Bid and the Cash Bid Assets.

Any doubt that the joint bid embodied in APA 1 survived the

December 18 Letter is dispelled by the Trustee's explanation of his

determination to respect the outcome of the Auction.    The Trustee

testified as follows:

> Q.    [Y]ou're proposing a transaction that's
> based on the initial APA, right?
>
> A.    Yes.
>
> Q.    What's the initial APA based on?
>
> A.    The results of the Auction.

DX 147 (6/24/11 Garrity Dep.) at 203:22-204:3.

The Trustee's June, 2011 motion to approve the sale of

GSC's assets described the proposed transaction as one which "respects

---

[17] While APA 2 does reference the December 18 Letter, the references are
innocuous and do not change the fact that the Sale Order authorized the Trustee to
consummate the transactions in accordance with *both* APAs and the Transaction
Documents.  *See* JX 12 at RECITALS ("WHEREAS, on December 18, 2010, the
Purchaser executed a Counterpart to APA 1, pursuant to which it agreed to be
deemed the "Designated Purchaser" under APA 1 . . . . ), and at DISCLOSURE
SCHEDULE (describing APA 1 as 10/31/10 agreement between GSCAP and the
Sellers "to which the Purchaser executed a counterpart . . . on December 18,
2010").

NY 76962594v5

the winning bid submitted at the Auction held in [those] cases in October 2010." DX 92 at 2. In seeking approval the Trustee stated that:

> [t]he proposed sale of assets pursuant to APA 1 is a duly authorized bid resulting from a court-appointed, highly competitive auction process to which all of the Debtors' major constituents – including the Non-Controlling Lender Group (as defined below) – consented and in which they actively participated and that produced a result that far exceed[ed] the expectations of the Debtors and their advisors.

*Id.* at 6.

As the Trustee explained in rejecting other transactions he took into account that "[t]he Auction procedures had gone forward, that the Auction had been conducted and that the joint bid had been submitted with the consent of the Minority Lenders." DX 147 at 63:7-10. The Trustee elaborated, "I'm saying, the use of [the] joint bid was consented to by the Minority Lenders and *the right of the parties* to allocate among themselves was consented to among the Minority Lenders." *Id.* at 63:20-24 (emphasis added).

Once both the Cash and Credit Bid Assets were designated to be received by GSCAH, the Agent deferred the implementation of the

allocation until after the sale.  The purpose of this appears to be two-fold: *First*, it insulated the Debtors from participating in any way in the allocation, something Mr. Manzo had sought all along.  *Second*, it eased the path to approval of the sale, relieving the Bankruptcy Court of any obligation to consider the allocation issue.

Finally, we address Claimants' contention that the Bankruptcy Court had been told by both the NCLs and Black Diamond – and clearly understood -- that there had been no allocation of GSCAH's assets when it approved the sale.  *See* JX 14 (Sale Order) and JX 15 (Sale Opinion).  Claimants argue that this lack of allocation supports their argument that Respondents breached section 14.7(b) of the Credit Agreement.

Claimants point out that the Trustee testified at the hearing that he was unaware of what interest the Secured Lenders (through their Agent) would have in GSCAH.  *See* DX 97 at 82:20-22 ("Q.  And where it [the allocation] falls within that range [of 0 to 100%], you don't have any idea, right?  A.  I do not know."); *see also id*. at 224:19-21 ("I don't know how the consideration is going to be allocated; I do not.").

-81-

Similarly, Mr. Manzo testified that he did not know what the allocation would be.  *See id.* at 329:18-20 ("I can't tell you what the allocation is among the secured creditors as part of that group.  I don't know what that is."); *see also id.* at 341:2-3 ("I don't know the allocation once the assets are conveyed to the vehicle that's purchasing the assets.").

Counsel for Respondents also informed the court on July 7, 2011 that "There's a buyer and it's there and there's no allocation going on" (DX 98 at 113:23-24) and "the single entity was, in part, in response to Your Honor's concerns that there not be any diversion of assets and the like or any finding that this or that was right or wrong."  *Id.* at 115:1-4.  Respondents' counsel also quoted Mr. Deckoff's Sale Hearing deposition where Mr. Deckoff described the factors he would use in ultimately deciding the allocation as "consistent with the agreements that we have and is consistent with the law that exists in this area and takes

in to account what different people are contributing.  And we plan to do this in a fair way." *Id.* at 114:13-16.[18]

The NCLs, in turn, informed the Court that Mr. Deckoff testified at his deposition that "he [Deckoff is] not committing to more than .1 percent of the overall equity in the acquisition vehicle or [sic] interest in the acquisition vehicle will be allocated to the minority lenders." *Id.* at 96:23-97:1

In his testimony at the Arbitration Hearing Mr. Deckoff attempted to explain away his prior statements that the assets had not been allocated based on the results of the Auction by saying that the *interests in GSCAH* had not yet been allocated.  *See* Hr. Tr. at 1158, 1162, 1189-1312 (Deckoff).  That argument is not persuasive because the assets of GSCAH eventually were allocated based on the allocations between the Cash  and Credit Bids.

Respondents point to the fact that the NCLs' counsel informed the Bankruptcy Court at the Sale Hearing that "[t]he [T]rustee

---

[18] At the July 7 hearing the Judge also gave his understanding of what he was told: "But there hasn't been, in my understanding, an allocation of the value within that asset purchase vehicle." *Id*. at 40.

NY 76962594v5

testified he *believes the allocation's going to be based on the joint bid.*"
DX 98 at 96:21-22 (emphasis added). But Respondents' counsel also
stated "there's no allocations going on." *Id.* at 113:24. Respondents'
counsel also stated "Your Honor, they've got to go to state court and
make the arguments they're already making [regarding the allocation]. . .
." *Id.* at 114:21-22.

Against this backdrop, however, BDCM disclosed the
intended allocation just days before the Closing. In their July 22, 2011
emergency motion for a hearing on a preliminary injunction or
temporary restraining order or a remand to state court, the NCLs'
informed the court that: "we've now received Mr. Deckoff's statement
of the allocation . . . if the transaction isn't stopped we may never be
able to get that seventy-five million dollars [claimed damages] back."
CX 103 (7/22/11 Hearing re Application for Temporary Restraining
Order) at 6:13-19. In denying injunctive relief the Bankruptcy Court
stated that the allocation was a matter to be decided by the state court.
*See id.* at 38-39.

-84-

Based on the above evidence, it appears that notwithstanding the terms of the transaction documents, the Bankruptcy Court believed that BDCM could change the allocation of the assets purchased at the Auction at any time prior to the actual distribution of interests in GSCAH, and there would be no allocation until the sale was approved. While Claimants argue that this lack of allocation supports their argument that Respondents breached section 14.7(b) of the Credit Agreement, we are not persuaded.

*First,* for the reasons stated above section 14.7(b) does not apply to these circumstances. The lack of an allocation does not mean that all of the assets (or interests in GSCAH) later allocated were received in repayment of the Loan and thus subject to *pro rata* sharing under section 14.7(b). *Second,* while the Bankruptcy Court was wary of approving an allocation in the Sale Order, the court also made clear that the propriety of the ultimate allocation was not its concern. For example, at the Sale Hearing the NCLs argued that BDCM's good faith could not be shown without the Bankruptcy Court ordering BDCM to state "what the allocation is. They can't get away with saying I'm not

going to tell you how I'm doing it . . . ." DX 98 at 97:17-19.  The NCLs argued "[a]s of the sale, there's no allocation done. . . . If he [Deckoff] wants a finding of good faith or Black Diamond wants a finding of[] good faith and they want a finding that there's no collusion, there has to be a statement of ownership." *Id.* at 99:24-100:9.

Rejecting this request, the Bankruptcy Court approved the sale on July 7, 2011, and issued its Order Approving the Sale on July 18, 2011, without requiring BDCM to reveal the allocation.  In so doing, the Bankruptcy Court stated:

> The Non-Controlling Lenders' allegations all related to their grievance concerning the allocation of assets under the Proposed Transactions.  In that regard, as has been stated repeatedly, nothing in this process impairs their right to continue to adjudicate their dispute over the allocation of assets in the action that they have commenced in State Court.

JX 15 at 79.

We conclude that the allocation adopted by BDCM is consistent with the results of the Auction and the transaction documents giving effect to the results of the Auction.  As stated above, that

-86-

allocation does not offend the express terms of section 14.7(b).  At the

same time, that does not mean that the NCLs have no possible redress

for their claim that BD Lenders disproportionately allocated the assets to

themselves at the expense of the Claimants.  As discussed below, we

find that remedy in the breach of the implied covenant of good faith and

fair dealing cause of action.

## C.  The Tribunal Finds That the Agent Did Not Breach Section 12.5 of the Credit Agreement and Section 6.1 of the Security Agreement (Count IV)

### 1.  Legal Standard

As a general matter, New York law requires the enforcement

of contractual exculpation clauses.  *See Nomura Home Equity Loan,*

*Inc., Series 2006-FM2, by HSBC Bank USA, Nat'l Ass'n v. Nomura*

*Credit & Capital, Inc.*, 30 N.Y.3d 572, 579-80 (2017).  This is because

"[a] limitation on liability provision in a contract represents the parties'

Agreement on the allocation of the risk of economic loss in the event

that the contemplated transaction is not fully executed, which the courts

should honor."  *Metropolitan Life Ins. Co. v. Noble Lowndes Int'l, Inc.*,

84 N.Y.2d 430, 436 (1994).  At the same time, "'[l]imitations on a

NY 76962594v5

party's liability . . . to be enforceable must be clearly, explicitly and

unambiguously expressed in a contract [and] are . . . strictly construed

against the party seeking to avoid liability.'"  JX 25 at 7 (quoting

*Terminal Cent., Inc. v. Henry Modell & Co.*, 212 A.D.2d 213, 218-19

(1st Dep't 1995)).

           However, exculpation clauses will not be enforced where

they purport to immunize "willful or grossly negligent acts." *Kalisch-*

*Jarcho, Inc. v. City of New York*, 58 N.Y.2d 377, 384-85 (1983)

(explaining that "an exculpatory agreement, no matter how flat and

unqualified its terms, will not exonerate a party from liability under all

circumstances. Under announced public policy, it will not apply to

exemption of willful or grossly negligent acts."). *See* JX 25 at 7 ("Bad

faith, wrongful conduct or gross negligence may bar enforcement of

exculpatory agreements.") (citing *Kalisch-Jarcho, Inc.*, 58 N.Y.2d at

385).  "[G]ross negligence, when invoked to pierce an agreed-upon

limitation of liability in a commercial contract, must smack of

intentional wrongdoing." *Abacus Fed. Sav. Bank v. ADT Sec. Servs.,*

*Inc.*, 18 N.Y.3d 675, 683 (2012) (internal quotation marks, brackets, and

NY 76962594v5

citations omitted).  Gross negligence "'is conduct that evinces a reckless indifference to the rights of others.'"  *Id.* at 683 (quoting *Sommer v. Federal Signal Corp.*, 79 N.Y.2d 540, 554 (1992)).  Furthermore, the Court of Appeals has interpreted a clause providing immunity except with regard to "willful acts," as evincing the parties' intent "to narrowly exclude from protection truly culpable, harmful conduct, not merely intentional nonperformance of the Agreement motivated by financial self-interest."  *Metropolitan Life Ins. Co.*, 84 N.Y.2d at 438 ("Under the interpretation tool of *ejusdem generis* applicable to contracts as well as statutes, the phrase 'willful acts' should be interpreted here as referring to conduct similar in nature to the 'intentional misrepresentation' and 'gross negligence' with which it was joined as exceptions to defendant's general immunity from liability for consequential damages.").

## 2.    Claims Against the Agent

In Count IV of the Amended Complaint, Claimants allege that the Agent breached section 6.1 of the Security Agreement and section 12.5 of the Credit Agreement by failing to act "'for the benefit of the Secured Creditors.'"  JX 16 ¶ 121 (quoting Security Agreement § 6.1

-89-

and citing Credit Agreement § 12.5). With respect to section 12.5 of the Credit Agreement, which applies upon a default by GSC, the Claimants focus on the language requiring the Agent to take such actions that are "reasonably directed by the Required Banks" and in the absence of reasonable instructions to act in the "best interests of" the Lenders.[19] As to section 6.1 of the Security Agreement, the Claimants rely on the language stating that the Agent's actions are "for the benefit of" the Lenders.[20]

   Claimants argue that the Agent's breach occurred at Closing, on July 26, 2011. Specifically, Claimants contend that the "Agent's decision to extinguish the $257 million in loans and release all of the

---

[19] Credit Agreement § 12.5 (stating that upon default, "the Administrative Agent shall take such action with respect to such Default or Event of Default as shall be reasonably directed by the Required Banks, provided that unless and until the Administrative Agent shall have received such [reasonable] directions, the Administrative Agent may (but shall not be obligated to) take such action, or refrain from taking such action, with respect to such Default or Event of Default as it shall deem advisable in the best interests of the Banks.").

[20] Security Agreement § 6.1 ("By accepting the benefits hereof, the Secured Creditors agree that this Agreement may be enforced only by the action of the Collateral Agent, in each case acting upon the instructions of the Required Banks … it being understood and agreed that such rights and remedies may be exercised by the Collateral Agent . . . for the benefit of the Secured Creditors upon the terms of this Agreement.").

-90-

Collateral in exchange for no known recoveries to the Lenders[,]"
violated both of these provisions.    CL FOF ¶ 97.    According to
Claimants, the Agent's delivery of the Payoff Letter caused the release
of the Collateral to GSCAH, which the Agent did not control, which in
turn permitted Mr. Deckoff to misallocate the interests in GSCAH after
the Closing.  *See id.*

> Claimants also rely on the pre-hearing deposition testimony
of Hugo Gravenhorst, the Agent's sole employee.[21]   Mr. Gravenhorst
testified that he followed Mr. Deckoff's instructions to release all liens
on the Collateral without having any knowledge or understanding of the
terms of the GSCAH LLC Agreement or what the Lenders would
receive in exchange for the release of the liens.  *See* CL FOF ¶ 98 (citing
*id.* ¶ 77).   According to Claimants, "the record evidence . . . establishes
that Agent acted with a willful disregard of its fundamental contractual
duties to follow only 'reasonable' directions and to act for the benefit of
the Lenders."  *Id.* ¶ 100 (citing *id.* ¶¶ 75-77).

---

[21] Mr. Gravenhorst was deposed on December 12, 2010 and November 12, 2014.
He was not called as a witness at the Arbitration Hearing, but selected deposition
testimony was introduced by designation.

NY 76962594v5

Respondents argue that Claimants have misconstrued fundamentally the Agent's obligations and duties under the Credit Documents — (1) the Agent was not obligated to determine the reasonableness of instructions and (2) the "for the benefit" language means only that the Agent is not acting for itself.

Respondents contend that when read together, sections 12.1, 12.4, and 12.5 of the Credit Agreement "protect the Agent from liability when it follows the directions of the Required Banks." Respondents' Pre-Hearing Brief at 36. Section 12.1 states that the Credit Documents cannot be read to imply covenants or fiduciary duties. Section 12.4 provides that the Agent "shall in all cases be fully protected in acting or in refraining from acting, under this Agreement and the other Credit Documents in accordance with a request of the Required Banks." And section 12.5 — which, again, states that the "Agent shall take such actions . . . as shall be reasonably directed by the Required Banks" — "is understood in the industry to confer limited discretion on the Agent[:] It can either (i) follow the Required Banks' directions, in which case it is shielded from liability by §12.4, or (ii) reject instructions it deems

-92-

unreasonable and risk suit by the Required Banks." *Id*. at 36-37 (citing Gray Rept. ¶ 40). Respondents contend that the Agent cannot be held liable under the exculpation clauses in the Credit Agreement because Claimants have failed to show that the Agent's conduct constitutes gross negligence or willful misconduct. *See* Respondents' Reply to Claimants' Proposed Findings of Fact and Conclusions of Law at 9. According to Respondents, Claimants have failed to identify the duty purportedly breached by Respondents in connection with this claim. Respondents brush aside Mr. Gravenhorst's deposition testimony conceding that the Agent did not conduct any due diligence, arguing that the Agent had no such duty under the Credit Documents. *See id*.

In its decision denying the Agent's motion for summary judgment with respect to Count IV, the trial court identified several unresolved issues. *First*, whether the Agent was required to consider the "reasonableness" of instructions under section 12.5 of the Credit Agreement. In identifying this issue the trial court noted that Mr. Gravenhorst had "testified that, in some instances, the agent might have to consider the reasonableness of instructions . . . ." JX 25 at 16

*Second*, whether the "for the benefit" language in section 12.1 was meant for the Agent's benefit or the benefit of both the Agent and the Lenders. *See id*. at 15-16. *Third*, whether section 12.4 applied to exculpate the Agent for a breach of section 6.1 if "GSCAH's structure . . . enabled some secured creditors, BDC Lenders, to receive collateral in a more advantageous manner than others." *Id*. at 15. Finally, the trial court found that there were issues of fact as to good faith, gross negligence, and willful misconduct arising from Mr. Gravenhorst's testimony that he had not reviewed the GSCAH LLC agreement prior to the closing. *See id*. at 16.

### 3. Discussion

The Panel finds that the Agent did the not breach either section 12.5 of the Credit Agreement or section 6.1 of the Security Agreement. Absent a direction that on its face would cause the Agent to violate the Credit Documents, the Agent had no duty to assess the reasonableness of instructions, and the "for the benefit" language meant only that the Agent was not acting on its own behalf. Because the Agent

NY 76962594v5

did not have a duty to conduct due diligence, its failure to do so cannot be considered willful misconduct or gross negligence.

*First*, the testimony of Mr. Gray, establishes that the "reasonably directed" language in section 12.5 does not impose any obligations or duties on the Agent. *See* Hr. Tr. at 2307:16-21 (Gray). Indeed, even if an Agent receives a direction that is not reasonable it has no *obligation* to decline to follow the direction. *See id.* at 2305:19-2306:5. In fact, Mr. Gray testified that he has never heard anyone argue, other than in this case, that an Agent has such a duty. *See id.* at 2307:16-21.

Claimants' expert, Brad Hall, agreed with Mr. Gray that he had never encountered an Agent that declined to follow the directions of the Required Banks. *See id.* at 2309:24-2310:4 (Gray); *id.* at 432:23-433:2 (Hall). While Mr. Gray asserted that unreasonable instructions should not be followed, (*see id.* at 359:4-16), both experts agreed that the Agent's role is administrative or ministerial, (*see id.* at 434:19-435:5 (Hall); *id.* at 2302:11-25 (Gray)); just as both experts agreed that an Agent is not expected to do any analysis of various proposals or their

-95-

financial effects, (*see id*. at 363:3-364:19; 432:23-432:2 (Hall); *id*. at 2310:5-2311:23 (Gray)).

     *Second*, Mr. Gray's testimony and report also establish the meaning of the "for the benefit of" lenders language in section 12.1 of the Credit Agreement and section 6.1 of the Security Agreement.  Mr. Gray explains in his report that that language and phrases such as "on behalf of" lenders are "not generally understood in the industry to convert the relationship between the administrative or collateral agent, on the one hand, and the lenders, on the other hand, or to imply any additional duties, responsibilities or liabilities for the administrative agent and collateral agent," but instead "merely emphasize that the administrative agent or collateral agent is acting for others rather than for itself."  DX 124 ¶ 30; Hr. Tr. at 2303:16-2304:16 (Gray).

     We find the testimony of Mr. Gray both credible and persuasive.  He is a recognized specialist in syndicated loan transactions. He has been personally involved in more than 350 such transactions. He drafted the standard forms widely used in drafting syndicated loan transactions.  *See* DX 124 ¶¶ 1-4.  As a result of these qualifications his

Case 1:18-cv-00730-RJH   Document 115   Filed 06/04/58   Page 367 of 288

opinions are entitled to great weight.  As noted, Mr. Gray opined that it would be highly unusual for an agent to refuse to follow directions of the Required Banks and he has never seen this.  *See id.* ¶ 17(A).  Subject to a circumstance where a direction directly violates the agreement, we accept his testimony that an Agent would not assess the reasonableness of a direction.

    *Third*, given that we find that BD Lenders did not breach the Credit Agreement, there is no merit to Claimants' argument that because BD Lenders breached the Credit Agreement in directing the Agent to act, section 12.4 cannot apply to exculpate the Agent.  *See* CL FOF ¶ 99.[22]  Claimants' interpretation also is inconsistent with section 12 as a

---

[22] Claimants' argument is predicated on the incorrect assertion that the trial court *held* that the exculpatory language in section 12.4 of the Credit Agreement applies only where the Required Banks have authority to direct the Agent and only in accordance with the terms of the Agreements.  However, we do not regard the trial court's remark in the context of the denial of a summary judgment motion to be a holding. Furthermore, the reason given by the trial court as to why the Agent's defense under section 12.4 failed was that "Neither party [had] adequately demonstrate[d] the meaning of the provision in credit agreement § 12.4, that the agent be 'fully protected,' or that the term applies to the structuring of the collateral sale."  JX 25 at 15.  Similarly, in denying Claimants' motion for summary judgment on Count  IV, the trial court indicated that the exculpation provisions raised "threshold issue[s]," including, with respect to section 12.4, that "its meaning is not defined or self-evident in terms of the relationship among the secured creditors, which is intercreditor in nature."  JX 24 at 47.  While the

whole, and sections 12.4 and 12.5 in particular. As explained by Mr. Gray in his report and at the Hearing, sections 12.4 and 12.5 are common clauses that are understood in the industry to mean that when an agent follows directions it can expect to be exculpated. *See* DX 124 ¶ 17(B); Hr. Tr. at 2309:6-23 (explaining that if the Agent does not follow directions, it "has potential liability for refusing to follow instructions of the required banks if it basically guesses wrong or others disagree with it about the reasonableness of those instructions").

We thus find that the Agent did not breach section 12.5 of the Credit Agreement or section 6.1 of the Security Agreement. Furthermore, while conduct that is either willful or grossly negligent is not subject to exculpation, Claimants have not shown that the Agent's conduct "smack[s] of intentional wrongdoing." *Abacus Fed. Sav. Bank.*, 18 N.Y.3d at 683 (internal quotation marks, brackets, and citations omitted). While Mr. Gravenhorst's deposition testimony shows a remarkably disinterested Agent who did not conduct due diligence in

---

meaning of section 12.4 was unsettled at the time of the trial court's rulings, the arguments and evidence in this Arbitration have provided us with a basis to determine its meaning.

NY 76962594v5

connection with the Closing, this conduct cannot serve as a basis for liability if the Agent, as both experts agreed, had no duty to conduct such due diligence. Thus, Claimants' primary argument, that the Agent breached "its fundamental contractual duties to follow only 'reasonable' directions and to act for the benefit of the Lenders" CL FOF ¶ 100 suffers from the fatal flaw that the "reasonably directed" language does not impose any duties or obligations on the Agent to conduct an economic analysis; just as the language "for the benefit of the Lenders" does not impose a duty on the Agent to, for example, maximize the recovery for the Lenders (and instead indicates only that the Agent is not acting on its own behalf).

Claimants present additional theories of intentional wrongdoing based on the notion that the Agent acted as part of a scheme to deprive them of their fair share of the Collateral. According to the Amended Complaint, "Black Diamond Agent has planned and undertaken actions with full knowledge that such actions would cause harm to the Secured Creditors, including the Plaintiffs." JX 16 ¶ 122. Likewise the Amended Complaint states that

-99-

> Black Diamond Agent has [acted] as part of a deliberate strategy to siphon the collateral securing the Secured Creditors' claim to its affiliates in an attempt to avoid complying with the sharing provisions contained in Section 10.14 of the Credit Agreement and Section 6.5 of the Security Agreement, which require that the value of the collateral be shared ratably by all the Secured Creditors.

*Id.* ¶ 123.

However, Claimants have failed to submit evidence to show that the Agent planned or acted in a way that demonstrates that it was part of a scheme or that it independently acted to harm the NCLs. Rather, the evidence shows that the Agent was entitled to follow instructions from the Required Banks, and that the Agent was following instructions from the Required Banks when it submitted the Payoff Letter.[23]

The above findings address each of the issues raised by the trial court when denying the Agent's motion for summary judgment:  (1)

---

[23] In their post-Hearing briefings, Claimants also assert that "Given that Mr. Deckoff was the ultimate owner and controller of Agent, [his] intent to divert Collateral recoveries from the Lenders to entities under his exclusive control *is* Agent's intent." CL FOF ¶ 100.  The Panel rejects Claimants' half-hearted attempt to impute Mr. Deckoff's intent to the Agent to solve its failure of proof on the claim against the Agent.

-100-

section 12.5 of the Credit Agreement does not impose upon the Agent a
duty to assess the reasonableness of instructions; (2) section 12 as a
whole is meant to shield the Agent from liability, and when the Agent
acts it acts for the Lenders' benefit, not its own; (3) section 12.4 applies
broadly to exculpate the Agent for actions it performs at the direction of
the Required Banks, including actions taken pursuant to section 6.1 of
the Security Agreement; and (4) the Claimants have failed to establish
either gross negligence or willful misconduct.

In short, the Agent did not breach either section 12.5 of the
Credit Agreement or section 6.1 of the Security Agreement, but if it had,
it would be exculpated under section 12.4 of the Credit Agreement
because Claimants have failed to prove willful misconduct or gross
negligence.

### D. The Tribunal Finds That Respondents Did Not Breach Section 14.12 of the Credit Agreement (Count VI Against BD Lenders and Count IV Against the Agent)

#### 1. Claim

In their Amended Complaint, Claimants alleged that under
section 14.12 of the Credit Agreement, unanimous consent of the

Secured Creditors is required to effectuate a "'waiver'" that reduces the principal amount of the Loans or "'releas[es] all or substantially all of the Collateral (except as expressly provided in the relevant Credit Documents).'" JX 16 ¶ 124 (quoting JX 2 § 14.12). The relevant portion of section 14.12 states:

> Neither this Agreement nor any other Credit Document nor any terms hereof or thereof may be changed, waived, discharged or terminated unless such change, waiver, discharge or termination is in writing signed by the respective Credit Parties party thereto and the Required Banks, provided that no such change, waiver, discharge or termination shall, without the consent of each Bank directly affected thereby . . . release all or substantially all of the Collateral (except as expressly provided in the relevant Credit Documents).

As to the Agent, Claimants alleged that "By releasing the Secured Creditors' lien in exchange for nothing, Black Diamond Agent has purported to effectuate such a waiver. The Plaintiffs did not consent to such a waiver." JX 16 ¶ 124.[24] Claimants alleged that BD Lenders

---

[24] *See also* JX 25 at 8 ("[Claimants] maintain that by releasing the liens on the collateral in the security agreement in this manner, the agent purported to effectuate a waiver under credit agreement § 14.12, to which plaintiffs did not consent, thereby breaching that provision.").

NY 76962594v5

> directed Black Diamond Agent to submit credit
> bids in connection with APA I and APA II that
> would extinguish the $257 million of outstanding
> obligations under the Credit Agreement. BDCM,
> BDC Finance, and Black Diamond CLO provided
> such direction as part of a deliberate strategy to
> siphon the collateral securing the Secured
> Creditors' to themselves and their affiliates, in
> violation of the sharing provisions of the Credit
> Agreement and Security Agreement, which
> require that the value of the collateral be shared
> ratably by all the Secured Creditors.

JX 16 ¶ 140. Claimants further alleged that BD Lenders breached

section 14.12 by directing the Agent to release the liens in "exchange for

nothing" which has "effectuate[d] such a waiver" and reduces the

principal amount of the Loans. *Id.* ¶ 142.[25]

According to Claimants, BD Lenders' breach occurred

between May 23, 2011 – when pursuant to the Side Letter and APA 2,

BD Lenders directed the Agent to release all the Collateral – and July

26, 2011, when BD Lenders completed the breach by closing APA 1 and

APA 2 and directing the Agent to release all liens on the Collateral. *See*

---

[25] *See also* JX 24 at 16 ("[Claimants] also allege that Black Diamond breached
credit agreement § 14.12 by directing the agent to release the secured creditors'
lien on the collateral in exchange for nothing to the secured creditors, causing the
agent to effectuate a waiver to which plaintiffs did not unanimously consent.").

NY 76962594v5

CL FOF ¶ 92.  Claimants contend that the Agent breached section 14.12 by following BD Lenders' instructions to deliver the Payoff Letter at Closing.  *See id.* ¶ 103.

Focusing on the exception in section 14.12 stating that the Agent is required to obtain consent "except as expressly provided in the relevant Credit Documents," Claimants argue that credit bidding is not expressly mentioned in the Credit Documents.  Furthermore, Claimants argue, section 363(k) provides that a secured creditor "may bid at [a section 363] sale, and, if the holder of such claim purchases such property, such holder may offset such claim against the purchase price of such property."   11 U.S.C. § 363(k).   According to Claimants, however, the Agent did not purchase the Collateral.  *See* CL FOF ¶ 94.  "Instead, Agent, as directed by the Required Banks, agreed to release all Collateral to Mr. Deckoff's control [and the] recoveries turned out to be 'interests' in a vehicle controlled entirely by BD Lenders."  *Id.*

Finally, Claimants contend that

[the] Agent's ability to enforce this right of setoff is expressly circumscribed by two provisions of the Security Agreement. *First*, Section 6.1(l) of

> the Security Agreement provides that if Agent sets
> off (i.e., releases) Collateral against Obligations,
> Agent must apply the Collateral to the payment of
> the Obligations. Here, the vast majority of
> Collateral released was not applied to the payment
> of Obligations but rather was delivered to the
> control of BD Lenders. *Second*, all enforcement
> rights under Section 6.1 of the Security
> Agreement (the same provision Respondents
> claim incorporates Section 363(k) of the
> Bankruptcy Code) are expressly subject to the
> qualification that Agent enforce rights "for the
> benefit of the Secured Creditors." As discussed in
> more detail below, the credit bid, and the release
> of all Collateral, in furtherance of the 363 sale
> process was plainly not done "for the benefit of"
> the Lenders but rather for the exclusive benefit of
> BD Lenders.

*Id.* ¶ 95.

Respondents argue that the Collateral was released in
accordance with section 14.12 because the Agent did not release the
liens; rather, the Bankruptcy Court did in the Sale Order. *See* RFOF
¶ 77 (citing JX 14 at 9). In addition, Respondents advance two
alternative arguments.

*First*, Respondents contend that unanimous consent was not
required because section 14.12 states that consent is required except

NY 76962594v5

where the Agent is acting "'as expressly provided in the relevant Credit Documents.'" *Id.* at 10 (quoting JX 2 § 14.12). According to Respondents, section 10.13 of the Credit Agreement and section 6.1 of the Security Agreement authorize the Agent to credit bid at a Bankruptcy Auction under section 363(k) of the Bankruptcy Code. *See id.* Both provisions have similar language, with section 6.1 stating that:

> If there shall have occurred and be continuing an Event of Default, then and in every such case, the Collateral Agent shall be entitled to exercise all of the rights, powers and remedies (whether vested in it by this Agreement, any other Secured Debt Agreement or by law) for the protection and enforcement of its rights in respect of the Collateral, and the Collateral Agent shall be entitled to exercise all the rights and remedies of a secured party under the Uniform Commercial Code as in effect in any relevant jurisdiction and also shall be entitled, without limitation, to exercise the following rights.

*Second*, Respondents argue that to the extent consent was required, it was given. According to Respondents, Claimants gave such consent when they consented to the Bidding Procedures Order which allowed the Agent to credit bid at the section 363 sale. *See* RFOF ¶ 79.

-106-

NY 76962594v5

## 2.    Trial Court

In ruling on the parties' motions for summary judgment on the section 14.12 claim, the trial court considered whether any provisions of the Credit Documents authorized the Agent to release the liens on the Collateral without Claimants' consent.  The court opined that Respondents could not rely on section 6.1(k) of the Security Agreement because that provision only applies to sales by the Agent, whereas the bankruptcy sale was conducted by GSC.  *See* JX 24 at 29-30.

Although the trial court determined that a "credit bid by the agent is consistent with the credit documents, as the security agreement provides the agent with the right to access any right, power or remedy vested in it by law, which would include credit bidding under the bankruptcy law" (JX 24 at 24-25 (citing *Metaldyne*, 409 B.R. at 678-79)), it declined to grant summary judgment in favor of the Respondents. The court found that the Respondents had not demonstrated "*as a matter of law*, that the agent purchased or collected the collateral, for which it was instructed to bid, with the credit bid, a basis for the release of the

GSC debt, where the assets were transferred to GSCAH, or how it is consistent with the credit documents . . . ." *Id.* at 25 (emphasis added).

### 3.  Findings of Fact

The Panel finds that neither BD Lenders nor the Agent breached section 14.12 of the Credit Agreement.  The Agent was authorized to credit bid at the Auction, and thus the release of the Collateral through credit bidding does not of itself violate section 14.12. Alternatively, to the extent that consent was required, it was given when the NCLs consented to the Bidding Procedures that permitted the Agent to credit bid.  The use of a limited liability company to receive the assets did not violate the Credit Documents.  Finally, the substance of the transaction consummated at the Closing — which resulted in a disproportionate asset allocation — does not alter the conclusion that consent was not required under section 14.12.

*First*, we interpret section 14.12 as requiring unanimous consent only when the Agent's conduct results in a change, waiver, discharge or termination of the Credit Documents which, in turn, leads to the release of all or substantially all of the Collateral.  While

Claimants allege that Respondents' conduct in pursuing the closing transaction in accordance with the Side Letter and APA 2 resulted in a "waiver" (*see* JX 16 ¶¶ 124, 142), no such "waiver" has been shown.

Credit bidding itself does not constitute a waiver (or change, discharge, or termination) of the Credit Documents because the Credit Documents permit credit bidding. Specifically, the Agent has authority to credit bid under section 6.1 of the Security Agreement, which authorizes the agent to exercise "all . . . rights and remedies . . . vested in it . . . by law" with respect to the Collateral. Because the Agent's conduct in credit bidding did not alter or amend the terms of the Credit Documents, unanimous consent of all lenders was not required.

This conclusion is supported by several cases cited by Respondents. *See generally Metaldyne*, 409 B.R. 671; *GWLS Holdings, Inc.*, 2009 WL 453110; *In re Chrysler LLC*, 576 F.3d 108, 120 (2d Cir.), *cert. granted, judgment vacated sub nom. Indiana State Police Pension Tr. v. Chrysler LLC*, 558 U.S. 1087 (2009), *and vacated sub nom. In re Chrysler, LLC*, 592 F.3d 370 (2d Cir. 2010), *aff'g*, 405 B.R. 84 (Bankr. S.D.N.Y. 2009) (Gonzalez, J.). Each of these cases involved an

objection by a minority lender to the approval of a section 363 sale and stands for the proposition that when an agent is otherwise acting in accordance with the terms of controlling loan documents (including provisions substantially similar to section 6.1 of the Security Agreement), the release of collateral over the objection of a secured lender does not violate provisions substantially similar to section 14.12 because the loan documents have not been waived or amended.

In *GWLS*, for example, Bankruptcy Judge Peter J. Walsh interpreted "any applicable law" in a provision authorizing the agent to exercise all rights and remedies under "any applicable law" to include "the Bankruptcy Code in general, and § 363(k) in particular." 2009 WL 453110, at *5 (applying New York law). Judge Walsh held that acting pursuant to that provision by exercising a credit bid did not effect "a waiver, amendment, supplement, or modification" of the credit agreement and therefore written consent to act was not required. *Id.* at *5-6.

The parties' focus on the phrase "except as expressly provided in the relevant Credit Documents" in section 14.12 partially

misses the point. What the "expressly provided" language adds to the above analysis is that where the Agent's conduct *would* work a change, waiver, discharge, or termination, the Agent can still act without unanimous consent provided that the Agent's conduct is in accordance with the express provisions of the Credit Documents. *See Chrysler*, 405 B.R. at 103 (holding with respect to a provision almost identical to section 14.12, that "even if the action were viewed as an amendment to the loan documents, the prohibition against releasing collateral without the consent of all lenders . . . itself has an exception where the action is otherwise provided for in the loan documents. Here, the loan documents expressly provide for the Administrative Agent to direct the Collateral Trustee to take Enforcement Actions, including the sale of all or any of the Collateral."). *See also GWLS*, 2009 WL 453110, at *5.

The primary case relied on by Claimants, *Prudential Ins. Co. of America v. WestLB AG*, interprets a consent provision in a credit agreement differently than *Metaldyne*, *GWLS*, and *Chrysler*. Specifically, the *Prudential* court read a provision substantially similar to those in *Metaldyne* and *GWLS* to mean that "In the instance of

-111-

releasing 'all or substantially all of the collateral,' [the agent] could not act on the direction of the Required Lenders alone, but was required to obtain the unanimous consent of the lenders." *Id.* at *5.

We find this interpretation unpersuasive. The *Prudential* court did not address *Metaldyne*, *GWLS*, or *Chrysler*, and, significantly, does not explicitly address the argument that a consent provision is not implicated if it does not effect a waiver or amendment of the credit documents. In addition, as discussed further below, the *Prudential* court applied its interpretation of section 14.12 in a context that makes it distinguishable from the precedent cited above and the facts of this Arbitration. Indeed, the court's conclusion in *Prudential* that the credit agreement was breached necessarily depends on the agent's conduct having modified the parties' rights by distributing funds respecting the collateral in violation of the *pro rata* sharing provisions in the credit documents.

Furthermore, to the extent that credit bidding and the subsequent release of the Collateral can be viewed as a change, waiver, discharge, or termination of the Credit Documents, thereby requiring

-112-

consent under section 14.12, such consent was given when the Claimants consented to the Bidding Procedures which permitted the Agent to credit bid. *See* Koneval WD ¶ 45 (admitting that the NCLs consented to the Agent's credit bidding); DX 36 (stating that the Agent was entitled to credit bid).

Nor do we find that the transfer of Collateral to GSCAH at Closing rendered the transaction inconsistent with the Credit Documents. Specifically, we find that (1) the Agent was permitted to act through an affiliate; (2) GSCAH was an affiliate of the Agent; (3) this practice of structuring an asset purchase through an affiliate entity is not uncommon; and (4) the Agent effectively purchased the Credit Bid Assets through the Credit Bid when it received its distribution of Class A interests from GSCAH at Closing.

Section 12.12 of the Credit Agreement states that the agent may "execute any of its duties under this Agreement or any other Credit Document by or through its affiliates [or] agents." This provision permits the use of an affiliated limited liability company to purchase the assets, and the Claimants have not provided any basis to conclude

-113-

otherwise.  There can be no dispute that under the terms of the Amended

and Restated LLC Agreement, GSCAH is an affiliate of the Agent.  *See*,

*e.g.*, DX 101 at Schedule A (listing GSCAH and GSCAP as owners and

the allocation of interests in GSCAH); JX 11 (stating that GSCAH is

owned by both the Agent and GSCAP).  Notably, Mr. Gray's expert

report states, without contradiction, that "[w]hen lenders in a syndicated

loan transaction acquire assets in satisfaction of debt owing to them, it is

typical that they will do so through the use of an acquisition vehicle."

DX 124 ¶ 48.  *See also* ¶¶ 47-49.[26]

        Likewise, there can be no dispute that under the LLC

Agreement, the Agent received the Class A interests in GSCAH, which

corresponded to assets acquired with the Credit Bid.  *See*, *e.g.*, DX 101

---

[26] Further support is found in two of the cases cited by the parties.  *See Prudential*,
2012 WL 4854713, at *3 (explaining that "the Bankruptcy Court approved the
lenders' Credit Bid and successful purchase of the Linden and Bloomingburg
plants, and the asset purchase agreement (APA), which memorialized the
transaction[, and under which] . . . the plants would be transferred to limited
liability companies, which would be owned by the lenders"); *id.* at *1 (explaining
that three of the defendants were these limited liability companies, consisting of a
holding company and two LLCs for each plant); *Metaldyne*, 409 B.R. at 672
(explaining that the sale of the debtors' assets was to MD Investors Corporation [ ],
a consortium led by The Carlyle Group and Solus Alternative Asset Management
LP representing approximately 97% of the Debtors' Prepetition Term Lenders'
secured debt").

at Schedule A (showing the allocation of interests in GSCAH). Claimants hold fast to the "purchase" language in section 363(k), but have not cited to any authority for the proposition that the award of interests in assets held by an affiliate is not a purchase within the meaning of section 363(k), and we can think of no reason why it would not be. Accordingly, we conclude that this transaction satisfies section 363(k).

Finally, we find that the overall transaction effectuated at Closing was consistent with the Credit Documents and therefore does not offend section 14.12. Claimants argue in slide 57 of their Closing Argument that "[t]he only issue is whether the Loan payoff and Collateral release was 'consistent' with the Credit Documents." The subtext of this statement is that the resulting allocation of assets was unfair because the Credit Bid of $257 million was used as part of a transaction that greatly advantaged the BD Lenders. But the APAs and the Side Letter reflect the results of joint bidding, which like credit bidding, is authorized under section 6.1 of the Security Agreement. In any event, joint bidding was authorized by the NCLs when they

-115-

consented to joint bidding subject to a reservation of rights. Claimants have not shown how consummating the transaction in accordance with the results of the bidding at the Auction and the Sale Order violates section 14.12.

Another argument advanced by Claimants is that the transaction does not conform to the Credit Documents because section 6.1 of the Security Agreement requires that the Agent act "for the benefit of" the Lenders. However, as discussed in connection with Claimants' allegation that the Agent breached section 6.1 of the Security Agreement, Mr. Gray's testimony and report establish that the "for the benefit of" lenders language "merely emphasize[s] that the administrative agent or collateral agent is acting for others rather than for itself." DX 124 ¶ 30; Hr. Tr. at 2303:16-2304:16.[27] The record does not support the conclusion that the Agent was acting for itself when it complied with directions to credit bid and to execute or deliver closing documents.

---

[27] As also noted in connection with Claimants' allegations of breach against the Agent, for the reasons set forth above we find the testimony of Mr. Gray both credible and persuasive.

NY 76962594v5

Likewise, BD Lenders as Required Banks were authorized to direct the Agent to credit bid and to joint bid and to eventually finalize the transactions based on the results of the Auction.  The fact of BD Lenders' Cash Bid does not make its direction to the Agent inconsistent with the Agent's duty to act "on behalf of the lenders."  BD Lenders were giving directions to finalize a transaction authorized by the Credit Documents.  Any ambiguity in such authorization is mooted by the fact that the NCLs consented to Bidding Procedures authorizing cash bidding on individual lots by Lenders in their personal capacities, and later consented to joint bidding (subject to their reservation of rights).[28]  In sum, because the BD Lenders were acting consistently with the Credit Documents, as well as the Bidding Procedures and the NCLs' consent, BD Lenders' direction to the Agent to credit bid and to deliver the closing documents was "on behalf of the" Lenders within the meaning of section 6.1.

---

[28] It would be inconsistent with the Credit Documents to give the Required Banks *less* rights than the other Lenders — who were all authorized by the Bidding Procedures to make cash bids — just because they have the right to direct the Agent.  In any event, we find that joint bidding, a species of credit bidding, is authorized under the Credit Documents.

-117-

Claimants also argue that the transaction was inconsistent with the Credit Documents because section 6.1(l) requires that the Agent apply the Collateral to the payment of the Obligations, and "[h]ere, the vast majority of Collateral released was not applied to the payment of Obligations but rather was delivered to the control of BD Lenders." CL FOF ¶ 95. But the alleged misallocation of assets does not offend the express terms of the Credit Documents. As argued by Respondents, the Agent complied with section 6.1(l) of the Security Agreement "because the Agent set off the collateral acquired with the Credit Bid against the Obligations [and n]othing more was required." Respondents' Reply at 7.

In attempting to show that an allegedly unfair transaction can violate section 14.12, Claimants place a lot of weight on *Prudential*. But *Prudential* actually supports the Panel's conclusions. In *Prudential*, the agent, WestLB, successfully credit bid for two of the debtors' primary assets, the Linden and Bloomingburg ethanol plants; WestLB then structured the purchase so that these assets were placed into various

acquisition vehicles. *Prudential*, 2012 WL 4854713, at *2.[29] Crucially, WestLB allocated interests in the acquisition vehicles in a way that favored prepetition lenders who had provided exit financing during the bankruptcy at the expense of the plaintiffs, who were prepetition lenders who had not provided exit financing. As a result, plaintiffs sued WestLB for breach of the *pro rata* sharing and consent provisions of the controlling credit documents. While the suit was pending, a third-party purchaser offered to purchase the plants held by the LLCs, and the Class A members, lenders who had provided exit financing, exercised certain of their exclusive share rights. As a result, plaintiffs argued, their return went from 51% to 41% while defendants' return increased to between 70% and 137%. *See id.* at *4-5.

On cross motions for summary judgment, the court rejected WestLB's argument that it was permitted "to pursue the conveyance of the collateral to the [LLCs] along with the participation enhancements

---

[29] At the auction, a non-party made the winning bid, a cash bid, for the Valero ethanol plant, one of three plants that comprised substantially all of the debtors' assets. Notably, plaintiffs received their *pro rata* share of the sale proceeds for the Valero plant — less amounts used to repay DIP financing — and did not assert claims based on that distribution. *See id.*

-119-

which followed the exit facility and modified the lenders' interests in the

collateral" because it was acting at the direction of the required banks

and because it had the discretion to act on behalf of the lenders. *Id.* at

*5. In finding that the contract had been breached, the court explained

that

> WestLB c[ould] point to no language in the Credit
> Agreement or Financing Documents which
> grant[ed] it authority to reduce a lender's
> interests, or permit the differential treatment of
> lenders vis-a-vis their rights in the collateral
> without their consent. Accordingly, there [was] no
> legal justification for its contention that the exit
> lenders deserve more than other lenders in the
> proceeds from the Valero transaction.

*Id.*

While the court did not focus on whether the agent's conduct

modified a term of the credit documents, it implicitly found that WestLB

*had* altered the secured lenders' rights under the *pro rata* sharing

provision. The unanimous consent provision was implicated because the

Agent modified the rights of the plaintiffs over their objection. By

contrast, Respondents are not attempting to alter any of Claimants'

rights with respect to assets purchased by a credit bid. The Agent has

NY 76962594v5

received all of the assets for which it credit bid (on behalf of the Secured Lenders), and the proceeds in those assets remain subject to the *pro rata* distribution required by section 14.7 of the Credit Agreement. Claimants have not shown disparate treatment with respect to the Credit Bid Assets.

In addition, Claimants' allegations of unfairness are based primarily on the result of joint bidding, an issue *Prudential* does not address. It is noteworthy that the plaintiffs in *Prudential* accepted, without objection, the proceeds of the sale of the Valero plant by a third-party cash purchaser. But the more salient point is that the Respondents' conduct, unlike WestLB's conduct in *Prudential*, was not proscribed by the terms of the Credit Documents. In short, Respondents' conduct did not result in a waiver of rights under the Credit Documents and therefore section 14.12 was not violated.

### 4. Conclusions of Law

The release of the liens on the Collateral pursuant to credit bidding did not waive or amend the Credit Documents and therefore no breach of section 14.12 occurred as to either BD Lenders or the Agent.

NY 76962594v5

In the alternative, even if such waiver occurred, the Agent was authorized to credit bid under section 6.1 of the Security Agreement and therefore unanimous consent was not required and section 14.12 was not breached by either BD Lenders or the Agent.

Furthermore, and also in the alternative, section 14.12 of the Credit Agreement was not breached by either BD Lenders or the Agent because the Claimants consented to credit bidding by agreeing to the Bidding Procedures.

Furthermore, as a matter of law, the Agent purchased the Collateral when it received the allocation of the Class A interests in GSCAH, and the structure of the transaction consummated at Closing was otherwise consistent with the terms of the Credit Documents.

Finally, for the reasons discussed in connection with the claim that the Agent breached section 12.5 of the Credit Agreement and section 6.1 of the Security Agreement, even if the Agent had breached section 14.12 its conduct would be exculpated because no willful misconduct or gross negligence has been shown.

NY 76962594v5

## III. THE TRIBUNAL FINDS THAT BD LENDERS BREACHED THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING (COUNT VII) BUT THE AGENT DID NOT BREACH THIS IMPLIED COVENANT (COUNT V)

### A. Legal Standard

New York law recognizes that every contract contains an implied covenant of good faith and fair dealing which "embraces a pledge that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." *Dalton v. Educational Testing Serv.*, 87 N.Y.2d 384, 389 (1995). *Accord Demetre v. HMS Holdings Corp.*, 127 A.D.3d 493, 494 (1st Dep't 2015). The party claiming an implied promise in an agreement, "must prove not merely that it would have been better or more sensible to include such a covenant, but rather that the particular unexpressed promise sought to be enforced is in fact implicit in the agreement viewed as a whole." *Rowe v. Great Atl. & Pac. Tea Co.*, 46 N.Y.2d 62, 69 (1978).

Where a contract contemplates the exercise of discretion, the implied covenant requires that the discretion be exercised in a rational,

-123-

non-arbitrary manner, not in bad faith to deprive other parties of the
benefits of the contract. *See Dalton*, 87 N.Y. 2d at 389; *Hirsch v. Food
Resources, Inc.*, 24 A.D.3d 293, 296 (1st Dep't 2005) ("The exercise of
an apparently unfettered discretionary contract right breaches the
implied obligation of good faith and fair dealing if it frustrates the basic
purpose of the agreement and deprives plaintiffs of their rights to its
benefits."). Finally, an implied covenant claim that is based on the same
facts of alleged injury as an express contract claim, must be dismissed as
duplicative. *See Logan Advisors, LLC v. Patriarch Partners, LLC*, 63
A.D.3d 440, 443 (1st Dep't 2009).

In determining the existence and scope of an implied
covenant, "[t]he boundaries set by the duty of good faith are generally
defined by the parties' intent and reasonable expectations in entering the
contract." *Cross & Cross Props., Ltd. v. Everett Allied Co.*, 886 F.2d
497, 502 (2d Cir. 1989). But the party asserting an implied covenant
claim "bears a heavy burden" because "it is not the function of the
[arbitral panel] to remake the contract agreed to by the parties." *Rowe*,
46 N.Y. 2d at 69. Moreover, the implied covenant "cannot be construed

NY 76962594v5

so broadly as effectively to nullify other express terms of a contract, or to create independent contractual rights." *Diamond Servs. Mgmt. LLC v. Fable Jewelry Co.*, 2012 WL 5871616, at *4 (S.D.N.Y. Nov. 20, 2012). That court also explained that "Under New York law, the covenant of good faith and fair dealing provides a means for a promisee to vindicate its rights when the promisor has violated 'the spirit, if not the letter of [a] contract.'  It does not create a free-floating right to relief untethered from a contract's express terms." *Id.* (quoting *In re Refco Inc. Sec. Litig.*, 826 F. Supp. 2d 478, 497 (S.D.N.Y. 2011)).

Finally, "[t]he implied covenant does not extend so far as to undermine a party's 'general right to act in its own interests in a way that may incidentally lessen' the other party's anticipated fruits from the contract." *M/A-Com Secs. Corp. v. Galesi*, 904 F.2d 134, 136 (2d Cir. 1990) (quoting *Van Valkenburgh, Nooger & Neville, Inc. v. Hayden Publishing Co.*, 30 N.Y.2d 34, 46 (1972)).  In *Van Valkenburgh*, the New York Court of Appeals stated

> Although a [party] has a general right to act on its
> own interests in a way that may incidentally
> lessen [the other party's financial interest], there

-125-

> may be a point where that activity is so manifestly
> harmful to the [other party], and must have been
> seen by the [first party] so to be harmful, as to
> justify the court in saying there was a breach of
> the covenant [of good faith and fair dealing] . . . .

30 N.Y.2d at 46. Thus, there is indisputably a difference between destroying a party's right to receive the fruits of the contract and a general right to act in one's own self-interest even though it may "incidentally" lessen another party's anticipated fruits from the bargain.

## B. The Implied Covenant Claims

### 1. Count VII Against BD Lenders

Claimants assert that the BD Lenders' acts deprived them of the fruits of the Credit Documents which Claimants contend is the right of each secured creditor to receive its *pro rata* share of the proceeds from the sale of the Collateral, and that the Required Banks must exercise their control rights to advance the collective interest of all of the secured creditors. Claimants argue that the BD Lenders violated the implied covenant in both ways: *first*, by engaging in acts that destroyed their right to receive the fruits of the contract; and *second* by exercising

-126-

contractually-afforded discretion arbitrarily or irrationally.  *See* CL FOF

¶ 104.

In response, the BD Lenders make several arguments as to

why Claimants fail to succeed on this claim.  *First*, Respondents argue

that the claim is duplicative of the breach of contract claims.  In support

of this argument they cite *Mill Finance, LLC v. Gillett*, 122 A.D.3d 98,

104 (1st Dep't 2014), holding that "where a good faith claim arises from

the same facts and seeks the same damages as a breach of contract

claim, it should be dismissed" as duplicative.  *Second*, Respondents

argue that the Appellate Division's decision (JX 21) limited this claim to

BD Lenders' conduct at the Auction.  *Third*, Respondents argue that

they acted reasonably and that no reasonable expectations of Claimants

were thwarted.  We address each of these arguments below.

## 2.    Count V Against the Agent

Claimants assert that the Agent breached the implied

covenant of good faith and fair dealing through its actions which

> manifested an intent to deprive the [Claimants] of
> their rights to receive the fruits of the[] [Credit
> and Security] [A]greements and their reasonable

-127-

> expectations thereunder, including their rightful
> share of the collateral securing the loans made
> under the Credit Agreement.

JX 16 ¶ 130.  Specifically, Claimants contend that the Agent improperly followed BDCM's directions to bid at the Auction in a manner that disproportionately benefitted BD Lenders at the expense of the NCLs — in short by submitting inflated credit bids.  Claimants also contend that the Agent wrongfully permitted, or acquiesced to, a sale of the collateral to GSCAH without having any knowledge of what the NCLs would recover as a result of that sale.

Respondents make several arguments as to why Claimants cannot succeed on this claim:  *First*, the claim is duplicative of the contract claims against the Agent; *second*, the claim is contrary to explicit terms found in the Credit Documents; *third*, the Agent's role is ministerial and it is not expected to undertake any analysis or investigation; and *fourth* the Agent did not abuse its discretion or act irrationally in following the directions of the Required Banks.

NY 76962594v5

## C. Discussion

### 1. The Claim Against the BD Lenders

Count VII of the Amended Complaint alleges that

> [T]he fruits of the agreements for the Secured
> Creditors include the rights of each Secured
> Creditor to: (i) receive its *pro rata* share of the
> proceeds from a disposition of the collateral . . .,
> and (ii) have the controlling lenders under the
> Credit Agreement and Security Agreement
> exercise their control rights thereunder to advance
> the collective interest of the Secured Creditors
> rather than their own pecuniary interests at the
> expense of all Secured Creditors. Through their
> actions . . . Defendants . . . have deprived the
> Plaintiffs of their rights to receive the fruits of
> these agreements and their reasonable
> expectations thereunder, including their rightful
> share of the collateral securing the loans made
> under the Credit Agreement.

JX 16 ¶¶ 147-148.

### 2. Are the Breach of the Implied Covenant Claims Duplicative?

On July 21, 2014, the trial court denied Respondents' (then

defendants') motion to dismiss the implied covenant claim against them

finding that the claim was not duplicative of the contract claims.

"Although counts five [against the Agent] and seven [against the BD

-129-

Lenders] appear on their face to be duplicative of counts four and six, in according non-movant plaintiffs every possible favorable inference, I decline to dismiss the allegedly duplicative counts at this juncture of the proceedings." JX 20 at 5, *aff'd*, JX 21.

In affirming the decision of the trial court, the Appellate Division stated that the motion court correctly held that the implied covenant claims were not duplicative of the breach of contract claims. The opinion then noted that "even if none of the [contract] provisions were violated" plaintiffs also allege that the implied covenant was violated "by [defendants] deliberately manipulating and depressing the bids of other bidders during the auction of the debtor's assets, thereby acquiring all of the debtor's assets and depriving plaintiffs of the benefit of their bargain. These claims are sufficiently distinct." JX 21.

A year later, in denying Respondents' motion for summary judgment on the implied covenant claim, the trial court found that there were triable issues of fact. The trial court also denied Claimants' motion for summary judgment on the implied covenant claims, again finding triable issues of fact. *See* JX 24 at 31-36. In particular, the trial court

NY 76962594v5

specifically noted that BDCM had not demonstrated, as a matter of law or undisputed fact, that it had exercised good faith at the Closing (implementing amended APA 1 and APA 2) or in instructing the Agent to release the Collateral to GSCAH instead of to the direct control of the Agent. *See* JX 24 at 34. Thus, those assertions were left to be decided at trial.

None of these three decisions determined, as a matter of law, that the claims are not duplicative, and we now conclude that they are not. The factual and legal determinations relevant to the claimed breach of section 14.7(b) concerned whether the BD Lenders had received payments on account of the Loan without sharing them *pro rata*. The factual and legal determinations relevant to the section 14.12 claim was whether the release of the Collateral and/or the structuring of the transaction created a waiver or amendment of the Credit Documents such that unanimous consent of all lenders was needed before the Agent could act.

The breach of the implied covenant of good faith and fair dealing claims ask a different question and are based on different facts.

NY 76962594v5

The issue here is whether the BD Lenders abused their discretion in a way that deprived Claimants of their right to receive their bargained for benefits under the Credit Documents. That question is resolved without consideration of whether under the precise language of section 14.7(b) the BD Lenders must share the proceeds they received for their Cash Bid, and whether the release of the Collateral required unanimous consent.

Based on the entire record of the Arbitration Hearing we find that Claimants have shown that the BD Lenders abused their discretion. Specifically, after directing the Agent to exercise a $224 million Credit Bid that purchased assets with much less value than the amount of the bid, and much less value than the assets BDCM allocated to its $11 million cash/note bid, BD Lenders directed the Agent to release the Collateral to GSCAH without disclosing any allocation of the assets being released and then proceeded to allocate the interests in GSCAH in a way that reflected a disproportionate allocation of GSC assets to BD Lenders at the expense of the Claimants. This conduct deprived

NY 76962594v5

Claimants of the right to receive the fruits of their contract.  For these reasons, we find that these claims are not, in fact, duplicative.

### 3.    Are the Breach of the Implied Covenant Claims Barred by the Appellate Division Decision?

As noted, the Appellate Division stated that plaintiffs alleged that the implied covenant was violated "by [defendants] deliberately manipulating and depressing the bids of other bidders during the auction of the debtor's assets, thereby acquiring all of the debtor's assets and depriving plaintiffs of the benefit of their bargain." JX 21.  Respondents assert that because of this language Claimants are now limited solely to conduct that occurred at the Auction with respect to this claim.  And, Respondents argue, Claimants have asserted that the breach of the contract occurred at the closing of the sale on July 26, 2011.

But the implied covenant claim was never limited to conduct that occurred on or after July 26, 2011.  A review of the Amended Complaint, quoted above, reveals that Claimants assert that the implied covenant was breached by BD Lenders' conduct in destroying Claimants' right to receive the fruits of the contract and by exercising its

NY 76962594v5

contractually-afforded discretion arbitrarily or irrationally. Such conduct, if it took place, occurred throughout a course of conduct that continued from the Auction through the Closing and the subsequent allocation of interests in GSCAH. It is for this reason that we conclude that the Appellate Division decision noting conduct at the Auction was never meant to limit the claim solely to that conduct.

### 4. Did the BD Lenders Engage in Conduct that Denied Claimants the Right to Receive the Fruits of the Contract?

Experts for both Claimants and Respondents agreed that the hallmark of a syndicated loan is that each lender will receive recoveries on a *pro rata* basis with the other lenders in the syndicate. *See* Hr. Tr. at 343:15-344:14 (Hall); 2298:15-2299:13 (Gray). While we have found that the sharing clause of the contract was not violated, we nonetheless find that the BD Lenders' conduct did, in fact, deny Claimants the right to receive the fruits of their bargain by the manner in which they exercised their discretion to instruct the Agent.

On this record, there can be no doubt the BD Lenders used their discretion as the Required Banks to instruct the Agent to Credit Bid

in a manner that produced a vastly disproportionate allocation of assets
between the Cash Bid and the Credit Bid as ultimately reflected in the
distribution of shares in GSCAH at Closing. BDCM's Cash Bid of $5
million in cash and $6 million in a note, purchased assets with a
significantly higher value. Capstone, for one, provided a value of
$126,690,357 for those assets. While later valuations of these assets
were even higher, using this Capstone figure we do agree that the value
of the assets purchased for $11 million was significantly greater than
that amount. At the same time, the Credit Bid of $224 million purchased
assets valued at far less. Once again, the Capstone valuation for those
assets was $11,681,570, which was later reduced to $5 million. At the
Closing, the Claimants were allocated their *pro rata* share (31.1112%)
of *only* the Credit Bid Assets, as well as of the cash received by the
Debtors as a result of the Cash Bid (now $11.7 million). We conclude
that the misallocation of shares in GSCAH, which mirrored the
allocation in APA 1, which in turn reflected the bidding at the Auction,
resulted in a disproportionate sharing of assets. As a result, we further
conclude that this misallocation resulted in denying Claimants the right

-135-

to receive the fruits of their bargain — *i.e.* to receive the fair value of the

assets purchased with a Credit Bid by the Agent as instructed by

BDCM.[30]

We also note the comments of the trial court in its January,

2017 decision denying the parties' cross motions for summary judgment

on this claim.  The court stated:

> The evidence demonstrates that what Black
> Diamond claims was purchased with the credit bid
> may have been grossly disproportionate to the
> value of the bid, and employing Black Diamond's
> logic, the secured creditors would have no
> recourse had Black Diamond bid $11 in cash for a
> $100 million mansion, and instructed the agent to
> credit bid $100 million of the outstanding loan
> debt for the door mat.

JX 24 at 34-35.  This statement lends further weight to our conclusion

that the misallocation of shares in GSCAH, which reflected the

misallocation of assets between the Cash and Credit Bids, breached the

---

[30] Mr. Manzo testified that for "internal purposes" he valued the assets acquired by
the Credit Bid at $55 million.  He further testified that BD received $82.5 million
in value for its $11 million cash/note bid.  DX 145 at 50:25-51:3, 63:10-17.  Even
these less disparate figures still reflect a significant misallocation.

NY 76962594v5

implied covenant of good faith and fair dealing by depriving Claimants of the fruits of their bargain.

### 5. Did the BD Lenders Exercise Their Contractually-Afforded Discretion Arbitrarily and Capriciously?

Claimants argue that the BD Lenders acted in an arbitrary and capricious manner by directing the Agent to release the Collateral free and clear to BDCM, in the person of Stephen Deckoff, in order to maximize BD Lenders' recovery at the expense of the recoveries that should be shared with all Lenders. A condition of the Closing was the release of all liens. This condition was set forth in the Sale Order. *See* JX 14 at 9. It was neither arbitrary nor capricious to direct the Agent to release the liens. This conclusion is addressed in great detail in Part II.C, *supra.*

As discussed above, however, we do find that there was an abuse of discretion in the misallocation of the assets by BDCM once the assets were transferred to GSCAH. As the trial judge found in denying BDCM's summary judgment motion

> Black Diamond uses the term 'majority rules,' but does not demonstrate that the term is synonymous

-137-

> under the credit documents with conferring on the
> majority lender unbridled discretion to exercise
> control rights over the distribution of assets or
> monies, where pertinent provisions governing
> distribution evince the intentions that the lenders
> act collectively, with the required banks directing
> the agent for the benefit of the collective group.

JX 24 at 34.  While the Credit Agreement provided explicit exculpation for the Agent in following instructions of the Required Banks, and also limited the imposition on the Agent of implied duties, no such provisions apply to the BD Lenders as the Required Banks.

Accordingly, we conclude that the BD Lenders were required to exercise their discretion in a reasonable manner.  We further conclude that this unexpressed promise is implicit in section 12.5 of the Credit Agreement, which provides that the Agent "shall take such action . . . as shall be *reasonably* directed by the Required Banks . . . ."

In reaching this conclusion we note that BDCM was well aware that that the NCLs were extremely concerned about the manner in which BDCM would instruct the Agent to credit bid at the Auction. Nonetheless, while BDCM provided a separate counsel to represent the Agent at the auction, who could object to procedures advocated by the

Debtors, it did not provide a process or procedure for its own interactions with the Agent to satisfy any notion of an arms-length relationship. Once joint bidding was permitted, BDCM's absolute control over the Agent fostered a hopelessly conflicted situation. Every dollar allocated to the Cash Bid Assets lowered the value of the Credit Bid Assets, in which the NCLs were entitled to a *pro rata* share. The fact that the BD Lenders were plainly incentivized to allocate the most valuable assets to the Cash Bid at the expense of the NCLs, coupled with the absence of any process or procedure to protect the Agent's ability to negotiate with BDCM, ultimately resulted in the disproportionate allocation that disfavored the NCLs.

It is also important to note that the reservation of rights in the Consent Letter reserved Claimants' rights to challenge the improper *use* of joint bidding rather than the *concept* of joint bidding. Surely the reservation allowed Claimants to challenge the allocation between the Cash and Credit Bids. It is because of the misallocation in the shares of GSCAH, which reflected the allocation between the two bids — as opposed to the use of joint bidding — that we find that the BD Lenders

violated their obligation of good faith and fair dealing.  The BD Lenders could not instruct the Agent to act in a manner that would enrich Black Diamond at the expense of the NCLs — to the point where BD Lenders' actions were "so manifestly harmful to the [other party], and must have been seen by the [first party] so to be harmful, as to justify the court in saying there was a breach of the covenant [of good faith and fair dealing]." *Van Valkenburgh*, 30 N.Y. 2d at 46.  In instructing the Agent to release the Collateral without an allocation of the assets and then allocating the shares in GSCAH, BD Lenders deprived the NCLs of a fair share of the Collateral.

While BDCM was not required to allow the Agent to joint bid with other bidders, its refusal to permit the Agent to join with other bidders, no matter how favorable to the lender group as a whole the division of assets might have been, creates a strong inference that BDCM intended the lopsided allocation for its own benefit.  Moreover, by preventing joint bidding with others, BDCM was able to unilaterally impose an allocation of the assets between the Cash and Credit Bids as opposed to being forced to negotiate with a cash bidder who would join

-140-

with the Agent exercising the Credit Bid in a joint bid.  These facts reinforce our conclusion that BDCM's discretion was used intentionally to enrich the BD Lenders at the expense of the NCLs.

In sum, BD Lenders' decision at the Closing to implement the disproportionate allocation under the same terms as the joint bid, rather than reconsider the Auction allocation, which BD Lenders had seven months to do, constitutes a breach of the implied covenant of good faith and fair dealing.

### 6.    Did the Agent Breach the Implied Covenant of Good Faith and Fair Dealing?

In its decision denying the Agent's motion for summary judgment with respect to Count V, the trial court identified two issues of fact to be determined by the trier of fact. *First*, the court found an issue of fact as to whether the Agent acted in good faith in exercising the Credit Bid as instructed by BDCM and in refusing to joint bid with any other bidder. *Second*, the court found an issue of fact as to whether the Agent acted in bad faith by permitting the structuring of the sale to

GSCAH, intending thereby to evade the requirements of the Credit Documents. *See* JX 25 at 24.

We find that the Agent did the not breach the implied covenant for several reasons. Under the Credit Agreement, absent a direction that on its face would cause the Agent to violate the Credit Documents, the Agent was obligated to follow the instructions given to it by the Required Banks in connection with either the credit bidding or the subsequent structuring of the sale to include GSCAH. As discussed in connection with the breach of contract claims against the Agent, this follows from sections 12.1 and 12.5 of the Credit Agreement. Section 12.5 states that "The Administrative Agent *shall* take such action [with respect to an EOD] as shall be reasonably directed by the Required Banks (emphasis added)." And section 12.1 provides that "notwithstanding anything to the contrary elsewhere in this Agreement, the Administrative Agent shall not have any duties or responsibilities except those expressly set forth herein nor in other Credit Document, nor any fiduciary relationship with any Bank, and no implied covenants . . . shall be read into this Agreement or otherwise exist against the

-142-

Administrative Agent."  Finally, section 12.4 of the Credit Agreement
provides that "The Administrative Agent shall in all cases be fully
protected in acting, or in refraining from acting, under this Agreement
and the other Credit Documents in accordance with a request of the
Required Banks, and such request and any action taken . . . pursuant
thereto shall be binding upon all the Banks."  These sections,
collectively, insulate the Agent from the liability that Claimants seek to
impose.  Furthermore, for the reasons already discussed, the  testimony
of Mr. Gray supports this conclusion.  As noted, Mr. Gray opined that it
would be highly unusual for an agent to refuse to follow directions of the
Required Banks and he has never seen this. *See* DX 124 ¶ 17(A).  He
also noted that the Bankruptcy Court said that the "'[A]gent had no
discretion to act independently, but simply was obligated to act in
accordance with the instructions of BDCM as the Required Bank.'"  *Id.*
¶ 32 (quoting JX 15).  Finally he noted that both sections 12.4 and 12.5
are common clauses and that when an agent follows directions he can
expect to be exculpated under section 12.4.  *See id.* ¶ 17(B).

NY 76962594v5

Thus, we answer the fact questions left open by the trial court's summary judgment opinion as follows: (1) the Agent acted in good faith in exercising the Credit Bid at the direction of the Required Banks; and (2) the Agent did not act in bad faith transferring the Collateral to GSCAH at the direction of the Required Banks. The Panel further finds that, in any event, section 12.1 does not permit us to impose any implied duties on the Agent.

### D. Findings of Fact and Conclusions of Law

The Panel finds that the BD Lenders breached the implied covenant of good faith and fair dealing. The Panel further finds that the Agent did not breach the implied covenant of good faith and fair dealing.

Based on these findings we conclude, as a matter of law, that Claimants are entitled to damages as a result of the BD Lenders' breach of the implied covenant of good faith and fair dealing.

## IV. THE TRIBUNAL AWARDS DAMAGES TO CLAIMANTS

### A. Legal Standard

Where a breach of contract claim "involves the deprivation of an item with a determinable market value, the market value at the time

-144-

of breach is the measure of damages." *Sharma v. Skaarup Ship Mgmt. Corp.*, 916 F.2d 820, 825 (2d Cir. 1990) (applying New York law). The party "complaining of injury has the burden of proving the extent of the harm suffered." *Berley Indus., Inc. v. City of New York*, 45 N.Y.2d 683, 686 (1978).

> Where, however, the non-breaching party has proven the *fact* of damages by a preponderance of the evidence, 'the burden of uncertainty as to the amount of damage is upon the wrongdoer.' Doubts are generally resolved against the party in breach. Therefore, a plaintiff need only show a 'stable foundation for a reasonable estimate' of the damages incurred as a result of the breach.

*Process America, Inc. v. Cynergy Holdings*, 839 F.3d 125 (2d Cir. 2016) (citations omitted). In short, Claimants here must prove that damages have been caused by a breach, and must "present[] an adequate basis for computing that amount." *Coniber v. Center Point Transfer Station, Inc.*, 137 A.D.3d 1604, 1606 (4th Dep't 2016).

Finally, the calculation of damages does not require exactitude; a reasonable approximation based on credible evidence is sufficient to support a damages award. "[W]hile damages may not be

NY 76962594v5

determined by mere speculation or guess, evidence that, 'as a matter of just and reasonable inference,' shows their existence and the extent thereof will suffice, even though the result is only an approximation." *Spectra Audio Research, Inc. v. Chon*, 62 A.D.3d 561, 564 (1st Dep't 2009) (citation omitted).

## B.    Expert Reports

As noted above, we have found that BD Lenders breached the implied covenant of good faith and fair dealing.  We have also concluded that Claimants were damaged as a result of that breach because the distributions of the proceeds of the sale of GSC's assets were misallocated.  As a result, the NCLs received less than they were entitled to receive when the BD Lenders allocated shares in GSCAH in accordance with the split between the Cash and Credit Bids at the Auction.

The remaining question, then, is whether Claimants have established a "stable foundation for a reasonable estimate of the damages incurred."  In order to make that assessment we carefully examined the reports and testimony of the experts who provided the

NY 76962594v5

proof on the quantum of damages.  Before turning to an examination of each expert's opinions, we note that both experts began by fixing the value of *all* of the assets purchased at the sale.  Both then calculated the Claimants' agreed upon 31.1112% of that total, applied pre-judgment interest ("PJI") at the agreed rate of 9% per annum, and then subtracted the amounts already received by the Claimants through various distributions by Respondents.

### 1. James K. Finkel – Claimants' Expert – Qualifications and Opinions

#### a. Summary of Qualifications

Mr. Finkel is now a Managing Director at Duff & Phelps, where he has worked since 2010.  While at the firm he has been the head of the Complex Asset Solutions group — a valuation unit specializing in structured credit products and derivatives.  He is now the firm's National Practice Leader for Financial Crisis Disputes, in which capacity he provides advice on disputes involving complex financing transactions.  Prior to his employment at Duff & Phelps he spent seven years as the CEO and managing member of Dynamic Credit Partners ("DCP"), a

firm he founded. While at DCP he managed a number of CDO and CLO funds but they were in wind down for the last three years of the firm's existence. He acknowledged during his testimony that the fund had probably lost sixty percent of its value, or close to $3 billion. *See* Hr. Tr. at 1449:2-10. He ran another fund under a fee-splitting arrangement that was in default. Therefore, as to that fund he was unable to invest in any funds but could only monitor and report on the defaulted performance of the CDO fund. During his last three years at DCP, the firm developed an advisory and valuation business completing over ninety consulting projects for global clients. He managed a valuation practice for CDOs and CLOs and other complex fund vehicles. In the seventeen years before starting his own firm he worked at several banks, at two brokerage firms, and as a junior associate at a law firm. None of those positions involved valuation expertise.

Mr. Finkel does not have a degree in economics and is not trained as an economist. He has a BA from Colorado College, an MSc from the London School of Economics, where he majored in international politics, a JD degree from the University of Miami, and an

-148-

LLM in tax from NYU. He does not have any certification as a
valuation expert. *See id*. at 1553:14-17 (Finkel). Mr. Finkel admitted
that he "base[d] [his] views . . . on both [his] judgment and experience,
as well as anecdotal evidence." Finkel Rept. at 17 n.20, 20 n.30.

### b. Summary of Opinions

Mr. Finkel provided several damage calculations, always
based on the value as of July, 2011 of all of the Collateral securing the
Loan. Mr. Finkel computed damages using two approaches. The first
was what he termed the "present value" methodology. In this approach
he assumed that GSCAH acquired all of GSC's assets at Closing and
that GSCAH received 100% of GSC's pre-petition management fees.
He then proceeded to apply a discounted cash flow ("DCF") analysis to
both the value of the management contracts and to the equity in the
various Funds.

With respect to the management contracts, the analysis
consisted of determining the net present value of the revenue stream
from those contracts. He did this by subtracting the projected expenses
to service the contracts from the projected revenue stream and then

-149-

discounting that figure to present value. In providing his valuation of the GSC management contracts, he relied almost exclusively on a four-page term sheet submitted by Sankaty in a restructuring attempt following the Auction that was ultimately rejected by the Trustee. This term sheet, of course, was merely a proposal — not a consummated transaction — and was not a proposal to buy the contracts but only to manage them. The proposal offered to manage all of the management contracts for a fee based solely on 40% of senior fees. Mr. Finkel relied on this proposal to establish a market rate for managing the Funds. He described this as a fair estimate of the market for subadvisory services. He also assumed overhead costs of $425,000 per year. The projected revenue stream was based on 100% of the pre-restructuring fees charged by GSC. He then made certain assumptions to determine the appropriate discount rate. Based on this methodology he determined the net value of the revenue stream as of the acquisition dates to fall between $79.5 and $84.2 million. His average net present value figure came to $81,893,007.

NY 76962594v5

With respect to the value of the equity in the various Funds he again used a DCF analysis, using his own projected cash flow analysis. *See* Finkel Rept. at 22-23. Based on this methodology he concluded that the net present value of the equity was $109,052,659.

He then added in the value of other assets, including the $26.1 million cash retained by GSC, and determined that the total present value of all of the assets was $250,611,288, which was his mid-point between a higher and lower figure. He then calculated damages as Claimants' *pro rata* share (31.1112%) of the value of all of the Collateral, minus monies already received, plus PJI at 9% through March 31, 2018, for a total award of $115,292,229. *See* Finkel Supplemental WD ¶ 2.

In what he termed his second approach, he used the same methodology but excluded the $26.1 million in cash retained by GSC following the sale of assets. This approach yielded a total damage award of $102,288,847. *See id.* ¶ 3.

Finally, in a third approach, Mr. Finkel abandoned the DCF methodology and instead calculated damages based on the actual cash

-151-

proceeds generated over the last six years from the Collateral acquired by GSCAH, net of expenses (calculated again based on the Sankaty term sheet). To this he added the cash on hand at GSCAH as of the acquisition date, for a total of $299,156,211. He then calculated Claimants' 31.1112% share, subtracted the funds already received by Claimants, and then added 9% PJI through March 31, 2018, for a total award of $108,600,631. *See id.* ¶ 4.

### 2. Dr. Paul Gompers – Respondents' Expert – Qualifications and Opinions

#### a. Summary of Qualifications

Dr. Paul Gompers earned a BA from Harvard College, a Masters in Economics from Oxford University, and both a PhD in Business Economics and an MBA from Harvard University. He is currently a Professor at the Harvard Business School, where he teaches and conducts research on corporate finance, the structure and governance of public and private companies, the valuation of companies, and the behavior of institutional investors. According to Respondents, Gompers teaches and performs valuations of bank debt; has written case

NY 76962594v5

studies for his courses analyzing the execution and trading strategies of distressed debt investors (case studies in which debt trading prices and quotes are used in valuations); and has substantial experience with both private equity and venture capital valuations. His courses also cover the topic of bankruptcy reorganization. He is frequently retained as an expert and has testified over fifty times during the past four years. *See* Gompers Rept. Appendix B. He has provided expert testimony on several subjects including, but not limited to, the valuation of public and private companies, and the valuation of private equity funds. He has also authored many books and articles. Finally, he has consulted, advised, and invested in private equity and venture capital funds and has founded a fund with $1 billion in assets. *See* Gompers Rept. ¶¶ 1-4 and Appendix A and B.

On the other hand, Claimants allege that Dr. Gompers has no training, education or experience in distressed debt. They note that he has never provided an expert opinion on the efficiency of a bank-debt market or the valuation of a CLO equity, bond, or management contract, or a CDO. Finally, they assert that he has never written, lectured, or

taught about the fair market value of CDOs or CLOs, the accuracy of CLO or CDO cash flows, or the conduct of bidders at auction.

### b. Summary of Opinions

Dr. Gompers' report and testimony included a number of opinions. We now summarize his key opinions. *First*, his opinion is based on his view that the fair market value (based on trading value) of the GSC debt determines the fair market value of the GSC assets or, as he stated, "the anticipated net proceeds of secured lenders from the collateral assets . . . ." *Id*. ¶ 9.

*Second*, Dr. Gompers concluded that based on trading data the expected recovery was 20-25% of the total outstanding debt or somewhere between $48 and 60 million. He then cross-checked this valuation by reviewing price quotes, market estimates and Auction bids. He specifically noted Mr. Manzo's pre-auction declaration to the Bankruptcy Court in which Mr. Manzo said the market was suggesting a price from 15 to 20% of the debt. *See* DX 72 ¶ 28. He further noted that after APA 1 was terminated, no one made a significant cash proposal for GSC's assets. The only alternative offered to the Trustee was the NCLs'

-154-

proposed plan of reorganization premised on the Sankaty term sheet offering to manage the Funds for 40% of senior fees.

*Third*, Dr. Gompers opined that the market value of revenue sharing bids cannot be determined reliably.  Indeed, he noted that under the Bidding Procedures such bids should not even have been allowed as they had "no readily ascertainable value."  A revenue sharing bid is merely a promise to share future revenue which at the end of the day provides no guarantee of any revenue, much less a definite quantifiable sum.  According to Dr. Gompers, revenue sharing contracts are never traded so it is difficult if not impossible to estimate their market value. The value of such bids will fluctuate based on such intangibles as the quality of the manager; the consent of investors; the alignment of incentives between the manager and the investors; and future market conditions, all of which are uncertain and subject to vast variations.

*Fourth*, Dr. Gompers opined that the later Capstone valuations of the revenue sharing bids were inconsistent with other valuations Capstone presented.  In late August 2010, Capstone provided a valuation of $50-75 million but in October claimed that the value was

-155-

$138 million.  Despite that, Capstone later provided a valuation of $193 million for only a portion of the assets.

Finally, based on his valuation of $48-60 million, Dr. Gompers calculated a damage award, after taking 31.1112% of that amount, subtracting monies received, and adding PJI (on a staggered basis based on dates payment were received), of $14.1 million at the high end.

## C.    Analysis and Findings of Facts

Although we conclude that the disproportionate allocation of assets created "injury in fact" to the Claimants, the Panel has considered the damage calculations provided by both of these experts and, for different reasons, finds both to be unpersuasive and that we are unable to adopt the model presented by either expert for the calculation of damages.  Rather, as discussed below, we conclude that the best way to calculate damages is premised on a series of valuations Mr. Manzo provided in the period around the time of the Auction, supplemented by his later valuation of the assets included in APA 2.

NY 76962594v5

*First*, we do not find Mr. Finkel's presentation to be persuasive and do not believe we can rely on his report to support a damage calculation. Among the issues we see with his report are:

1. He portrayed a surprising lack of familiarity with relevant details of the management contracts including, for example, his erroneous insistence (without reviewing the contracts) that the management contracts could not have had clauses allowing the investors to terminate them. *See* Hr. Tr. at 1483:18-1484:22.

2. There was a lack of support for his conclusion that the Sankaty Term Sheet defined the market for the cost of managing these assets. The Term Sheet was subject to due diligence (*see* CX 91 at 1) and to further negotiations. *See* Hr. Tr. at 1541:9-25. We note that Mr. Manzo testified that his due diligence disclosed that the Sankaty rate was under market. Moreover, he could point to no other examples of the proposed Sankaty fee to support his conclusion other than his unsupported statement of his "judgment and experience." *Id.* at 1543:17-24. He also wrongly contested the fact that under its proposal Sankaty, not

-157-

GSC, would make final investment decisions. *Id.* at 1490:19-
1493:22.[31]  Respondents also provided persuasive evidence that
both managers and investors desire that the manager receive
incentive fees and have equity interests which align the
manager's interests with those of the investors. *See, e.g.*, RFOF
¶¶ 95-96 (citing among other things Hr. Tr. at 774-775 (Nahas)
(stating that PSERS, GSC's largest investor, is "well known for
forcing the managers of any fund that they invest in to actually
invest 20 to 25 percent of the total size of the fund"); *id*. at
1828-1830 (Gompers) (testifying that based on his research
"incentive compensation matters; that the [managers] have both
skin in the game and . . . stand[] a chance to make . . . a lot more
money if they do well by the investors").

3.  At the end of the day, Mr. Finkel identified no actual transaction
to support the claim that 40% of senior fees is an accepted

---

[31] Claimants also point to the 2008 subadvisor agreements where 38.8% of senior
and incentive fees were charged, but those subadvisors were not making final
investment decisions, and if they acquired the contracts and did make those
decisions the fees would be 100%. *See, e.g.*, CX 272 (11/12/08 Subadvisory
Agreement between GSCAP (NJ), L.P. and ICP Asset Management, LLC) § 5.

-158-

market rate for managing these Funds, which involved full decision making by the manager. The closest analogy was BDCM's offer of 65% of senior and incentive fees for subadvisory services which was rejected by the then controlling Lenders. *See* DX 14 (Draft Services Agreement) at 1, 9-10. While the proposed agreement arguably contemplated only limited involvement by GSC in the management process, under its terms final investment decisions were made by GSC. This is different than the case of BDCM's agreement with GSCAH.

4. He used 100% of the pre-bankruptcy fees as the basis for his calculation of projected revenues from the management contracts, even though BDCM was required to reduce those rates in some instances in order to obtain consents. *See* DX 100; RFOF ¶ 67.

5. He erroneously stated that consents were not required under the management contracts. *See* Hr. Tr. at 1488:1-7. Indeed, he did not review the actual consents and seemingly did not know

whether the consents GSCAH had received would preclude GSCAH from hiring Sankaty. *See id*. at 1473:4-15.

6. He unrealistically assumed that the fee split could somehow be kept secret from sophisticated investors. *See id*. at 1483:13-17.

7. He included the $26.1 million in assets retained by the Debtors in one of his damage analyses, without acknowledging that those assets would never have been available to Claimants. *See* Finkel Rept. ¶ 97; Hr. Tr. at 1564:21-1565:22.

8. Mr. Finkel's running damages theory suffers from some of the same infirmities as his DCF analysis because it relies on the 40% of senior fees proposed in the Sankaty Term Sheet for the expenses associated with providing the management services. We also conclude that a damage calculation premised on actual cash flows over an approximately seven-year period after the breach is legally unsupportable — if only because that result might have varied significantly depending on the quality of the asset manager and the unpredictable market conditions.

-160-

In sum we are not persuaded by either Mr. Finkel's DCF analysis or his running damages analysis, and therefore do not adopt his conclusions.

We are similarly not persuaded by Dr. Gompers' analysis for the following reasons:

1. As he seemingly admits, his use of market value of the debt really measures expected recovery more than the fair market value of the assets which comprise the Collateral. *See* Gompers Rept. ¶¶ 9-10; Hr. Tr. at 2069-2070.

2. The weakness of his position was demonstrated by the example of $100 million in cash producing different likely prices for the debt depending on the amount of the claims on that cash. If $200 million of secured debt had uncontested rights to that cash, the potential recovery for the holders of that debt, and presumably the market value of that debt, would be 50 cents on the dollar. If, however, the liens were avoided and that $100 million in cash had to be shared with $2 billion in unsecured claims, the expected recovery for the secured debt holders and

NY 76962594v5

the presumptive price of the debt would be less than 5 cents on the dollar. While the trading price of the debt dramatically changed, in both these scenarios the fair market value of the $100 million in cash is $100 million. *See* Hr. Tr. at 1911:23-1918:25.

3. He relies on a handful of sales to opine as to the market value of the assets. The last trade he used in his analysis occurred in December, 2010, seven months before the Closing and before a number of events that may have affected the value of the assets. *See* CL FOF ¶ 129.

Dr. Gompers claims that a DCF analysis would be difficult, if not impossible, to accomplish because of the illiquidity of the assets, because of the inherent uncertainty in the market, because of the risk that investors might not consent to a proposed manager, because projected cash flow would turn on the quality of the manager, and because of the lack of cash bids at the Auction. While all of these are concerns, we do not agree that they warrant disregarding DCF valuations of the assets. In fact, Dr. Gompers eventually conceded that a DCF analysis could be

NY 76962594v5

done despite these concerns but he did not do one. *See* CL FOF ¶ 127 (citing to Hr. Tr. at 1958-1959; 1993:10-1994:7; 2000:2-6; 2002:18-2003:6; 2014:9-2015:6; 2021:5-12; 2035:19-24; 2061:12-2062:5; 2064:4-9). We agree that a DCF analysis could be done, but it has not been properly done by Mr. Finkel and was not done at all by Dr. Gompers.

In sum, we are not persuaded by Dr. Gompers' analysis and do not adopt his conclusions.

Claimants also believe that we should rely on the figures used in IRS Form 8594 filings as representing the fair market value of the assets transferred to GSCAH. We do not agree. In this regard we find the testimony of Respondents' expert, Gregory Falk, particularly persuasive with respect to these forms.

Mr. Falk has spent nearly thirty years working at three major accounting firms — PwC, KPMG and now BDO. See 12/15/17 Expert Report of Gregory Falk ("Falk Rept.") ¶¶ 2-3. His practice is solely focused on advising client on Mergers and Acquisitions. As part of that practice he has worked on hundreds of transactions in which he helped

NY 76962594v5

to prepare Form 8594 filings, applying the residual method for allocating purchase price and fair market value of assets. *See id.* ¶ 2. In his opinion, these filings reflect an agreed-upon allocation solely for tax purposes. In the instant case, the valuations were based on figures provided by Capstone which was the basis for a "combined 'Purchase Price' for all acquired assets" in the GSC sale. *Id.* ¶ 21. *See also* Nahas WD ¶¶ 66-67. As more fully discussed below, the Capstone valuations increased markedly following the Auction, based primarily on the use of the Credit Bid at the Auction. Mr. Falk opined that the Form is a consensus document for tax purposes and parties commonly agree upon the figures to be used on the Form solely for tax purposes. He further opined that these figures are not "necessarily tied to [the parties'] independent views of the actual economic or market value of the assets." Falk Rept. ¶ 6. We find Mr. Falk's opinions to be persuasive and conclude that the valuations on the Forms do not, in fact, reflect either the actual economic or fair market value of the assets. While Mr. Falk conceded in his testimony that the figures on the Form must be within a reasonable range and have a basis in reason, he concluded that the form

is not an acknowledgement by GSCAH of the actual fair market value of the allocated assets. Indeed, he testified that in hundreds of 8594 negotiations he "never heard reference to fair market value." Hr. Tr. at 2172:4-8.

### D. Calculation of Damages

Given our findings we find ourselves in the position of being required to reach our own determination of the appropriate damages to be awarded to Claimants. To do that, we have, in effect, adopted parts of the approaches used by both of the experts. *First*, we agree that the only credible way to calculate damages is to determine the total value of the assets at the time of the breach. Here, while the breach occurred at the Closing, the record indicates that the value of the assets remained fairly stable between the time of the Auction and the Closing. *See e.g.*, CX 97 at 296:25-297:2 (Mr. Manzo explained (in his July 6, 2011 testimony) that there had "actually [been] no appreciation at all in any of the debtors['] assets" since the Auction). Moreover, we find that the best and most credible valuations occurred before, during, and shortly after the Auction. The later valuations for all of the assets, by contrast,

-165-

had significantly increased so as to approximate the total value of the Cash and Credit Bids accepted at the Auction and the additional credit bid for the APA 2 assets, rendering the later valuations unpersuasive evidence for purposes of calculating damages.

Second, we have determined that it is appropriate to look both to trading values and to cash flow (or DCF) analyses to determine, within a reasonable approximate range, the value of the assets at or shortly after the Auction. To do that we have searched the record for what we determine to be credible valuations of all of GSC's assets at or about the time of the Auction. These valuations follow.

In connection with negotiations with BDCM over the amount of a potential "stalking horse" bid for all GSC's assets, Capstone advised GSC to reject a $5 million "stalking horse" bid after making an initial assessment that these assets "had a value in the range of at least $50-$75 [million]." DX 94 at 30. Mr. Manzo described the negotiations with BDCM as "hard fought" and "contentious." DX 72 ¶ 15. Given that fact, Capstone had no incentive to *understate* its valuation.

-166-

In his December 3, 2010 declaration to the Bankruptcy Court in support of the sale of GSC's assets, which was submitted more than a month after the Auction, Mr. Manzo stated: "Prior to the auction, the market was suggesting a price for the [Prepetition Lender Claims] in the range of $0.15 to $0.20, implying a value of $30 to $45 million for substantially all of GSC's assets." *Id.* ¶ 28. "Subsequent to the Auction the bid/ask for the Prepetition Lender Claims did not substantially change." DX 94 at 29.

In that same declaration, Mr. Manzo went on to state that, "Capstone performed a separate valuation for GSC's assets based upon, among other factors, the projected cash flow for each lot/asset being sold. Based on these calculations, I believed that the value for *all or substantially all* of the assets could, in a best case scenario, potentially reach approximately $140 million." DX 72 ¶ 28 (emphasis added). However, in the Disclosure Statement, the NCLs attached a Capstone Summary of Lot Values Sold in the October 26-29, 2010 Auction dated December 10, 2010. *See* DX 94, Exhibit I to Exhibit A at 343 of 456. This document reveals that Capstone placed a total value on the assets

-167-

acquired in the joint bid of $138,371,927.  *See id.*; *see also* CX 60 (12/10/10 Valuation of GSC Group assets prepared by Capstone during the Auction).

We then placed a value of $19 million on the APA 2 assets which are a part of the total assets purchased and eventually transferred to GSCAH, a portion of which was allocated to the NCLs.  The $19 million valuation is found in the testimony of Mr. Manzo under questioning by the Trustee's counsel at the July 7 Bankruptcy Court hearing on the Trustee's Motion for Entry of Order Authorizing Sale of Assets.  In that testimony, Mr. Manzo reduced his valuation of the APA 2 assets from the valuation in his affidavit submitted in connection with the Sale Hearing.  *See* DX 98 at 56; CX 90 ¶ 12 (providing initial valuation).  We quote the relevant portion of that testimony:

> Q.  Okay.  So with respect to APA 2, we have debt being extinguished on the order of thirty-five million dollars, if I heard you correctly, and assets being conveyed on the order or nineteen million dollars.
>
> A.  That's correct.

NY 76962594v5

> Q.  In your view, is that a good deal for the estates?
>
> A.  Certainly.  It's an extinguishment of thirty-five million dollars of debt for nineteen million of assets . . . .

We then added $138,371,927 to $19 million for a total of $157,371,927.

We then subtract $6.5 million from this total figure because Mr. Manzo

testified in a June 26, 2011 deposition conducted by counsel for the

NCLs that he would reduce the value of the assets purchased by the

Credit Bid in the Auction by that amount.  *See* DX 148 at 59-60.  This

reduces the total to $150,871,927.  We quote the relevant portion of that

testimony:

> Q.  [Y]ou'd actually delete 6 and a half million dollars from the value that would be received pursuant to the credit bid; is that right?
>
> A.  I would.
>
> Q.  So there would be $5 million received in exchange for $224 million credit bid; is that right?
>
> A.  That's what the schedule would say if I had updated it.

*Id*.

-169-

Finally, we note that while there may have been some confusion regarding whether certain cash was transferred with the APA 2 assets, Mr. Manzo definitely testified that this was not the case. Mr. Manzo gave the following testimony on this issue: "So if there's a simultaneous closing [which there was], the cash included in the APA 2 would be zero. There would be no cash. We would convey all the assets." DX 98 at 58-59.

We note, however, that in the NCLs' Disclosure Statement, the NCLs also presented Capstone's various analyses of GSC's assets as of December 31, 2010. Those analyses provided "indicative values" of the assets of between $173.6 million and $229.4 million. The Disclosure Statement goes on to say that "the [NCLs] believe that the value of the Debtors' assets has remained relatively stable since December 31, 2010. Based on information made available to date, the [NCLs] believe that these year-end 2010 Capstone valuations are the best indication of the current value of the Debtors' assets." DX 94 at 30.

However, for various reasons we do not agree that these later valuations are, in fact, the best indication of the actual value of the

-170-

assets.   These valuations were based in large part on the results of the

Auction, which included a Cash Bid of $11 million and a Credit Bid of

$224, and the added Credit Bid of $33 million for the APA 2 assets.  But

these credit bids do not reflect the true value of the assets.[32]

---

[32] At his post-auction December 2, 2010 deposition, in response to questioning by Claimants' counsel, Mr. Manzo gave the following testimony:

> Q.   You understand that a credit bid in and of itself doesn't bring cash into the estate, right?
>
> A.   A credit bid does not bring cash, correct.   It reduces debt obligations of the estate.
>
> Q.   In your view, the [value of the] assets acquired pursuant to the credit bid was $55 million of value?
>
> A.   In our internal valuation that's correct.
>
> Q.   Is there some external valuation?
>
> A.   Yeah, the auction.  The auction actually set the fair market value of all the Lots we sold at $235 million and there were other bids at lesser amounts but that in fact is, in my view, the – the material finding is what will the market pay for the assets being sold, not an internal valuation.
>
> Q.   In your view, effectively the Agent would acquire $55 million of assets for relieving $224 million of secured claim?
>
> A.   If you were to use our valuation, your statement would be correct.

DX 145 at 81:17-82:15.

NY 76962594v5

*First*, the initial Credit Bid was $130 million. *See* JX 4 at 47:3. The Credit Bid was then consistently raised in order to defeat Sankaty's revenue sharing bid.[33] This was an appropriate decision by BD Lenders because the Sankaty bid could not guarantee a specific value to the Secured Creditors, much less to the Majority Lender. Sankaty was not a qualified bidder under the Bidding Procedures Order and should never have been accepted as a bidder by Mr. Manzo. For one, it failed to make the required $1 million deposit. More importantly, a revenue sharing bid does not have a "readily ascertainable market value" as required by the Bidding Procedures. *See* DX 36 at 24. Finally, no proof was offered of any effort by Sankaty to obtain investor consent to its revenue sharing proposal making it even more difficult to evaluate its monetary value.

---

[33] The Sankaty revenue sharing bid would provide Sankaty with 40% of senior fees, the remainder to be shared with GSC. Mr. Manzo reported on some of the feedback he received regarding the quality of the Sankaty bid, summarizing the feedback as stating, "you don't necessarily want to incentivize somebody that way [referring to the 40% of senior fees proposal], because they're not incentivized to produce better returns, because their economics don't change at all. And, therefore, you're better off with some kind of upside; that is, giving them some portion of, you know, an incentive fee or a carry of some sort, to incentivize them to put more senior people on and to do a better job, and therefore, give you more return . . . ." CX 92 at 95-96.

All of this leads to the ineluctable conclusion that Mr. Manzo was using the Sankaty bid to spur increased credit bidding by the Agent. *See* DX 77 at 147:16-17 ("It was my belief that eventually the Agent would go ahead and bid with their credit currency"). Thus, the Capstone year end 2010 valuations, which were significantly higher than the $140 million valuation at the start of the Auction, was based solely on the alleged value of the Sankaty and Saratoga revenue sharing bids, or on the Agent's exercise of the Credit Bid for the full amount of the debt, or both. Indeed, the Claimants themselves recognized that the joint bid of $235 million was not a fair valuation of GSC's assets.[34] Neither the Sankaty nor the Saratoga bids offered a "readily ascertainable" value to the creditors and for the same reason do not provide a stable foundation on which to predicate a damages award.

For this reason, we have determined to take the average of the three above valuations that we find to be the most credible. Where a

---

[34] *See* DX 94 at 28 ("[T]he Plan Proponents do not believe that the BD Joint Bid is any way indicative of the value of the Debtors' assets. . . . [T]he Plan Proponents believe that the value of the Debtors' assets is *substantially less* than the amount of the Prepetition Lender Claims.") (emphasis added).

NY 76962594v5

range of value was given, we took the midpoint. Thus, we added $62.5 million (the midpoint of $50-75), $37 million (the midpoint of $30-45), and $150,871,927 and took the average of the three which came to $83,457,309. Claimants' 31.1112% *pro rata* share of $83,457,309 is $25,964,570.3176.

From this figure we then subtracted the cash payments received and calculate PJI accordingly.

Here is our calculation:

(1)    From July 26, 2011 – February 28, 2016, interest of 9% is calculated on the full amount of $25,964,570.3176, for a total of $10,729,591.9244 (or $194,734.277382 per month for 55 months and 3 days). This brings the total, as of March 2016, to $36,694,162.242. From this we subtracted the first payment of $7,200,000 made in March 2016, for a total of $29,494,162.242.

(2)    From March 2016 – June 2016, we calculated three months of interest on the balance of $29,494,162.24 which comes to $663,618.65 for a total of $30,157,780.89. From this we subtracted the June, 2016 payment of $1.3 million for a total of $28,857,780.89.

-174-

(3)    We then calculated the remaining PJI as follows:  For the period from June 2016 through and including April 20, 2018, PJI totals $4,903,846.19 (or $216,433.36 per month for 22 months and 20 days).  This brings the total award to $33,761,627.08.

We also award 9% interest per annum from April 21, 2018 through the date of payment.  Finally, the Claimants' total recovery will also include the expected payment in May 2018 of $5.4 million, which Respondents agree they must make on termination of the tax indemnity.[35]

## V.    CONCLUSION

For the foregoing reasons, we award as follows:

---

[35] Two notes are in order:  *First*, after exploring the history of the funds used to support the letter of credit, we concluded that the $20 million was not included in either Mr. Manzo's valuation of the Auction lots eventually included in APA 1 or in the $19 million valuation we are using for the APA 2 assets.  Because this amount is not included in our damage award, the Claimants are entitled to receive this additional payment.  Cash had not transferred and remained with GSC at all times. *Second*, the Panel considered three alternative methodologies for calculating the award.  Without disclosing the details of those alternative methodologies we merely note that the other three produced awards within a very close range of the award determined by the methodology which we all agreed was the best approach to calculating damages.

-175-

1.    $33,761,627.08, together with interest of 9% per annum from April 21, 2018 through the date of payment, in favor of Claimants and against BD Lenders on Count VII of the Amended Complaint.

2.    The $951,272 that was wired to White & Case on February 5, 2018 (*see* CL FOF ¶ 58) may be used towards payment of the Award.

3.    No liability was found against BD Lenders for breach of sections 14.7(b) and 14.12 of the Credit Agreement.

4.    No liability was found against the Agent.

5.    The costs of this Arbitration will be borne equally by Claimants and Respondents, with the exception of party-appointed arbitrators.  The Administrative fees and expenses of the AAA totaling $31,470.00 are to be borne $15,735.00 by Credit Agricole Corporate and Investment; $15,735.00 by Black Diamond Capital Management, LLC. The Compensation and expenses of Arbitrators totaling $1,022,470.96 are to be borne as incurred. Therefore, Black Diamond Capital Management, LLC has to pay Credit Agricole Corporate and Investment, an amount of $15,735.00.

-176-

NY 76962594v5

6. To the extent any argument has not been discussed herein, it has been considered and either rejected or found unnecessary to a determination of the issues in contention.

7. This Final Award may be executed in any number of counterparts, each of which shall be deemed an original, and all of which shall constitute together one and the same instrument.

**So ordered.**

4/19/18
Date

Hon. Shira A. Scheindlin (Ret.), Chair

4/19/18
Date

Richard J. Davis, Arbitrator

4/19/18
Date

Jonathan J. Lerner, Arbitrator

I, Shira A. Scheindlin, do hereby affirm upon my oath as Arbitrator that I am the individual described in and who executed this instrument which is my Award.

4/19/18

-177-

Date                                    Hon. Shira A. Scheindlin (Ret.), Chair

I, Richard J. Davis, do hereby affirm upon my oath as Arbitrator that I am the individual described in and who
executed this instrument which is my Award,

_4/19/18_                               _____
Date                                    Richard J. Davis, Arbitrator

I, Jonathan J. Lerner, do hereby affirm upon my oath as Arbitrator that I am the individual described in and who
executed this instrument which is my Award.

_4/19/18_                               _____
Date                                    Jonathan J. Lerner, Arbitrator

-178-