James H.M. Sprayregen, P.C.
Brian E. Schartz, P.C.
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:     (212) 446-4800
Facsimile:     (212) 446-4900

Anup Sathy, P.C.
Stephen C. Hackney, P.C. (*admitted pro hac vice*)
Alexandra Schwarzman (*admitted pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:     (312) 862-2000
Facsimile:     (312) 862-2200

*Counsel to ASSF IV AIV B Holdings III, L.P. and AEIF Trade, LLC*

Steven M. Abramowitz
Marisa Antos-Fallon
**VINSON & ELKINS LLP**
666 Fifth Avenue, 26th Floor
New York, NY 10103-0040
Telephone:     (212) 237-0000
Facsimile:     (212) 237-0100

*Counsel to SPT Infrastructure Finance Sub-1, LLC and SPT Infrastructure Finance Sub-2, Ltd*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>EMPIRE GENERATING CO, LLC, *et al.*,[1]<br><br>　　　　　　　　　Debtors. | Chapter 11<br><br>Case No. 19-23007 (RDD)<br><br>(Jointly Administered) |

**OBJECTION OF THE MINORITY LENDERS TO THE DEBTORS' SALE MOTION**

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification number are:  Empire Generating Co, LLC [3821], Empire Gen Holdco, LLC [3820], Empire Gen Holdings, LLC [4849], and TTK Empire Power, LLC [none] (collectively, the "Debtors").  The Debtors' corporate address is: Empire Generating Co, LLC, c/o Tyr Energy, LLC, 7500 College Blvd., Suite 400, Overland Park, Kansas 66210.

ASSF IV AIV B Holdings III, L.P. and AEIF TRADE, LLC ("Ares") and SPT Infrastructure Finance Sub-1, LLC and SPT Infrastructure Finance Sub-2, Ltd. ("Starwood" and, together with Ares, the "Minority Lenders") respectfully state as follows in support of this objection (this "Objection") to the Sale:[2]

**Preliminary Statement**

1. As holders of 45% of the secured claims against multiple Debtors, the Minority Lenders' primary concerns throughout these chapter 11 cases have been to preserve their rights as secured creditors in the Debtors' reorganizations and to pursue remedies in both this Court, and, if necessary, other forums, against non-Debtor parties to the extent their actions violate the Minority Lenders' rights under the Prepetition Loan Documents. The proposed Sale, involving only the sale of stock of a non-recourse holding company, is admittedly structured for the purpose of prejudicing the Minority Lenders' rights under both bankruptcy and nonbankruptcy law, and, for that reason and the reasons set forth below and in the Omnibus Objection (as defined below), the Minority Lenders respectfully object to the Sale.

**Background**

2. On May 19, 2019 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of New

---

[2] Capitalized terms used but not defined herein shall have the meanings given to them in the *Debtors' Motion for Entry of Orders (I) (A) Approving Bid Procedures Relating to the Sale of Substantially All of the Assets of Empire Generating Co, LLC, or Interests in Empire Gen Holdings, LLC, (B) Establishing Procedures in Connection with the Assumption or Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, (C) Approving Notice Procedures, (D) Approving Stalking Horse Bid Protections, and (E) Granting Related Relief; and (II) (A) Authorizing the Sale of Substantially All of the Assets of Empire Generating Co, LLC, or Interests in Empire Gen Holdings, LLC, Free and Clear of Liens, Claims, Encumbrances, and Other Interests, (B) Approving the Assumption or Assumption and Assignment of Certain Executory Contracts and Unexpired Leases Related Thereto, and (C) Granting Related Relief* [Docket No. 6] (the "Sale Motion").

York (the "Court").  The Debtors are operating their businesses and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  On May 21, 2019, the Court entered an order authorizing the joint administration and procedural consolidation of the Debtors' chapter 11 cases pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedures (the "Bankruptcy Rules") [Docket No. 34].  No entity has requested appointment of a trustee or examiner in these chapter 11 cases.  The United States Trustee for the Southern District of New York (the "U.S. Trustee") has not appointed any statutory committees.

3.      On the Petition Date, the Debtors filed the *Debtors' Joint Chapter 11 Plan* [Docket No. 8] (the "Plan") and the Sale Motion.

4.      On May 28, 2019, the Minority Lenders filed the *Minority Lenders' Omnibus Objection to Debtors' Motion for Entry of an Order Authorizing and Directing Assumption of the Restructuring Support Agreement and Debtors' Sale Motion* [Docket No. 61] (the "Omnibus Objection").

5.      On June 4, the Court held a hearing (the "Bid Procedures Hearing") with respect to approval of Bidding Procedures under the Sale Motion as well as the Debtors' separate motion to assume the RSA.  On June 10, 2019, the Court entered the *Order (A) Approving Bid Procedures Relating to the Sale of Substantially All the Assets of Empire Generating Co, LLC or Interests in Empire Gen Holdings, LLC, (B) Establishing Procedures in Connection with the Assumption or Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, (C) Approving Notice Procedures, (D) Approving Stalking Horse Bid Protections, and (E) Granting Related Relief* [Docket No. 99] (the "Bid Procedures Order").  On the same date, the Court also entered the *Order Authorizing and Directing the Debtors to Assume Restructuring Support Agreement* [Docket No. 98] (the "RSA Order").

3

6.   On June 17, 2019, the Minority Lenders filed a notice of appeal from the Bid Procedures Order [Docket No. 123] and, in an abundance of caution, a motion for leave to appeal from that order [Docket No. 124].[3]

## Objection

7.   The Bankruptcy Code allows a debtor in possession to, "after notice and a hearing, use, sell, or lease, other than in the ordinary course of business, property of the estate."[4]  In the Second Circuit, the standard that courts apply in determining whether to approve a proposed sale is well-established by case law:  a debtor's decision to sell assets outside the ordinary course of business must be based upon sound business judgment.[5]  The Court of Appeals for the Second Circuit has identified several non-exclusive factors that bankruptcy courts may consider in conducting a section 363(b) analysis, including, for example, whether: (a) a "sound business purpose" exists that justifies the sale; (b) adequate and reasonable notice has been provided to interested parties; (c) the sale value obtained is fair and reasonable; and (d) the debtor acted in good faith.[6]

---

[3]   The Minority Lenders believe the Bid Procedures Order to be final and appealable as of right under 28 U.S.C. § 158(a)(1).  The Minority Lenders moved for leave to appeal out of an abundance of caution should the Bid Procedures Order be considered interlocutory.  The Minority Lenders also appealed the RSA Order.

[4]   11 U.S.C. § 363(b)(1).

[5]   *See, e.g.*, *In re MF Glob. Inc.*, 535 B.R. 596, 605 (Bankr. S.D.N.Y. 2015); *In re Genco Shipping & Trading Ltd.*, 509 B.R. 455, 464 (Bankr. S.D.N.Y. 2014); *Licensing By Paolo, Inc. v. Sinatra (In re Gucci)*, 126 F.3d 380, 387 (2d Cir. 1997); *Official Comm. of Unsecured Creditors of LTV Aerospace and Defense Co. v. LTV Corp. (In re Chateaugay Corp.)*, 973 F.2d 141 (2d Cir.1992); *Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1070 (2d Cir. 1983); *Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.)*, 147 B.R. 650, 656 (S.D.N.Y. 1992) (law vests the debtor's decision to use property out of the ordinary course of business with a strong presumption that in making a business decision, the directors acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company).

[6]   *See In re Global Crossing Ltd.*, 295 B.R. 726, 744 (Bankr. S.D.N.Y. 2003) (citing *Lionel*, 722 F.2d at 1071).

8. Where, as here, aspects of the sale inure to the benefit of the Debtors' otherwise out-of-the-money equity sponsors—who negotiated the sale on behalf of the Debtors[7]—the sale should be subject to heightened scrutiny akin to an "entire fairness" standard.[8] "In applying heightened scrutiny, courts are concerned with the integrity and entire fairness of a transaction, typically examining whether the process and price of a proposed transaction not only appear fair but are fair and whether fiduciary duties were properly taken into consideration."[9]

9. The Debtors have not met, and cannot meet, their burden to satisfy either standard necessary to approve the Sale for the reasons set forth below and in further detail in the Omnibus Objection, which is incorporated to this Objection by reference as if fully set forth herein and at length, and at the Bid Procedures Hearing.

## I.   THE COURT SHOULD NOT APPROVE THE SALE.

10. The Sale is not a straightforward sale of collateral by a debtor in which the party with the exclusive right to credit bid offsets its claim against the selling debtor or debtors to purchase the collateral. The Sale does far more: the Debtors chose to structure the transaction as a sale of equity by the lead Debtor entity, TTK Empire, that is not obligated whatsoever under the Credit Agreement, and against which the lenders specifically, pervasively, and expansively waived

---

[7] *See* June 4, 2019 H'rg Trans. [Docket No. 95] at 27:6–15 ("Q. Is it fair to say that you were the business lead when it came to negotiating this agreement on behalf of the five parties for whom you've signed? A. One of the business leads. Q. Okay. And who were the other business leads along with you? A. Internally at Tyr? Q. Yes. A. Yeah. We relied quite a bit on counsel and advisers, but Brock Shealy and Tat So.") (cross-examination of Garrick Venteicher).

[8] *See, e.g.*, *In re Bidermann Indus. USA, Inc.*, 203 B.R. 547, 551–52 (Bankr. S.D.N.Y. 1997) (applying heightened scrutiny to proposed bid protections where debtor's fiduciary would benefit personally if contemplated sale was consummated).

[9] *In re Residential Capital, LLC*, No. 12-12020 (MG), 2013 WL 3286198 at *19 (Bankr. S.D.N.Y. June 27, 2013) (citing *In re Innkeepers USA Trust*, 442 B.R. 227, 231 (Bankr. S.D.N.Y. 2010)).

5

any claims, except to the limited extent necessary to preserve their lien rights in the pledged equity that TTK Empire owns in its subsidiary, Debtor Empire Gen Holdings, LLC.[10] Then, by the magic of decretal paragraph 13 in the proposed Sale Order, all of the Credit Agreement claims are deemed fully discharged, so that the Debtors and Black Diamond Capital Management, LLC (together with its affiliates, "Black Diamond) can then assert that the Minority Lenders either have no claims whatsoever, and thereby are not subject to classification or treatment under the chapter 11 Plan which the Debtors will then seek to confirm on the same day of the sale hearing, or are unimpaired.[11] Neither the Sale itself, nor its purported effect, is permitted by bankruptcy law or the governing Prepetition Loan Documents.

11. The Minority Lenders object to the Sale on the same grounds and by the same arguments presented in the Omnibus Objection and at the Bid Procedures Hearing. Specifically, and without limitation, the Minority Lenders object to the Sale Motion on the following grounds:

- The Sale is an impermissible *sub rosa* plan that will allow Black Diamond and MJX Asset Management LLC (together with its affiliates, "MJX"), together constituting a bare majority of the Prepetition Lenders, and the Debtors to "circumvent the [Bankruptcy] Code's procedural safeguards" by using an asset sale to deny the Minority Lenders any vote on the reorganization.[12] The Debtors do not have a debtor-in-possession financing facility and the evidence shows they have more than sufficient cash to operate for the foreseeable future.[13] There is no evidence of emergency or other finding of "good business reason" as required by governing Second Circuit precedent to permit this transaction to take place pursuant to a sale rather than

---

[10] *See generally* Pledge Agreement § 6.25.

[11] The mechanic of how the Credit Agreement claims are dealt with under the Plan is opaque since they are not specifically listed in the classification section. The Minority Lenders specifically reserve all rights with respect to the proposed Plan and the treatment and classification (or lack thereof) of their claims.

[12] *Czyzewski v. Jevic Holding Corp.*, 137 S. Ct. 973, 986 (2017).

[13] *See* June 4 H'rg Trans. [Docket No. 95] at 42:14–17 ("Q. Okay. And would you agree with me that the debtors' business operations are currently stable? A. Sure. Stable, but certainly not vigorous in terms of overall cash flow at this facility right now.") (cross-examination of Garrick Venteicher).

6

with the protections of a plan process. Indeed, the Sale is structured for the *express purpose* of denying the Minority Lenders' the opportunity to vote on a plan of reorganization.[14] Numerous cases have held that this type of sale, which is expressly designed to avoid the plan confirmation requirements of section 1129 of the Bankruptcy Code and for no other reason, is impermissible.[15]

- The credit bid in connection with the Sale is a violation of the Collateral Agent's duties under the Intercreditor Agreement, including the duty to act "for the benefit solely and exclusively of *all* present and future Secured Parties."[16] The Intercreditor Agreement is also clear that it is designed solely to define relative rights in respect of Collateral, and not to impair the obligations that the Loan Parties, *i.e.*, the non-selling Debtors, have to the Prepetition Lenders.[17]

---

[14] *See* First Day Decl. ¶ 47 (explaining that the planned credit bid "mak[es] it unnecessary to solicit votes from Prepetition Lenders"); June 4, 2019 Hr'g Trans. [Docket No. 95] at 74:7–10 ("Q: . . . [T]he other side of this strategy was a sale that would allow the parties to avoid the [M]inority [L]enders voting on a plan, correct? A: Yes.").

[15] *See In re Chrysler LLC*, 576 F.3d 109, 117–18 (2d Cir. 2009) ("Although *Lionel* did not involve a contention that the proposed sale was a *sub rosa* or *de facto* reorganization, a bankruptcy court confronted with that allegation may approve or disapprove a § 363(b) transfer that is a sale of all or substantially all of a debtor's assets, using the analysis set forth in *Lionel* in order to determine whether there was a good business reason for the sale." (citing *In re Iridium Operating LLC*, 478 F.3d 452, 466 n. 21 (2d Cir. 2007) ("The trustee is prohibited from such use, sale or lease if it would amount to a *sub rosa* plan of reorganization. In this Circuit, the sale of an asset of the estate under § 363(b) is permissible if the 'judge determining [the] § 363(b) application expressly find[s] from the evidence presented before [him or her] at the hearing [that there is] a good business reason to grant such an application.'" (citing *Lionel*, 722 F.2d , at 1071))), *vacated as moot*, 592 F.3d, 370 (2d Cir. 2010) (per curiam). Unlike cases like *Chrysler*, *Metaldyne*, and *GSC* where such sales were permitted, the Debtors have offered no justification for moving forward with a sale other than the avoidance of the Minority Lenders' voting rights and the generalized desire—daresay held by all Debtors—to reach "finality" on the restructuring process as quickly as possible. *Compare* June 4, 2019 H'rg Trans. at 82:7–12 [Docket No. 95] ("We need to reach finality with this project and get it set on a new course at a right-size balance sheet . . .") *with Chrysler*, 576 F.3d at 118 ("Bankruptcy Judge Gonzalez found good business reasons for the Sale. The linchpin of his analysis was that the only possible alternative to the Sale was an immediate liquidation that would yield far less for the estate—and for the objectors"); *In re Metaldyne*, 409 B.R. 671, 680 (Bankr. S.D.N.Y. 2009) ("The evidence at the hearing showed that the value of the Debtors' business is declining rapidly and that if a sale is not consummated at this time, there may be even less available for creditors."); *In re GSC, Inc.*, 453 B.R. 132, 167 (Bankr. S.D.N.Y. 2011) (permitting sale of assets rather than completion of plan process, where trustee James Garrity testified that assets being sold were "wasting asset" and court concluded that any substantial delay in closing proposed transaction "would have precipitated an immediate and drastic reduction in value").

[16] Intercreditor Agreement § 2.3 ("The Collateral Agent and its successors and assigns under this Agreement will act for the benefit solely and exclusively of all present and future Secured Parties as security for the payment and performance of all present and future Secured Obligations."); *see also* Credit Agreement § 9.02 (authorizing the Collateral Agent to "take such action on such Lender Party's behalf and to exercise such powers, rights and remedies hereunder and under the other Loan Documents as are specifically delegated or granted to such Agent by the terms hereof and thereof").

[17] Intercreditor Agreement § 9.16 ("<u>Provisions Solely to Define Relative Rights.</u> Nothing in this Agreement is intended to or shall impair the obligations of any Loan Party, which are absolute and unconditional, to pay the

7

- The purported linchpin to, and justification for, the Collateral Agent's monumental action is section 3.1(a) of the Intercreditor Agreement, pursuant to which the Prepetition Lenders delegated to the Collateral Agent the "exclusive" right to enforce rights, exercise remedies, and make determinations regarding Collateral, including the right to credit bid the Secured Obligations. The Minority Lenders do not disagree with the proposition that individual Prepetition Lenders are not permitted to credit bid. However, the Minority Lenders never contractually delegated authority to the Collateral Agent to bid *at the outset* the full face amount of all the debt *carte blanche* and without regard to any value of the subject collateral, the prospect of competing third party bids, and the manner in which the purchased collateral would be managed post-Sale, let alone to deprive the Minority Lenders of all of their non-lien remedial rights under the Bankruptcy Code, including their claims against the other Debtors that are not owners of the relevant collateral. Were the Collateral Agent to consummate the proposed credit bid in the manner proposed and to benefit the two creditors constituting the bare majority (Black Diamond and MJX) at the expense of others (Ares and Starwood), such action would be a violation both of the Collateral Agent's duties under, and other provisions of, the Intercreditor Agreement.

- The proposed credit bid is impermissible under the plain text of section 363(k) of the Bankruptcy Code because the proposed purchaser does not hold an allowed claim against the selling Debtor, TTK Empire, against which to "offset" the purchase price of the subject property (*i.e.*, the equity in Debtor Empire Gen Holdings, LLC) as part of a so-called "credit bid."[18] In any event, since the Collateral Agent and the Prepetition Lenders have waived all claims against Debtor TTK Empire "except to the extent of such Pledgor's ownership interest in its Pledged Collateral,"[19] allowing the Collateral Agent, at the outset, to make a credit bid in the full face amount of the Secured Obligations (as defined in the Intercreditor Agreement) against either the non-recourse selling Debtor (TTK Empire), or other, non-selling Debtors should not be permitted.

- There is no legal basis for finding as part of the proposed Sale Order that "[u]pon the Closing Date, all obligations under the Prepetition Credit Agreement, and any related obligations which are used as part of the Credit Bid, shall be deemed discharged against the Debtors and satisfied in full."[20] Although, as noted, section 363(k) of the

---

Secured Obligations as and when the same shall become due and payable in accordance with their terms.").

[18] *See* 11 U.S.C. § 363(k) (permitting a secured creditor to bid at a sale of "property that is subject to a lien *that secures an allowed claim*," and only to "offset *such claim* against the purchase price of such property." (emphasis added)). This legal flaw necessarily invalidates the proposed credit bid regardless of the Bankruptcy Code section 363(k) "cause" standard.

[19] *See* Pledge Agreement § 6.25(d).

[20] Sale Order ¶ 13.

8

Bankruptcy Code permits the holder of an allowed claim against a specific selling debtor[21] to offset such claim against the purchase price of such property, reducing the claim against other non-selling Debtors in the context of a sale transaction (as opposed to the plan process or claim disallowance process) is not permissible under either bankruptcy law or the Prepetition Loan Documents.[22] Indeed, the Minority Lenders believe that this structural flaw is the source of the debate amongst the Debtors and Black Diamond brought out at the Bid Procedures hearing on June 4 about a credit bid at the equity level verses the operating company level.[23]

- The effect of the Credit Bid, as structured, on the obligations of the non-selling Debtors under the Prepetition Loan Documents is, at a minimum, a complex question governed by the underlying loan and security documents and applicable bankruptcy and non-bankruptcy law.[24] It is also an issue that will be of monumental importance in connection with the proposed Plan that basically ignores the existence, classification, or treatment of claims under the Prepetition Loan Documents, presumably because the Debtors and Black Diamond will take the position that all such claims, against all Debtors, have been satisfied in full by virtue of the Sale. The Minority Lenders vehemently disagree, and an order approving the Sale should not be the context for making that decree. Thus, even if the Court were to approve the Sale, paragraph 13 of the proposed Sale Order is an overreach and should not be approved as part of the Sale.[25]

- The proposed credit bid may violate the *pro rata* sharing provisions of the Intercreditor Agreement.[26] Absent full disclosure of the post-reorganization governance plan, no

---

[21] Section 363(k) refers to "a sale under subsection (b)," which necessarily relates to property of a specific estate of a specific debtor. *See also* § 506(a) (referencing "an allowed claim of a creditor secured by a lien on property in which the estate has an interest").

[22] *See* Credit Agreement § 11.05(b); Intercreditor Agreement § 9.16 ("Nothing in this Agreement is intended to or shall impair the obligations of any Loan Party, which are absolute and unconditional, to pay the Secured Obligations as and when the same shall become due and payable in accordance with their terms."); Pledge Agreement § 6.22 (providing that obligations of TTK Empire are independent of those of Holdings or any other Person or any other security held by the Collateral Agent). Notably, unlike other provisions of the Credit Agreement (e.g., section 11.05(a) or (f)), the sacred consent rights of section 11.05(b) are ***not*** "subject to the terms of the Intercreditor Agreement."

[23] *See* June 4 H'rg Trans. at 68–71.

[24] *See generally, e.g.*, Credit Agreement, Intercreditor Agreement, and Pledge Agreement as cited herein. *See also In re Nat'l Energy & Gas Transmission, Inc.*, 492 F.3d 297, 301 (4th Cir. 2007) (interpreting *Ivanhoe v. Orr*, 295 U.S. 243 (1935) and noting that "the basic federal rule in bankruptcy is that state law governs the substance of claims[.]") (citing *Travelers Cas. & Sur. Co. of Am. v. Pac. Gas. & Elec. Co.*, 549 U.S. 443, 450–51 (2007)).

[25] *See* Sale Order ¶ 13; *see also* n. 20 *supra* and accompanying text.

[26] *See* Intercreditor Agreement § 4.1.

9

party, including the Court, can evaluate whether the distribution of the Interests will be in accordance with this provision. The Court should not approve a sale that, by its terms, may sanction a breach of the underlying loan documents.[27]

- The proposed credit bid likely is unauthorized under the Credit Agreement because it was not directed by the Required Secured Parties (as defined in the Intercreditor Agreement). Section 11.06 of the Credit Agreement states that no "Sponsor-Related Party, in its capacity as Lender, shall . . . be permitted to require any Agent or any other Lender to undertake any action (or refrain from taking any action) pursuant to or with respect to the Loan Documents." Under section 1.01 of the Credit Agreement, Black Diamond may be a Sponsor-Related Party due to the level of control it exercises over the Debtors, rendering Black Diamond unable to direct the Collateral Agent.

- The entity created at the direction of the Required Secured Parties to purchase the equity in Holdings owned by TTK Empire is not a "good faith" purchaser due to the circumstances and purposes of the credit bid, and the finding of paragraph 17 of the Proposed Sale Order should not be made. In any event, any "good faith" finding should be limited to the purchase of the property subject to the sale, rather than the proposed finding of good faith "in connection with . . . these Chapter 11 Cases generally."[28]

12. For these reasons, the Court should not approve the Sale and any related relief requested in the Sale Motion should be denied.

[*Remainder of page intentionally left blank.*]

---

[27] Any eventual distribution of the Interests may also violate the *pro rata* sharing provision with respect to the Minority Lenders' rights to prepetition indemnification by the Loan Parties and reimbursement of expenses by the Borrower (each as defined in the Credit Agreement). *See* Credit Agreement §§ 11.02–11.03. Such indemnification and expense reimbursement rights survive payment in full of the obligations under the Credit Agreement. *See* Credit Agreement § 11.08 ("[T]he agreements of each Loan Party set forth in Sections . . . 11.02 [and] 11.03 . . . shall survive the payment of the Advances, the cancellation or expiration of the Letters of Credit and the reimbursement of any amounts drawn thereunder, and the termination hereof."). For avoidance of doubt, the Minority Lenders expressly reserve all rights related to any post-Sale distributions made by the Collateral Agent or the purchaser.

[28] *See* Sale Order ¶ 17.

**Conclusion**

WHEREFORE, the Minority Lenders respectfully request that the Court deny the Sale Motion.

| | |
|---|---|
| Dated: June 26, 2019<br>New York, New York | */s/ Brian E. Schartz*<br>James H.M. Sprayregen, P.C.<br>Brian E. Schartz, P.C.<br>**KIRKLAND & ELLIS LLP**<br>**KIRKLAND & ELLIS INTERNATIONAL LLP**<br>601 Lexington Avenue<br>New York, New York 10022<br>Telephone:   (212) 446-4800<br>Facsimile:    (212) 446-4900 |

- and -

Anup Sathy, P.C.
Stephen C. Hackney, P.C. (*admitted pro hac vice*)
Alexandra Schwarzman (*admitted pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:   (312) 862-2000
Facsimile:    (312) 862-2200

*Counsel to ASSF IV AIV B Holdings III, L.P. and AEIF Trade, LLC*

- and -

Steven M. Abramowitz
Marisa Antos-Fallon
**VINSON & ELKINS LLP**
666 Fifth Avenue, 26th Floor
New York, NY 10103-0040
Telephone:    (212) 237-0000
Facsimile:     (212) 237-0100

*Counsel to SPT Infrastructure Finance Sub-1, LLC and SPT Infrastructure Finance Sub-2, Ltd*