James H.M. Sprayregen, P.C.                     Anup Sathy, P.C.
Brian E. Schartz, P.C.                          Stephen C. Hackney, P.C. (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**                        Alexandra Schwarzman (admitted *pro hac vice*)
**KIRKLAND & ELLIS INTERNATIONAL LLP**          **KIRKLAND & ELLIS LLP**
601 Lexington Avenue                            **KIRKLAND & ELLIS INTERNATIONAL LLP**
New York, New York 10022                        300 North LaSalle Street
Telephone:      (212) 446-4800                  Chicago, Illinois 60654
Facsimile:      (212) 446-4900                  Telephone:      (312) 862-2000
                                                Facsimile:      (312) 862-2200

*Counsel to ASSF IV AIV B Holdings III, L.P. and AEIF Trade, LLC*

Steven M. Abramowitz
Marisa Antos-Fallon
**VINSON & ELKINS LLP**
666 Fifth Avenue, 26th Floor
New York, New York 10103-0040
Telephone:      (212) 237-0000
Facsimile:      (212) 237-0100

*Counsel to SPTIF Parent, LLC*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| In re: | )    Chapter 11 |
|  | ) |
| EMPIRE GENERATING CO, LLC, *et al.*,[1] | )    Case No. 19-23007 (RDD) |
|  | ) |
| Debtors. | )    (Jointly Administered) |
|  | ) |
|  | ) |
|  | ) |

# MOTION FOR STAY PENDING APPEAL

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification number are: Empire Generating Co, LLC [3821], Empire Gen Holdco, LLC [3820], Empire Gen Holdings, LLC [4849], and TTK Empire Power, LLC [none]. The Debtors' corporate address is: Empire Generating Co, LLC, c/o Tyr Energy, LLC, 7500 College Blvd., Suite 400, Overland Park, Kansas 66210.

# TABLE OF CONTENTS

INTRODUCTION ............................................................................................................... 1

BACKGROUND ................................................................................................................ 2

ARGUMENT ..................................................................................................................... 5

I.      APPELLANTS WILL SUFFER IRREPARABLE INJURY ABSENT A STAY. ............ 5

II.     NO OTHER PARTIES WILL SUFFER SUBSTANTIAL INJURY. ............................... 7

III.    THERE IS A SUBSTANTIAL POSSIBILITY OF SUCCESS ON APPEAL.................. 9

        A.    The Court Approved an Unlawful *Sub Rosa* Plan. ................................. 9

        B.    The Court Approved an Unlawful Credit Bid....................................... 10

              1.    There is no "allowed claim" against TTK Empire.................................. 11

              2.    There is "cause" to disallow the credit bid. ............................... 12

              3.    The Plan's discharges are far too broad.................................. 13

        C.    The Special Purpose Entity Was Not a Good-Faith Purchaser........................... 14

        D.    The Court Should Have Reviewed the RSA for Entire Fairness. ........................ 14

IV.     THE PUBLIC INTEREST WEIGHS IN FAVOR OF A STAY..................................... 15

CONCLUSION.................................................................................................................. 16

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*In re Adelphia Cmmc'ns Corp.*,
361 B.R. 337 (S.D.N.Y. 2007)...................................................................5, 6, 7, 15

*In re AMR Corp.*,
485 B.R. 279 (Bankr. S.D.N.Y. 2013)........................................................13

*In re Bankr. Appeal of Allegheny Health, Educ. & Research Found.*,
252 B.R. 309 (W.D. Pa. 1999)..................................................................8

*In re BGI, Inc.*,
504 B.R. 754 (S.D.N.Y. 2014)..................................................................5

*In re Braniff Airways, Inc.*,
700 F.2d 935 (5th Cir. 1983) ..................................................................9

*In re Chrysler LLC*,
576 F.3d 108 (2d Cir. 2009)....................................................................8

*In re Cont'l Air Lines, Inc.*,
780 F.2d 1223 (5th Cir. 1986) ................................................................9

*In re Country Squire Assocs. of Carle Place, L.P.*,
203 B.R. 182 (B.A.P. 2d Cir. 1996).....................................................7, 9, 15

*In re Crowthers McCall Pattern, Inc.*,
114 B.R. 877 (Bankr. S.D.N.Y. 1990).......................................................9

*In re Genesis Health Ventures, Inc.*,
367 B.R. 516 (Bankr. D. Del. 2007) ........................................................9

*In re Great Atl. & Pac. Tea Co.*,
544 B.R. 43 (Bankr. S.D.N.Y. 2016).......................................................14

*Hirschfeld v. Bd. of Elections*,
984 F.2d 35 (2d Cir. 1993)....................................................................5

*In re Innkeepers USA Trust*,
442 B.R. 227 (Bankr. S.D.N.Y. 2010)......................................................14

*In re Iridium Operating LLC*,
478 F.3d 452 (2d Cir. 2007)...................................................................9

## TABLE OF AUTHORITIES (CONT'D)

**Page(s)**

*In re Lehman Bros. Holdings, Inc.*,
 445 B.R. 143 (S.D.N.Y. 2011)............................................................................8, 12

*Mastrobuono v. Shearson Lehman Hutton, Inc.*,
 514 U.S. 52 (1995)................................................................................................12

*In re MF Global Holdings Ltd.*,
 466 B.R. 239 (Bankr. S.D.N.Y. 2012)..................................................................14

*In re Motors Liquidation Co.*,
 430 B.R. 65 (S.D.N.Y. 2010)..................................................................................6

*In re Orion Pictures Corp.*,
 4 F.3d 1095 (2d Cir. 1993)....................................................................................14

*Osuji v. Deutsche Bank, N.A.*,
 589 B.R. 502 (E.D.N.Y. 2018) .............................................................................13

*In re Public Serv. Co.*,
 90 B.R. 575 (Bankr. D.N.H. 1988) .........................................................................9

*RadLAX Gateway Hotel, LLC v. Amalgamated Bank*,
 566 U.S. 639 (2012)..............................................................................................10

*In re Sabine Oil & Gas Corp.*,
 548 B.R. 674 (Bankr. S.D.N.Y. 2016).....................................................................5

*In re Sabine Oil & Gas Corp.*,
 555 B.R. 180 (Bankr. S.D.N.Y. 2016)...................................................................15

*In re SageCrest II, LLC*,
 2011 WL 134893 (D. Conn. Jan. 14, 2011)..........................................................10

*In re St. Johnsbury Truck Co.*,
 185 B.R. 687 (S.D.N.Y. 1995)............................................................................7, 8

*In re Taberna Preferred Funding IV, Ltd.*,
 594 B.R. 576 (Bankr. S.D.N.Y. 2018)..................................................................11

*In re Texaco, Inc.*,
 92 B.R. 38 (S.D.N.Y. 1988)....................................................................................6

**Statutes**

11 U.S.C. §363(k) ...................................................................................10, 11, 12, 13

11 U.S.C. §1125 ...........................................................................................................10

### TABLE OF AUTHORITIES (CONT'D)

**Page(s)**

11 U.S.C. §1126(f)............................................................................................................4

**Rules**

Fed. R. Bankr. P. 8007(b)(2).........................................................................................2

Fed. R. Bankr. P. 8013(a)(2)(D) ...................................................................................6

Fed. R. Bankr. P. 8018(a)(1).........................................................................................6

Fed. R. Bankr. P. 8018(a)(2).........................................................................................6

Fed. R. Bankr. P. 8018(a)(3).........................................................................................6

**Other Authorities**

*Setoff*, Black's Law Dictionary (11th ed. 2019) ........................................................12

iv

Pursuant to Federal Rules of Bankruptcy Procedure 8007 and 9013, Ares[2] and Starwood[3] (together, "Appellants") hereby move this Court to stay two recent orders pending appeal: *Order (A) Approving the Purchaser's Purchase Agreement, (B) Authorizing the Sale of Membership Interests in Empire Gen Holdings, LLC Free and Clear of Liens, Claims, Encumbrances, and Interests, (C) Authorizing the Related Assumption of Executory Contracts and Unexpired Leases, and (D) Granting Related Relief* (Dkt. 298) (the "Sale Order"), and *Findings of Fact, Conclusions of Law and Order Confirming Debtors' Modified Amended Joint Chapter 11 Plan* (Dkt. 304) (the "Confirmation Order").  The Sale Order was entered on September 19, 2019, and the Confirmation Order was entered on September 23, 2019.  In support of this Motion, Appellants state as follows:

## INTRODUCTION

Debtors' President and CEO, Garrick Venteicher, has admitted that the "purpose" of Debtors' approach to reorganization is "to avoid [Appellants'] voting on a plan."  Dkt.95 ("Tr.") 64:11-14; 74:7-10.  Debtors have not had a need for any debtor-in-possession financing, and there is no business reason, let alone an emergency, requiring an exit from bankruptcy.  Mr. Venteicher has also admitted that the reason for the sale and plan was a simple desire to resolve the capital structure and essentially move on.  *See* Tr.82:4-12.

Yet, under this sale and plan, Appellants will receive equity in an entity that indirectly owns assets (chiefly, a power plant) worth—as admitted in open Court—substantially less than the amount of their secured debt.  Appellants have still not received any information whatsoever regarding the terms of that equity notwithstanding repeated requests, including admonitions at this Court's confirmation hearing.  Under the Bankruptcy Code, a secured creditor who will not be paid in full has a right to vote on any reorganization.  Despite Appellants' right to vote on this

---

[2] "Ares" means ASSF IV AIV B Holdings III, L.P. and AEIF TRADE, LLC.
[3] "Starwood" means SPTIF Parent, LLC.

1

reorganization, Debtors, working with majority lender Black Diamond Capital Management, LLC ("Black Diamond"), unlawfully seek to sideline Appellants through an overvalued, one-sided, and misused credit bid.  Appellants intend to vigorously protect their rights.

Appellants recognize that the Court disagrees with them about the law.  Respectfully, Appellants believe that they will find success on appeal.  Accordingly, Appellants seek a stay of the Sale and Confirmation Orders pending resolution of the appeal process.  Appellants file this Motion at this time, moreover, because only last week did the New York State Department of Public Service schedule for October 17, 2019, a hearing regarding regulatory approval of Debtors' proposed reorganization involving their power plant.  Accordingly, Appellants seek a stay pending appeal to prevent any suggestion that their appeals are equitably moot.[4]

## BACKGROUND

Debtors, through several entities, own and operate a power plant.  In 2018, Debtor Empire Generating Co., LLC ("Empire Generating"), the only Debtor with any meaningful operations and the Debtor that directly owns the physical plant, began tripping certain loan defaults.  Debtors' secured creditors—including Black Diamond and Appellants—organized the "Ad Hoc Group" and began negotiating a consensual restructuring.  Dkt.3 ("Venteicher Decl.") ¶33.  The Ad Hoc Group appeared to make significant progress toward a consensual pre-packaged bankruptcy, which contemplated a debt-for-equity exchange under which the Ad Hoc Group would obtain ownership of Debtors.  These discussions progressed until the only material issue remaining was governance

---

[4] To be clear, Appellants believe that any closing of the transaction would not result in equitable mootness due to, among other things, the simple capital structure, the absence of other impaired creditors (besides the secured lenders), and the ability of an appellate court to grant effective relief.  Appellants file this motion out of an abundance of caution. Appellants intend to seek a stay from the District Court should this Court deny the requested relief or not "rule[ ] on the motion."  Fed. R. Bankr. P. 8007(b)(2).

of the reorganized entity—in particular, rights and protections for minority owners.   Dkt.61 ("Objection") ¶¶17-18.

In December 2018, amidst negotiations (and without informing other Ad Hoc Group members), Black Diamond purchased additional debt under a Credit and Guaranty Agreement ("Credit Agreement") until it obtained a large enough position to declare itself the majority holder. *Id*. ¶23.   Black Diamond then installed Ankura Trust Company as Collateral Agent, which represents *all* creditors with respect to the debt pursuant to a Collateral Agency and Intercreditor Agreement (the "Intercreditor Agreement").  *Id.* ¶23.

Appellants' continued attempts to develop a consensual restructuring plan proved fruitless. *Id.* ¶24.  Instead, Black Diamond and Debtors privately turned their attention to implementing a structure that would use Black Diamond's majority position to sideline Appellants, extinguish all the secured debt in exchange for "Topco" equity, and deprive them of their right to vote on any proposed restructuring.  *Id.*  Those efforts led eventually to the Restructuring Support Agreement ("RSA") between Debtors and Black Diamond and a planned credit bid.

Under the RSA, Debtor TTK Empire Power ("TTK Empire") would hold a §363 sale to auction off its entire equity ownership of Debtor Empire Generating Holdings, LLC ("Holdings"), which owns Debtor Empire Generating Holdco, LLC ("Holdco"), which owns Empire Generating. Venteicher Decl. ¶46.  In exchange, Black Diamond would instruct the Collateral Agent to bid the *entire* secured debt of *all* the secured creditors, *id.*—about $353 million as of the petition date, *id.* ¶22.  As Debtors admit, the $353 million credit bid is "a number that well exceeds what [Debtors] believe the value of its assets to be."  Dkt.46 at 10:17-18; Tr.94:5-11.  In fact, the power plant is only worth about $250 million, Tr.95:17-23, meaning that the credit bid would overvalue the assets by some *$100 million*.

Debtors filed their Chapter 11 petition on May 19, 2019. Dkt.1. On June 4, 2019, over Appellants' objections, the Court ordered Debtors to assume the RSA (the "RSA Order") and bid procedures (the "Bid Procedures Order") for the full-debt credit bid. Dkt.98 (RSA Order), 99 & 102 (Bid Procedures Order).[5] Not surprisingly, given the excessive credit bid amount, no other bidders materialized, and the credit bid was determined to be the winning bidder without an auction. Dkt.184. On September 16, 2019, the Court held a hearing on Debtors' sale motion, Dkt.6, which it granted on September 18, 2019, in the Sale Order. On September 23, the Court issued the Confirmation Order, confirming Debtors' restructuring plan (the "Plan").

Under the Plan, the narrow outcome is the same as the negotiated restructuring that the Ad Hoc Group originally intended: Black Diamond and Appellants are deemed to exchange their debt obligations for ownership of Debtors' assets. But, by structuring the transaction as an asset sale by one Debtor in exchange for the full secured debt against multiple Debtors, rather than a Chapter 11 reorganization, Debtors' approach treats Appellants as "unimpaired" creditors— despite the fact that they are not receiving their contractual entitlements to payment under their debt documents with Debtors and are indirectly receiving assets worth only about two-thirds of the value of their debt—and denies them any right to vote on the terms of that restructuring, including, principally, the terms of their post-restructuring rights in relation to the acquired assets. *See* 11 U.S.C. §1126(f) (unimpaired creditors "are conclusively presumed to have accepted the plan"). Absent judicial intervention, that decision risks leaving Black Diamond, as the majority debtholder, with unchecked authority to dictate the governance structure of the restructured non-Debtor entity, Empire Acquisition LLC ("Empire Acquisition"), raising substantial but well-founded fears that Black Diamond will take matters as creatively as possible to its own advantage

---

[5] These orders are subject to separate appeals before Judge Karas, and briefing was completed on October 2, 2019. *See* Dkt. 7:19-cv-5721, -5744 (S.D.N.Y.) (consolidated).

and that Empire Acquisition will lack any meaningful governance protections for Appellants. To this day, Black Diamond and Debtors have categorically refused to provide *any* information about the governance terms for Empire Acquisition or to commit to any protections for minority owners.

Appellants appealed from the Sale Order and Confirmation Order on September 27, 2019, Dkt.316, 317, and submitted Statements of Issues and Record Designations for each appeal on October 11, 2019, Dkt.332, 333.

## ARGUMENT

Courts consider four factors when deciding a motion to stay: "(1) whether the movant will suffer irreparable injury absent a stay, (2) whether a party will suffer substantial injury if a stay is issued, (3) whether the movant has demonstrated a substantial possibility, although less than a likelihood, of success on appeal, and (4) the public interests that may be affected." *Hirschfeld v. Bd. of Elections*, 984 F.2d 35, 39 (2d Cir. 1993). "[W]hether to grant a stay pending appeal [requires] a balancing of factors that must be weighed." *In re Adelphia Commc'ns Corp.*, 361 B.R. 337, 347 (S.D.N.Y. 2007). Although Appellants are not required to satisfy all four factors, *see id.* at 346-47, they do so here.

## I.    APPELLANTS WILL SUFFER IRREPARABLE INJURY ABSENT A STAY.

"A showing of probable irreparable harm is the 'principal prerequisite' for the issuance of a stay pursuant to Rule 8007." *In re Sabine Oil & Gas Corp.*, 548 B.R. 674, 681 (Bankr. S.D.N.Y. 2016) (citation omitted). Here, determining whether appellants will suffer irreparable harm "requires consideration of the doctrine of equitable mootness," *In re BGI, Inc.*, 504 B.R. 754, 763 (S.D.N.Y. 2014), and, "where the denial of a stay pending appeal *risks* mooting *any* appeal of significant claims of error, the irreparable harm requirement is satisfied," *Adelphia*, 361 B.R. at 348 (emphasis altered). Equitable mootness, in turn, "has been applied in two situations,"

including "when a reorganization is 'substantially consummated.'" *In re Motors Liquidation Co.*, 430 B.R. 65, 80 (S.D.N.Y. 2010).

Debtors have stated that they "anticipate that ... substantial consummation of the Plan will occur on or before October 30, 2019," Dkt.327-1; *see also* Dkt.336, yet Appellants' appeal of the Sale and Confirmation Orders will not be fully briefed (under a normal briefing schedule) until late December 2019 at the earliest. Only after this Court transmits the record does the clock begin to run on Appellants' opening appeal briefs. *See* Fed. R. Bankr. P. 8018(a)(1). Even if the records were transmitted today, Appellants' opening brief would not be due under a normal schedule until November 15, 2019—16 days *after* October 30—and briefing would not be completed until December 30, 2019. *See* Fed. R. Bankr. P. 8018(a)(2), (3). And while Appellants intend to move to expedite their appeals, *see* Fed. R. Bankr. P. 8013(a)(2)(D), even under an aggressive schedule, it is virtually impossible for Appellants' appeals to be resolved by October 30, 2019. A stay therefore is necessary to avoid the irreparable harm "inherent[ ]" in substantial consummation of the Plan. *In re Texaco, Inc.*, 92 B.R. 38, 46 (S.D.N.Y. 1988). In short, although Appellants would contest equitable mootness, without a stay, Debtors and Black Diamond no doubt would raise such arguments, and there is a "risk" that a court might agree with them. *Adelphia*, 361 B.R. at 358. That is enough for irreparable injury. *Id.*

Importantly, not only would denying a stay risk mooting Appellants' appeals of the Sale and Confirmation Orders, but it also would risk mooting Appellants' separate appeals of the RSA and Bid Procedures Orders, which are fully briefed and awaiting argument and decision. Although Appellants submit that the Sale and Confirmation Orders do not themselves moot the appeals of the RSA and Bid Procedures Orders, Debtors and Black Diamond likely would argue that substantial consummation of the Plan does moot them. Thus, absent a stay pending appeal, there

is a risk that *four* appeals—all of which raise "significant claims of error," *id.* at 348 (emphasis omitted)—will become moot.  These indisputable facts strongly counsel in favor of a stay.  *See In re St. Johnsbury Truck Co.*, 185 B.R. 687, 690 (S.D.N.Y. 1995) (agreeing that "irreparable injury" includes "the threat that the [appellant's] appeal will be mooted if the plan is substantially consummated").  Indeed, such facts are "dispositive" of the irreparable-injury factor.  *Adelphia*, 361 B.R. at 358 n.2 ("the loss of appellate rights is dispositive").

## II.    NO OTHER PARTIES WILL SUFFER SUBSTANTIAL INJURY.

Not only will Appellants suffer irreparable injury if a stay is *not* granted, but no other party would suffer substantial injury if a stay *is* granted.  In evaluating whether an alleged injury is "substantial," it is "appropriate to compare it with the irreparable harm [Appellants] will suffer if [the orders] [are] not stayed."  *In re Country Squire Assocs. of Carle Place, L.P.*, 203 B.R. 182, 184 (B.A.P. 2d Cir. 1996); *see Adelphia*, 361 B.R. at 349 (substantial injury considers whether "the balance of harms tips in favor of granting the stay").  That balance here favors a stay.

That Debtors will not be substantially injured by a stay is evident from their repeated practice of hurry-up-and-wait with respect to the two Orders on appeal.  Debtors originally proposed that the Court hear their motion for entry of a sale order "[o]n or before July 18, 2019," Dkt.6 at 15, which the Court scheduled for July 19, Dkt.99, and later moved to July 17, Dkt.144. Following Debtors' motion to expedite a scheduling hearing for the confirmation, Dkt.104, the Court also scheduled a hearing for July 17 to consider Plan confirmation, Dkt.158.  Yet Debtors then *voluntarily* adjourned the July 17 hearing date to August 14, Dkt.188, 189, and then *voluntarily* adjourned the August 14 date hearing until September 16, Dkt.221, 222.  That voluntary, months-long delay itself defeats any argument that a stay would cause substantial injury. Nothing has changed, moreover, since the Court issued the Sale and Confirmation Orders.

Debtors are not a "melting ice cube" such that immediate consummation of the Plan is necessary because "the only alternative 'is an immediate liquidation that would yield far less'" for creditors. *In re Lehman Bros. Holdings, Inc.*, 445 B.R. 143, 180 (S.D.N.Y. 2011) (quoting *In re Chrysler LLC*, 576 F.3d 108, 118-19 (2d Cir. 2009)); *compare, e.g.*, *Chrysler*, 576 F.3d at 119. On the contrary, Debtors generate sufficient cash in the ordinary course to fund ongoing operations. Dkt.51-1; *see also* Dkt. 322 (Empire Generating monthly operating report for August 2019). And although Debtors (and Black Diamond) might *prefer* not to continue the current status quo pending appeal, "inconvenience cannot be a basis for finding substantial harm ... if a stay is not granted." *In re Bankr. Appeal of Allegheny Health, Educ. & Research Found.*, 252 B.R. 309, 331 (W.D. Pa. 1999).

Finally, Judge Karas may soon issue a decision regarding the RSA and Bid Procedures Orders. Although briefing of the Sale Order and Confirmation Order appeals will not be completed for some time, *see supra* at 6, if Appellants prevail in their already-briefed appeals of the RSA Order or Bid Procedures Order, then the Sale and Confirmation Orders likely will be vacated. The Sale Order, for example, is premised upon "the Court having entered" the Bid Procedures Order. *See* Dkt.298 at 2. Accordingly, if Judge Karas concludes that the RSA Order or Bid Procedures Order is unlawful, then the Sale and Confirmation Orders almost certainly will also fall. Accordingly, because of the RSA and Bid Procedures appeals, "a stay pending appeal need not mean a lengthy delay." *St. Johnsbury*, 185 B.R. at 690.

In all events, as explained above, Appellants will seek to expedite their appeals of the Sale and Confirmation Orders. To the extent that Debtors and Black Diamond may resist that effort to accelerate briefing, they will not be able to credibly claim that delay of substantial consummation will result in irreparable injury.

## III.    THERE IS A SUBSTANTIAL POSSIBILITY OF SUCCESS ON APPEAL.

Appellants also have shown a substantial possibility of success on appeal.  Notably, Appellants need not show a *likelihood* of success; instead, the "substantial possibility of success" test "prescribes an intermediate level between possible and probable which is intended to eliminate frivolous appeals." *Country Squire*, 203 B.R. at 184.  Nor does it "matter whether this Court believes that [Appellants] should succeed on appeal," as it would be "'illogical ... to require that the court in effect conclude that its original decision … was wrong before a stay can be issued.'" *In re Genesis Health Ventures, Inc.*, 367 B.R. 516, 521 (Bankr. D. Del. 2007) (quotation marks omitted).  Here, Appellants raise serious challenges regarding whether:  (A) the Plan is an unlawful *sub rosa* restructuring; (B) the credit bid is unlawful; and (C) the RSA was approved using the wrong test.  Each of these issues alone—and certainly combined—satisfies this factor.

### A.    The Court Approved an Unlawful *Sub Rosa* Plan.

A bankruptcy court may not approve a plan that circumvents the creditor protections that Congress has provided.  *See, e.g.*, *In re Iridium Operating LLC*, 478 F.3d 452, 466 (2d Cir. 2007); *In re Braniff Airways, Inc*., 700 F.2d 935, 940 (5th Cir. 1983).  Accordingly, Debtors cannot use §363(b) "to sidestep the protection creditors have when it comes time to confirm a plan of reorganization."  *In re Cont'l Air Lines, Inc.*, 780 F.2d 1223, 1227 (5th Cir. 1986).

Three factors help determine whether a debtor has sidestepped the rights of creditors: whether (i) the transaction has "the practical effect of dictating some of the terms of any future reorganization plan"; (ii) creditor voting rights are restricted; and (iii) other rights are altered. *Braniff*, 700 F.2d at 940; *see also In re Crowthers McCall Pattern, Inc.*, 114 B.R. 877, 883, 888-90 (Bankr. S.D.N.Y. 1990).  Scrutiny is also "more strict and searching the nearer the transaction gets to the heart of the reorganization plan process in terms of channeling that process toward any particular plan option."  *In re Public Serv. Co.*, 90 B.R. 575, 582 (Bankr. D.N.H. 1988).

Here, Debtors' scheme subverts the Bankruptcy Code's safeguards at the expense of Appellants. Debtors' President and CEO has admitted that the "purpose" of Debtors' approach to reorganization is "to avoid the minority lenders voting on a plan." Tr.64:11-14, 74:7-10. Yet those "minority lenders" will receive assets worth only about two-thirds of the value of their debt. Nevertheless, Debtors purport to have structured a deal with "the effect of discharging and satisfying the Credit Facility in its entirety, making it unnecessary to solicit votes from Prepetition Lenders or to treat the Credit Facility under the Plans in any way." Tr.64:3-14.

Beyond denying Appellants the right to vote, Debtors' scheme, now approved by the Court, has also deprived Appellants of the right to receive information about the value of Debtors' assets and the governance of the reorganized entities, which Debtors otherwise would have to disclose under 11 U.S.C. §1125. The confirmed Plan also wrongly provides releases against Debtors that would bind Appellants without their consent. All of this is improper. *See, e.g.*, *In re SageCrest II, LLC*, 2011 WL 134893, at *11 (D. Conn. Jan. 14, 2011) (listing as a trait of a *sub rosa* plan that "the agreement forced creditors to waive their claims against the debtor").

Finally, the lack of a sound business justification for the excessive credit bid here—more than $100 million more than the power plant's value—further confirms that this is a *sub rosa* plan. Indeed, setting the credit bid far above the value of the assets turns the usual reason for a credit bid on its head. Rather than allowing creditors to make inflated bids, a credit bid is typically used to "protect a creditor against the risk that its collateral will be sold at a *depressed* price." *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 644 n.2 (2012) (emphasis added).

## B.    The Court Approved an Unlawful Credit Bid.

The credit bid at the heart of Debtors' scheme is also unlawful in at least three respects: It violates the terms of 11 U.S.C. §363(k), which requires an "allowed claim" that does not exist here; the Court has ample "cause" to disallow a credit bid that violates the Intercreditor Agreement;

and the discharges connected with the credit bid—including the discharge as against Debtors other than the selling Debtor—are far too broad.

### 1.    There is no "allowed claim" against TTK Empire.

A credit bid is permissible only at a sale of "property that is subject to a lien that secures an allowed claim," and only to "*offset* such claim against the purchase price of such property." 11 U.S.C. §363(k) (emphasis added).  Hence, where there is no claim against the seller to offset against the purchase price, there can be no credit bid under §363(k).  This point should be dispositive on appeal in this case because the secured creditors here have no "allowed claim" against TTK Empire.  *See, e.g.*, *CS Mining, LLC*, 574 B.R. 259, 285 (Bankr. D. Utah 2017) (denying bid by a creditor who "does not have an 'allowed claim'").

TTK Empire is neither a borrower nor guarantor with respect to the debt issued to Debtors' secured creditors.  Instead, TTK Empire's involvement in the transaction is limited to pledging its interest in Holdings as security for the underlying debt.  Accordingly, there can be no claim against TTK Empire.  Unsurprisingly, the Pledge Agreement *expressly* provides that "none of the Secured Parties shall have any claims with respect to [the debt] or any of the transactions contemplated thereby against [TTK Empire]."  Dkt.3-3 (Pledge Agreement) §§6.25(b), (d).  As a matter of law, Debtors' bankruptcy did not transform the creditors' lien on property owned by TTK Empire into a claim against TTK Empire that a credit bid could offset.  *See, e.g.*, *In re Taberna Preferred Funding IV, Ltd.*, 594 B.R. 576, 591 (Bankr. S.D.N.Y. 2018) (the Bankruptcy Code "does not change the nature or terms of a creditor's security interest").

Nor can an "allowed claim" against one of the other Debtors substitute for the missing "allowed claim" against TTK Empire that §363(k) requires.  A credit bid under §363(k) allows the creditor to "offset [its] claim against the purchase price of [the] property" being sold.  11 U.S.C. §363(k).  By definition, a claim against one party (Empire Generating, HoldCo, or Holdings)

cannot be "offset" against a purchase price owed to another party (TTK Empire).  *See Lehman Bros.*, 445 B.R. at 133 ("[A]t least a century's worth of bankruptcy law has limited setoffs to mutual obligations."); *see also Setoff*, Black's Law Dictionary (11th ed. 2019) ("2. A debtor's right to reduce the amount of a debt by any sum *the creditor owes the debtor* … 3. offset; esp., the balancing of *mutual liabilities* …" (emphases added)).  Congress thus has unambiguously limited credit bids to actual offsets.  That some corporate families position their assets in ways that do not map onto §363 does not create a license to set aside the limits Congress has enacted.

### 2.    There is "cause" to disallow the credit bid.

Even if there was an "allowed claim" here, this credit bid still would fail.  The ability to credit bid may be withheld where "the court for cause orders otherwise."  11 U.S.C. §363(k).  As Appellants have explained, there is ample "cause" to disallow this bid, especially because it requires the Collateral Agent to violate the Intercreditor Agreement in an unlawful effort to prevent other bids, shut Appellants out of the bankruptcy, and deprive them of governance rights.

Under the Intercreditor Agreement, the Collateral Agent must "act for the benefit solely and exclusively of *all* present and future Secured Parties," Dkt.3-1 (Intercreditor Agreement) §2.3 (emphasis added)—not just for the benefit of a single majority creditor.  Appellants never authorized the Collateral Agent to use their secured debt against their own interests, let alone to deprive them of their rights under the Bankruptcy Code.  Suffice it to say, foundational principles of contract law bar any interpretation that allows the Collateral Agent to nullify Appellants' rights. *See, e.g.*, *Mastrobuono v. Shearson Lehman Hutton, Inc.*, 514 U.S. 52, 63 (1995) (explaining the "cardinal principle of contract construction: that a document should be read to give effect to all its provisions and to render them consistent with each other").

The Court has never addressed Appellants' contract argument.  Instead, it has concluded that disputes about the meaning of the Intercreditor Agreement should be resolved in another court.

Nothing in the text of §363, however, allows a reviewing court to set aside the fact that the Collateral Agent's effort to benefit Black Diamond at the expense of everyone else violates the Intercreditor Agreement. Instead, §363 authorizes the Court to disallow a credit bid for "cause," a deliberately broad term that necessarily captures the totality of the circumstances. 11 U.S.C. §363(k); *cf. Osuji v. Deutsche Bank, N.A.*, 589 B.R. 502, 508 (E.D.N.Y. 2018) ("Courts consider the term 'for cause' to be 'a broad and flexible concept that must be determined on a case-by-case basis.'" (quoting *In re AMR Corp.*, 485 B.R. 279, 295 (Bankr. S.D.N.Y. 2013))). Appellants' argument about the Intercreditor Agreement is also directly relevant to this bankruptcy. This restructuring threatens to allow Black Diamond to take sole control of the power plant. If another court later agrees with Appellants and concludes that Black Diamond cannot do that, the business may very well fall back into bankruptcy while new governance documents are negotiated.[6]

### 3.    The Plan's discharges are far too broad.

There is no basis in law for ordering that "[u]pon the Closing Date, all obligations under the Prepetition Credit Agreement, and any related obligations which are used as part of the Credit Bid, shall be deemed discharged against the Debtors and satisfied in full." Sale Order ¶13. Although §363(k) permits the holder of an allowed claim to offset such claim against the purchase price of such property by a specific selling debtor, reducing the claim against non-selling Debtors in the context of a sale transaction is not allowed under either bankruptcy law or the Prepetition Loan Documents. In short, even if this credit bid were somehow allowed, there still would be no lawful grounds for this discharge of non-sellers.

---

[6] Appellants very recently filed suit in New York state court against Ankura Trust Company alleging that Ankura's contemplated distribution of equity interests does not comply with the relevant credit and intercreditor agreements. That action specifically does not challenge the orders entered in this proceeding, which are the subject of the appeals to the District Court.

### C.     The Special Purpose Entity Was Not a Good-Faith Purchaser.

Empire Acquisition—the entity Black Diamond ordered created to purchase the equity in

Holdings owned by TTK Empire—is not a "good faith" purchaser due to the circumstances and

purposes of the credit bid, and the §363(m) "good faith" findings in paragraphs L and 17 of the

Sale Order were made in error.  In particular, this purchaser is a special-purpose entity owned and

formed by an administrative agent, was not involved in any manner in the negotiation or

formulation of the transaction, and merely acted at Black Diamond's direction.  By finding such

an entity to be a "good faith" purchaser, despite the absence of any evidence in the record

supporting such a conclusion, the Sale Order again fails as a matter of law.

### D.     The Court Should Have Reviewed the RSA for Entire Fairness.

The Court used the wrong standard to approve the RSA.  Rather than review for "entire

fairness," the Court used the less demanding "business judgement" standard. Although a court

ordinarily may approve a contract "upon a showing that the debtor's decision to take such action

will benefit the debtor's estate and is an exercise of sound business judgment," *In re MF Global

Holdings Ltd.*, 466 B.R. 239, 242 (Bankr. S.D.N.Y. 2012); *see also In re Orion Pictures Corp.*, 4

F.3d 1095, 1098-99 (2d Cir. 1993), that standard only applies where "the debtor *is not conflicted*

and has taken sufficient steps to maximize value," *In re Great Atl. & Pac. Tea Co.*, 544 B.R. 43,

48 (Bankr. S.D.N.Y. 2016) (emphasis added).  By contrast, courts apply the "entire fairness"

standard where conflicts of interest exist. *See, e.g.*, *In re Innkeepers USA Trust*, 442 B.R. 227, 231

(Bankr. S.D.N.Y. 2010).  Because of the significant conflicts of interest here, a court must ensure

"the integrity and entire fairness of the transaction," including by "examining whether the process

and price of a proposed transaction not only appear fair but are fair."  *Id.*

The RSA is the product of such conflicts of interest.  The sole decision maker for TTK

Empire was Venteicher, who also is an officer and director of an entity ("Tyr") that indirectly owns

TTK Empire. Venteicher Decl. ¶6. Debtors' negotiator for the RSA, moreover, was Tyr's general counsel—who owed no duty of loyalty to Debtors. The RSA also benefits Tyr and Venteicher personally by releasing them from claims. Black Diamond, in turn, agreed to participate and provide those substantial benefits because Tyr and Venteicher consented to a plan that would deprive Appellants of their rights. The danger of self-dealing posed here is further compounded by the opaque process leading to the RSA. These conflicts of interest would not have existed if, as is typical, Debtors had independent directors—who would not benefit personally—review and approve any releases, and only then after a full investigation of potential claims. *See, e.g.*, *In re Sabine Oil & Gas Corp.*, 555 B.R. 180, 189-90 (Bankr. S.D.N.Y. 2016).

Nor is it true that the RSA is in the Debtors' best interests. Debtors, for instance, would be better off if the RSA did not include releases for non-debtors like Tyr and Venteicher. Indeed, Debtors also would be better off if the restructured entities were protected by minority governance rights that could prevent Black Diamond from using the business for its own interests. Debtors and Black Diamond may assert that a better deal was not available, but testing such assertions is the point of entire fairness review. Until the correct analysis is conducted, there is no basis to say that a more favorable deal would not have been negotiated if the conflicts were not present.

## IV.    THE PUBLIC INTEREST WEIGHS IN FAVOR OF A STAY.

Finally, the public interest will be served by a stay. It is well settled that "there is a significant public interest in vindicating the rights of the minority and preventing the will of the majority to go unchecked by appellate review." *Adelphia*, 361 B.R. at 367. For all the reasons explained above, Appellants submit that is precisely the situation here.

Additionally, the public's interest in having the fundamental legal questions raised here be resolved on appeal is difficult to overstate. Not only would an appellate decision provide clarity to the parties and the public at large about novel questions of bankruptcy law, *see, e.g.*, *Country*

*Squire*, 203 B.R. at 184, but the public interest will be served by ensuring that an appellate court can evaluate these issues before Debtors continue further down an unlawful path.  Here, the proposed restructuring will turn over control to Black Diamond, despite the provisions in the Intercreditor Agreement that prevent the Collateral Agent from acting solely for Black Diamond's benefit.  The risk that Black Diamond will use the business for its own interests, rather than for the long-term health of the power plant and those it serves, poses a direct threat to the public.

## CONCLUSION

The Court should stay the effect of the Sale Order and Confirmation Order and enter an Order in substantially the form attached hereto as Exhibit 1.

Dated:  October 16, 2019
New York, New York

/s/ Brian E. Schartz, P.C.
Brian E. Schartz, P.C.
James H.M. Sprayregen, P.C.
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:     (212) 446-4900
bshartz@kirkland.com
jsprayregen@kirkland.com

- and -

Anup Sathy, P.C.
Stephen C. Hackney, P.C. (*admitted pro hac vice*)
Alexandra Schwarzman (*admitted pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:    (312) 862-2000
Facsimile:     (312) 862-2200
asathy@kirkland.com
shackney@kirkland.com
alexandra.schwarzman@kirkland.com

*Counsel to ASSF IV AIV B Holdings III, L.P. and AEIF Trade, LLC*

16

- and -

Steven M. Abramowitz
Marisa Antos-Fallon
**VINSON & ELKINS LLP**
666 Fifth Avenue, 26th Floor
New York, NY 10103-0040
Telephone:      (212) 237-0000
Facsimile:      (212) 237-0100
sabramowitz@velaw.com
mantos-fallon@velaw.com

*Counsel to SPTIF Parent, LLC*

## CERTIFICATE OF COMPLIANCE

1. This document complies with the type-volume limit of Fed. R. Bank. P. 8013(f)(3)(A), because, excluding the parts of the document exempted by Fed. R. Bank. P. 8015(g), this document contains 5175 words.

2. This document complies with the typeface requirements of Fed. R. Bankr. P. 8015(a)(5) and the type-style requirements of Fed. R. Bankr. P. 8015(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in size 12 Times New Roman.

/s/ *Brian Schartz*
Brian E. Schartz, P.C.

October 16, 2019

## <u>CERTIFICATE OF SERVICE</u>

I certify that on October 16, 2019, I electronically filed the foregoing Motion to Stay Pending Appeal with the Clerk's Office of the United States Bankruptcy Court for the Southern District of New York. I certify that all participants in this case are registered CM/ECF users and that service will be accomplished by the Court's CM/ECF System.

/s/  *Brian Schartz*
Brian E. Schartz, P.C.

October 16, 2019